Michael J. Avenatti, Bar No. 206929
AVENATTI & ASSOCIATES, APC
mavenatti@eoalaw.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:   (949) 706-7000
Fax:   (949) 706-7050

Attorneys for Plaintiff Stephanie Clifford
a.k.a. Stormy Daniels a.k.a. Peggy Peterson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual,<br><br>            Plaintiff,<br><br>            vs.<br><br>DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive<br><br>            Defendants. | Case No. 2:18-CV-02217-SJO-FFM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF/JUDGMENT; AND**<br><br>**(2) DEFAMATION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## THE PARTIES

1.      Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.      Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.      Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.      Defendant Michael Cohen ("Mr. Cohen"), an individual, is a resident of the State of New York.

5.      Mr. Trump, EC, and Mr. Cohen together shall be referred to hereafter as "Defendants."

6.      The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

7.      Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over Plaintiff's claims based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000.

**FIRST AMENDED COMPLAINT**

9.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

## **FACTUAL BACKGROUND**

10.    Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006 in Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007.  This relationship included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly Hills Hotel located within Los Angeles County.

11.    In 2015, Mr. Trump announced his candidacy for President of the United States.

12.    On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

13.    On October 7, 2016, the Washington Post published a video, now infamously known as the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women.  In it, Mr. Trump described his attempt to seduce a married woman and how he may start kissing a woman that he and his companion were about to meet.  He then added: "I don't even wait.  And when you're a star, they let you do it, you can do anything . . ."

14.    Within days of the publication of the *Access Hollywood Tape*, several women came forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

15.    Around this time, Ms. Clifford likewise sought to share details concerning her relationship and encounters with Mr. Trump with various media outlets.

16.     As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York.  Mr. Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and presently serves as Mr. Trump's personal attorney.  He is also generally referred to as Mr. Trump's "fixer."

17.     After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election. Mr. Cohen subsequently prepared a draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush Agreement").  Ms. Clifford at the time was represented by counsel in California whose office is located in Beverly Hills, California within the County of Los Angeles.

18.     The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential Consultants LLC.  As noted above, Essential Consultants LLC ("EC") was formed on October 17, 2016, just weeks before the 2016 presidential election.  On information and belief, EC was created by Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

19.     By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and Mr. Trump.  Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP."  Mr. Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

20.     Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement.  Exhibit 1 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

21.     Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter Agreement, which was Exhibit A to the Hush Agreement.   Exhibit 2 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

22.     Importantly, the Hush Agreement imposed various conditions and obligations not only on Ms. Clifford, but also on Mr. Trump.   The agreement also required the signature of all parties to the agreement, including that of Mr. Trump. Moreover, as is customary, it was widely understood at all times that unless all of the parties signed the documents as required, the Hush Agreement, together with all of its terms and conditions, was null and void.

23.     On or about October 28, 2016, only days before the election, two of the parties signed the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC). Mr. Trump, however, did not sign the agreement, thus rendering it legally null and void and of no consequence.   On information and belief, despite having detailed knowledge of the Hush Agreement and its terms, including the proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.

24.     Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney.   He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

25.     Mr. Trump was elected President of the United States on November 8, 2016.

26.     In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the

draft agreement.  Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

27.     On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, details concerning the Hush Agreement, and an attack on Ms. Clifford's truthfulness.  He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place.  Among other things, Mr. Cohen stated:  "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford.  Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."  Mr. Cohen concluded his statement by stating:  "Just because something isn't true doesn't mean that it can't cause you harm or damage.  *I will always protect Mr. Trump.*" (emphasis added).  This statement was made in writing by Mr. Cohen and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout the United States.  Attached hereto as Exhibit 3 is a true and correct copy of Mr. Cohen's statement.  Exhibit 3 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

28.     Importantly, at no time did Mr. Cohen make a direct assertion that Ms. Clifford did not have an intimate relationship with Mr. Trump.  Indeed, were he to make such a statement, it would be patently false.  Mr. Cohen's statement was not a mere statement of opinion, but rather has been reasonably understood to be a factual statement implying or insinuating that Ms. Clifford was not being truthful in claiming that she had an intimate relationship with Mr. Trump.

29.     Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including

any obligations to keep information confidential.  Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

30.    To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated.  For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles. Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

31.    Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view.   The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

32.    Indeed, Rule 1.4 of the New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers."   Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

33.    Further, Rule 1.8(e) of the New York Rules of Professional Conduct provides that attorneys "shall not advance or guarantee financial assistance to the client[.]"  Although the Rule provides for certain exceptions, such as permitting lawyers to pay court costs and expenses for indigent clients, plainly, none of these exceptions

apply to Mr. Cohen's purported financial assistance of $130,000 on behalf of his client, Mr. Trump.

34.    Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

35.    Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

## FIRST CAUSE OF ACTION
### Declaratory Relief/Judgment
### (Against Defendants Mr. Trump and EC)

36.    Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 35 above as if fully set forth herein.

37.    This action concerns the legal significance, if any, of the documents attached hereto as Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

38.    California Code of Civil Procedure § 1060 authorizes declaratory relief for any person who desires a declaration of rights or duties with respect to one another.  In cases of actual controversy relating to the legal rights and duties of the respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.  This includes a determination of whether a contract was ever formed.

39.    28 U.S.C. § 2201 creates a remedy for the entry of a declaratory judgment in cases of "actual controversy", whereby the court may declare the rights and other legal relations of any interested party seeking such declaration.  Any such declaration shall have the force and effect of a final judgment or decree.

40.    An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Accordingly, a declaration is necessary and proper at this time.

## A.    No Agreement Was Formed – Lack of Signature, Consideration, or Consent

41.    Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore do not exist, because, among other things, Mr. Trump never signed the agreements (which was an express condition of the Hush Agreement that had to occur for the formation of a valid and binding agreement).  Nor did Mr. Trump provide any other valid consideration.  He thus never assented to the duties, obligations, and conditions the agreements purportedly imposed upon him, which included express obligations imposed on Mr. Trump to provide Plaintiff with releases, a covenant not to sue, and representations and warranties (all of which were separate and apart from the $130,000 payment).  Plaintiff contends that, as a result, no agreement was ever formed or ever existed and, consequently, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

## B.    The Agreement Is Unconscionable

42.    In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of unconscionability.  By way of example only (and not limitation), the Hush Agreement contains a "Liquidated Damages" provision in favor of

"DD" (Mr. Trump) purporting to require Plaintiff to pay $1 Million for "<u>each</u> breach" calculated on a "per item basis." However, $1 Million for "<u>each</u> breach" bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. Instead, the liquidated damages clause was intended to inflict a penalty designed to intimidate and financially cripple Plaintiff. It is therefore void as a matter of law.

43.     By way of further example, while on the one hand, the Hush Agreement purports to impose astonishingly broad restrictions on speech and disclosure upon Plaintiff (including prohibiting disclosure of matters that are of public record), on the other hand, Defendants, with few exceptions, have no such restrictions imposed upon them and are thus permitted to disclose matters covered by the Agreement, and publicly disparage Plaintiff and impugn her credibility. As but one illustration of the one-sided nature of the Hush Agreement, EC, through Mr. Cohen, violated paragraph 7.1 of the Agreement by disclosing terms of the Agreement to the *Wall Street Journal* on or about January 12, 2018. Although the Agreement attempts to impose astonishingly Draconian consequences and penalties upon Plaintiff for a breach of the Agreement, no such remedies are available to Plaintiff for Defendants' breach of the Agreement. An agreement that sanctions such overly-harsh, one-sided results without any justification and which allocates risks of the bargain in such an objectively unreasonable and unexpected manner is unconscionable as a matter of law. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

## C.     The Agreement Is Void *Ab Initio* Because It Is Illegal and Violates Public Policy

44.     In the further alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable,

and/or void because they are illegal, or that they violate public policy.  Essential to the "*existence*" of a contract is that the contract have a "lawful object" or lawful purpose.  See, e.g., Cal. Civ. Code § 1550.  No such lawful purpose existed in the Hush Agreement for at least the following reasons.

