# Exhibit B

Michael J. Avenatti, Bar No. 206929
AVENATTI & ASSOCIATES, APC
mavenatti@eoalaw.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:   (949) 706-7000
Fax:   (949) 706-7050

Attorneys for Plaintiff Stephanie Clifford
a.k.a. Stormy Daniels a.k.a. Peggy Peterson

**FILED**
Superior Court of California
County of Los Angeles

MAR 06 2018

Sherri R. Carter, Executive Officer/Clerk of Court
By_____, Deputy
Glorietta Robinson

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual, | Case No.  **BC 6 9 6 5 6 8** |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF** |
| vs. | |
| DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, and DOES 1 through 10, inclusive | |
| Defendants. | |

CIT/CASE:  BC696568
LEA/DEF#:

RECEIPT #:  CCH505376134
DATE PAID:  03/06/18   03:46 PM
PAYMENT:  $435.00
RECEIVED:                    310
         CHECK:
         CASH:           $435.00
         CHANGE:          $0.00
         CARD:            $0.00
                          $0.00



Doc# 1 Page# 2 - Doc ID = 1730293032 - Doc Type = OTHER

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## THE PARTIES

1.      Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.      Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.      Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.      Mr. Trump and EC together shall be referred to hereafter as "Defendants."

5.      The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

6.      Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

7.      Jurisdiction for this matter properly lies with this Court because Plaintiff seeks declaratory relief.

8.      Venue is appropriate in the County of Los Angeles, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

**COMPLAINT**

## FACTUAL BACKGROUND

9.      Ms. Clifford began an intimate relationship with Mr. Trump in the Summer of 2006 in Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007.  This relationship included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly Hills Hotel located within Los Angeles County.

10.     In 2015, Mr. Trump announced his candidacy for President of the United States.

11.     On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

12.     On October 7, 2016, the Washington Post published a video, now infamously known as the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women.  In it, Mr. Trump described his attempt to seduce a married woman and how he may start kissing a woman that he and his companion were about to meet.  He then added: "I don't even wait.  And when you're a star, they let you do it, you can do anything . . ."

13.     Within days of the publication of the *Access Hollywood Tape*, several women came forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

14.     Around this time, Ms. Clifford likewise sought to share details concerning her relationship and encounters with Mr. Trump with various media outlets.

15.     As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York.  Mr. Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and presently serves as Mr. Trump's personal attorney.  He is also generally referred to as Mr. Trump's "fixer."

16.     After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election.  Mr. Cohen subsequently prepared a draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush Agreement").  Ms. Clifford at the time was represented by counsel in California whose office is located in Beverly Hills, California within the County of Los Angeles.

17.     The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential Consultants LLC.  As noted above, Essential Consultants LLC ("EC") was formed on October 17, 2016, just weeks before the 2016 presidential election.  On information and belief, EC was created by Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

18.     By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and Mr. Trump.  Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP."  Mr. Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

19.     Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement.  Exhibit 1 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

20.     Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter Agreement, which was Exhibit A to the Hush Agreement.  Exhibit 2 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

21.     Importantly, the Hush Agreement imposed various conditions and obligations not only on Ms. Clifford, but also on Mr. Trump.  The agreement also required the signature of all parties to the agreement, including that of Mr. Trump.  Moreover, as is customary, it was widely understood at all times that unless all of the parties signed the documents as required, the Hush Agreement, together with all of its terms and conditions, was null and void.

22.     On or about October 28, 2016, only days before the election, two of the parties signed the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC).  Mr. Trump, however, did not sign the agreement, thus rendering it legally null and void and of no consequence.  On information and belief, despite having detailed knowledge of the Hush Agreement and its terms, including the proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.

23.     Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney. He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

24.     Mr. Trump was elected President of the United States on November 8, 2016.

25.     In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the draft agreement. Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

26.     On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, and details concerning the Hush Agreement. He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place. Among other things, Mr. Cohen stated: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly." Mr. Cohen concluded his statement with lawyer speak: "Just because something isn't true doesn't mean that it can't cause you harm or damage. *I will always protect Mr. Trump.*" (emphasis added).

27.     Importantly, at no time did Mr. Cohen claim Ms. Clifford did not have an intimate relationship with Mr. Trump. Indeed, were he to make such a statement, it would be patently false.

28.     Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including any obligations to keep information confidential. Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

29.     To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated.  For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles.  Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

30.     Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view.  The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

31.     Indeed, Rule 1.4 of New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers."  Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

32.     Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

33.     Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

**FIRST CAUSE OF ACTION**

**Declaratory Relief**

**(Against all Defendants)**

34.    Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 33 above as if fully set forth herein.

35.    This action concerns the legal significance, if any, of the documents attached hereto as Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

36.    California Code of Civil Procedure section 1060 authorizes declaratory relief for any person who desires a declaration of rights or duties with respect to one another.  In cases of actual controversy relating to the legal rights and duties of the respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.  This includes a determination of whether a contract was ever formed.

37.    An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Accordingly, a declaration is necessary and proper at this time.

38.    Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore do not exist, because, among other things, Mr. Trump never signed the agreements.  Nor did Mr. Trump provide any other valid consideration.  He thus never assented to the duties, obligations, and conditions the agreements purportedly imposed upon him.  Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

39.    In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of unconscionability.  Plaintiff contends that, as a result, she is not bound by any of the duties,

**COMPLAINT**

obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

40. In the further alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void because they are illegal and/or violate public policy. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

41. Defendants dispute these contentions.

42. Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable.

### ON THE FIRST CAUSE OF ACTION

1. For a judgment declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable.

2. For costs of suit; and

3. For such other and further relief as the Court may deem just and proper.

DATED: March 6, 2018                    AVENATTI & ASSOCIATES, APC


_____
MICHAEL J. AVENATTI
Attorneys for Plaintiff

-7-

# Exhibit C

Michael J. Avenatti, Bar No. 206929
AVENATTI & ASSOCIATES, APC
mavenatti@eoalaw.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:   (949) 706-7000
Fax:   (949) 706-7050

Attorneys for Plaintiff Stephanie Clifford
a.k.a. Stormy Daniels a.k.a. Peggy Peterson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive <br><br> Defendants. | Case No. 2:18-CV-02217-SJO-FFM <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **(1) DECLARATORY RELIEF/JUDGMENT; AND** <br><br> **(2) DEFAMATION** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## **THE PARTIES**

1.      Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.      Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.      Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.      Defendant Michael Cohen ("Mr. Cohen"), an individual, is a resident of the State of New York.

