# Exhibit G



One Night with Stormy Daniels, the Hero America Needs



PLAY HOT ARTISTS

NICKELBACK
HOW YOU REMIND ...



consumable exchange™

coming soon

learn more ›

# Frozen g-strings, squirt guns and hot wax – how Trump's alleged porn-star fling is unapologetically cashing in on a presidential scandal

By Denver Nicks
March 9, 2018

   

Stormy Daniels answers the door of her Houston hotel room wearing little

## Around the Web



This is Bono's Stunning Daughter
nickiswift.com

Science Says This Body Type is the Most Attractive Now
nypost.com

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

athletic shorts and a green Pantera tank top over a sports bra, her long blond hair in a loose ponytail. We shake hands and she jumps back onto her bed, sitting up with her legs tucked under her in half lotus. Her assistant and longtime friend Kayla Paige, a retired adult-film actress and wife of Limp Bizkit founding member Sam Rivers, buzzes with aimless energy around the room they're sharing. They'd only just woken up and are in the middle of a discussion about penile implants, which I confess I didn't know is a thing. Then Paige half-jokingly wonders if she needs vaginal lip reduction surgery and drops her pants for reference. She isn't wearing panties.

Daniels rolls her eyes and laughs. I stand for a moment unsure where to sit, then motion to the other bed, which Paige says I can sit on. "I don't have anything," she assures me with a chuckle. I sit on the edge of the bed and Daniels and I make small talk. Her safe word, I learn, is "penguin."

"Penguins have terrible breath," she says.

"How do you know penguins have terrible breath?" I ask.



**RELATED**

**Stormy Daniels Sues Trump, Claims He Never Signed 'Hush Agreement'**

Adult film star asks judge to void non-disclosure agreement regarding alleged affair with President



**Burt Reynolds Opens Up On His Relationship With Chevy Chase**
hollywoodreporter.com



**Famous Musicians Who Were Actually Terrible People**
grunge.com



**'Curvy' Instagrammer Won't Apologize for Handsome Husband**
nypost.com



**Celebs You Didn't Know Were in Same-Sex Relationships**
nickiswift.com

Powered by ZergNet



⛐ FROM OUR SPONSOR   CONTINUE FOR MORE CONTENT

LIFE HACK

**You Should Never Shop on Amazon Without Using This Trick – Here's Why**

This free tool could save you a ton of money.

READ MORE

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT



READ MORE

"They smell like they've been eating bad vagina. I got to pet one at a zoo – if you ever go to the zoo, the penguin habitat is the stinkiest one. It smells like a really bad porn set."

She goes on like this for half an hour, bouncing from topic to topic. They had dinner last night with retired adult-film icon Randy Spears, an old friend; they need to do a Walmart run later; a fan sent Stormy a piece of very expensive Louis Vuitton luggage. Finally we get to the business of a proper interview. I ask what everyone is getting wrong about Stormy Daniels right now.

# "If I was nominated for best sex scene at multiple award shows," Daniels says, "how was I not current?"

"That I somehow needed this current situation to happen to revive or restart my career," she says, without skipping a beat. She's been doing porn and stripping consistently for the past 15 years and had 17 total nominations at last year's adult-film awards shows, including for director of the year. "If I was nominated for best sex scene at multiple award shows," she says, "how was I not current?"

In the month since news reports first revealed that Donald Trump's attorney, Michael Cohen, paid Stormy Daniels $130,000, allegedly in exchange for her silence about a 2006 tryst the then-27-year-old porn star had with Trump, her celebrity had skyrocketed. She appeared on Jimmy Kimmel, was parodied on *Saturday Night Live*, and embarked on a nationwide "Make America Horny Again" strip club tour. Through Cohen, she issued a statement denying the affair, but then in public seemed to fan the story's flames by coyly denying the denial.

FROM OUR SPONSOR   CONTINUE FOR MORE CONTENT

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT



FROM OUR SPONSOR  CONTINUE FOR MORE CONTENT

LIFE HACK

**You Should Never Shop on Amazon Without Using This Trick – Here's Why**

This free tool could save you a ton of money.

READ MORE

But she was also in the uncomfortable position of being a political problem for the president of the United States. Behind the scenes, she was in a tug of war with Cohen, as she sought to free herself from the nondisclosure agreement she'd signed – in a cruel twist, after news broke of the alleged affair between Donald Trump and Stormy Daniels, Stormy Daniels was the one person on Earth forbidden from talking about it.

Hated by the right, mocked by the left and pursued doggedly by unscrupulous press over a decade-old tryst with a man twice her age, Daniels was at that very center of the swirling centrifuge of wide-eyed WTF weirdness that is America in the age of Trump. And in the midst of all of it she was doing a national strip-club tour with a title that played on Trump's campaign slogan. At a time when many people might attempt seclusion, Daniels was, in the parlance of our times, leaning in.



Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT





Stormy Daniels in 2006, two years after she won Best New Starlet at the AVNs. Gordon Rondelle/REX/Shutterstock

**My inbox is flooded daily** with unsolicited press releases, and this meeting began with one such message, promoting a "Make America Horny Again" tour date at a club on Long Island. The release was riddled with typos, so I did what anyone does with something like that in 2018: posted a screenshot of it with a snarky tweet pointing out how Trump's alleged porn-star ex-mistress's PR people can't spell. Daniels herself responded minutes later, "Haha! Not from my PR team. But my guess is someone from the club is gonna get in trouble for not proofreading."

Moments later, she followed that up: "Side note: Wish I had a PR team. That sounds very fancy...although I'd make said team do other mundane shit just so I could say things like 'When you're done spelling checking the release about anal, can you get my Gstring out of the freezer & help me scrape the candle wax off it?'" In the exchange that followed she sent me a picture of her actual G-strings in the freezer – "overpriced butt floss," she called them.

Needless to say, I was intrigued. She seemed funny and quick, but also thick-skinned and refreshingly playful in response to my light Internet derision. I asked if she'd be up for an interview, DM'd her my phone number. A few days later I got a call from "No Caller ID."

"Hello?" I said, hesitantly.

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

"You shouldn't answer calls from blocked numbers," a female voice said. I stayed silent. "This is Stormy," she said.

"Oh," I said. "I thought you were my ex-girlfriend."

"Not yet!" Daniels chirped.

We arranged to meet in Houston a few days later, when her tour passed through town.

# "I have two choices," Daniels says of the Trump scandal. "Sit at home and feel sorry for myself, or make lemonade out of lemons."

Sitting across from one another in her hotel room, she tells me a little about her childhood. Daniels was born in Baton Rouge, Louisiana, in 1979, and grew up with her mom. Her dad was rarely around. Her name at birth was Stephanie Clifford, but Stormy is in every other sense her real name – it's what she went by growing up before it became her stage name. "Up until this, if someone called me Stephanie, I thought you were the IRS," she says. "No one calls me Stephanie. My own child doesn't even know that Stephanie is my name."

She left home at 17 and soon started stripping, and then doing porn. She became one of only a handful of contract girls with Wicked Pictures, one of the industry's leading companies, and in 2004 won "Best New Starlet" at the AVN Awards, often called "the Oscars of porn." She continued acting and directing under contract with Wicked until January when, she says, she left the company and signed a contract with Digital Playground, another dominant studio in the adult-film industry.

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

She's been stripping all along too, except for a forced interlude last year after she broke her back in a horse-riding accident. "A lot of the bookings were already in place before all the current things came to light," Daniels says. In fact, there really is no "Make America Horny Again" tour per se. The name was concocted independently by a club owner in South Carolina, and "other clubs just jumped on board," she says. The "Make America Horny Again" tour – a name Daniels finds irksomely cheesy – has evolved around her, almost independent of her, much like the maelstrom involving the payment and the president, with one key difference: Unlike the Trump and Stormy scandal, if she wants to turn the tour off, she can. But Stormy Daniels is facing her newfound infamy head-on.

"I can't make it go away," she says. "I don't have a magic wand to erase what people are saying. So I have two choices: Sit at home and feel sorry for myself, or make lemonade out of lemons." She was already dancing – now she's dancing more, for a much higher rate. "I would be a fucking idiot to turn it down," she says. "We live in a capitalist society. I think if anyone, in any field, was approached and someone said, 'Hi! You know that job you are already doing? Would you like to do it next week for quadruple your normal pay?' Show me one person who would say no."



Daniels is currently on a "Make America Horny Again" strip-club tour – though she finds the name irksomely cheesy. Patrick Fallon/ZUMA

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

About eight hours before showtime, I join Paige on a Walmart run for props: a laundry basket, a sponge, squirt guns and body wash. Daniels would have only a light dinner before that night's show, so Paige and I stop at a Chipotle. As we sit eating our burrito bowls, I ask her what it was like when the Trump news broke.

"It was just weird to me, because I remember being on set years ago and we would hear him calling all the time – it was like a joke," Paige says. "She would put him on speakerphone and walk away and he'd still be talking." At the time, no one thought much about it, she says, because there wasn't much to it.

"She was just a girl that met a rich dude that runs pageants, and, like, 'Fuck it, let's go hang out, who cares?' " Paige says. "Who hasn't gone and fucked someone we regret?"

When we get back to the hotel, Paige disrobes almost immediately and starts romping around the room naked, getting ready for the night. As Daniels and I sit down to talk some more, barely audible moans start issuing from the room next door, then a loud and distinct cry of arousal – by the sound of it, someone is having rather good sex.

