AVENATTI & ASSOCIATES, APC
Michael J. Avenatti, State Bar No. 206929
Ahmed Ibrahim, State Bar No. 238739
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:   (949) 706-7000
Fax:   (949) 706-7050

Attorneys for Plaintiff Stephanie Clifford
a.k.a. Stormy Daniels a.k.a. Peggy Peterson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual,<br><br>     Plaintiff,<br><br>     vs.<br><br>DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive<br><br>     Defendants. | CASE NO.:  2:18-cv-02217-SJO-FFM<br><br>**DECLARATION OF MICHAEL J. AVENATTI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S MOTION TO COMPEL ARBITRATION**<br><br>**Hearing Date:  April 30, 2018**<br>**Hearing Time: 10:00 a.m.**<br>**Location:     350 West 1st Street**<br>               **Courtroom 10C**<br>               **Los Angeles, CA 90012** |

## <u>DECLARATION OF MICHAEL J. AVENATTI</u>

I, MICHAEL J. AVENATTI, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am an attorney with the law firm of Avenatti & Associates, APC, counsel of record for Plaintiff Stephanie Clifford.  I am submitting this declaration in support of Plaintiff's Opposition to Defendant Essential Consultants, LLC's Motion to Compel Arbitration.  I have personal knowledge of the information stated herein and if called to testify to the same would and could do so.

2.     On March 21, 2018, during the Local Rule 7-3 meet and confer conference regarding the Motion to Compel Arbitration, I asked Defendant Donald Trump's counsel, Mr. Charles Harder, point blank whether Mr. Trump was a party to the purported settlement agreement with my client, Ms. Clifford.  Mr. Harder evaded my question and would not provide a straight answer.  He then responded "We don't know." When I pressed him further and stated that it was incredulous that such a basic question could not be answered, and inquired as to why he didn't simply ask his client Mr. Trump, Mr. Harder further responded with "We haven't done the research yet."

3.     On March 30, I again followed up, this time in an e-mail directed at Mr. Harder and Mr. Brent Blakely, counsel for Mr. Michael Cohen.  I wrote as follows:  "I inquired 10 days ago and have yet to receive an answer to the following question - Was Donald Trump ever a party to the agreement?  If so, how and when?  Presumably, your side has determined the answers to these questions as they are not complicated questions." *Inexplicably, neither Mr. Harder nor Mr. Brent Blakely have responded to these basic questions despite the passage of nearly 10 days or 240 hours since my e-mail.*  In sum, for nearly 19 days since the meet and confer of March 21, we have been trying to get a straight answer as to a simple factual issue that is at the center of the case and have been stonewalled at every attempt.

4.     Attached hereto as Exhibit 3 is true and correct copy of the *CNN* article titled "Michael Cohen Says He Used His Own Home Equity Line for Stormy Daniels Payment," obtained from the internet.

5.     Attached hereto as Exhibit 4 is true and correct copy of the March 19, 2018 *Vanity Fair* article titled "'I Have Never Threatened Her in Any Way': Michael Cohen Offers His Side of the Stormy Daniels Saga," obtained from the internet.

6.     Attached hereto as Exhibit 5 is true and correct copy of a transcript of the March 26, 2018 press briefing by White House Deputy Press Secretary Raj Shah, obtained from the internet.

7.     Attached hereto as Exhibit 6 is true and correct copy of a transcript of the April 5, 2018 remarks by Donald Trump, obtained from the internet.

I declare, under penalty of perjury and under the laws of the United States of America, that the foregoing is true and correct.  Executed this 9th day of April, 2018.

_____/s/ Michael J. Avenatti_____
Michael J. Avenatti

# EXHIBIT 3

# Michael Cohen says he used his own home equity line for Stormy Daniels payment

 By Veronica Stracqualursi, CNN

Updated 7:59 PM ET, Fri March 9, 2018





    

Cohen: I used home equity line to pay Daniels | Polygraph: Stormy Daniels truthful about Trump | Stormy Daniels' friend: She fears for her life | Stormy's lawyer: Some incidents took place during Trump presidency | Lawy was t thea

**Washington (CNN) —** President Donald Trump's personal lawyer used funds from his own home equity line to make a $130,000 payment to porn star Stormy Daniels on Trump's behalf, he told CNN.

"The funds were taken from my home equity line and transferred internally to my LLC account in the same bank," Michael Cohen said in a statement.

Cohen also confirmed that he used his Trump Organization email account to communicate details of a payment transfer to Stephanie Clifford, the adult film star known as Stormy Daniels, who allegedly had an affair with the President before his time in office.

Earlier Friday, Clifford's lawyer, Michael Avenatti, provided an email to CNN in which Cohen confirmed the transfer to Daniels' former attorney, Keith Davidson. In the email, both Cohen's personal email account and trumporg.com email account were used. The deposit was confirmed to Cohen by a First Republic Bank employee.

From: Michael Cohen
To: Keith Davidson
Subject: Fwd: FW: First Republic Bank Transfer
Date: October 26, 2016 1:53:11 PM

---------- Forwarded message ----------
From: Michael Cohen <mcohen@trumporg.com>
Date: Wed, Oct 26, 2016 at 4:49 PM
Subject: FW: First Republic Bank Transfer
To: "mdcohen██@gmail.com" <mdcohen██@gmail.com>

From: ████████ [mailto: ████████
Sent: Wednesday, October 26, 2016 4:15 PM
To: Michael Cohen <mcohen@trumporg.com>
Subject: RE: First Republic Bank Transfer

Good Afternoon Mr. Cohen,

The funds have been deposited into your checking account ending in x1897.