45.    *First*, the Hush Agreement was entered with the illegal aim, design, and purpose of circumventing federal campaign finance law under the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101, *et seq.*, and Federal Election Commission (FEC) regulations. The purposes and aims of the FECA include the promotion of transparency, the complete and accurate disclosure of the contributors who finance federal elections, and the restriction on the influence of political war chests funneled through the corporate form.

46.    In order to effectuate these purposes, FECA imposes various contribution limits, and reporting and public disclosure requirements, on candidates for Federal office, including the office of President of the United States.  With regards to the 2016 Presidential Election, FECA required that the maximum any "person"—defined to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons" —was permitted to contribute to any candidate was $2,700.  52 U.S.C. §§ 30101(11); 30116(a)(1)(A), (c); see also FEC, Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 82 Fed. Reg. 10904, 10906 (Feb. 16, 2017).  Mr. Trump and his campaign for the presidency were subject to FECA and its contribution limit at all relevant times.

47.    The term "contribution" is defined broadly to include "any gift, subscription, loan, advance, or deposit of money *or anything of value* made by any person *for the purpose of influencing any election for Federal office*[.]"  52 U.S.C. § 30101(8)(A) (emphasis added); see also 11 C.F.R. §§ 100.51-100.56.  The phrase "anything of value" includes "all in-kind contributions."  11 C.F.R. § 100.52(d)(1).  In other words, "the provision of any goods or services without charge or at a charge that

is less than the usual and normal charge for such goods or services is a contribution." Id.

48.     In addition, under FECA, Mr. Trump and his campaign for the presidency were required to report the identification of each person who made a contribution to his campaign with an aggregate value in excess of $200 within an election cycle.   52 U.S.C. § 30104(b)(3)(A).   Mr. Trump and his campaign for the presidency were also required to report the name and address of each person *to whom* an expenditure in an aggregate amount in excess of $200 within the calendar year was made by his campaign committee.

49.   FECA also imposes similar requirements on the reporting of "expenditures."  52 U.S.C. § 30104(b)(4)-(5).  The term "expenditure" includes "(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money *or anything of value*, made by any person *for the purpose of influencing any election for Federal office*; and (ii) a written contract, promise, or agreement to make an expenditure."  52 U.S.C. § 30101(9) (emphasis added).  As with "contributions," the phrase "anything of value" in the context of "expenditures" includes "all in-kind contributions."  11 C.F.R. § 100.111(e)(1).

50.     Moreover, "contributions from the candidate" or "expenditures" from the candidate must also be reported.   11 C.F.R. § 104.3(a)(3)(ii); see also, e.g., FEC Advisory Opinion 1990-09.

51.     Here, the Hush Agreement did not have a lawful object or purpose.   The Hush Agreement, and the $130,000 payment made pursuant to the agreement, was for the "purpose of influencing" the 2016 presidential election by silencing Plaintiff from speaking openly and publicly about Mr. Trump just weeks before the 2016 election. Defendants plainly intended to prevent American voters from hearing Plaintiff speak about Mr. Trump.   This $130,000 payment was a thing "of value" and an "in-kind" contribution exceeding the contribution limits in violation of FECA and FEC regulations.   It was also a violation of FECA and FEC regulations because it was not

publicly reported as a contribution.  Further, it was a violation of FECA and FEC regulations because it was a thing "of value" and an "in-kind" expenditure that was required to be reported as such.  Therefore, because the Hush Agreement did not have a lawful object or purpose, the Agreement was void *ab initio*.  Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

52.    *Second*, the Hush Agreement is also void *ab initio* because it violates public policy by suppressing speech on a matter of public concern about a candidate for President of the United States, mere weeks before the election.  Agreements to suppress evidence are void as against public policy, both in California and in most common law jurisdictions.   "A bargain that has for its consideration the nondisclosure of discreditable facts, or of facts that the promisee is under a fiduciary duty not to disclose, is illegal."  Restatement (First) of Contracts § 557 (1932).  Remarkably, illustration 1 in the official comments to section 557 provides the following example of a bargain that is illegal:

> 1.  A, a candidate for political office, and as such advocating certain principles, had previously written letters to B, taking a contrary position. B is about to publish the letters, and A fearing that the publication will cost him his election, agrees to pay $1000 for the suppression of the letters. The bargain is ***illegal***.

Restatement (First) of Contracts § 557, Illustration 1 (1932)(emphasis added).

53.    *Third*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered for the purpose of covering-up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of the intimate relationship between Plaintiff and Mr. Trump.  N.Y. Penal Law § 255.17 ("A person is guilty of adultery

when he engages in sexual intercourse with another person at a time when he has a living spouse, or the other person has a living spouse.   Adultery is a class B misdemeanor.").

54.    *Fourth*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered into by Defendant EC at the behest of Defendant Cohen, a New York attorney then subject to the New York Rules of Professional Conduct.  If Mr. Cohen's public statements are true (which is unlikely), he violated Rule 1.4 of the New York Rules of Professional Conduct by entering into an agreement on his client Mr. Trump's behalf without notifying him of the agreement, including, among other things, the fact that the agreement required a payment of $130,000 to be made, that he was making the payment for Mr. Trump on Mr. Trump's behalf, that Mr. Trump was being encumbered with various duties and obligations under the Agreement, that the Agreement and $130,000 payment would possibly subject Mr. Trump to violations of federal campaign finance laws, and that the Agreement would raise questions about whether he had an adulterous affair that Mr. Trump apparently now denies ever occurred.

55.    Moreover, if Mr. Cohen's public statements are true, he also violated Rule 1.8(e) of the New York Rules of Professional Conduct by advancing or guaranteeing financial assistance to a client by paying $130,000 from his own personal funds to benefit his client Mr. Trump.

### D.    There Was No Agreement to Arbitrate Between Plaintiff and EC

56.    Separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio*, all as set forth above, Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists between Plaintiff and EC.  Under paragraph 5.2 of the Hush Agreement, entitled "Dispute Resolution," only those "claims and controversies arising between DD [Mr. Trump] on the one hand,

and PP [i.e., Plaintiff] on the other hand" are subject to arbitration.  To be clear, there is not presently nor has there ever been any agreement to arbitrate between Plaintiff and EC.

**E.     The Arbitration Clause Is Void *Ab Initio* Because It Is Unconscionable, Illegal, and Violates Public Policy**

57.    Moreover, also separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio* (as set forth above), Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists because no agreement was formed (see Complaint, ¶41, supra), and further, that no agreement to arbitrate exists because paragraphs 5.2 of the Agreement (which contains the arbitration clause) along with various parts of paragraph 5.1 of the Agreement (describing "DD's" remedies that Defendants would presumably argue are available to them in a confidential arbitration proceeding) are void *ab initio* because they unconscionable, illegal, and violates public policy.

58.    *First*, the arbitration clause is unconscionable, particularly when combined with the remedies section of the Agreement.  The clause is extremely one-sided by conferring significant rights exclusively to Mr. Trump (as "DD" referred to in the Agreement), provided he is a party to the agreement.  Among other things, (a) Mr. Trump is given the right to seek injunctive relief *either* in court or arbitration, while Defendants contend Plaintiff must pursue all rights in arbitration, (b) Mr. Trump is given the exclusive right to elect which state's laws will apply to the arbitration (California, Nevada, or Arizona) and he is not required to provide notice of which state's laws he elects will be applied until after he has filed an arbitration proceeding, and (c) Mr. Trump is given the exclusive right to choose venue in *any* location (i.e., anywhere in the country) he selects and is permitted to elect which of two arbitration

agencies the arbitration proceeding may be initiated in (either JAMS or Action Dispute Resolution Services).