5.      Mr. Trump, EC, and Mr. Cohen together shall be referred to hereafter as "Defendants."

6.      The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

7.      Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## **JURISDICTION AND VENUE**

8.      Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over Plaintiff's claims based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000.

**FIRST AMENDED COMPLAINT**

9. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

## **FACTUAL BACKGROUND**

10. Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006 in Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007. This relationship included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly Hills Hotel located within Los Angeles County.

11. In 2015, Mr. Trump announced his candidacy for President of the United States.

12. On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

13. On October 7, 2016, the Washington Post published a video, now infamously known as the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women. In it, Mr. Trump described his attempt to seduce a married woman and how he may start kissing a woman that he and his companion were about to meet. He then added: "I don't even wait. And when you're a star, they let you do it, you can do anything . . ."

14. Within days of the publication of the *Access Hollywood Tape*, several women came forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

15. Around this time, Ms. Clifford likewise sought to share details concerning her relationship and encounters with Mr. Trump with various media outlets.

16.     As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York.  Mr. Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and presently serves as Mr. Trump's personal attorney.  He is also generally referred to as Mr. Trump's "fixer."

17.     After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election.  Mr. Cohen subsequently prepared a draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush Agreement").  Ms. Clifford at the time was represented by counsel in California whose office is located in Beverly Hills, California within the County of Los Angeles.

18.     The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential Consultants LLC.  As noted above, Essential Consultants LLC ("EC") was formed on October 17, 2016, just weeks before the 2016 presidential election.  On information and belief, EC was created by Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

19.     By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and Mr. Trump.  Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP."  Mr. Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

20.     Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement.  Exhibit 1 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

**FIRST AMENDED COMPLAINT**

21.    Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter Agreement, which was Exhibit A to the Hush Agreement.  Exhibit 2 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

22.    Importantly, the Hush Agreement imposed various conditions and obligations not only on Ms. Clifford, but also on Mr. Trump.  The agreement also required the signature of all parties to the agreement, including that of Mr. Trump. Moreover, as is customary, it was widely understood at all times that unless all of the parties signed the documents as required, the Hush Agreement, together with all of its terms and conditions, was null and void.

23.    On or about October 28, 2016, only days before the election, two of the parties signed the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC). Mr. Trump, however, did not sign the agreement, thus rendering it legally null and void and of no consequence.  On information and belief, despite having detailed knowledge of the Hush Agreement and its terms, including the proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.

24.    Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney.  He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

25.    Mr. Trump was elected President of the United States on November 8, 2016.

26.    In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the

draft agreement. Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

27.     On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, details concerning the Hush Agreement, and an attack on Ms. Clifford's truthfulness. He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place. Among other things, Mr. Cohen stated: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly." Mr. Cohen concluded his statement by stating: "Just because something isn't true doesn't mean that it can't cause you harm or damage. *I will always protect Mr. Trump.*" (emphasis added). This statement was made in writing by Mr. Cohen and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout the United States. Attached hereto as Exhibit 3 is a true and correct copy of Mr. Cohen's statement. Exhibit 3 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

28.     Importantly, at no time did Mr. Cohen make a direct assertion that Ms. Clifford did not have an intimate relationship with Mr. Trump. Indeed, were he to make such a statement, it would be patently false. Mr. Cohen's statement was not a mere statement of opinion, but rather has been reasonably understood to be a factual statement implying or insinuating that Ms. Clifford was not being truthful in claiming that she had an intimate relationship with Mr. Trump.

29.     Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including

**FIRST AMENDED COMPLAINT**

any obligations to keep information confidential. Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

30. To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated. For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles. Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

31. Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view. The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

32. Indeed, Rule 1.4 of the New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers." Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

33. Further, Rule 1.8(e) of the New York Rules of Professional Conduct provides that attorneys "shall not advance or guarantee financial assistance to the client[.]" Although the Rule provides for certain exceptions, such as permitting lawyers to pay court costs and expenses for indigent clients, plainly, none of these exceptions

**FIRST AMENDED COMPLAINT**

apply to Mr. Cohen's purported financial assistance of $130,000 on behalf of his client, Mr. Trump.

34.     Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

35.     Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

## FIRST CAUSE OF ACTION
### Declaratory Relief/Judgment
### (Against Defendants Mr. Trump and EC)

36.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 35 above as if fully set forth herein.

37.     This action concerns the legal significance, if any, of the documents attached hereto as Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

38.     California Code of Civil Procedure § 1060 authorizes declaratory relief for any person who desires a declaration of rights or duties with respect to one another.  In cases of actual controversy relating to the legal rights and duties of the respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.  This includes a determination of whether a contract was ever formed.

39.    28 U.S.C. § 2201 creates a remedy for the entry of a declaratory judgment in cases of "actual controversy", whereby the court may declare the rights and other legal relations of any interested party seeking such declaration.  Any such declaration shall have the force and effect of a final judgment or decree.

40.    An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Accordingly, a declaration is necessary and proper at this time.

**A.    No Agreement Was Formed – Lack of Signature, Consideration, or Consent**

41.    Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore do not exist, because, among other things, Mr. Trump never signed the agreements (which was an express condition of the Hush Agreement that had to occur for the formation of a valid and binding agreement).  Nor did Mr. Trump provide any other valid consideration.  He thus never assented to the duties, obligations, and conditions the agreements purportedly imposed upon him, which included express obligations imposed on Mr. Trump to provide Plaintiff with releases, a covenant not to sue, and representations and warranties (all of which were separate and apart from the $130,000 payment).  Plaintiff contends that, as a result, no agreement was ever formed or ever existed and, consequently, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

**B.    The Agreement Is Unconscionable**

42.    In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of unconscionability.  By way of example only (and not limitation), the Hush Agreement contains a "Liquidated Damages" provision in favor of

**FIRST AMENDED COMPLAINT**

"DD" (Mr. Trump) purporting to require Plaintiff to pay $1 Million for "each breach" calculated on a "per item basis." However, $1 Million for "each breach" bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. Instead, the liquidated damages clause was intended to inflict a penalty designed to intimidate and financially cripple Plaintiff. It is therefore void as a matter of law.