Paige and I press our ears against the wall. "Look at you two," Daniels says with mock ridicule. "Should I offer to give them some direction?" All of us laugh.

On the surface, Daniels seems to be having fun with everything going on. But underneath her peppy, inviting façade, this looks like an ordeal for her. In addition to come-ons from fans, she gets a steady stream of hateful messages on social media, mostly from women – I watch them pour in all afternoon while we talk. She's quick to brush off all the hate mail, but she also keeps showing it to me, as if to convince me, and perhaps herself, of how little it bothers her.

# "Don't get me wrong, I'm not an angel," says Daniels. "I'm capitalizing on this."

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

Then there are the news reports she says are untrue. She shows me an item in TMZ that she says falsely claims she took her dirty laundry to a strip-club appearance – for years she's used a Walmart laundry basket to carry her show props. There was a report in the *Los Angeles Times* in which a club manager is quoted complaining of her arriving late – she shows me text messages that she says indicate the club manager flatly disavowing the quote. "I'm trying to salvage my reputation as a stripper!" she says. The trolls that do get under her skin are those who say she, at 38, is too old to be plying the sex-fantasy trade. "I mean, a woman doesn't reach her sexual peak until 40, right?" she says.

Plus, there's the fact that there are things she wants to tell me – to tell everyone – that she can't. She can't even say why she can't. She's frustrated.

"It's supershitty," she says, looking me dead in the eyes, moaning neighbors in the background. "I'm just trying to do things to keep it fun."

Amid all of it, her life – the quiet, private life that has almost nothing to do with porn or Trump –has been turned upside down.

Daniels lives with her daughter and partner in a quiet community in the Dallas metro area, where she keeps seven horses, including a pony for her little girl. She's a nationally ranked equestrian (the back injury last year was from a show-jumping accident), and her personal Instagram account is of the wife-and-mother variety, riddled with pictures of horses. Though she doesn't talk to her mom or her biological father, she's close to the celebrity photographer Keith Munyan, who is a generation older than Stormy and also grew up in small-town Louisiana. (She calls Munyan her dad.)

Glendon Crain, whom she's been with since 2009, is a professional heavy-metal drummer who has played in bands like Godhead and Hollywood Undead and toured alongside the likes of Katy Perry and Korn; he's not unaccustomed to dealing with media, but the scale and intensity of this have been something else entirely. Since the story broke, Daniels says, she's been hounded by reporters, disinvited from a friend's wedding, and seen her daughter disinvited from a birthday party.

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

One Night with Stormy Daniels, the Hero America Needs

*Rolling Stone*

"My daughter didn't deserve any of this," Daniels says. "[Crain] didn't deserve any of this. Don't get me wrong, I'm not an angel. I'm capitalizing on this." But the idea that she needed 15 minutes of fame, or orchestrated or wanted any of this, she says, is absurd. "I didn't retire, I wasn't trying to retire, I wasn't in any sort of need to do this," she says. "It eclipses everything else that I've worked hard on that I wanted to be known as, and I was very happily living incognito back home."



thestormydaniels   **Follow**

1,279 likes

**thestormydaniels** Missing my handsome boy. 2 more days

view all 89 comments

1 MONTH AGO

Document title: One Night with Stormy Daniels, the Hero America Needs - Rolling Stone
Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

**When we arrive at the Vivid strip club in Houston,** the place is almost sleepy, with blank-faced women bouncing and rotating under purple lights while a few dozen men drink beers and watch. There's a bar along the length of one wall and a fish tank in the corner where a hallway leads to the smoking patio and the private rooms in the back. In a small beige-and-brown, paper-strewn office in the bowels of the club, Daniels sits at the desk and takes her props out of a suitcase. She asks me to light some candles, which she tucks away in another room to burn undisturbed for a while.

A little after 11 p.m., it's finally time for Daniels to hit the stage. The Cult's "Fire Woman" kicks off as she walks out, and she struts up and down the catwalk in a hooded red cape. She's got intense in-character focus, and the place transforms. "Is that really her?" a guy standing at the tip rail says to no one in particular. Daniels lays down a blanket at the front of the stage and places her tray of burning candles on it. She lifts one up to her face, pours wax down her enormous breasts and into the front of her G-string. She orders a guy at the tip rail to spin around and lay back onto the stage, then drops her crotch onto his face, writhing over him. Paige works the crowd, eliciting tips, and at the end of the set, about 15 minutes after it began, she scurries about the stage sweeping up cash. Daniels cleans up and, around midnight, sits at a table to sign fan merch before doing it all again in a couple of hours. No one can say she doesn't work hard for her money.