Best,

████████

████████

First Republic Bank

1230 Ave of the Americas, 3rd Floor | New York, NY 10020

Cohen responded later Friday, saying that he regularly used his business email account for personal matters.



"I sent emails from the Trump Org email address to my family, friends as well as Trump business emails. I basically used it for everything. I am certain most people can relate," he said.

Avenatti, speaking on MSNBC, said Cohen's use of his business email to conduct this transaction could be an indication that he was acting in an official capacity as a legal counsel to Trump when he transferred the money to Clifford.

While this development brings the payment to Clifford closer to Trump himself, it is not proof that he knew about it. Any involvement by Trump would indicate the payment was an in-kind campaign contribution which was not disclosed to the Federal Election Commission, which would be a violation of federal law, according to Paul S. Ryan, a campaign finance attorney who works for Common Cause.

The email does not say where the funds originated from.



**Related Article:** Law firm handling Stormy Daniels case for Cohen also did legal work with Trump campaign

NBC News first reported Cohen's use of the email account.

The day after the email, Cohen wired money from First Republic Bank to Davidson's bank account, according to NBC News.

Davidson did not respond to a request for comment from CNN. First Republic Bank declined to comment to the network.

Trump's 2017 financial disclosures listed an account at First Republic Bank, valued between $15,001 and $50,000.

Cohen also regularly used that same email account to negotiate with Clifford last year before she signed a nondisclosure agreement, NBC News reported.

Last month, Cohen said he wired Clifford $130,000 of his own money right before the 2016 election in exchange for her silence about the alleged affair.

Cohen said Friday that he is in the midst of a "witch hunt," saying, "These incessant attacks against me are meritless and are concocted by the liberal mainstream media to continue to malign our President and distract the country from his historic achievements over the past year. This witch hunt has now gone from ludicrous to insane."

He has denied the Trump Organization's involvement in the payment, and both Cohen and the White House have denied any sexual encounter between the President and Clifford.



**Related Article:** Stormy Daniels' attorney argues 'cover-ups matter'

"In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford," Cohen said in a statement in February. "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

favor" regarding the case. The statement is an admission that the nondisclosure agreement exists and that it directly involves Trump. It was the first time the White House had admitted the President was involved in any way with Clifford.




Clifford filed suit against Trump on Tuesday, alleging that he never signed a hush agreement regarding the alleged affair and therefore the agreement is void.

*CNN's Wolf Blitzer contributed to this report.*



Now Playing Cohen: I used home...

EXHIBIT 4

Sign In    Subscribe    Q

H I V E

Stormy Daniels

# "I HAVE NEVER THREATENED HER IN ANY WAY": MICHAEL COHEN OFFERS HIS SIDE OF THE STORMY DANIELS SAGA

A week before Stephanie Clifford's widely anticipated interview with Anderson Cooper, Trump's longtime personal lawyer proclaims his innocence—and his unbreakable bond with his old boss.



**BY EMILY JANE FOX**
MARCH 19, 2018 4:17 PM

  





Michael Cohen speaks to reporters after a closed-door meeting with the Senate Intelligence Committee on Capitol Hill in Washington, Sept. 19, 2017.
By Al Drago/The New York Times/Redux.

"R emember something," **Michael Cohen** told me, unbuttoning his navy cashmere double-breasted Moncler coat and unrumpling his gray turtleneck. "If she would have come to me a month before, or three months before, I would have done the same thing." It was a Wednesday afternoon and Cohen, President **Donald Trump's** longtime personal attorney and loyal fixer, was sitting on a desk chair in the office of a friend's townhouse on the Upper East Side. He was referring, of course, to **Stephanie Clifford,** the adult-film actress also known as Stormy Daniels, who has alleged that she and Trump had a consensual affair in 2006. As Cohen spoke, his combativeness and notoriously deep fealty to Trump were indeed evident. "People are mistaking this for a thing about the campaign," he continued. "What I did defensively for my personal client, and my friend, is what attorneys do for their high-profile clients. I would have done it in 2006. I would have done it in 2011. I truly care about him and the family—more than just as an employee and an attorney."

Stormygate has, in many ways, become a quintessential political saga for the Trump Age. And Cohen is a fitting star. Once a bit player inside Trump's New York inner sanctum, he has gained his own twisted notoriety during his boss's ascent. Last year, Cohen sued BuzzFeed for libel after the news organization published the infamous dossier alleging that he met with Russian officials in Prague during the summer of 2016. (Cohen said he has never been to Prague and was visiting the University of Southern California with his son at the time that the dossier had him taking the meetings.) But that crisis has hardly compared to the scrutiny Cohen has received since January, when *The Wall Street Journal* first reported that he facilitated a $130,000 payment to Clifford weeks before the 2016 presidential election. Cohen has

reiterated, as he noted in his friend's sunlit office, that the six-figure payout came out of his own pocket, and that he was not reimbursed by the Trump Organization or the Trump campaign. It was not an election issue, in other words. In fact, it seemed that Cohen, like the rest of the world, was surprised by his boss's win. At the time, Cohen said, he was "hopeful and optimistic" about Trump's chance in the election, but "everyone said that you can't beat the Clinton machine. The election would be over in a few weeks."