59.     *Second,* the arbitration clause is illegal and without lawful object or purpose because it was entered with the purpose of keeping facts concerning federal campaign contributions and expenditures secret and hidden from public view by using a confidential arbitration proceeding in violation of FECA's mandates to publicly report campaign contributions and expenditures.  In other words, the principal aim and design of the arbitration clause is to keep confidential that which, by law, must be publicly disclosed.  Indeed, the clause plainly is designed to prevent the public disclosure of an illegal campaign contribution by mandating that disputes between Plaintiff and Mr. Trump be resolved in a confidential arbitration proceeding shielded from public scrutiny.

60.     *Third*, the arbitration clause is void because it violates public policy by suppressing speech on a matter of enormous public concern about a candidate for President of the United States mere weeks before the election.  See Restatement (First) of Contracts § 557.

61.     *Fourth,* the arbitration clause is illegal and without lawful object or purpose because it was designed to cover up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of Plaintiff and Mr. Trump's intimate relationship.  N.Y. Penal Law § 255.17.  It is also illegal and without lawful object or purpose because it was designed to cover up Mr. Cohen's ethical violations, including his violations of Rule 1.4 and 1.8(e) of the New York Rules of Professional Conduct.

62.     Defendants dispute all of the foregoing contentions.

63.     Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

**FIRST AMENDED COMPLAINT**

## SECOND CAUSE OF ACTION

### Defamation

### (Against Defendant Mr. Cohen)

64.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 64 above as if fully set forth herein.

65.     On or about February 13, 2018, Mr. Cohen issued a public statement.  The entirety of the statement is attached hereto as Exhibit 3.  In it, he states in part:  "*Just because something isn't true* doesn't mean that it can't cause you harm or damage.  I will always protect Mr. Trump." (emphasis added).  Mr. Cohen's statement was made in writing and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout California and across the country (and the world) on television, on the radio, in newspapers, and on the Internet.

66.     It was reasonably understood by those who read or heard the statement that Mr. Cohen's defamatory statement was about Ms. Clifford.

67.     Both on its face, and because of the facts and circumstances known to persons who read or heard the statement, it was reasonably understood Mr. Cohen meant to convey that Ms. Clifford is a liar, someone who should not be trusted, and that her claims about her relationship with Mr. Trump is "something [that] isn't true."   Mr. Cohen's statement exposed Mr. Clifford to hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with her.

68.     Mr. Cohen's defamatory statement was false.

69.     Mr. Cohen made the statement knowing it was false or had serious doubts about the truth of the statements.

70.     As a result, Plaintiff Ms. Clifford has suffered damages in an amount to be proven at trial according to proof, including but not limited to, harm to her reputation, emotional harm, exposure to contempt, ridicule, and shame, and physical threats of violence to her person and life.

**FIRST AMENDED COMPLAINT**

71.     In making the defamatory statement identified above, Mr. Cohen acted with malice, oppression, or fraud, and is thus responsible for punitive damages in an amount to be proven at trial according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void *ab initio*, invalid, or otherwise unenforceable.

## ON THE FIRST CAUSE OF ACTION (DECLARATORY RELIEF/JUDGMENT)

1.     For a judgment declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

2.     For a judgment declaring that no agreement to arbitrate was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

3.     For costs of suit; and

4.     For such other and further relief as the Court may deem just and proper.

## ON THE SECOND CAUSE OF ACTION (DEFAMATION)

1.     For damages in an amount to be proven at trial;

2.     For punitive damages;

3.     For pre-judgment and post-judgment interest;

4.     For costs of suit; and

5.     For such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all causes so triable.  Said demand includes a demand, pursuant to 9 U.S.C. § 4, for a trial by jury concerning whether the parties entered into the agreement at issue by which EC, Mr. Trump, or both, will seek to compel arbitration.

DATED:  March 26, 2018                    AVENATTI & ASSOCIATES, APC


                                          /s/ Michael J. Avenatti
                                          MICHAEL J. AVENATTI
                                          Attorneys for Plaintiff

EXHIBIT 1

**CONFIDENTIAL SETTLEMENT AGREEMENT
AND MUTUAL RELEASE; ASSIGNMENT OF
COPYRIGHT AND NON-DISPARAGMENT
AGREEMENT**

## 1.0    THE PARTIES

1.1    This Settlement Agreement and Mutual Release (hereinafter, this "Agreement") is made and deemed effective as of the ___ 2 ___ day of October, 2016, by and between "**EC, LLC**" and/or **DAVID DENNISON**, (DD), on the one part, and **PEGGY PETERSON**, (PP), on the other part. ("EC, LLC," "DD" and "PP" are pseudonyms whose true identity will be acknowledged in a Side Letter Agreement attached hereto as "EXHIBIT A") This Agreement is entered into with reference to the facts and circumstances contained in the following recitals.

## 2.0    RECITALS

2.1    Prior to entering into this Agreement, PP came into possession of certain "Confidential Information" pertaining to DD, as more fully defined below, only some of which is in tangible form, which includes, but is not limited to information, certain still images and/or text messages which were authored by or relate to DD (collectively the "Property", each as more fully defined below but which all are included and attached hereto as Exhibit "1" to the Side Letter Agreement).

2.2    (a)    PP claims that she has been damaged by DD's alleged actions against her, including but not limited to tort claims proximately causing injury to her person and other related claims. DD denies all such claims. (Hereinafter "PP Claims").

(b)    DD claims that he has been damaged by PP's alleged actions against him, including but not limited to the alleged threatened selling, transferring, licensing, publicly disseminating and/or exploiting the Images and/or Property and/or other Confidential Information relating to DD, all without the knowledge, consent or authorization of DD.  PP denies all such claims. (Hereinafter "DD Claims").

(c)    The PP Claims and the DD Claims are hereinafter collectively referred to as "The Released Claims."

2.3    DD desires to acquire, and PP desires to sell, transfer and turn-over to DD, any and all tangible copies of the Property and any and all physical and intellectual property rights in and to all of the Property.  As a condition of DD releasing any claims against PP related to this matter, PP agrees to sell and transfer to DD all and each of her rights in and to such Property.  PP agrees to deliver each and every existing copy of all tangible Property to DD (and permanently delete any electronic copies that can not be transferred), and agrees that she shall not possess, nor directly nor indirectly disclose convey, transfer or assign Property or any Confidential Information to any Third Party, as more fully provided herein.

2.4    It is the intention of the Parties that Confidential Information, as defined herein, shall remain confidential as expressly provided hereinbelow.  The Parties expressly acknowledge, agree and understand that the Confidentiality provisions herein and the



Page **0**



representations and warranties made by PP herein and the execution by her of the Assignment & Transfer of Copyright are at the essence of this Settlement Agreement and are a material inducement to DD's entry into this Agreement, absent which DD would not enter into this Agreement. DD expects and requires that PP never communicate with him or his family for any reason whatsoever.

2.5    The Parties wish to avoid the time, expense, and inconvenience of potential litigation, and to resolve any and all disputes and potential legal claims which exist or may exist between them, as of the date of this Agreement including but not limited to the PP Claims and/or the DD Claims. The Parties agree that the claims released include but are not limited to DD's Claims against PP  as relates to PP having allowed, whether intentionally, unintentionally or negligently, anyone else other than those listed in section 4.2 herein below to become aware of the existence of and content of the Property, to have gained possession of the Property, and to PP's having allegedly engaged in efforts to disclose, disseminate and/or commercially exploit the Images and/or Property and/or Confidential Information, and any harm suffered by DD therefrom. The Parties agree that the claims released include but are not limited to PP's Claims against DD  as relates to DD having allowed, whether intentionally, unintentionally or negligently, anyone else to have interfered with PP's right to privacy or any other right that PP may possess.