43. By way of further example, while on the one hand, the Hush Agreement purports to impose astonishingly broad restrictions on speech and disclosure upon Plaintiff (including prohibiting disclosure of matters that are of public record), on the other hand, Defendants, with few exceptions, have no such restrictions imposed upon them and are thus permitted to disclose matters covered by the Agreement, and publicly disparage Plaintiff and impugn her credibility. As but one illustration of the one-sided nature of the Hush Agreement, EC, through Mr. Cohen, violated paragraph 7.1 of the Agreement by disclosing terms of the Agreement to the *Wall Street Journal* on or about January 12, 2018. Although the Agreement attempts to impose astonishingly Draconian consequences and penalties upon Plaintiff for a breach of the Agreement, no such remedies are available to Plaintiff for Defendants' breach of the Agreement. An agreement that sanctions such overly-harsh, one-sided results without any justification and which allocates risks of the bargain in such an objectively unreasonable and unexpected manner is unconscionable as a matter of law. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

### C. The Agreement Is Void *Ab Initio* Because It Is Illegal and Violates Public Policy

44. In the further alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable,

and/or void because they are illegal, or that they violate public policy. Essential to the "*existence*" of a contract is that the contract have a "lawful object" or lawful purpose. See, e.g., Cal. Civ. Code § 1550. No such lawful purpose existed in the Hush Agreement for at least the following reasons.

45. *First*, the Hush Agreement was entered with the illegal aim, design, and purpose of circumventing federal campaign finance law under the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101, *et seq.*, and Federal Election Commission (FEC) regulations. The purposes and aims of the FECA include the promotion of transparency, the complete and accurate disclosure of the contributors who finance federal elections, and the restriction on the influence of political war chests funneled through the corporate form.

46. In order to effectuate these purposes, FECA imposes various contribution limits, and reporting and public disclosure requirements, on candidates for Federal office, including the office of President of the United States. With regards to the 2016 Presidential Election, FECA required that the maximum any "person"—defined to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons" —was permitted to contribute to any candidate was $2,700. 52 U.S.C. §§ 30101(11); 30116(a)(1)(A), (c); see also FEC, Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 82 Fed. Reg. 10904, 10906 (Feb. 16, 2017). Mr. Trump and his campaign for the presidency were subject to FECA and its contribution limit at all relevant times.

47. The term "contribution" is defined broadly to include "any gift, subscription, loan, advance, or deposit of money *or anything of value* made by any person *for the purpose of influencing any election for Federal office*[.]" 52 U.S.C. § 30101(8)(A) (emphasis added); see also 11 C.F.R. §§ 100.51-100.56. The phrase "anything of value" includes "all in-kind contributions." 11 C.F.R. § 100.52(d)(1). In other words, "the provision of any goods or services without charge or at a charge that

is less than the usual and normal charge for such goods or services is a contribution." Id.

48.     In addition, under FECA, Mr. Trump and his campaign for the presidency were required to report the identification of each person who made a contribution to his campaign with an aggregate value in excess of $200 within an election cycle.   52 U.S.C. § 30104(b)(3)(A).   Mr. Trump and his campaign for the presidency were also required to report the name and address of each person *to whom* an expenditure in an aggregate amount in excess of $200 within the calendar year was made by his campaign committee.

49.   FECA also imposes similar requirements on the reporting of "expenditures."  52 U.S.C. § 30104(b)(4)-(5).  The term "expenditure" includes "(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money *or anything of value*, made by any person *for the purpose of influencing any election for Federal office*; and (ii) a written contract, promise, or agreement to make an expenditure."  52 U.S.C. § 30101(9) (emphasis added).  As with "contributions," the phrase "anything of value" in the context of "expenditures" includes "all in-kind contributions."  11 C.F.R. § 100.111(e)(1).

50.     Moreover, "contributions from the candidate" or "expenditures" from the candidate must also be reported.   11 C.F.R. § 104.3(a)(3)(ii); see also, e.g., FEC Advisory Opinion 1990-09.

51.     Here, the Hush Agreement did not have a lawful object or purpose.   The Hush Agreement, and the $130,000 payment made pursuant to the agreement, was for the "purpose of influencing" the 2016 presidential election by silencing Plaintiff from speaking openly and publicly about Mr. Trump just weeks before the 2016 election. Defendants plainly intended to prevent American voters from hearing Plaintiff speak about Mr. Trump.  This $130,000 payment was a thing "of value" and an "in-kind" contribution exceeding the contribution limits in violation of FECA and FEC regulations.  It was also a violation of FECA and FEC regulations because it was not

publicly reported as a contribution. Further, it was a violation of FECA and FEC regulations because it was a thing "of value" and an "in-kind" expenditure that was required to be reported as such. Therefore, because the Hush Agreement did not have a lawful object or purpose, the Agreement was void *ab initio*. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

52.     *Second*, the Hush Agreement is also void *ab initio* because it violates public policy by suppressing speech on a matter of public concern about a candidate for President of the United States, mere weeks before the election. Agreements to suppress evidence are void as against public policy, both in California and in most common law jurisdictions. "A bargain that has for its consideration the nondisclosure of discreditable facts, or of facts that the promisee is under a fiduciary duty not to disclose, is illegal." Restatement (First) of Contracts § 557 (1932). Remarkably, illustration 1 in the official comments to section 557 provides the following example of a bargain that is illegal:

> 1. A, a candidate for political office, and as such advocating certain principles, had previously written letters to B, taking a contrary position. B is about to publish the letters, and A fearing that the publication will cost him his election, agrees to pay $1000 for the suppression of the letters. The bargain is *illegal*.

Restatement (First) of Contracts § 557, Illustration 1 (1932)(emphasis added).

53.     *Third*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered for the purpose of covering-up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of the intimate relationship between Plaintiff and Mr. Trump. N.Y. Penal Law § 255.17 ("A person is guilty of adultery

when he engages in sexual intercourse with another person at a time when he has a living spouse, or the other person has a living spouse. Adultery is a class B misdemeanor.").