Watching Daniels that night in full command of the crowd, titillating strangers for cash and flirting with her fans like a pro, I think of how she's portrayed as a dumb bimbo in the *SNL* parody, in which Cecily Strong says that in 2018 Stormy Daniels is the hero America deserves. Whether that's true or not, in 2018 Stormy Daniels may be the hero America needs.

A decade and a half working in porn imbues a person with an unusual frankness, a kind of extreme authenticity. A successful porn star with a career like Daniels' must be comfortable in her own skin and with other people's bodies, including the weird-looking parts (penises and vaginas, anuses and perinea), and with the various kinds of discharge the human body produces – all things the rest of us would rather stop thinking about

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

when the erotic moment has passed and we put our clothes back on. Porn stars also have to be comfortable dwelling in the contradictions of porn: in fans' fantasies, but also in the mundane world of bills, groceries, hobbies and, in Daniels' case, being a mom; in exposing the most intimate parts of themselves doing one of the most intimate things humans do, while maintaining a life as an authentic person who feels passion and love. Maybe what America needs most in 2018, as we stew in rage, simultaneously enthralled, bewildered and revolted by ourselves, is a porn star to help us take a long, uncompromising, compassionate look at our country and culture, gross parts and all.



Daniels before her Long Island appearance earlier this year. Mike Pont/Getty

At around 3 a.m., back in the office, Daniels changes into street clothes and deflates a sex doll she had used in her act. She and Paige pack up her props and costumes and count out cash to tip the DJ. She gathers up her things, takes one last glance around the room where she'd prepped for two shows a night, three nights in a row, and flashes me a smile.

"Time to go put my G-strings in the freezer!"

Though she didn't mention it once, throughout the course of the day we spent together, Daniels had been staring down the barrel of a restraining order filed by Michael Cohen to prevent her from speaking about the alleged affair or the NDA. She'd learned of it when she landed on her flight to Houston. She had recently retained a new attorney who was aggressively representing her interests, but when we met, the precise meaning of the restraining order was not yet clear and the fact of its existence not yet something she could discuss.

On the following Tuesday, Daniels filed a lawsuit against Donald Trump asking the court to declare the NDA she signed regarding the alleged affair invalid on the grounds that Trump himself never signed it. In her complaint, she confirmed that the affair took place and alleges that in

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

myriad ways Cohen, acting as Trump's agent, has intimidated and coerced her from October 2016, when she first agreed to sign the agreement, to the present.

"I was fine with saying nothing," Daniels tells me when we catch up over the phone a few days later. "But I am not fine with being bullied into lying, or being bullied at all.

"Standing up to bullies is kind of my thing," she says, cheerfully. "They started it."

*Press Secretary Sarah Huckabee Sanders denied Daniels' claims when asked yesterday. Watch below.*



# More News

▶ HQ: Inside the Game Show App Phenomenon

▶ 10 Things We Learned from Stormy Daniels' 60 Minutes Interview

▶ How a New Senate Bill Will Screw Over Sex Workers

▶ Colbert on Stormy Daniels Story: 'Felt Truer Than Trump Getting Elected'

▶ Jamil Smith: The President Is Soft

All Stories »



Topics:  Donald Trump  |  Pornography  |  Long Reads  |  Stormy Daniels

Capture URL: https://www.rollingstone.com/culture/features/one-night-with-stormy-daniels-the-hero-america-needs-w517692
Capture timestamp (UTC): Mon, 02 Apr 2018 18:20:29 GMT

# Exhibit H

| From: | Michael J. Avenatti <mavenatti@eaganavenatti.com> |
|---|---|
| Sent: | Wednesday, March 21, 2018 9:05 PM |
| To: | Brent Blakely |
| Cc: | Ahmed Ibrahim; Judy K. Regnier; Charles Harder |
| Subject: | RE: Clifford v. Trump et. al. |

Brent:

The attaching of such an email is not common practice in my experience.  Further, as I have indicated, there are a number of inaccuracies in your email.  I see little point in pointing them out now as there can be no question that we have collectively met our meet and confer obligations.

In any event, however, I wish to point out that we provide two additional case cites which were not addressed in your summary but that we provided.

One is Sanford v. MemberWorks, Inc., which held that "when one party disputes 'the making of the arbitration agreement,' the Federal Arbitration Act requires that 'the court [ ] proceed summarily to the trial thereof' before compelling arbitration under the agreement."  483 F.3d 956, 962 (9th Cir. 2007) (quoting 9 U.S.C. § 4). The Court "interpreted this language to encompass not only challenges to the arbitration clause itself, but also challenges to the making of the contract containing the arbitration clause."  Id.  The Court thus concluded:  "challenges to the existence of a contract as a whole must be determined by the court prior to ordering arbitration."  Id.

The other is Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1140–41 (9th Cir. 1991) ("[A] party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate.").