Yet Trump did win, and in the two months since the *Journal* story, there have been numerous questions surrounding whether Cohen's payment violated federal-election law; what the president knew; why Cohen had paid Clifford out of his own pocket, particularly after she had already shared her story with *In Touch Weekly* (which reportedly shelved the story for over six years, after Cohen threatened Trump would sue their parent company); and if the contract could actually be enforced. In order to answer some of these questions, a government watchdog group has filed a complaint with the Federal Election Commission. (There are laws and ethics and rules that require the reporting of any outlay that could influence one candidate's standing. Trump had not reported Cohen's settlement. Cohen has claimed that his client didn't know about the payment at the time, and told me that it was not a campaign donation. "There is clear case law that negates the F.E.C. complaint raised against me.") Meanwhile, Cohen, who was compelled to respond to the complaint, issued a statement describing his actions to *The New York Times* in mid-February—a move that Clifford's manager subsequently claimed violated the terms of her non-disclosure agreement, thus allowing her to tell her version of the story. (Both Cohen and the White House have denied Clifford's accusations.)

At the end of February, Cohen obtained a temporary restraining order through an arbitrator in California to prevent Daniels from speaking about the alleged sexual encounters. Clifford's new attorney, **Michael Avenatti,** followed up with a lawsuit of his own at the beginning of March, contending that the non-disclosure agreement was void because Trump did not personally sign it. (Avenatti filed a civil suit in Los Angeles claiming that the agreement was signed by both his client and Cohen, but

Trump himself did not sign the agreement, which he argues makes it invalid, unenforceable, and void.) Then, a couple weeks back, Clifford taped an interview with **Anderson Cooper,** which is set to air on CBS's *60 Minutes* on March 25. And if the interview hadn't already become a Super Bowl–sized media supernova, Avenatti went on a morning-show blitz, on Friday, to promote what has essentially become possibly the most anticipated political interview since **Larry King** sat down with **Bill Clinton** in January 2000. When Avenatti appeared on MSNBC's *Morning Joe,* co-host **Mika Brzezinski** asked him if his client had been threatened in any way. "Yes," Avenatti responded. "Was she threatened with physical harm?" she followed up. "Yes."

Afterward, Cohen tried to dismiss his counterpart's tactics. "Unlike Mr. Avenatti, we are not handling this matter through the court of public opinion," he told me. "We are handling it through a court of competent jurisdiction." As Cohen presumably knew, however, the court of public opinion was already inching toward a verdict. Later that afternoon, Cohen filed papers to move Clifford's lawsuit to federal court, and claimed that she could owe upwards of $20 million for violating the terms of the agreement. In another Trumpian twist, **Charles Harder**—the attorney best known for representing **Hulk Hogan** in his lawsuit against Gawker—is handling the case on behalf of Trump.

C ohen and I spoke a number of times last week, as events transpired rapidly. As Avenatti appeared with CNN's **Chris Cuomo,** after the MSNBC hit on Friday, social media swelled with guesswork regarding who he was referring to when he intimated that Clifford had been physically threatened. While Cuomo conducted his interview, I conducted another with Cohen by phone, as we both watched Avenatti on television. Cohen told me that he had never threatened Clifford. "In fact, I have never spoken to her. I have never e-mailed her. I have never met her. I have never texted her," he told me. "Every interaction with Ms. Clifford was always through her previous attorney." I asked if he knew whether she was threatened by anyone with any connection to Donald Trump. "I can only speak for myself," he said. "I reiterate: I have never threatened her in any way and I am unaware of anyone else doing so."

Cohen denied reports from earlier in the week claiming that he was considering legal actions in an attempt to stop CBS from airing Clifford's sit-down. "I have not spoken to CBS, and I'm not aware that my counsel has spoken to CBS." And if her sit-down should air as scheduled, Cohen said "it's just another breach by Ms. Clifford and will only further increase the damages I will be seeking pursuant to the agreement." Those damages could very quickly turn crippling. According to the agreement, Clifford is required to pay $1 million for each breach of her non-disclosure deal. The court documents filed on Friday made it clear that Cohen and Trump plan to collect.

Avenatti has continued to counter that the agreement was void because Trump never signed it. Cohen told me, however, that he disagreed. "The only person who decrees it such is Mr. Avenatti," he said in his signature bluster. "His decrees carry no weight, as this issue will be decided not by him, but by the court." Cohen contends that the agreement is a two-party contract between the L.L.C. he set up to pay Clifford and the actress herself, which would deem a signature from anyone else unnecessary to execute the agreement.



**WATCH**
**Is Donald Trump Emotionally Intelligent?**

We also spoke about the chatter on cable news and social media over whether or not he could make an agreement on behalf of his client without his client knowing, as he

claims that Trump did not know that he had paid Clifford the $130,000. Cohen told me that he has recently conferred with counsel, and their determination was that there is no bar-association violation for his action. As to confusion regarding why he would pay six-figures of his own money without expecting to get paid back, he told me that he did it for his own reasons and it's irrelevant if people believe him or not. When I asked if he bullied Clifford or if she signed the agreement under duress, he responded, "Absolutely not."

Cohen is a loyal fixer by trade and street fighter by nature, often earning him comparisons in the media to the character Ray Donovan. "I only take offense to CNN's depiction of me as a less sexy version of him," he told me. His handling of the Clifford payment is, to a degree, merely an extension of the job he'd been undertaking for a decade. In explaining how the election-time payment came to fruition, he jumped back several years. He said that he didn't know that Clifford had even met his boss until her former attorney, **Keith Davidson,** called him in 2011. At that time, Clifford denied the affair and wanted an interview about their alleged encounter removed from a Web site that had published her account. (The *Washington Post* reported over the weekend that Cohen tried to bury the story then, too.)