2.6    These Recitals are essential, integral and material terms of this Agreement, and this Agreement shall be construed with respect thereto.  The Parties enter into this Agreement in consideration of the promises, covenants and conditions set forth herein, and for good and valuable consideration, the receipt of which is hereby acknowledged. It is an essential element of this Settlement Agreement that the Parties shall never directly or indirectly communicate with each other or attempt to contact their respective families. This matter, the existence of this Settlement Agreement and its terms are strictly confidential.

NOW, THEREFORE, the Parties adopt the foregoing recitals as a statement of their intent and in consideration of the promises and covenants contained herein, and further agree as follows:

///

///

///



PP                                              P a g e **1**                                              DD

**3.0    SETTLEMENT TERMS**

3.0.1.1 EC, LLC SHALL PAY TO PP $130,000.00 U.S.D. AS FOLLOWS:

3.0.1.1.1    $130,000.00 USD shall be wired into PP's Attorney's Attorney Client Trust Account on or before 1600 hrs. PST on 10/27/16.(Hereinafter "Gross Settlement Amount"). PP's Attorney's Wiring Instructions are:

| | |
|---|---|
| Bank Name: | City National Bank |
| Bank Address: | 8641 Wilshire Blvd. |
| | Beverly Hills, CA 90211 |
| ABA Routing No: | 122016066 |
| Beneficiary Account Name: | Keith M. Davidson & Associates, |
| | PLC, Attorney Client Trust Account |
| Beneficiary Account No: | 600106201 |
| Beneficiary Address: | 8383 Wilshire Blvd. Suite 510 |
| | Beverly Hills, CA 90211 |
| SWIFT Code: | CINA US6L |

3.0.1.1.2    Keith M. Davidson, Esq. shall receive the Gross Settlement Amount in Trust. No portion of the Gross Settlement Amount shall be disbursed by Attorney for PP unless and until PP executes all required Settlement Documents.

3.1    Undertakings & Obligations by PP.  PP will do each of the following by 11/01/16:

(a)    PP shall execute this Agreement and return a signed copy to DD:

(b)    PP shall transfer and/or assign any and all rights in and to the Property to DD (as set forth hereinbelow), and execute an Assignment & Transfer of Copyright, in the form attached hereto, and return a signed copy of same to DD's counsel;

(c)    PP shall deliver to DD every existing copy of all tangible Property.  PP shall completely divest herself of any and all artistic media, impressions, paintings, video images, still images, e-mail messages, text messages, Instagram message, facebook posting or any other type of creation by DD. PP shall transfer all physical, ownership and intellectual property rights to DD;

(1)    PP shall deliver to DD any and all non-privileged correspondence concerning or related to DD between PP and any 3rd party.

(d)    PP shall not, at any time from the date of this Agreement forward, directly or indirectly disclose or disseminate any of the Property or any Confidential Information (including confirmation of the fact that it exists or ever existed, and/or confirming any rumors as to any such existence) to any third party, as more fully provided herein.

(c)    PP shall provide to DD (to the extent not already done so and set forth in paragraph 4.2 hereinbelow), summary details disclosing to whom PP (or anyone else on PP's behalf) disclosed, displayed to, disseminated, transferred to, provided a copy to, and/or

distributed, sold, licensed or otherwise sought to have commercially exploit, the Images and/or Property and/or any Confidential Information.

(f)     PP shall provide to DD's counsel the names and contact information of each and any persons or entities who: (1) PP has provided to or who otherwise obtained possession of the original and/or any copies of any of the Images and/or any Property, if any, (ii) to whom PP has scanned the Images and/or any Property at any time, and (iii) to whom PP knows had, has or may potentially have possession of a copy of the Images and/or any Property at any time, including but not limited to the present time (and specify with detail to which of the referenced categories (i.e., possession, shown, past, present, etc.) any name corresponds, the name so relates).

(g)     PP shall provide to DD's counsel copies of any agreements and/or other documentation in PP's possession, custody or control, if any, regarding (e) and/or (f) above, that evidences who has or may have been provided a copy of any of the Property.

3.2     Transfer of Property Rights to DD.  In further consideration for the promises, covenants and consideration herein, PP hereby transfers and conveys to DD all of PP's respective rights, title and interest in and to the Property, and any and all physical and intellectual property rights related thereto.  Without limiting the generality of the foregoing, PP does hereby sell, assign, and transfer to DD, his successors and assigns, throughout the universe in perpetuity, all of PP's entire right, title, and interest (including, without limitation, all copyrights and all extensions and renewals of copyrights), of whatever kind or nature in and to the Property, without reservation, condition or limitation, whether or not such rights are now known, recognized or contemplated, and the complete, unconditional and unencumbered ownership and all possessory interest and rights in and to the Property, which includes, but is not limited to the originals, copies, negatives, prints, positive, proof sheets, CD-roms, DVD-roms, duplicates, outtake and the results of any other means of exhibiting, reproducing, storing, recording and/or archiving any of the Property or related material, together with all rights of action and claims for damages and benefits arising because of any infringement of the copyright to the Property, and assigns and releases to DD any and all other proprietary rights and usage rights PP may own or hold in the copyright and/or Property, or any other right in or to the Property.  PP assigns and transfers to DD all of the rights herein granted, without reservation, condition or limitation, and agrees that PP reserves no right of any kind, nature or description related to the Property and contents therein.  Notwithstanding the foregoing, if any of the rights herein granted are subject to termination under section 203 of the Copyright Act, or any similar provisions of the Act or subsequent amendments thereof, PP hereby agrees to re-grant such rights to DD immediately upon such termination.  All rights granted herein or agreed to be granted hereunder shall vest in DD immediately and shall remain vested in perpetuity.  DD shall have the right to freely assign, sell, transfer or destroy the Property as she desires.  DD shall have the right to register sole copyright in and to any of the Property with the US Copyright Office.  DD shall also have the right, in respect to the Property, to add to, subtract from, change, arrange, revise, adapt, into any and all form of expression or tangible communication, and the right to combine any of the Property with any other works of any kind and/or to create derivative works with any of the Property, and to do with it as she so deems.  To the fullest extent allowable under the applicable law, PP shall irrevocably waive and assign to DD any of PP's so-called "moral rights" or "droit moral" (laws for the protection of copyrights outside of the United States), if any, or any similar rights under any principles of law which PP may now have or later have in the Property.  With respect to and in furtherance of the above, PP agrees to and shall execute and deliver to DD an

PP _____

Page **3**


DD

"Assignment & Transfer of Copyright", in the form attached hereto as <u>Exhibit "B"</u>. For greater certainty the foregoing assignment shall be applicable worldwide.

       3.2.1   Notwithstanding the foregoing paragraph 3.2, and without in anyway limiting or diminishing from the full transfer and assignment of rights therein without reservation, the Parties understand the purpose of the transfer of rights is to provide DD the fullest possible ability and remedies to prevent and protect against any publication and/or dissemination of the Property.