54.     *Fourth*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered into by Defendant EC at the behest of Defendant Cohen, a New York attorney then subject to the New York Rules of Professional Conduct. If Mr. Cohen's public statements are true (which is unlikely), he violated Rule 1.4 of the New York Rules of Professional Conduct by entering into an agreement on his client Mr. Trump's behalf without notifying him of the agreement, including, among other things, the fact that the agreement required a payment of $130,000 to be made, that he was making the payment for Mr. Trump on Mr. Trump's behalf, that Mr. Trump was being encumbered with various duties and obligations under the Agreement, that the Agreement and $130,000 payment would possibly subject Mr. Trump to violations of federal campaign finance laws, and that the Agreement would raise questions about whether he had an adulterous affair that Mr. Trump apparently now denies ever occurred.

55.     Moreover, if Mr. Cohen's public statements are true, he also violated Rule 1.8(e) of the New York Rules of Professional Conduct by advancing or guaranteeing financial assistance to a client by paying $130,000 from his own personal funds to benefit his client Mr. Trump.

### D.     There Was No Agreement to Arbitrate Between Plaintiff and EC

56.     Separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio*, all as set forth above, Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists between Plaintiff and EC. Under paragraph 5.2 of the Hush Agreement, entitled "Dispute Resolution," only those "claims and controversies arising between DD [Mr. Trump] on the one hand,

and PP [i.e., Plaintiff] on the other hand" are subject to arbitration. To be clear, there is not presently nor has there ever been any agreement to arbitrate between Plaintiff and EC.

### E.     The Arbitration Clause Is Void *Ab Initio* Because It Is Unconscionable, Illegal, and Violates Public Policy

57.     Moreover, also separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio* (as set forth above), Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists because no agreement was formed (see Complaint, ¶41, supra), and further, that no agreement to arbitrate exists because paragraphs 5.2 of the Agreement (which contains the arbitration clause) along with various parts of paragraph 5.1 of the Agreement (describing "DD's" remedies that Defendants would presumably argue are available to them in a confidential arbitration proceeding) are void *ab initio* because they unconscionable, illegal, and violates public policy.

58.     *First*, the arbitration clause is unconscionable, particularly when combined with the remedies section of the Agreement. The clause is extremely one-sided by conferring significant rights exclusively to Mr. Trump (as "DD" referred to in the Agreement), provided he is a party to the agreement. Among other things, (a) Mr. Trump is given the right to seek injunctive relief *either* in court or arbitration, while Defendants contend Plaintiff must pursue all rights in arbitration, (b) Mr. Trump is given the exclusive right to elect which state's laws will apply to the arbitration (California, Nevada, or Arizona) and he is not required to provide notice of which state's laws he elects will be applied until after he has filed an arbitration proceeding, and (c) Mr. Trump is given the exclusive right to choose venue in *any* location (i.e., anywhere in the country) he selects and is permitted to elect which of two arbitration

**FIRST AMENDED COMPLAINT**

agencies the arbitration proceeding may be initiated in (either JAMS or Action Dispute Resolution Services).

59.     *Second,* the arbitration clause is illegal and without lawful object or purpose because it was entered with the purpose of keeping facts concerning federal campaign contributions and expenditures secret and hidden from public view by using a confidential arbitration proceeding in violation of FECA's mandates to publicly report campaign contributions and expenditures.  In other words, the principal aim and design of the arbitration clause is to keep confidential that which, by law, must be publicly disclosed.  Indeed, the clause plainly is designed to prevent the public disclosure of an illegal campaign contribution by mandating that disputes between Plaintiff and Mr. Trump be resolved in a confidential arbitration proceeding shielded from public scrutiny.

60.     *Third*, the arbitration clause is void because it violates public policy by suppressing speech on a matter of enormous public concern about a candidate for President of the United States mere weeks before the election.  See Restatement (First) of Contracts § 557.

61.     *Fourth,* the arbitration clause is illegal and without lawful object or purpose because it was designed to cover up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of Plaintiff and Mr. Trump's intimate relationship.  N.Y. Penal Law § 255.17.  It is also illegal and without lawful object or purpose because it was designed to cover up Mr. Cohen's ethical violations, including his violations of Rule 1.4 and 1.8(e) of the New York Rules of Professional Conduct.

62.     Defendants dispute all of the foregoing contentions.

63.     Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

**FIRST AMENDED COMPLAINT**

## **SECOND CAUSE OF ACTION**

### **Defamation**

### **(Against Defendant Mr. Cohen)**

64.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 64 above as if fully set forth herein.

65.     On or about February 13, 2018, Mr. Cohen issued a public statement.  The entirety of the statement is attached hereto as Exhibit 3.  In it, he states in part:  "*Just because something isn't true* doesn't mean that it can't cause you harm or damage.  I will always protect Mr. Trump." (emphasis added).  Mr. Cohen's statement was made in writing and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout California and across the country (and the world) on television, on the radio, in newspapers, and on the Internet.

66.     It was reasonably understood by those who read or heard the statement that Mr. Cohen's defamatory statement was about Ms. Clifford.

67.     Both on its face, and because of the facts and circumstances known to persons who read or heard the statement, it was reasonably understood Mr. Cohen meant to convey that Ms. Clifford is a liar, someone who should not be trusted, and that her claims about her relationship with Mr. Trump is "something [that] isn't true."   Mr. Cohen's statement exposed Mr. Clifford to hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with her.

68.     Mr. Cohen's defamatory statement was false.

69.     Mr. Cohen made the statement knowing it was false or had serious doubts about the truth of the statements.

70.     As a result, Plaintiff Ms. Clifford has suffered damages in an amount to be proven at trial according to proof, including but not limited to, harm to her reputation, emotional harm, exposure to contempt, ridicule, and shame, and physical threats of violence to her person and life.

71.     In making the defamatory statement identified above, Mr. Cohen acted with malice, oppression, or fraud, and is thus responsible for punitive damages in an amount to be proven at trial according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void *ab initio*, invalid, or otherwise unenforceable.