Moreover, contrary to your assertions during the meet and confer, Buckeye did not involve a challenge to the formation of the contract.  Indeed, this is not our interpretation of Buckeye; it is the one advanced by Justice Thomas writing for the Supreme Court in 2010:  "In Buckeye, the formation of the parties' arbitration agreement was not at issue because the parties agreed that they had 'concluded' an agreement to arbitrate and memorialized it as an arbitration clause in their loan contract."  Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 300–01, 130 S. Ct. 2847, 2858, 177 L. Ed. 2d 567 (2010).

There was also no challenge to the very formation and existence of the contract in Guadagno v. E'Trade Bank, 592 F. Supp. 2d 1263 (C.D. Cal. 2008).  Thus, there was no occasion to consider the issue that is now before the Court.  Nothing stated in the opinion is contrary to Sanford.

We also discussed at the meet and confer that there is no agreement to arbitrate between our client and EC.  The agreement only speaks to disputes between our client and "DD" or Donald Trump (and you refuse to tell us whether he is a party to the agreement in our view).

Regards,

Michael

Michael J. Avenatti, Esq.

1

Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Brent Blakely [bblakely@blakelylawgroup.com]
**Sent:** Wednesday, March 21, 2018 7:40 PM
**To:** Michael J. Avenatti
**Cc:** Ahmed Ibrahim; Judy K. Regnier; Charles Harder
**Subject:** RE: Clifford v. Trump et. al.

Dear Mr. Avenatti:

As I indicated in my prior email, if you have anything to add or clarify to the summary, please do so.  I in no way wrote the email to mischaracterize our discussions.  Rather, given Judge Otero's Standing Order, the email, which will be attached to Essential Consultants'  motion,  was written to ensure that the Court is satisfied that the parties sufficiently discussed the merits of their respective motions pursuant to Local Rule 7-3.  This is a common practice in the Central District of California, which has stringent requirements regarding meet and confer discussions as set forth in Local Rule 7-3 and the Courts' respective Standing Orders.

Regards, Brent


Brent H. Blakely, Esq.
Blakely Law Group
1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com


**From:** Michael J. Avenatti [mailto:mavenatti@eaganavenatti.com]
**Sent:** Wednesday, March 21, 2018 7:25 PM
**To:** Brent Blakely
**Cc:** Ahmed Ibrahim; Judy K. Regnier; Charles Harder
**Subject:** Re: Clifford v. Trump et. al.

Brent:

This does not accurately reflect what transpired. In any event, it is of no moment, because it was a meet and confer and no agreement was reached.

Please refrain from trying to summarize meet and confers in the future. I have never seen this done before in my career and it appears that you are undertaking this now for some self-serving reason that is not immediately apparent.

On a more important issue, have you or Mr. Harder determined yet whether Mr. Trump is a party to the agreement?  Perhaps you can simply ask him?

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

On Mar 21, 2018, at 10:19 PM, Brent Blakely <bblakely@blakelylawgroup.com> wrote:

Dear Mr. Avenatti:

It was a pleasure meeting you today and discussing the parties' respective motions pursuant to Local Rule 7-3.   In summary, we discussed the following:

Essential Consultants' Motion to Compel Arbitration:

As I had set forth in my prior email, the Federal Arbitration Act ("FAA") established a clear preference for enforcing arbitration agreements.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)   Because the FAA "is phrased in mandatory terms," a district court "has little discretion to deny an arbitration motion." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

You indicated today that Plaintiff was going to oppose Essential Consultants' anticipated Petition to Compel Arbitration because you believe that the parties did not enter into a valid and binding agreement.  I responded that under the FAA, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator, not the court. *Buckeye Check Cashing, Inc. v. Cardgna*, 546 U.S. 440,

449 (2006); *Grove Lumber & Bldg. Supply, Inc. v. Argonaut Ins. Co.*, 2008 WL 2705169, at *7 (C.D. Cal. July 7, 2008). Specifically, the district court "can only determine whether a written arbitration agreement exists, and if it does, enforce it 'in accordance with its terms.'" *Weyerhaeuser Co. v. Western Seas Shipping Co.*, 743 F.2d 635, 637 (9th Cir.), cert denied, 469 U.S. 1061 (1984).  Under the FAA, a challenge to the validity of the contract as a whole must go to the arbitrator, not the court. *Buckeye Check Cashing*, 546 U.S. at 449.

We also cited the decision in *Guadagno v. E'Trade Bank*, 592 F. Supp. 2d 1263 (C.D. Cal. 2008) wherein Judge Otero reiterated the well-established principles I've mentioned above.  (*Id*. at 1270)

In the present case there is no dispute that the agreement in question contains an arbitration provision, which was signed by your client and EC.  (Moreover, your client was represented by counsel and received substantial consideration.)  You also agreed that the scope of this arbitration clause was broad, and did not contend that the arbitration clause did not cover the subject matter of the present dispute.