Cohen said that he did not hear about the matter again until 2016, when he caught wind of media interest in Clifford's story. "I called Mr. Davidson and asked if this was true. He told me that he would find out." Cohen says Davidson called back and relayed that there was media interest. Cohen responded if there was a price to own the story. Cohen says that Davidson replied that her number was $130,000. It was a strange, not entirely rounded number, but Cohen accepted. He then recalled asking Davidson why she would tell her story when she had previously denied it. "He said that she needed the money. I didn't come up with this number." (Davidson told me on Friday that he could not comment on these matters.)

Even if Cohen did not bully or intimidate Clifford into signing an agreement, a restraining order binding Clifford from speaking appeared as a different kind of intimidation, particularly because it involved such a great power divide—with the

president of the United States on one side and a porn star on the other. These types of agreements are often inherently based on this sort of imbalance, only now, with one party in the White House, the disparity is cartoonish. Cohen, who's spent years figuring out how to defend and downplay and get rid of these things, had a response at the ready. "It is irrelevant who the client is," Cohen told me. "These types of arbitration clauses exist and are used frequently. The agreement specifically called for obtaining the injunction based upon a breach or threat of a breach. We followed the executed agreement as written."

Did he use these types of agreements frequently for this particular client, I asked? "I don't discuss things I've done for my clients," he responded. "There are thousands of lawyers who, in order to protect their high-profile clients, draft these sorts of documents daily."

**B**ecause this small little world has turned into a long-running episode of The Trump Show, Cohen left our interview for his son's baseball game before going to dinner with his wife and some friends at Avra, a scene-y Greek restaurant on Madison Avenue. His wife elbowed him when she saw Avenatti walk in and sit down a few tables away. Cohen got out of his chair and tapped him on the shoulder. "I just wanted to introduce myself," he says he told Avenatti. "It was totally cordial."

It is impossible to know what Michael Cohen was thinking in October of 2016, when he made the payment—whether it was the muscle memory of a lifetime defending Trump, or something perhaps more calculated. What is clear now is that he is up against a worthy adversary. Avenatti has, in fact, pulled a remarkably Trumpian move, in raising the specter of a bombshell revelation to come in an interview then more than a week away, dropping little hints about what it could be, and urging audiences to tune in live and judge for themselves. As the guessing game builds about what Clifford actually said, what she actually knows, and what actually happened to her, the questions will keep coming, the speculation will keep building.

Cohen, for his part, said that for as many questions as can be asked, "the only issue that will ultimately be decided is the amount of damages Ms. Clifford will owe." If a judge does ultimately order Clifford to pay damages, Cohen said that any money he receives will go to pay lawyers first. After that, he said, the balance will be donated to various charities. "You know what?" he added. "The more I'm thinking about it, I might even take an extended vacation on her dime."

## DONALD TRUMP

FOLLOW

## BILL CLINTON

FOLLOW

Follow to get the latest news and analysis about the players in your inbox.

SEE ALL PLAYERS



## EMILY JANE FOX

Emily Jane Fox is a reporter for the Hive covering Wall Street, Silicon Valley, and the .001 percent everywhere.



**YOU MIGHT LIKE**



Jared Kushner's Month Goes from Bad to Weeping Inconsolably in a Janitor's Closet

Vanity Fair



Bone Spur Victim Calls on Military to Pay for His Border Wall

Vanity Fair



Zuckerberg Hits Users with the Hard Truth: You Agreed to This

Vanity Fair



"Their Names Are Their Downfall": After a Year in Washington, Ivanka and Jared Are Isolated on Kushner Island

Vanity Fair



"A Target, Not a Witness": Will Trump's Legal B-Team Collapse Before Mueller?

Vanity Fair



"We're Not Trying to Save the World": Deep in Trump Country, They Are Still Grappling with Trump

Vanity Fair

NEWSLETTER SIGN UP

SUBSCRIBE

FOLLOW VF

f  y        

**VANITY FAIR WORLDWIDE:**

UNITED KINGDOM

ITALY

MEXICO

SPAIN

FRANCE

VISIT OUR SISTER SITES

CONDÉ NAST STORE

REPRINT/PERMISSIONS

VF MEDIA KIT

PROMOTIONS

CONTACT VF

NEWSLETTER

CUSTOMER

SERVICE

ADVERTISING

INSIDE THE

ISSUE

CAREERS

DIGITAL EDITION

SITEMAP

ACCESSIBILITY

HELP

© Condé Nast. Use of this site constitutes acceptance of our User Agreement (effective January 2, 2014) and Privacy Policy (effective January 2, 2014). Your CA Privacy Rights. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast. CN Entertainment

**AD CHOICES**

# EXHIBIT 5

Press Briefing by Principal Deputy Press Secretary Raj Shah

Skip to content

 White House Logo

🔗 Share

- Economy
- National Security
- Budget
- Immigration
- The Opioid Crisis



Press Briefings

# Press Briefing by Principal Deputy Press Secretary Raj Shah

Issued on: March 26, 2018

- Share:



- f
- 🐦
- 🔗

:::: [All News](#)

James S. Brady Press Briefing Room

2:09 P.M. EDT

MR. SHAH: Good afternoon, everyone. Let me start by saying that the United States is deeply saddened by the news of yesterday's tragic fire at a shopping mall in Siberia. The American people extend our deepest sympathies to the Russian people and the families of those who lost their lives and were injured in the fire.