    3.3   <u>Delivery of the Property to DD</u>.  Concurrently upon execution of this Agreement, PP, as applicable, shall deliver to DD, by delivery to his counsel herein, all of the Property which is embodied in tangible form (all originals and duplicates), whether documents, canvasses, paper art, digital copies, letters, prints, electronic data, films, tapes, CD-Roms, DVD-Roms, Images recording tapes, photographs, negatives, originals, duplicates, contact sheets, audio recordings, Images recordings, magnetic data, computerized data, digital recordings, or other recorded medium or any other format of embodying information or data.  Without limiting the generality of the foregoing, such tangible Property shall include all documents as defined by California Evidence Code §250 which contain any of the Property.  PP represents and warrants that the materials delivered pursuant to the terms of this Paragraph 3.3 comprise the totality of all existing originals and duplicates of all Property in any tangible form, whether within their possession, custody or control, and including otherwise (and that PP knows of no other copies or possible or potential copies not in PP's possession and control and delivered pursuant to this paragraph), and that upon such delivery to DD, PP shall not maintain possession, custody or control of any copy of all or any portion of any tangible Property. The Property Delivered under this Paragraph shall become Exhibit 1 to the Side Letter Agreement. For avoidance of any doubt, PP, nor her attorney are entitled to retain possession of said Property after execution of this Agreement. The retention of said Property by PP is a material breach of this agreement.

       3.3.1   This Agreement is conditioned on PP's compliance with each and every term of the Settlement Agreement including Paragraph 3.3 <u>and</u> the personal verification by DD or his attorney of the Images and that the Images are comprised of and captures the content previously represented to his counsel to exist and be captured therein (i.e., text messages between PP and DD)), all of which terms are essential and material.

## 4.0   <u>CONFIDENTIALITY & REPRESENTATIONS & WARRANTIES.</u>

    4.1   <u>Definition of Confidential Information</u>.  "Confidential Information" means and includes each and all of the following:

       (a)   All *intangible* information pertaining to DD and/or his family, (including but not limited to his children or any alleged children or any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct or  related matters ),and/or friends learned, obtained, or acquired by PP, including without limitation information contained in letters, e-mails, text messages, agreements, documents, audio or Images recordings, electronic data, and photographs;

       (b)   All *intangible* information pertaining to the existence and content of the Property;



PP

Page 4



DD

(c)     All *intangible* private information (*i.e.*, information not generally available to and/or known by the general public) relating and/or pertaining to DD, including without limitation DD's business information, familial information, any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct, related matters or paternity information, legal matters, contractual information, personal information, private social life, lifestyle, private conduct, (all information/items in 4.1 "(a)", "(b)" and "(c)" are sometimes collectively referred to as, "Intangible Confidential Information");

(d)     All *tangible* materials of any kind containing information pertaining to DD learned, obtained, participated or acquired by PP, including without limitation letters, agreements, documents, audio or Images recordings, electronic data, and photographs, canvas art, paper art, or art in any other form on any media. The Images and Photos and all information/items in 4.1(d) are collectively referred to as, the "Property" and/or the "Tangible Confidential Information");

4.2     PP's Representations & Warranties Regarding Prior Disclosures of Tangible Confidential Information.  PP represents and warrants that prior to entry into this Agreement, PP has directly or indirectly disclosed any *Tangible* an/or Intangible Confidential Information (i.e., any of the Property), to any Third Party, including without limitation disclosure or indirect disclosure of the content of such Confidential Information in tangible form, other than the following persons or entities to whom PP has made such prior disclosures (herein "PP Disclosed Individuals/Entities"):

a)   *Mike Mosney*

b)   *Angel Ryan*

c)   *Gina Rodriguez*

d)   *Keith Munyan*

e)   _____

f)   _____

g)   _____

h)   _____

i)   _____

PP shall not be responsible for any subsequent public disclosure of any of the Confidential Information (a) attributable <u>directly</u> to each of them; and/or (b) not disclosed hereinabove as a previously disclosed PP Disclosed Individuals/Entities, and any such disclosure shall be deemed a breach of this Agreement by PP. For greater clarity, PP must not induce, promote or actively inspire anyone to disclose Confidential Information.


**PP**

P a g e **5**

**DD**

4.3     Representations & Warranties and Agreements.

(a)     Representations & Warranties and Agreements By DD.  The following agreements, warranties and representations are made by DD as material inducements to PP to enter into this Agreement, and each Party acknowledges that she/he is executing this Agreement in reliance thereon:

(b)     DD warrants and represents that, as relates to or in connection with any of PP's attempts to sell, exploit and/or disseminate the Property prior to the date of this Agreement, DD and his counsel will refrain (i) from pursuing any civil action against PP, and/or (ii) absent a direct inquiry from law enforcement, from disclosing PP's name to the authorities. Notwithstanding the foregoing, if DD is informed that or should or if it is believed that either of PP has possession, custody and/or control of any of the Property after the date of this Agreement and/or transferred any copies to any Third Party, and/or it is believed that any of PP, whether directly or indirectly, intends the release, use, display, dissemination, disclosure or exploitation, whether actual, threatened or rumored, of any for the Property, then DD and his counsel shall be entitled to, at DD's sole discretion, (i) contact the respective member of PP, including with legal demands and related statements of liability and legal action, and/or (ii) advance a civil action against the respective member of PP, and/or (iii) disclose any of PP's name to the authorities.

4.3.2   Representations & Warranties and Agreements By PP.  The following agreements, warranties and representations are made by PP as material inducements to DD to enter into this Agreement, without which DD would not enter into this Agreement and without which DD would not agree to pay any monies whatsoever hereunder, and with the express acknowledgment that DD is executing this Agreement in reliance on the agreements, warranties, and representations herein which are at the essence of this Agreement, including, the following:

(a)     PP agrees and warrants and represents that PP will permanently cease and desist from any efforts to and/or attempting to and/or engaging in and/or arranging the use, License, distribution, dissemination or sale of any of the Confidential Information and/or Property, including any Tangible and/or Intangible Confidential information created by or relating to DD;

(b)     PP agrees and warrants and represents that PP will permanently cease and desist from any posting or dissemination or display of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including the Images (including, but not limited to, to any form media outlet, on any blog or posting board, on the Internet, or otherwise);

(c)     PP agrees and warrants and represents that PP will permanently cease and desist from using or disseminating or disclosing any information to any Third Persons (including, but not limited to, to any media outlet, on any blog or posting board, on the Internet, or otherwise) about any details of or as to the contents of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including any Text Messages, and/or as to any other personal details of or about or pertaining to DD and/or his family and/or friends and/or social interactions;

(d)     PP agrees and warrants and represents that PP will permanently cease and desist from and will not, at any time, make any use of or reference to the name, image or likeness


PP

P a g e 6


DD

of DD in any manner whatsoever, including without limitation, through any print or electronic media of any kind or nature for any purpose, including, but not limited to, on any websites;

(e)     PP agrees and warrants and represents that any and all existing copies of the Images, Text Messages and any Property (other than as expressly specified in paragraphs 3.2 and 3.3 herein) have been turned over and provided to counsel; and PP further warrants and represents that the only copy of the Images and Property that has ever existed, at any time, has been turned over to DD's counsel pursuant to this Agreement, and the Images and any Property has never been transferred to or existed in any other form, including not in electronic form, nor on any computer, or electronic device and other storage media;

(f)     PP warrants and represents that PP has not provided any copies, whether hard-copy or electronic copies, of the Property to anyone other than as specified in paragraph 4.2 herein);

(g)     PP warrants and represents that the information PP is obligated to provide pursuant to the terms herein will be complete and truthful;

(h)     PP warrants and represents that PP has not omitted or withheld any information that PP is obligated to provide pursuant to the terms herein;

(i)     PP warrants and represents that PP has not contracted to earn and/or collect any monies as compensation from the sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD nor any monies as compensation or an advance for any efforts to sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information or any Tangible and/or Intangible Confidential information created by or relating to DD;

(j)     PP warrants and represents that PP has not assigned nor transferred, either in whole or in part, any purported rights in or to the Images and/or any Property to any other person or entity, other than to DD pursuant to this Agreement.