## **ON THE FIRST CAUSE OF ACTION (DECLARATORY RELIEF/JUDGMENT)**

1.     For a judgment declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

2.     For a judgment declaring that no agreement to arbitrate was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

3.     For costs of suit; and

4.     For such other and further relief as the Court may deem just and proper.

## **ON THE SECOND CAUSE OF ACTION (DEFAMATION)**

1.     For damages in an amount to be proven at trial;

2.     For punitive damages;

3.     For pre-judgment and post-judgment interest;

4.     For costs of suit; and

5.     For such other and further relief as the Court may deem just and proper.

**FIRST AMENDED COMPLAINT**

# **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all causes so triable.  Said demand includes a demand, pursuant to 9 U.S.C. § 4, for a trial by jury concerning whether the parties entered into the agreement at issue by which EC, Mr. Trump, or both, will seek to compel arbitration.

DATED:  March 26, 2018                    AVENATTI & ASSOCIATES, APC


                                                    /s/ Michael J. Avenatti
                                                   MICHAEL J. AVENATTI
                                                   Attorneys for Plaintiff

# Exhibit D

Case 2:18-cv-02217-SJO-FFM Document 20-3 Filed 04/02/18 Page 32 of 44 Page ID #:287

Feedback 👍 Like 14.4M

Monday, Apr 2nd 2018 6PM 56°F ☁ 9PM 57°F ☀ **5-Day Forecast**



| Home | U.K. | **News** | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Columnists | DailyMailTV |

| Latest Headlines | *News* | World News | Arts | Headlines | Pictures | Most read | Wires | Coupons | Login |

ADVERTISEMENT

  

# EXCLUSIVE: How Stormy Daniels tried to sell story about her one-night-stand with Donald Trump for $200,000 THREE weeks before the election but worked out a deal with Trump's lawyer Michael Cohen after she got no takers

- Stormy Daniels's manager offered her client's story to celebrity magazines, television shows and websites in the run-up to the 2016 election
- The titillating tell all was peddled to the media around October 17, three weeks before the election
- But the adult actress apparently had no takers as Hillary was expected to win at the time, and Stormy's story would have been worth a fraction of her asking price
- Daniels then accepted the $130k from Trump's lawyer Michael Cohen, who had made her the offer after Trump won the nomination
- 'It looks to me that she accepted Cohen's money because she could not get the money she wanted from anyone else,' one media executive said
- Daniels told her version of her tryst with Trump to Anderson Cooper on CBS's 60 Minutes on Sunday
- Stormy made it seem as though she did not seek to sell her story, telling Cooper: 'Suddenly people are reaching out to me again, offering me money. Large amounts of money'

By MARTIN GOULD FOR DAILYMAIL.COM
PUBLISHED: 14:30 EDT, 29 March 2018 | UPDATED: 16:08 EDT, 29 March 2018

 Share      **2.4k** shares 💬 **480** View comments

The porn star whose bombshell claims about sex with **Donald Trump** have rocked his presidency desperately tried to sell her story for $200,000 – nearly 50 percent more than the 'hush' money she received, DailyMail.com can reveal.

Stormy Daniels's manager made the rounds of celebrity magazines, television shows, and websites in the run-up to the 2016 presidential election, hoping someone would bite.

ADVERTISEMENT





**Like** Daily Mail | **+1** Daily Mail
**Follow** @DailyMail | **Follow** Daily Mail
**Follow** @DailyMail | **Follow** Daily Mail

**FEMAIL TODAY**

▶ Double twinning! Jessica Simpson matches floral dresses with daughter Maxwell as Eric and Ace also pair up in cute Easter family snap



Case 2:18-cv-02217-SJO-FFM   Document 20-3   Filed 04/02/18   Page 33 of 44   Page ID #:288

She promised a story of Stormy's titillating sexcapade with the man who would soon be in the Oval Office.

But with polling day getting ever closer, and her chances of a payday getting more remote as Trump appeared doomed to lose to **Hillary Clinton**, Daniels gave up on her money chase and accepted the $130,000 that Trump attorney Michael Cohen had dangled in front of her in a bid to keep the story quiet.

Cohen insists he paid the money out of his own pocket and was not reimbursed by either the Trump campaign or the Trump Organization.

'It looks to me that she accepted Cohen's money because she could not get the money she wanted from anyone else,' one media executive said.



**Stormy Daniels's tried to sell her story about sex with Trump to multiple celebrity magazines, television shows, and websites in the run-up to the 2016 election**



**Lisa Rinna, 54, displays toned figure in skimpy orange bikini after Real Housewives of Beverly Hills fight**
Actress took to Snapchat to show off body



**Andie MacDowell, 59, has 'no shame' with sex scenes in new film and 'yoga, sleep' keeps her a size 4**
Actress romps with Chris O'Dowd in flick



**Kendra Wilkinson CONFIRMS she is splitting from husband Hank Baskett in tearful Instagram post**
'10 years. I did everything I could,' she said in clip



**'I was in shock. She really just came for me': Woman 'attacked' by Blac Chyna with stroller at Six Flags claims she only patted Dream's hand**



**She's his ride or die! Cookie rescues Lucious by hiding a RAZOR under her tongue in heart-stopping spring premiere of Empire**
SPONSORED



**'You'd die if I told you who it was!' Kaley Cuoco reveals she dumped famous ex because he was such a bad TIPPER - so just who is her 'cheap' ex?**



**Love on the lawn! Trump praises First Lady Melania for organizing Easter Egg Roll at the White House and gives her a kiss for the cameras**



**Kyle Richards, 49, proves she's still a pinup as she poses in string bikini for eye-popping selfie**
Real Housewives Of Beverly Hills star



**Tori Spelling celebrates Easter with her family... after 'mental breakdown' and three police calls**
Actress-turned-reality star is 45 next month



**Rory McIlroy, a Canadian hockey star and top chef: New book looks into Meghan Markle's rumored past romances before she met Prince Harry**

ADVERTISEMENT



Stormy's manager had promised a titillating story of their one-night-stand. Daniels provided
this picture of herself with Trump to back her claim





FREE SHIPPING $79+

VIEW MORE ▶

▶ **The Ricky Gervais Guide to Life: The comedian's take on everything from fatherhood to flying First Class** SPONSORED



▶ **Tia Mowry dons flowing pink frock over pregnant belly for family-filled baby shower in Beverly Hills** The 39-year-old actress was all-smiles



▶ **John Legend leaves NYC with Chrissy Teigen and their daughter Luna in a silk robe... after winning performance in Jesus Christ Superstar Live**



▶ **Justin Theroux hugs Paul Rudd in NYC... as 'he has barely spoken to Jennifer Aniston since split'** Newly single actor was dressed casually



▶ **Incredible footage shows Blac Chyna appear to throw Dream's stroller at woman before being held back during huge melee at Six Flags park**

'It was like the least surprising thing!' Seth Rogen says porn star Stormy Daniels told him



DailyMail.com was among the outlets approached by Stormy's manager Gina Rodriguez in October 2016. We turned her down.