I have taken a look at the two cases you cited in your email, *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) and *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010).  Neither of these cases are on point, as both involved a dispute as to the existence and scope of an arbitration agreement.

Based on the foregoing, I once again request that you stipulate to have this dispute, and your argument that Plaintiff is not bound by the Confidential Settlement Agreement, decided by an arbitrator.

Plaintiff's Motion for Expedited Discovery:

You indicated that you wanted to seek the following expedited discovery: 1) a two hour deposition of Mr. Cohen, 2) a two hour deposition of President Trump, and 3) ten to twenty document requests.   You also indicated that the need for the expedited discovery is to support Plaintiff's challenge to the validity of the Confidential Settlement Agreement.

We responded that, for the same reasons given in support of Essential Consultants' anticipated Petition to Compel Arbitration, there is no merit to Plaintiff's proposed motion for expedited discovery.  Specifically, evidence pertaining to the validity or supposed invalidity of the Confidential Settlement Agreement is irrelevant at this juncture of the proceedings due to the simple fact that a challenge to the validity of the contract as a whole goes to the arbitrator, not the District Court.  *Buckeye Check Cashing*, 546 U.S. at 449.  Thus, if a Court finds that there is an arbitration agreement, then, as a matter of substantive federal arbitration law, the arbitration agreement is severable from the remainder of the contract.  An arbitration agreement survives even in a contract that the arbitrator later finds to be void. *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 70, 130 (2010) (a challenge to the contract as a whole "does not prevent a court from enforcing a specific agreement to arbitrate").  Thus, an arbitrator may resolve the merits of a dispute even if the arbitrator finds the contract as a whole to be void for illegality or otherwise unenforceable. See *Buckeye*, 546 U.S. at 448-49.  As such, your desire to obtain expedited discovery regarding your underlying claims does not satisfy the "good cause"

requirement set forth by the courts.  See e.g., *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 296 F.R.D. 1 (DC Dist. Court. 2013).

I've done my best to accurately summarize our discussion.   Please let me know if I've inadvertently misstated and/or omitted anything.

Regards,

Brent Blakely

Brent H. Blakely, Esq.
Blakely Law Group
1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com

---

**From:** Michael J. Avenatti [mailto:mavenatti@eaganavenatti.com]
**Sent:** Tuesday, March 20, 2018 3:15 PM
**To:** Brent Blakely
**Cc:** Ahmed Ibrahim; Judy K. Regnier; Charles Harder
**Subject:** Re: Clifford v. Trump et. al.

Counsel:

In furtherance to my email below, the basis of our motion for expedited discovery and trial setting is as follows:

Plaintiff contends no agreement was formed.  Thus, there was no agreement to arbitrate.  Where "the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply."  Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 742 (9th Cir. 2014) (emphasis in original).  This issue will be decided by the Court.  Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 130 S.Ct. 2847, 2855, 177 L.Ed.2d 567 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide.").  And it will require a jury trial, 9 U.S.C. § 4, accompanied by discovery.

Accordingly, because there are numerous factual questions that bear on the issue of whether a contract exists that will have to be resolved in the trial, we are entitled to discovery from your respective clients.  This includes prompt limited depositions of Mr. Trump and Mr. Cohen (not to exceed two hours each), along with responses to document demands (less than 10).

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

On Mar 20, 2018, at 6:02 PM, Michael J. Avenatti <mavenatti@eaganavenatti.com> wrote:

Mr. Blakely:

We can meet at your office at 9:30 tomorrow - the time originally planned.  We assume counsel for all parties will be present.

We will be providing authority for the motion we intend on filing before the meeting.  Note that we will not be filing a motion for remand, however.

Thank you.

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

On Mar 20, 2018, at 5:54 PM, Brent Blakely <bblakely@blakelylawgroup.com> wrote:

Dear Mr Averatti:

I was looking at the Judge's standing order, which states:

"The Court strongly emphasizes that under L.R. 7-3, discussion of the substance of contemplated motions are to take place, if at all possible, <u>in person</u>.  (emphasis in original)  Only in exceptional cases will a telephonic conference be allowed."

It's clear from this Order that the Court requires LR 7-3 conferences to occur in person.  I would recommend my office as the half-way point but am flexible regarding time and location.    Please let me know if you are available to meet at my office tomorrow, and at what time.

Regards, Brent


Brent H. Blakely, Esq.
Blakely Law Group
1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com




**From:** Brent Blakely [mailto:bblakely@blakelylawgroup.com]
**Sent:** Monday, March 19, 2018 12:14 PM
**To:** 'Michael J. Avenatti'
**Cc:** 'Ahmed Ibrahim'; 'Judy K. Regnier'; 'Charles Harder'
**Subject:** RE: Clifford v. Trump et. al.