Separately, as many of you saw, the President ordered the expulsion of dozens of Russian intelligence officers, and the closure of the Russian consulate in Seattle.

This action is a response to Russia's use of a military-grade chemical weapon in the United Kingdom, and was taken in conjunction with our allies and partners around the world, including more than a dozen countries in the EU and NATO, and others around the world.

Today's actions make the United States safer by reducing Russia's ability to spy on Americans and to conduct covert operations and threaten America's national security. With these steps, the U.S. and our allies and partners around the world make clear to Russia that actions have consequences.

We stand ready to cooperate to build a better relationship with Russia, but this can only happen with a change in the Russian government's behavior.

Looking ahead to next week, the President will welcome the leaders of Estonia, Latvia, and Lithuania to the White House on April 3rd.

President Trump and the three Baltic heads of state will celebrate the 100th anniversary of Estonia, Latvia, and Lithuania's independence and set the stage for another century of strong ties between our countries.

The U.S.-Baltic Summit will focus on how best to strengthen our security, business, trade, energy, and cultural partnerships. The visit will also highlight Baltic States' achievements since their independence, including their economic growth, recent success in meeting NATO's defense and spending pledges.

A quick reminder for everyone here, the annual White House Easter Egg Roll will take place on the South Lawn a week from today. We are inviting members of the White House Press Corps to bring your kids to the event. So please work with the Press Office to secure tickets, if you haven't already.

And with that, I'll take your questions.

Zeke.

Q    Thanks, Raj. Thanks for doing this. First, on Thursday, White House officials were up on the stage and they said the President would sign the omnibus legislation. On Friday morning, he threatened to veto it. Ultimately, he signed it. Ten days ago, Sarah said that H.R. McMaster had the President's confidence and support and wouldn't be leaving. Last Thursday, it was announced that he would be leaving the White House. And about two and a half weeks ago, the President expressed confidence in his attorneys. And then there was a bit of shake-up there last week. So can you talk — speak to the White House's credibility, why should we, in this room, and more importantly, the American people, trust anything that this administration is telling them?

MR. SHAH: Well, our job, as a press office and as an administration, is to give you the best information that we have available to us, the most accurate information in a timely fashion. Sometimes the dynamics are fluid in any given situation. You mentioned some personnel matters; facts and circumstances change. We continue to give you guys the best information that we can as quickly as possible.

Q   Thanks, Raj. One more for you just on the Stormy Daniels incident. I'm sure my colleagues have more questions on that. Could you state, categorically, that the President, his campaign, and the Trump Organization did not violate federal law — specifically, election law — regarding that payment?

MR. SHAH: Well, I can speak for only the White House, and I can say, categorically, and obviously, the White House didn't engage in any wrongdoing. The campaign or Mr. Cohen —

Q   (Inaudible.)

MR. SHAH: Yeah. The campaign or Mr. Cohen can address anything with respect to their actions. With respect to that interview, I will say the President strongly, clearly, and has consistently denied these underlying claims. And the only person who's been inconsistent is the one making the claims.

Phil.

Q   Yeah, Raj. Regarding the Russia actions that were announced earlier today, the President has not personally said anything about the expulsion of these 60 diplomats. And in his phone call last week with President Putin, he decided not to confront Putin on the attack despite the advice he was given from his national security advisors. And he went on to congratulate Putin on that phone call. So how do you square the aggressive actions that the administration is taking with an entirely different approach from the President?

MR. SHAH: Well, I think there was a statement coming out from the Press Secretary on this. And the last sentence basically outlined our approach to this, which is our relationship with Russia is, frankly, up to the Russian government and up to Vladimir Putin and others in senior leadership in Russia.

We want to have a cooperative relationship. The President wants to work with Russia, but their actions sometimes don't allow that to happen.

The poisoning in the UK that has kind of led to today's announcement was a very brazen action. It was a reckless action. It endangered not just two individuals who were poisoned, but many civilians — many innocent civilians. And this is not the type of conduct that the United States or allies can accept. But the President still remains open to working with the Russians on areas of mutual concern — counterterrorism, for example, and others. But, you know, that's really up to the Russians to decide.

Q   But if the President believes it was a reckless and brazen action, why did he not say so to Putin, directly, when he spoke with him and had the opportunity to do that?

MR. SHAH: Well, he raised a number of issues and we did secure with Putin, on that call, some positive interaction when it comes to nuclear arms. So there were certainly positive developments on that call, and the President will continue diplomacy with Russia and with Putin. But, you know, this action by the President is very clear. We're very heartened that it comes in conjunction with over a dozen allies, both in NATO and EU.

Kevin.

Q   Thank you, Raj. You mentioned that it was brazen and that it was reckless. Does that attack on the soil of a valued ally rise to the level of an act of war? Is that the administration's policy, here?

MR. SHAH: Well, we've been joined at the hip with the UK on this matter. We stand firmly with our ally. Again, I'll classify this action as both brazen and reckless. And I don't want to get ahead of anything the President may or may not announce or declare later on.

Q   And if I could follow up very quickly —

MR. SHAH: Yeah.

Q   You mentioned that the President continues to maintain his consistent story that he did not do what has been alleged by Ms. Daniels.  Did he, by chance, watch the interview last night?  Did you ask him about that?

MR. SHAH: You know, I'm not going to get into what the President may or may not have seen.  I'll just say that he's consistently denied these allegations.