4.3.3   Agreement By PP Not to Disclose/Use Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD. As further material inducements for DD to enter into this Agreement, PP agrees, represents and warrants that she shall not directly or indirectly, verbally or otherwise, publish, disseminate, disclose, post or cause to be published, disseminated, disclosed, or posted (herein "disclose"), any Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any person, group, firm or entity whatsoever, including, but not limited to, family members, friends, associates, journalists, media organizations, newspapers, magazines, publications, television or radio stations, publishers, databases, blogs, websites, posting boards, and any other enterprise involved in the print, wire or electronic media, including individuals working directly or indirectly for, or on behalf of, any of said persons or entities ("Third Parties" and/or Third Party"). In no event shall PP be relieved of such party's confidentiality obligations herein by virtue of any breach or alleged breach of this Agreement. In no event shall any dispute in connection with this Agreement relieve PP of her confidentiality obligations arising pursuant to this Agreement, and any disclosure of Confidential Information and/or Tangible and/or Intangible Confidential information created by or relating to DD in connection with any such

Page 7



proceeding or dispute shall constitute a breach of this Agreement. PP shall use their best efforts to prevent the unauthorized disclosure of Confidential Information in connection with any such proceeding or dispute.

4.3.4   Any direct or indirect disclosure of Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any Third Party by PP and/or any of her representatives, heirs, agents, children, family members, relatives , confidents, advisors, employees, attorneys, transferors, transferees, successors or assigns, and/or any friend of any of PP (collectively "PP Group"), after the date of this Agreement, shall be deemed a disclosure by PP in breach of the terms of this Agreement, entitling the non-breaching Party to all rights and remedies set forth herein.

4.3.5   PP separately and further warrants and represent that, prior to entering into this Agreement, that she has not written, published, caused to be published, or authorized the writing, publication, broadcast, transmission or public dissemination of any interview, article, essay, book, memoir, story, photograph, film, script, Images tape, biography, documentary, whether written, oral, digital or visual, whether fictionalized or not, about the opposing Party to this Agreement or their family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral, which discloses any Confidential Information and/or which includes any description or depiction of any kind whatsoever whether fictionalized or not, about any Party to this agreement or their respective family, other than as expressly disclosed by PP hereto in writing and as set forth herein in paragraph 4.2 above.

4.3.6   <u>Agreement By PP Not to Disparage DD</u>. PP hereby irrevocably agrees and covenants that she shall not, directly or indirectly, publicly disparage DD, nor write, publish, cause to be published, or authorize, consult about or with or otherwise be involved in the writing, publication, broadcast, transmission or dissemination of any book, memoir, letter, story, photograph, film, script, Images, interview, article, essay, biography, diary, journal, documentary, or other written, oral, digital or visual account or description or depiction of any kind whatsoever whether fictionalized or not, about DD or his family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral. PP further warrants and represents that PP has not and will not enter into any written or oral agreement with any third party purportedly requiring or obligating PP to do so. Fore greater clarity PP will never discuss with anyone the contents of this Settlement Agreement, nor will she voluntarily confirm the existence of this Settlement Agreement.

4.4   <u>Disclosure Of Confidential Information Is Prohibited</u>: The Parties to this Agreement hereby recognize and agree that substantial effort and expense have been dedicated to limit the efforts of the press, other media, and the public to learn of personal and business affairs involving DD. PP further acknowledges that any future disclosure of Confidential Information to any Third Party would constitute a serious and material breach of the terms of this Agreement, and shall constitute a breach of trust and confidence, invasion of privacy, and a misappropriation of exclusive property rights, and may also constitute fraud and deceit. Some of the Confidential Information may also constitute and include proprietary business information and trade secrets which have independent economic value. The Parties hereto acknowledge that any unauthorized use, dissemination or disclosure of Confidential Information, or the fabrication and dissemination of false and/or misleading information, about DD would result in irreparable injury to him, and would be injurious to a reasonable person, and/or would constitute an injurious violation of the right of privacy or publicity, and/or would be injurious to his business,

PP

Page **8**

DD

profession, person, family and/or career. The Parties acknowledge that substantial and valuable property rights and other proprietary interests in the exclusive possession, ownership and use of Confidential Information, and recognizes and acknowledges that such Confidential Information is a proprietary, valuable, special and unique asset which belongs to DD and to which the PP has no claim of ownership or other interest.

4.4.1   Disclosures Permitted By PP.  Notwithstanding the foregoing, PP shall only be permitted to disclose Confidential Information to another person or entity only if compelled to do so by valid legal process, including without limitation a subpoena duces tecum or similar legal compulsion, provided that PP shall not make any such disclosure unless PP has first provided DD with notice of such order or legal process not less than ten (10) days in advance of the required date of disclosure pursuant to the Written Notice provisions set forth hereinbelow, providing DD with an opportunity to intervene and with full and complete cooperation should she choose to oppose such disclosure. PP agrees that if the valid legal process can be stopped by her consent or at her behest then PP shall agree to use best efforts to avoid the disclosure of the Confidential Information.

## 5.0   REMEDIES

5.1   DD's Remedies for Breach of Agreement.  Each breach or threatened breach (*e.g.*, conduct by PP reflecting that said person intends to breach the Agreement), including without limitation by breach of any representation or warranty, by failing to deliver to DD all tangible Property as required, by the disclosure or threatened disclosure of any Confidential Information to any Third Party by PP (herein "Prohibited Communication"), or otherwise, shall render PP liable to DD for any and all damages and injuries incurred as a result thereof, including but not limited to the following, all of which rights and remedies shall be cumulative:

5.1.1   Disgorgement of Monies:  In the event an Arbitrator determines there has been a breach or threatened breach of this Agreement by PP, PP shall be obligated to account to, and to disgorge and turn over to DD any and all monies, profits, or other consideration, or benefits, which PP, or anyone on PP's behalf or at PP's direction, directly or indirectly derive from any disclosure or exploitation of any of the Confidential Information; and

5.1.2   Liquidated Damages:  PP agrees that any breach or violation of this Settlement Agreement by either of PP individually or the PP Group by his/her/their unauthorized disclosure of any of the Confidential Information (as defined in paragraphs 4.1(a), (b), (c), and (d)) to any Third Party, and/or any unauthorized exploitation or prohibited use of the same, and/or by the breach of and/or by any false representations and warranties set forth in this Agreement, and/or any public disparagement of DD by PP (collectively, the "LD Breach Terms"), shall result in substantial damages and injury to DD, the precise amount of which would be extremely difficult or impracticable to determine, even after the Parties have made a reasonable endeavor to estimate fair compensation for such potential losses and damages to DD. Therefore, in addition to disgorgement of the full amount of all monies or other consideration pursuant to paragraph 5.1.2, in the event an Arbitrator determines there has been a breach of the LD Breach Terms of this Agreement by PP individually or the PP Group, PP shall also be obligated to pay, and agree to pay to DD the sum of One-Million Dollars ($1,000,000.00 as a reasonable and fair amount of liquidated damages to compensate DD for any loss or damage


**PP**

**DD**

resulting from each breach, it being understood that the Liquidated damages calculation is on a per item basis. The Parties agree that such sum bears a reasonable and proximate relationship to the actual damages which DD will or might suffer from each breach of the terms of this Agreement and that this amount is not a penalty. Alternatively, at DD's sole discretion, DD may seek to recover actual damages proximately caused by each such breach, according to proof. Any other breaches not a LD Breach Terms shall be subject to a claim for actual damages according to proof; furthermore, any monies held in Trust by PP's Attorney shall be frozen and shall not be disbursed to PP until the Arbitrator finally resolves the allegation of Breach.