Daniels told her version of her tryst with Trump to Anderson Cooper on CBS's 60 Minutes on Sunday. Cooper reported that she had sold her story to a tabloid magazine for $15,000 years before, but it did not run because of libel threats from Cohen and she was never paid.

After Trump won the Republican presidential nomination interest in Daniels's story grew and she claims she turned down offers to speak.

Stormy made it seem as though she did not seek to sell her story, telling Cooper: 'Suddenly people are reaching out to me again, offering me money. Large amounts of money. Was I tempted? Yes - I struggle with it,' she told Cooper.

Then, she claims, Cohen approached her with his $130,0000 offer.

But the fact is that Stormy's team was aggressively pursuing a deal to sell her story to the highest bidder.

During the 60 Minutes interview, Daniels, 39, said she had 'swatted' the future president's backside a couple of times with a copy of Trump Magazine and that they had had sex just once in a Nevada hotel suite.

Cooper did not ask her to elaborate on what the sex was like.

Daniels, 39, an adult film actress whose body of work includes The Witches of Breastwick, Camp Cuddlypines Powertool Massacre, and Spreading My Seed, mused to Cooper on whether she should now be speaking out.

She pointed out she was not being paid for the interview and when Cooper asked her if the notoriety would help her 'Make America Horny Again' tour of strip clubs, she replied that she could end up being shunned.

**Stormy Daniels breaks silence on Trump relationship**



about alleged Donald Trump affair over a decade ago



Donald Trump Jr and estranged wife Vanessa smile and laugh as they put on a united front while taking their kids to the White House Easter Egg Roll



Hair-raising! Jared Leto, 46, sports vibrant colorful blue track pants and a seriously shaggy beard for an afternoon stroll in New York City



Willow Smith celebrates Easter by wrapping her long dreadlocks in beautiful pastel-colored ribbons
Will and Jada's daughter is now 17



'I feel like an a**hole': Busy Philipps breaks down in TEARS as she admits she left her nine-year-old daughter's beloved teddy bears in a Hawaii hotel



ADVERTISEMENT



New York Man Suits
3 Wool Suits for $499
SHOP NOW

DailyMail.com

Jennifer Lopez and Alex Rodriguez: Superstar

Case 2:18-cv-02217-SJO-FFM   Document 20-3   Filed 04/02/18   Page 36 of 44   Page ID



Daniels ultimately did not receive any takers on her story because Hillary Clinton was expected to secure the presidency, meaning her story would have been worth a fraction of her asking price




She was then forced to accept the $130k 'hush money' from Trump's lawyer Michael Cohen (left) who had made her the offer after Trump won the nomination

'I could automatically be alienating half of my fan base right at this very moment,' she said.

But in 2016, Daniels saw her opportunity to cash in on the one-night-stand that she says occurred 10 years earlier, and she had a picture of herself in a body-hugging cropped black tank top standing next to Trump in a yellow golf shirt and red cap, to back her claim.

▶ couple hold hands as they enjoy Easter dinner date in West Hollywood
Dined at Craig's





▶ Bikini-clad Elsa Pataky, 41, shares a kiss with hubby Chris Hemsworth as he grabs her pert derrière on the beach in Australia with Matt Damon

▶ EXCLUSIVE: Did Liev Schreiber's girlfriend skip March For Our Lives because she's pro-gun? Photos show beauty queen and family posing with rifles



▶ 'A perfect morning!': Makeup-free Jennifer Garner leaves Ben Affleck with the kids as she hikes with a cute blonde pal in the hills of Hawaii



▶ Farrah Abraham sports baby blue floral dress and slides for Easter brunch with nine-year-old daughter Sophia in Los Angeles
Made a cute duo



▶ REVEALED: Don Jr. and estranged wife Vanessa spent Easter TOGETHER with kids as his alleged ex-lover Aubrey O'Day marks holiday with sassy pics



▶ Meghan Markle's tortoiseshell sunglasses are FINALLY back in stock - six months after they sold out when she wore them on her first official outing with Harry



▶ 'It's powerful, but simple!': Hugh Jackman reveals the secret behind his unbreakable marriage to wife Deborra-lee Furness as they celebrate 22 years



▶ She can't stop! Miley Cyrus goes braless in see-through dress and gets spanked by the Easter bunny in risque videos
Sexy photo session



▶ Drake sports 'album hour' dark circles under his eyes... as his legal battle with Detail heats up

Rodriguez pushed Daniels's story to the media around October 7, three weeks before the election and the same day that Cohen registered a limited liability company called Essential Solutions in Delaware. Rodriguez said she was keen for the story to appear before the final presidential debate between Trump and Clinton, set for October 19.

Some 10 days later, Essential Solutions paid Daniels $130,000 after she signed an agreement not to talk about Trump. The agreement used pseudonyms — David Dennison for Trump and Peggy Peterson for Daniels.

Daniels and her attorney Michael Avenatti claim the agreement is non-binding because Trump did not sign in, although Cohen did.

Trump, then 60, was playing in a celebrity golf tournament at the Edgewood Tahoe Golf Course in Stateline, Nevada, in July 2006, finishing 62nd in a field of 80. Daniels was working a gifting suite for Wicked Pictures, one of the leading porn companies, and says he invited her up to his suite at the Harrah's Casino.


© AP

Trump's wife Melania had given birth to their only child, Barron, just three months earlier.

Once she got to the room, Daniels says Trump showed her a copy of his new magazine — which had a picture of the businessman in a navy suit and blue tie on the cover under the caption 'On Top of the World.'