Dear Mr. Avenatti:

        Thank you for your response.    We are available to meet and confer with you this Wednesday at 9:30 a.m. on  the parties' respective motions.  I can initiate the call, which will also include Charles Harder.

I believe that the LR 7-3 meet and confer would be more productive if each side were to set forth the basis for their proposed motion(s) beforehand.   With regard to Essential Consultants' Motion to Compel Arbitration, it would appear that controlling authority mandates that this case be stayed and that the dispute be decided in arbitration.

The Federal Arbitration Act ("FAA") established a clear preference for enforcing arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements."); accord *Mortensen v. Bresnan Comm.*, LLC, 722 F.3d 1151, 1160 (9th Cir. 2013) ("the FAA's purpose is to give preference (instead of mere equality)to arbitration provisions").   Accordingly, the FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)(emphasis in original);  *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 n.8 (9th Cir. 1991) (FAA "reflects the strong Congressional policy favoring arbitration by making such clauses 'valid, irrevocable, and enforceable'").  Because the FAA "is phrased in mandatory terms," a district court "has little discretion to deny an arbitration motion." *Republic of Nicaragua*, 937 F.2d at 475. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

A district court "can only determine whether a written arbitration agreement exists, and if it does, enforce it 'in accordance with its terms.'"  Importantly, under the FAA a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator, not the court. *Buckeye Check Cashing, Inc. v. Cardgna*, 546 U.S. 440, 449 (2006).

I would appreciate it if Plaintiff were to reciprocate and provide us with the basis of her proposed Motion to Remand and Motion for Expedited Discovery prior to our conference on Wednesday.

Regards,

Brent Blakely

Brent H. Blakely, Esq.
Blakely Law Group
1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com

**From:** Michael J. Avenatti [mailto:mavenatti@eaganavenatti.com]
**Sent:** Monday, March 19, 2018 12:59 AM
**To:** Brent Blakely
**Cc:** Ahmed Ibrahim; Judy K. Regnier
**Subject:** Re: Clifford v. Trump et. al.

Mr. Blakely:

I am available this Wednesday morning to meet and confer on this issue pursuant to the local rule. At that time, I would like to also meet and confer on our anticipated motion for remand and motion for expedited discovery.  Please confirm we can meet and confer on all three motions this Wednesday at 9:30 am by telephone.

Thank you.  All rights are expressly reserved.

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

On Mar 16, 2018, at 4:25 PM, Brent Blakely <bblakely@blakelylawgroup.com> wrote:

Dear Mr. Avenatti:

I left a message for you at your office at about 2:00 PM today, to please call me back.  As I stated in the message, I am counsel for Essential Consultants, LLC in the lawsuit filed by you on behalf of Stephanie Clifford aka Stormy Daniels.  The purpose for my call is to request that you stipulate to submit your lawsuit to the pending arbitration proceeding at ADR Services, Inc., case no. 18-1118-JAC (the "Arbitration") which my client filed against your client regarding the same and related subject matter as your lawsuit.  Your lawsuit even makes reference to the Arbitration, and was filed nearly two weeks after the Arbitration was filed.

As we assume you are aware, applicable law strongly favors the arbitration of disputes when the parties have agreed to submit their disputes to arbitration—which is the case here.  See 9 USC § 1; *Perry v. Thomas*, 482 U.S. 483, 489 (1987); *Hall v. Nomura Sec. Int'l*, 219 Cal.App.3d 43, 48 (1990); *Lehto v. Underground Constr. Co.*, 69 Cal.App.3d 933, 939 (1977) among many other legal authorities.

If you do not intend to consent to arbitration,  Essential Consultants LLC will be filing a motion to compel arbitration in the United States District Court, Central District of California, where the case has been removed.  Please let me know when you are available to discuss this matter pursuant to Local Rule 7-3.

Regards,

Brent Blakely

Brent H. Blakely, Esq.
Blakely Law Group

10

1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com

---

**From:** Brent Blakely
[mailto:bblakely@blakelylawgroup.com]
**Sent:** Friday, March 16, 2018 2:05 PM
**To:** 'mavenatti@eaganavenatti.com'
**Subject:** Clifford v. Trump et. al.

Dear Mr. Avenatti:

I represent Essential Consultants LLC in connection with the above-referenced matter.  Can you please call me at your earliest possible convenience to discuss the case.