Kristen.

Q   Thank you.  Was the President aware of a physical threat made against Ms. Daniels when she was with her daughter back in 2011?

MR. SHAH: Well, the President doesn't believe that any of the claims that Ms. Daniels made last night in the interview are accurate.

Q   He doesn't believe she was threatened?

MR. SHAH: No, he does not.

Q   What's his basis for that, Raj?

MR. SHAH: Sorry?

Q   What's his basis for that?

MR. SHAH: Well, he just doesn't believe that — you know, there's nothing to corroborate her claim.

Q   And Raj, did he have dinner with Michael Cohen at Mar-a-Lago on Saturday?

MR. SHAH: Yeah, I believe he did.

Q   Can you give us a readout of that?  Did they discuss the interview with Stormy Daniels?

MR. SHAH: I don't have any additional information on it.

Cecilia.

Q   So if he doesn't believe her claims made in that TV interview, we can deduce he saw it from that?

MR. SHAH: Well, I'm — again, I'm not going to get into what he saw.  There are clips of it playing all over in the morning new shows.  What I'll just say is that he's denied the accusations that she made last night and has been consistent in doing so.  She has not.

Q   So on the expulsions, three weeks passed between the attacks and the expulsions.  What took so long?

MR. SHAH: Well, I mean, actions like this take time and we coordinated with, again, over a dozen allies.  We wanted this to be a joint effort in which the United States is joining both the European Union and NATO Allies.

Q   And a spokeswoman for the Russian Foreign Minister is now threatening retaliation against the U.S. and other countries involved in these expulsions.  Your response to that?

MR. SHAH: Look, we want to work with Russia, but this type of an action cannot be tolerated.  The United States is responding to Russia's action — as I called it, brazen and reckless.  So this is a U.S. response.  We want

to work with Russia. You know, the ball is in their court with respect to how they want to respond.

Jim.

Q    If you listen to national security experts, diplomatic experts on what happened with Russia, they will say that you have to hit Russia where it hurts. You have to sanction them. Economically, you have to go after Putin's cronies. You have to go after Putin himself, potentially. Would this President consider sanctioning Vladimir Putin or his cronies to punish him and the Russian government for what happened in the UK and also for meddling in the 2016 election?

MR. SHAH: Well, the United States has issued sanctions on key Russian oligarchs in response to the meddling in the 2016 election.

Q    What about Putin himself?

MR. SHAH: So, I wouldn't close any doors or I wouldn't preclude any potential action. But the President doesn't telegraph his moves.

Q    And one other question about this weekend: There was this massive march here in Washington, led by the students from Parkland, Florida. The President did not tweet about it, he hasn't really said anything about this. What is the White House response to this? And are the actions of the President signed into law last week strengthening some of the, I guess, background check systems and whatnot we have in this country? Is that the end of it? Is the President going to do any more on the gun safety issue? And what about that question that he asked of the Republican lawmakers here — "Are you afraid of the NRA?"

MR. SHAH: Look, the President does respect everyone's First Amendment right and wants their voices to be heard. As you mentioned, there were actions that he signed into law on Friday in the omnibus bill. They included over $2 billion in new funding for school safety. He signed into law the STOP School Violence Act which was, actually, a priority of the Sandy Hook Promise Organization; and the Fix NICS bill, the background check portion that you mentioned.

Also on Friday, the Department of Justice announced a new rule which effectively banned the sale of bump stock devices. And the President is a strong believer in the Second Amendment, but he does believe other measures could potentially be taken both at the federal and also at the state level to improve school safety. He's mentioned hardening schools. He's talked about these extreme risk protective orders that states can engage in. So there's a whole lot of things that can be done.

This Wednesday, the School Safety Commission that is chaired by Secretary DeVos will be meeting for the first time, and we hope some fruitful ideas can come from that.

Mike.

Q    Can you talk a little bit about David Shulkin? Is he going to be fired face-to-face or is it going to be through the media, on Twitter? Can you give us an update on that?

MR. SHAH: I have no personnel announcements to make at this time.

Steven.

Q    Raj, just to follow up on Stormy Daniels. Can you explain, Raj, why it has been the President's practice, or the practice of those associated with the President, to offer compensation to people to keep them silent? Why would the President do that? And why has he done that or caused others to do that?

MR. SHAH: Well, I would have Michael — you can have Michael Cohen address any specifics regarding this agreement that you're referring to. But, look, false charges are settled out of court all the time, and this is nothing outside the ordinary.

Press Briefing by Principal Deputy Press Secretary Raj Shah

Q   But why would, in this case, $130,000 be paid to a woman in the days before the election?  You're saying that she made false claims, but why, then, would $130,000 be paid to her?

MR. SHAH:  Again, false charges are settled out of court all the time.  You'd have to ask Michael Cohen about the specifics.

Q   Does the President have any intention of responding directly himself?  You've said that he denies the claims.  Why haven't we heard from him?

MR. SHAH:  Well, that will be up to the President.

Jen.

Q   Thanks, Raj.  On North Korea, Bloomberg has reported that Kim Jong-un is in China right now.  Does the White House see that as a precursor to talks between President Trump and Kim Jong-un?  And has China offered to host that summit?

MR. SHAH:  Well, you know, we can't confirm those reports.  We don't know if they're necessarily true.  What I'll just state, though, is that, you know, where we are with North Korea is in a better place than we used to be because the President's maximum pressure campaign, in conjunction with dozens of countries around the world, has paid dividends and has brought the North Koreans to the table.  So we're looking forward to a potential summit some months in advance.