      5.1.3   Injunctive Relief. PP acknowledges and agrees that any unauthorized disclosure to Third Parties of any Confidential Information will cause irreparable harm to DD, which damages and injuries will most likely not be measurable or susceptible to calculation. PP further acknowledges and agrees that any breach or threatened breach of this Agreement due to the unauthorized disclosure or threatened disclosure by PP to Third Parties, of any Confidential Information shall entitle DD to immediately obtain, either from the Arbitrator and/ or from any other court of competent jurisdiction, an *ex parte* issuance of a restraining order and preliminary injunction or other similar relief (herein "Injunctive Relief") without adverse notice to any of PP, preventing the disclosure or any further disclosure of Confidential Information protected by the terms hereof, pending the decision of the Arbitrator or Court. The Parties further acknowledge and agree that in connection with any such proceeding, any Party may obtain from the Court or Arbitrator on an ex parte application or noticed motion without opposition, an order sealing the file in any such proceeding, and the Parties stipulate to the factual and legal basis for issuance of an order sealing the file in any such proceedings. The rights and remedies set forth in this Injunctive Relief Section are without prejudice to any other rights or remedies, legal or equitable, that the Parties may have as a result of any breach of this Agreement.

      5.2   Dispute Resolution. In recognition of the mutual benefits to DD and PP of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes which may arise between them, it is their intention and agreement that any and all claims or controversies arising between DD on the one hand, and PP on the other hand, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law. Arbitration shall take place before JAMS ENDISPUTE ("JAMS") pursuant to JAMS Comprehensive Arbitration Rules and Procedures (including Interim Measures) ("JAMS Rules") and the law selected by DD, (such selection shall be limited to either, California, Nevada or Arizona), or before ACTION DISPUTE RESOLUTION SERVICES ("ADRS") pursuant to the ADRS Rules (including Interim Measures) and the law selected by DD (whichever the claimant elects upon filing an arbitration), in a the location selected by DD, and will be heard and decided by a sole, neutral arbitrator ("Arbitrator") selected either by agreement of the Parties, or if the Parties are unable to agree, then selected under the Rules of the selected arbitration service. The costs and fees associated with any Arbitrator and/or Arbitration service shall be split equally among the parties to any such dispute. The Parties shall have the right to conduct discovery in accordance with the California Code of Civil Procedure Section 1283.05 *et. seq.* or any similar provision existing in the jurisdiction selected by DD and the written discovery requests and results of discovery shall be deemed to constitute Confidential Information. The Arbitrator shall have the right to impose all legal and equitable remedies that would be available to any Party before any governmental dispute resolution forum or court of competent jurisdiction, including without limitation temporary, preliminary and permanent injunctive relief, compensatory damages, liquidated damages, accounting, disgorgement, specific performance, attorneys fees and costs,


**PP**

Page **10**


**DD**

and punitive damages.  It is understood and agreed that each of the Parties shall bear his/its own attorneys' fees, expert fees, consulting fees, and other litigation costs (if any) ordinarily associated with legal proceedings taking place in a judicial forum, subject to the Arbitrator's reassessment in favor of the prevailing party to the extent permitted by law.  **Each of the Parties understands, acknowledges and agrees that by agreeing to arbitration as provided herein, each of the Parties is giving up any right that he/she/it may have to a trial by judge or jury with regard to the matters which are required to be submitted to mandatory and binding Arbitration pursuant to the terms hereof.  Each of the Parties further understands, acknowledges and agrees that there is no right to an appeal or a review of an Arbitrator's award as there would be a right of appeal or review of a judge or jury's decision.**

### 6.0   MUTUAL RELEASES

6.1     Except for the rights and obligations of the Parties set forth in this Agreement, DD, for himself, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever releases and discharges PP, individually, and all of PP's heirs, and PP's attorneys, and each of them ("PP Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the effective date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Matter, or which could have been asserted in any other legal action or proceeding, except as may be provided herein (the "DD Released Claims").

6.2     Except for the rights and obligations of the Parties set forth in this Agreement, PP, for herself, and her representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever release and discharge DD, individually, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them ("DD Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Action, or which could have been asserted in any other legal action or proceeding (the "PP Released Claims").

6.3     The subject matter referred to in paragraphs 6.1 and 6.2, above (i.e., the DD Released Claims and PP Released Claims), are collectively referred to as the "Released Matters."

6.4     The Parties hereto, and each of them, hereby warrant, represent and agree that each of them is fully aware of §1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."


PP


DD

**The Parties, and each of them, voluntarily waive the provisions of California <u>Civil Code</u> § 1542, and any other similar federal and state law as to any and all claims, demands, causes of action, or charges of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected.**

> 6.4.1   For avoidance of any doubt, by virtue of this Settlement and this Settlement Agreement, the parties hereby waive any unknown claims against each other individually, and each of their representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them.

6.5   Each of the Parties hereto acknowledges and agrees that this Agreement constitutes a settlement and compromise of claims and defenses in dispute, and shall not be construed in any fashion as an admission of liability by any party hereto.

**7.0   <u>CONFIDENTIALITY OF THIS AGREEMENT</u>**

7.1   The Parties, respectively, shall not to disclose the terms of this Agreement, either directly or indirectly, to the media or to anyone else other than their respective attorneys and representatives and/or as may be required by law.  PP may not comment or make any press releases or otherwise discuss the resolution of the subject of this Agreement.

**8.0   <u>MISCELLANEOUS TERMS</u>**

8.1   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding concerning the Released Matters hereof between the Parties hereto and supersedes any and all prior negotiations and proposed agreement and/or agreements, written and/or oral, between the Parties.  Each of the Parties hereto acknowledges that neither they, nor any other party, nor any agent or attorney of any other party has made any promise, representation, or warranty whatsoever, expressed or implied, written or oral, which is not contained herein, concerning the subject matter hereof, to induce it to execute this Agreement, and each of the Parties hereto acknowledges that she/he has not executed this Agreement in reliance on any promise, representation, and/or warranty not contained herein.  This Agreement shall be binding on and inure to the benefit of the Parties, the Releasees, and each of their respective successors and assigns and designees.

8.2   <u>DD's Election of either California, Nevada or Arizona Law & Venue</u>.  This Agreement and any dispute or controversy relating to this Agreement, shall in all respects be construed, interpreted, enforced and governed by the laws of the State of California, Arizona or Nevada at DD's election.  <u>Attorneys' Fees in the case of a Dispute</u>.  In the event of any dispute, action, proceeding or controversy regarding the existence, validity, interpretation, performance, enforcement, claimed breach or threatened breach of this Agreement, the prevailing party in any resulting arbitration proceeding and/or court proceeding shall be entitled to recover as an element of such Party's costs of suit, and not as damages, all attorneys' fees, costs and expenses incurred or sustained by such prevailing Party in connection with such action, including, without limitation, legal fees and costs.


PP

Page **12**


DD

8.3    Attorney Fees and Costs in Formation of this Agreement.  The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with the creation this Settlement Agreement.

8.4    Waivers; Modification.  This Agreement cannot be modified or changed except by written instrument signed by all of the Parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

8.5    Scope of Provisions/Severability/Headings.  None of the Parties hereto shall be deemed to be the drafter of this Agreement, but it shall be deemed that this Agreement was jointly drafted by each of the Parties hereto.  Should any provision of this Agreement be found to be ambiguous in any way, such ambiguity shall not be resolved by construing this Agreement in favor of or against any party herein, but rather construing the terms of this Agreement as a whole according to their fair meaning.  In the event that any provision hereof is deemed to be illegal or unenforceable, such a determination shall not affect the validity or enforceability of the remaining provisions thereof, all of which shall remain in full force and effect.  Notwithstanding the foregoing, if a provision is deemed to be illegal the Parties agree to waive any defense on said grounds.  In the event that such any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.  The captions appearing at the commencement of certain paragraphs herein are descriptive only and for convenience of reference.  Should there be any conflict between any such caption or heading and the paragraph at the caption of which it appears, the paragraph, and not such caption, shall control and govern.