**Attorney Michael Avenatti, who is representing Daniels, says the $130,000 agreement was not binding because Trump did not sign it**

She says she asked him whether boasting about himself normally worked with women, a question she says surprised him.

'He looked very taken aback, like he didn't really understand what I was saying.' she told Cooper.

'And I was like, "Someone should take that magazine and spank you with it." I don't think anyone's ever spoken to him like that, especially, you know, a young woman who looked like me.

'And I said "Give me that," and I just remember him going, "You wouldn't. Hand it over." And so he did, and I was like, "Turn around, drop 'em."

'So he turned around and pulled his pants down a little,' she added saying he was wearing underwear. 'I just gave him a couple swats. '

Daniels — real name Stephanie Clifford — said Trump then stopped talking about himself and even offered to see if he could persuade NBC executives to allow her to appear on his TV show, Celebrity Apprentice.


White House denies Trump has sexual relationship with Stormy

▷ R&B star grabbed a bite to eat in Calabasas

ADVERTISEMENT



DailyMail.com

▶ Chrissy Teigen brings up Bill O'Reilly's sexual harassment settlement as she hits back at the former Fox News host for mocking NBC's Jesus Christ Superstar


▶ Inside the decadent Kardashian-Jenner Easter: KUWTK stars celebrate with gold eggs, a 10ft tall flower bunny and a CASH HUNT for the kids


▶ Daddy's little girl! Bradley Cooper kisses one-year-old daughter Lea at Easter party with model mom Irina Shayk
Easter party in Brentwood, California


▶ Tom Hardy as James Bond: Actor teases fans he's the next 007 as he reacts to Daniel Craig quitting the role in April Fools' joke
It was all done in fun


▶ Prince Edward and Sophie Wessex's 10-year-old son Viscount Severn is spotted DRIVING family's Land Rover at Windsor Castle


▶ Blac Chyna says she's 'all love' and posts

4/2/2018　　Stormy Daniels 'tried to sell story to Trump' weeks before election | Daily Mail Online
Case 2:18-cv-02217-SJO-FFM   Document 20-3   Filed 04/02/18   Page 38 of 44   Page ID
#:293



▶ Watch the full video

0:00 / 3:36



© Instagram / Karen McDougal          +6

Daniels's account had many similarities to one from former Playboy centerfold Karen MacDougal, who says she had a year-long affair with Trump starting in June 2006

Daily **Mail** tv    **Trump says Stormy Daniels is not his type**



▶ video of daughter Dream hugging her brother at Six Flags just moments before she THREW a stroller at a woman



▶ Human Ken Doll Rodrigo Alves catches the eye in a blue velvet suit as he enjoys a night out in London
Wore a sheer lace shirt and a matching corset



▶ Maria Shriver and kids attend church service days after Arnold Schwarzenegger's open-heart surgery
With her children Patrick, Katherine and Christina



▶ Stormi's first Easter: Kylie Jenner joins beau Travis Scott in swooning over baby daughter during lavish festivities at family home in Hidden Hills



▶ Lupita Nyong'o and Angela Bassett attend revival of Tony award winning Children of a Lesser God
Actresses were in high spirits posing for pics



▶ Kim Kardashian flaunts her TINY waist on Instagram in Fendi fur...after Photoshop fail
She's a top star who only has taste for the finest things



▶ Topless Toni Garrn flaunts her flawless figure on bikini break with gal pals in Miami
The blonde beauty enjoyed a sunny day in Miami with her friends



▶ John Legend leads all-star cast in rocking production of Jesus Christ Superstar Live in NYC
The singer rocked out on Easter Sunday



▶ Meghan Markle's father is 'terrified' of walking her down the aisle but will do it 'to represent America because he worships her', his son reveals



▶ The day Meghan Markle posted back her wedding ring to the husband who made her a star: New book portrays a calculating princess-to-be



ADVERTISEMENT



After dinner in the room, she says she went to the bathroom and when she returned she found Trump 'perched' on the edge of the bed.

'I realized exactly what I'd gotten myself into. And I was like, "Ugh, here we go." And I just felt like I had it coming for making a bad decision for going to someone's room alone and I just heard the voice in my head, "Well, you put yourself in a bad situation and bad things happen, so you deserve this."

They then had unprotected sex, she claims, although Cooper did not ask her for any further details. She said she did not consider herself a victim as the sex was consensual, even though she insists she was not physically attracted to him.

Trump denies ever having sex with Daniels, but the $130,000 payout could bring more problems to his presidency as there are now calls to have it investigated as an illegal campaign contribution from Cohen.

## SHARE THIS ARTICLE



**2.4k** shares

## RELATED ARTICLES



Now Stormy¿s lawyer will try to depose President Trump and...

¿Sound familiar?¿: Megyn Kelly says she was threatened by...



Trump is 'obsessed' with going after Amazon because

White House claims Trump is TOO BUSY to tweet about Stormy...

Daniels said she stayed in contact with Trump and went to his suite at the Beverly Hills Hotel the following year to discuss her possible appearance on Celebrity Apprentice. She said he made her watch a Shark Week documentary and then came on to her but she left without having sex.

Daniels's account had many similarities to one from former Playboy centerfold Karen MacDougal, who says she had a year-long affair with Trump starting in June 2006, the month before his alleged night with Daniels.

Both said Trump had told them they reminded him of his daughter Ivanka, and both said he told them that he and Melania slept in separate rooms despite only being married for around 18 months at the time.

Clifford said Trump offered to pay her for the sex. Cooper did not ask Daniels whether he made a similar offer to her.