Regards,

Brent Blakely


Brent H. Blakely, Esq.
Blakely Law Group
1334 Parkview Ave., Suite 280
Manhattan Beach, California 90266
Telephone:   310.546.7400
Facsimile:    310.546.7401
www.blakelylawgroup.com

# Exhibit I



1334 PARKVIEW AVENUE, SUITE 280 MANHATTAN BEACH, CALIFORNIA 90266
WWW.BLAKELYLAWGROUP.COM **T** 310-546-7400 **F** 310-546-7401

E-mail bblakely@blakelylawgroup.com

March 27, 2018

**VIA EMAIL & U.S. MAIL**
Mr. Michael J. Avenatti
Avenatti & Associates, APC
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Email: mavenatti@eoalaw.com

    Re:  **Clifford v. Trump, et. al.**
         **Case No. 18-cv-02217-SJO-FFM**

Dear Mr. Avenatti:

   I am writing to request an in-person meet and confer conference pursuant to Local Rule 7-3 regarding the First Amended Complaint you recently filed.  Defendant Michael Cohen is considering filing an anti-SLAPP motion pursuant to California Code of Civil Procedure §425.16 in connection to Clifford's Second Cause of Action for Defamation. Under the statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

   Here, Cohen's alleged statement arose in connection with a public issue.  *See e.g*., *Paris Hilton v. Hallmark Cards et al*., 580 F.3d 874 (9th Cir. 2009).  Ms. Clifford will have the burden of establishing that there is a probability of her prevailing on her defamation claim.

   As set forth in the First Amended Complaint, Clifford's defamation claim is premised on the following statement by Mr. Cohen:

   "*Just because something isn't true doesn't mean that it can't cause you harm or damage.  I will always protect Mr. Trump.*"

   "Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation."  *Wilbanks v. Wolk* (2004) 121

March 27, 2018
Page 2

Cal.App.4th 883, 901.  *Washer v. Bank of America* (1948) 87 Cal. App. 2d. 501, 509.
The *sine qua non* of recovery for defamation … is the existence of falsehood.'  Because
the statement must contain a provable falsehood, courts distinguish between statements of
fact and statements of opinion for purposes of defamation liability.  Although statements
of fact may be actionable as libel, statements of opinion are constitutionally protected."
*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112.

Truth is an absolute defense to defamation.  *Washer v. Bank of America* (1948) 87
Cal. App. 2d. 501, 509.  Nothing about the aforementioned statement, which is not
directed at anyone in particular, is untrue.  Indeed, as of this date, Ms. Clifford had stated
on at least three different occasions, including in a letter that she signed one month before
Mr. Cohen's alleged statement, that she did **not** have an intimate relationship with Mr.
Trump.  Thus, her statements which are completely contradictory—that she did **not**, and
that she did, have an intimate relationship—cannot both be true.

Ms. Clifford's defamation claim also will fail because when Mr. Cohen made the
alleged statement, he was engaging in his constitutionally protected right to express his
opinion.  "Under the First Amendment there is no such thing as a false idea.  However
pernicious an opinion may seem, we depend for its correction not on the conscience of
judges and juries but on the competition of other ideas."  *Gertz v. Robert Welch, Inc*. 418
U.S. 323, 339-340 (1974).

Finally, Ms. Clifford will be required to establish a prima facie claim that she
suffered actual damages.  Because the purported libelous statement would require further
consideration of extrinsic facts, it is not libel *per se*.  Cal. Civil Code §45a.  Thus, Ms.
Clifford would have to prove that she suffered special damages as a proximate result
thereof.  Again, as of the time Mr. Cohen made this statement, Ms. Daniels had stated on
at least three different occasions that she did **not** have an intimate relationship with Mr.
Trump.  Even if one were to distort Mr. Cohen's statement to the length that you attempt
in the First Amended Complaint, it can hardly be said that Mr. Cohen's statement, which
nowhere contradicts Ms. Clifford's stated position at this time, somehow damaged Ms.
Clifford.

Should Ms. Clifford's defamation claim fail to survive an anti-SLAPP challenge,
she would be held responsible for Mr. Cohen's legal fees.

Moreover, you have exposed yourself personally to potential sanctions for filing a
frivolous pleading in violation of Federal Rule of Civil Procedure, Rule 11, which was

March 27, 2018
Page 3

enacted to deter abusive pretrial tactics and to streamline litigation by excluding baseless filings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 392-393; *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F. 2d 1531, 1542 (9th Cir. 1986).

We therefore ask that you reconsider Ms. Clifford's Second Cause of Action for Defamation against Mr. Cohen, and stipulate to the voluntary dismissal of same.

I have a trial beginning on April 3, 2018 in another matter and therefore request that we hold the meet and confer conference regarding Mr. Cohen's anti-SLAPP motion **this week**. As the prior meet and confer conference was held at my office, I'll be happy to travel to Newport Beach for this one.

Naturally, all of my client's claims are expressly reserved and none are waived.

Sincerely,

BRENT H. BLAKELY

cc:    Charles J. Harder, Esq. (via email)
       Ryan Stonerock, Esq. (via email)