Q   On Shulkin, does the White House believe that the nation's veterans are best served by having David Shulkin serve as VA Secreaty?

MR. SHAH:  Again, I have no personnel announcements to make at this time when it comes to —

Q   How much longer should the Secretary expect to work in the administration?

MR. SHAH:  Sorry, say that again.

Q   How much longer should the Secretary expect to work in the administration?

MR. SHAH:  Guys, I have no personnel announcements.

Yeah.

Q   Thanks, Raj.  The Israeli press is reporting that Prime Minister Netanyahu has begun informing French and German foreign ministers that the U.S. is very likely to pull out of the Iran deal in May.  Can you confirm that?

MR. SHAH:  Well, I can't confirm that.  What I can tell you is that the President has been pretty clear since January, where he gave some remarks about this, what he thinks of the Iran deal.  In fact, that goes back years.  He thinks it's one of the worst agreements the United States has ever made internationally, and he is insistent on changes both at the congressional level working with Congress, and also with our European partners.  If changes aren't made, the President is prepared to potentially withdraw from the agreement.

Jon.

Q   Thanks a lot, Raj.  In light of these announced expulsions of these 60 Russian intelligence agents, is the President still going full steam ahead in meeting with Russian President Vladimir Putin?

MR. SHAH:  Again, we have no announcements on a potential meeting or any kind of summit.

Q   But you still want to do it, right?

MR. SHAH: Yeah. Again, as I said, we want to work with Russia. We have areas of mutual concern where we can work with them. Again, I mentioned counterterrorism. There's general global stability and other matters where we can — we want to work with Russia. But that ball is in their court. It is up to them on whether we're going to have a fruitful and constructive relationship or an adversarial relationship.

Q   But why give that gift of meeting with the President after they've done what the U.S. not just alleges — say they have done? They've poisoned a former Russian spy on British soil, and you've punished them for it. Why, at this point, also give them this gift of meeting with the President of the United States?

MR. SHAH: Well, again, there's no meeting to announce.

Jordan.

Q   Thanks, Raj. Treasury Secretary Mnuchin said this weekend that there might be some kind of workaround for a Supreme Court ruling that said line-item vetoes are unconstitutional. What is that workaround, and is that something that the White House is aggressively pursuing and is going to propose that Congress take care of?

MR. SHAH: Well, the President outlined on Friday why he was very frustrated with the legislation that he was given. It was a massive spending bill handed to him at the eleventh hour. You know, spending by Congress hasn't really been executed properly since 1996. They haven't had individual spending bills for over two decades.

And so this omnibus process, the President wants to reform. He's talked about ending the filibuster. He's talked about a line-item veto. Obviously, it has to pass constitutional muster — anything that's passed. But he wants to fix the budget process. And, you know, his message to leaders in Congress of both parties is that if something similar happens again, he's much more inclined to veto it.

Q   On the line-item veto in particular, though, have you been able to find a workaround to that Supreme Court ruling that says it's unconstitutional?

MR. SHAH: Well, there are certain things being discussed with respect to House and Senate rules. I don't want to get ahead of anything that we may come out in favor of.

John.

Q   Yeah. Thank you, Raj. Two questions. First, last week Senator Barrasso, the Republican Whip, made a very strong speech in which he denounced, as Marc Short did, the necessity to use cloture on all appointments, and he called for a new agreement similar to the bipartisan agreement Senator Schumer had with Republicans in 2013, allowing several votes on a nomination to come up and not requiring the cloture so much. Have you talked to Senator Barrasso about this, or has the President talked to him? And is that something the administration endorses?

MR. SHAH: Well, I'm not aware of a White House conversation with Senator Barrasso. I haven't spoken to him. You know, I would generally agree with the concept. But having not seen all the details, I don't want to commit to it.

Q   The other thing is that Egypt is having an election this week, and all signs are President Al Sisi will be reelected without much opposition. Does the President plan to call him?

MR. SHAH: I don't have any call plans to read out to you.

Trey.

Q   Thanks, Raj. The President spoke with Russian President Vladimir Putin last week. Today, we saw this major action by the United States to expel these 60 diplomats and, additionally, close the consulate in Seattle.

Why did the President not bring up this poisoning of a former Russian spy with President Putin when he spoke with him on the phone?

MR. SHAH: Well, as I mentioned earlier, the President did discuss a range of issues with Vladimir Putin. But, you know, he's addressed this matter publicly and repeatedly addressed it. After he spoke with Prime Minister May, he addressed it in the quad statement, and, you know, with this action right now.

So the President has made his position and the country's position pretty clear.

Q   And if I could ask you about Shulkin. I'm not looking for a personnel announcement here; I'd simply like to ask you, how would you describe the relationship between President Trump and VA Secretary Shulkin?

MR. SHAH: Well, I haven't asked the President about it directly, today. So I don't want to comment on it too specifically.

Q   Thanks very much, Raj. You said earlier that the only person who's been inconsistent is the one making these claims, meaning Stormy Daniels. What has she said that's inconsistent?

MR. SHAH: Well, my understanding is that she signed some statements that conflict with what she said last night.

Last question.

Q   Thanks, Raj. There have a been cascade of expulsion announcements from around the globe today. I think some 130 diplomats across 18 countries. What was the U.S. role in this? And can you tell us a little bit more about the President's role in what looks like a pretty coordinated effort?