8.6    Advice of Counsel and Understanding of this Binding Agreement.  Each of the Parties represents, acknowledges, and declares that she/he has received the advice of legal counsel of his/her own choosing regarding the form, substance, and effect of this Agreement.  Each of the Parties represents, acknowledges, and declares that she/he has carefully read this Agreement, knows and understands this Agreement's contents, and signs this Agreement freely, voluntarily, and without either coercion or duress.  Each of the Parties represents and warrants that she/he is fully competent to manage his/her business affairs, and that she/he has full power and authority to execute this Agreement, and to do any and all of the things reasonably required hereunder; and that this Agreement, when signed by all Parties, is a valid and binding agreement, enforceable in accordance with its terms.

8.7    Further Execution.  In order to carry out the terms and conditions of this Agreement, PP agrees to promptly execute, upon reasonable request, any and all documents and instruments necessary to effectuate the terms of this Agreement.

8.8    Notice Provisions.  Any notice, demand or request that one Party desires, or is required to give (including service of any subpoena, court pleadings, summons and/or complaint), to the other Party must be promptly communicated to the other Party by using their respective contact information below, by both (i) e-mail or facsimile; *and* (ii) telephone.  Either Party may change his or her contact information by notifying the other Party of said change(s) pursuant to the applicable terms herein.


PP

Page **13**

ひ
DD

8.8.1   <u>To DD as follows:</u>

*ESSENTIAL CONSULTANTS, LLC*
*C/O: MICHAEL COHEN, ESQ.*
*502 PARK AVENUE 40A*
*NEW YORK, NY 10022*

8.8.2   <u>To PP, as follows:</u>

C/O KEITH M. DAVIDSON, ESQ.
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211
tel. 323.658.5444
fax. 323-658-5444
e-mail: keith@KmdLaw.com

8.9 .  This Agreement may be executed with one or more separate counterparts, each of which, when so executed shall be deemed to be an original and, together shall constitute and be one and the same instrument.  Any executed copies or signed counterparts of this Agreement, the Declaration, and any other documentation may be executed by scanned/printed pdf copies of signatures and/or facsimile signatures, which shall be deemed to have the same force and effect as if they were original signatures.

**IN WITNESS WHEREOF,** by their signatures below, the Parties each have approved and executed this Agreement as of the effective date first set forth above.

DATED: _____, 2016

DATED: *Oct 28*, 2016

DATED: *10/28*, 2016

_____
**PP**

**DD** _____

**PP** _____

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

*E C, LLC*

Page **14**

*EC*
*DD*

DATED: _10/21/16_, 2016

As to Form:

Keith M. Davidson, Esq., Attorney for PP

DATED: _____, 2016

As to Form:

_____

Attorney for DD

DATED: _10/28_____, 2016

As to Form:

MICHAEL D. COHEN, ESQ.
Attorney for ███
ESSENTIAL CONSULTANTS, LLC

EXHIBIT 2

EXHIBIT "A" TO THE **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE; ASSIGNMENT OF COPYRIGHT AND NON-DISPARAGMENT AGREEMENT**

## SIDE LETTER AGREEMENT

### DATED _10_ / _28_ / 2016.

To Whom It May Concern:

This Side Letter agreement is entered into by and on behalf of the Parties with respect to the Confidential Settlement Agreement and Mutual Release entered into by and between them on or about _Oct 28_ , 2016 ("Settlement Agreement"), in which Stephanie Gregory Clifford a.k.a. Stormy Daniels, is referred to by the pseudonym, "PEGGY PETERSON," and ███████████, is referred to by the pseudonym "DAVID DENNISON."

It is understood and agreed that the true name and identity of the person referred to as " PEGGY PETERSON " in the Settlement Agreement is Stephanie Gregory Clifford a.k.a. Stormy Daniels and that any reference or designation to PEGGY PETERSON shall be deemed the same thing as referring to Stephanie Gregory Clifford a.k.a. Stormy Daniels by her true name as identified herein.

It is understood and agreed that the true name and identity of the person referred to as "DAVID DENNISON" in the Settlement Agreement is ██████████, and that any reference or designation to DAVID DENNISON shall be deemed the same thing as referring to ███████████, by his true name as identified herein.

It is understood and agreed that the true name and identity of the entity referred to as "EC, LLC" in the Settlement Agreement is ████████████ LLC and that any reference or designation to EC, LLC  shall be deemed the same thing as referring to ███████████████ LLC , by his true name as identified herein.

It is further acknowledged and agreed by the parties that notwithstanding the provisions of Paragraph 7.1 of the Settlement Agreement (which provides that the Settlement Agreement constitutes the entire agreement between the Parties with respect to the matters herein and in supersedes all prior and contemporaneous oral and written agreements and discussions pertaining to the matters herein), this Side Letter agreement shall be deemed part of the agreement between the Parties. Accordingly, Paragraph 7.1 of the Settlement Agreement is hereby amended via supplanting to provide as follows:

> "**7.1 Integration.** The Side Letter agreement entered into by the Parties concurrently with their entry into this Agreement shall be deemed part of this Agreement, and this Agreement and the Side Letter agreement together constitute the entire agreement between the Parties with

respect to the matters herein and supersedes all prior and contemporaneous oral and written agreements and discussions pertaining to the matters herein."

For avoidance of doubt, it is further agreed that this Side Letter agreement shall constitute Confidential Information as defined in the Settlement Agreement, that neither this Side Letter agreement nor any portion hereof may be disclosed to anyone except as and to the extent expressly provided in the Settlement Agreement, and that any unauthorized disclosure or use of this Side Letter agreement or any portion hereof shall constitute a material breach of the confidentiality provisions of the Settlement Agreement.

It is further agreed that neither party shall keep a copy of this document, and that only Keith M. Davidson, Esq. AND ████████████████ counsel for the parties herein), shall maintain possession of it or access to this Side Letter agreement. FOR AVOIDANCE OF DOUBT, THE PARTIES HERETO AGREE AND CONFIRM THAT THIS SIDE LETTER AGREEMENT IS DEEMED "ATTORNEY'S EYES ONLY."

This Side Letter agreement may be executed in counterparts and when each Party has signed and delivered one such counterpart to the other Party, each counterpart shall be deemed an original, and all counterparts taken together shall constitute one and the same Agreement, which shall be binding and effective as to the Parties. The Agreement may be executed by facsimile or electronic PDF signatures, which shall have the same force and effect as if they were originals.

By signing below, each of the Parties signifies their agreement to the terms hereof and each of their respective counsel signify their approval as to the form of this letter agreement.

PEGGY PETERSON a.k.a. Stephanie Gregory
Clifford a.k.a. Stormy Daniels

10/28/16
date

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

DAVID DENNISON a.k.a. _____

date

Keith M. Davidson, Esq.

10/31/16
date

_____, Esq.
████████████████

10/28/16
date

EXHIBIT 3

"In late January 2018, I received a copy of a complaint filed at the Federal Election Commission (FEC) by Common Cause. The complaint alleges that I somehow violated campaign finance laws by facilitating an excess, in-kind contribution. The allegations in the complaint are factually unsupported and without legal merit, and my counsel has submitted a response to the FEC.

I am Mr. Trump's longtime special counsel and I have proudly served in that role for more than a decade. In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone.

I do not plan to provide any further comment on the FEC matter or regarding Ms. Clifford."

"Just because something isn't true doesn't mean that it can't cause you harm or damage. I will always protect Mr. Trump."