**Stormy Daniels: I was threatened to drop Trump affair story.**

Courtesy of CBS "60 minutes"



'Pregnant' Chloe Green joins 'Hot Felon' Jeremy Meeks for dinner with her parents Sir Phillip and Tina... amid claims she's expecting her first child



Beyoncé 'books 11 HOUR studio sessions' ahead of Coachella performance... after going vegan for event
Singer, 36, desperate for flawless performance



It's Meghan McMarkle! Prince Harry's fiancé is descended from Scottish king Robert the Bruce (and is a distant cousin of her husband-to-be)



Jessica Alba celebrates Easter: Actress dotes on three-month-old son Hayes during fun family day... as husband Cash Warren enjoys ski trip



Sealed with a kiss! Matt Damon shares sweet kiss with wife Luciana Barrosa in rare PDA during vacation with Chris Hemsworth and wife Elsa Pataky

Andrea Corr, 43, parades her incredible figure in a tiny black bikini as she makes a





ADVERTISEMENT

## Share or comment on this article

**2.4k** shares

FROM THE WEB     Sponsored Links by Taboola



**Golfers Are Replacing Their Lob Wedge with This All-New Club**

Square Strike Wedge Golf



**How To: Boost Telomeres At Home**

LCR Health



**It's Like Ebay, but Everything Sells in 90 Seconds**

Tophatter



**Plastic Surgeon Reveals: "You Can Fill In Wrinkles At Home" (Here's How)**

Beverly Hills MD



**A Chef's Honest Review Of HelloFresh**

Popdust for HelloFresh



**Doctor Reveals The "Master Cause" Of Foot Calluses**

DermalMedix



**Forget Your 401k if you Own a Home (Do This)**

Morning Finance | LendingTree Quotes



**If You're A Veteran In California, You'd Better Read This**

LendingTree Mortgage Quotes



**Dog Goes Viral After Realizing He's At The Vet**

Give It Love

**MOST WATCHED NEWS VIDEOS**     Embed this 



▶ splash on boat trip in Barbados
The Irish singer

▶ Prince Philip misses his third appearance in 10 days when he pulls out of royals' Easter church service as hip problem continues to trouble him



▶ Mommy and me! Fergie bonds with her son Axl as they pay a visit to the Easter Bunny at holiday party in LA
Adorable outing



▶ Alessandra Ambrosio buys flowers as she shops with mystery man... as model moves on from ex fiancé of ten years Jamie Mazur
Moving on

▶ She's back! Amber Rose returns to Instagram with booty-full display just days after DELETING all her photos
Uploaded sexy pictures



ADVERTISEMENT

CARNIVAL
ROPES COURSE ON DECK &

BOOK NOW ▶



▶ Chloe Green 'is planning shotgun wedding' with beau Jeremy Meeks in Miami amid pregnancy claims
After Hot Felon's divorce is finalized



▶ She's his biggest fan! Chrissy Teigen spends time with hubby John Legend before live-tweeting Jesus Christ Superstar
Married duo of five years



▶ Brooklyn Beckham wears a blue sling after sharing a shirtless snap of his painful arm injury as he joins his family for the Miami Open Finals

# Exhibit F

# Stormy Daniels says Trump scandal has been good for business

By Nick Valencia and Dakin Andone, CNN

Updated 11:10 AM ET, Sun March 11, 2018



*Source: CNN*

**Stormy Daniels: Controversy is overshadowing my films** 02:23

**Pompano Beach, Florida (CNN)** — Interest in Stephanie Clifford, the porn star known as Stormy Daniels, is at an all-time high, and she's using it to her advantage, she told CNN after a performance Friday at the Solid Gold gentleman's club in Pompano Beach, Florida.

Clifford has been in the news since The Wall Street Journal reported in January that President Donald Trump's personal lawyer, Michael Cohen, paid her $130,000 weeks before the 2016 presidential election to keep quiet about an alleged affair with Trump.

In her interview with CNN, Clifford wouldn't answer any questions about the lawsuit or comment on Trump or their alleged relationship.

She did, however, talk about how all the attention has affected her life.

"Now, yes, I'm more in demand," Clifford told CNN. "Like I said in the Rolling Stone interview, if somebody came up to you and said, 'Hey, you know that job that you've been doing forever? How about next week I pay you quadruple,' show me one person who's going to say no."

Clifford has been in the adult entertainment business for 17 years, she said. According to her website, she started out as a dancer in Louisiana before moving to Los Angeles to make porn films. Now, she said, she not only acts but writes and directs films as well.

"The phone has been blowing up," said Craig Korka, manager of the Solid Gold club. "Interest is volcanic. It's like the perfect storm."



Clifford's case dominated headlines this week after she sued Trump, saying a nondisclosure agreement was void because the President never signed it. On Friday, hours before Clifford went out on stage, Cohen told CNN he used funds from his own home equity line of credit to make the payment.

And later, an email provided to CNN by Clifford's attorney showed Cohen used his Trump Organization signature in an email. Her lawyer, Michael Avenatti, said he believes it's proof that Cohen was acting in a professional capacity as Trump's attorney in the negotiations.

**Related Article:** Read CNN's interview with Stormy Daniels



Stephanie Clifford, better known as Stormy Daniels, talks to CNN's Nick Valencia on Friday in Pompano Beach, Florida.

Cohen has never stated the reason for payment. He and the White House have said Trump had no knowledge of the payment, and the White House has said Trump has denied having a relationship with Clifford.

While the notoriety has put a bigger spotlight on Clifford's career, she said, the attention also has its downsides.

"It's sort of been a double-edged sword where a lot of people are very interested in booking me for dancing and stuff like this," Clifford told CNN, taking away time from films and projects she's supposed to be promoting.

What bothers her, she said, is the "flat-out lies" that have been spread about her. "Like that I'm broke," she said. "I'm actually one of the most successful adult movie directors in the business."

In 2014, Clifford was inducted into the Adult Video News Hall of Fame. She also has appeared in such mainstream box-office hits as "The 40-Year-Old Virgin" and "Knocked Up."

But even Clifford admitted she's capitalizing on the moment when interest in her career is at an all-time high. The attention has helped her in the short term, as more people turn out for shows on her "Make America Horny Again" tour (a play on Trump's campaign slogan "Make America Great Again").



"I'm getting more dance bookings. I usually only dance once a month, and now I'm dancing three or four times a month. So that's been really great," she said.

*CNN's Nick Valencia reported from Pompano Beach, and Dakin Andone wrote and reported from Atlanta. CNN's Hadas Gold, Konstantin Toropin and Veronica Stracqualursi contributed to this report.*

**Related Article:** Porn star's attorney: Cohen used his Trump Organization signature in email



**Rare blue ice sparkles like jewels in Michigan's Mackinac Straits, drawing photographers and tourists**


Post-Soviet swingers versus the Kremlin


Jane Seymour opens up about Playboy shoot


White House scolds Cabinet officials after embarrassing ethics reports