MR. SHAH: Yeah. Well, this was a coordinated effort, and the President spoke with many foreign leaders — our European allies and others — and encouraged them to join the United States in this announcement.

We think that this is not just an important message to send to the Russian government, but it's also significant in degrading their intelligence capabilities around the world, not just in the United States.

Q   Raj, the President has come out strongly about the importance that law enforcement plays in this country. Has he commented at all about the shooting death of Stephon Clark? He was unarmed, shot by a police officer. A lot of protests happening across the country as a result.

MR. SHAH: I'm not aware of any comments that he has. I haven't asked him about that directly. Obviously, the President cares about any individual who would be harmed through no fault of their own. I don't know the specifics in that case, and I don't want to comment any further.

All right. Thanks, folks.

END

2:29 P.M. EDT

The White House

- [Live](#)
- [Jobs](#)

- Get Involved
- Copyright Policy
- Privacy Policy

- Twitter
- Facebook
- Instagram
- Contact



 Close Menu

- News
- Issues
- The Administration
- About The White House
- Get Involved

- Economy
- National Security
- Budget
- Immigration
- The Opioid Crisis



Close Search

Type Your Search  Type Your Search...          Press enter to search

EXHIBIT 6



Remarks

# Remarks by President Trump in Press Gaggle en route Washington, D.C.

Issued on: April 5, 2018

- Share:
- 
- 

- 🔗

⠿All News

Aboard Air Force One

En Route Washington, D.C.

4:22 P.M. EDT

THE PRESIDENT:  (In progress) — very happy.  Thought it was really great.

Q    How are you feeling about Scott Pruitt, Mr. President?  Is he —

THE PRESIDENT:  I think he's done a fantastic job at EPA.  I think he's done an incredible job.  He's been very courageous.  Hasn't been easy, but I think he's done an absolutely fantastic job.  I think he'll be fine.

Q    (Inaudible.)

THE PRESIDENT:  I think he'll be fine.  Yeah, I want to look at it.  I haven't seen the details, but I can tell you, at EPA he has done a fantastic job.

Q    Are you bothered by the reports about him, sir?

THE PRESIDENT:  On Scott?

Q    Yeah.

THE PRESIDENT:  Who's saying that?  I have to look at it, and close.  You know, I hear different versions of it.  But I'll make that determination.

But he's a good man.  He's done a terrific job.  But I'll take a look at it very closely.

Q    What did you think of his interview?

THE PRESIDENT:  You know, I didn't — with Ed Henry?

Q    Yes.

THE PRESIDENT:  Which one?  Ed Henry?

Q    Yes.  With Fox.

THE PRESIDENT:  It's an interesting interview.  (Laughs.)

Q    Are you thinking about switching him out for Attorney General?

THE PRESIDENT:  No, no.  No, Scott is doing a great job where he is.

Q    How many National Guard do you want to see at the border?

THE PRESIDENT:  Anywhere from 2,000 to 4,000.  We're looking at a combination of from 2,000 to 4,000.  We're moving that along.

Q    How much do you think that's going to cost?

THE PRESIDENT:  We're looking at it, but, I mean, I have a pretty good idea.  But it depends on what we do.  But we're looking from 2,000 to 4,000.  And we'll probably keep them, or a large portion of them, until such time as we get the wall.

Did you enjoy the roundtable?  A little different, right?

Q    (Inaudible) — about Amazon.  You've been tweeting a lot about that.  Are you going to actually take some action to change the law that would affect Amazon?

THE PRESIDENT:  Well, Amazon is just not on an even playing field.  You know, they have a tremendous lobbying effort, in addition to having The Washington Post, which is, as far as I'm concerned, another lobbyist.  But they have a big lobbying effort.  One of the biggest, frankly.  One of the biggest.  And it's — you know, what they have is a very uneven playing field.  You look at the sales tax situation — which is going to be taken up, I guess, very soon — it's going to be a decision by the Supreme Court.  So we'll see what happens.

The Post Office is not doing well with Amazon, that I can tell you.  But we're going to see what happens.  The playing field has to be level for everybody.  That's very important.

Q    Would you like to make changes to make that level playing field?

THE PRESIDENT:  Well, I'm going to study it and we're going to take a look.  We're going to take a very serious look at that.  But I want, as long — hey, it's very important for me.  It's got to be an even playing field for everybody.

Q    Mr. President, did you know about the $130,000 payment to Stormy Daniels?

THE PRESIDENT:  No.  No.  What else?

Q    Then why did Michael Cohen make those if there was no truth to her allegations?

THE PRESIDENT:  Well, you'll have to ask Michael Cohen.  Michael is my attorney.  And you'll have to ask Michael Cohen.

Q    Do you know where he got the money to make that payment?

THE PRESIDENT:  No, I don't know.  No.

Q    Did you ever set up a fund of money that he could draw from?

Q    I'm sorry, I couldn't hear your response earlier about Scott Pruitt.  Are you still —

THE PRESIDENT:  About who?

Q    About Pruitt.  I was — I couldn't hear it.

THE PRESIDENT:  I think that Scott has done a fantastic job.  I think he's a fantastic person.  I believe — you know, I just left — I just left coal and energy country.  They love Scott Pruitt.  They feel very strongly about Scott Pruitt, and they love Scott Pruitt.

Thank you very much everybody.  I'll see you back in New York.  Thank you.

END

4:26 P.M. EDT



The White House

- Live
- Jobs
- Get Involved
- Copyright Policy
- Privacy Policy

- Twitter
- Facebook
- Instagram
- Contact