1                   UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   STEPHANIE CLIFFORD a.k.a. STORMY    )
    DANIELS a.k.a. PEGGY PETERSON, an   )
6   individual,                         )
                                        )                 Case No.
7                        Plaintiff,     )    2:18-CV-02217-SJO-FFM
                                        )
8        vs.                            )
                                        )
9   DONALD J. TRUMP a.k.a. DAVID        )
    DENNISON, an individual, ESSENTIAL  )
10  CONSULTANTS, LLC, a Delaware Limited)
    Liability Company, MICHAEL COHEN, an)
11  individual, and DOES 1 through 10,  )
    inclusive,                          )
12                                      )
                         Defendants.    )
13  _____)

14

15

16                   REPORTER'S TRANSCRIPT OF
          JOINT EX PARTE APPLICATION TO STAY CASE
17                   FRIDAY, APRIL 20, 2018
                          9:01 A.M.
18                   LOS ANGELES, CALIFORNIA

19

20

21

22   _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
               FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA 90012-4565
25                      (213) 894-3539


                   UNITED STATES DISTRICT COURT

1        APPEARANCES OF COUNSEL:

2

3   **FOR THE PLAINTIFF:**

4       AVENATTI & ASSOCIATES
        BY:  MICHAEL J. AVENATTI
5       BY:  AHMED IBRAHIM
             Attorneys at Law
6       520 Newport Center Drive, Suite 1400
        Newport Beach, California 92660
7       (949) 706-7000

8

9   **FOR THE DEFENDANT DONALD J. TRUMP:**

        HARDER LLP
10      BY:  CHARLES J. HARDER
        BY:  RYAN J. STONEROCK
11      BY:  STEVEN H. FRACKMAN
             Attorney at Law
12      132 South Rodeo Drive, Fourth Floor
        Beverly Hills, California 90212
13      (424) 203-1600

14

    **FOR THE DEFENDANTS ESSENTIAL CONSULTANTS, LLC and MICHAEL**
15  **COHEN:**

16      BLAKELY LAW GROUP
        BY:  BRENT H. BLAKELY
17           Attorney at Law
        1334 Park View Avenue, Suite 280
18      Manhattan Beach, California 90266
        (310) 546-7400

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 20, 2018**

2                          **9:01 A.M.**

3                          --oOo--

4          THE COURTROOM DEPUTY:  Calling Item No. 1:

5    Case number CV 18-02217 SJO; Stephanie Clifford versus

6    Donald J. Trump, et al.

7        Counsel, please state your appearances.

8          MR. AVENATTI:  Good morning, Your Honor.  Michael

9    Avenatti on behalf of the plaintiff.

10          THE COURT:  Good morning.

11          MR. IBRAHIM:  Good morning, Your Honor.  Ahmed

12   Ibrahim on behalf of plaintiff.

13          THE COURT:  Good morning.

14          MR. BLAKELY:  Good morning, Your Honor.  Brent

15   Blakely on behalf of Essential Consultants and Michael Cohen.

16          THE COURT:  Good morning.

17          MR. HARDER:  Good morning, Your Honor.  Charles

18   Harder on behalf of Mr. Trump, and with me are Ryan Stonerock

19   and Steven Frackman from my office.

20          THE COURT:  Great.  Have a seat.

21        Let me just welcome everyone today.  I understand it's an

22   important matter for all of the parties and the lawyers in this

23   case.  And I think most of the lawyers in this case have been

24   before this Court on prior matters, so your relationship has

25   been established with the Court, and it will continue after

1  this matter is concluded.

2      So the matter is here today on the defendant's ex parte

3  application to stay proceedings, and because a stay may be

4  subject -- or a stay or not granting a stay may subject to

5  immediate appellate review, I think it's probably important to

6  put some procedural context to the application of the stay this

7  morning.  So bear with me while I cover some of the procedural

8  issues here.

9      This litigation before the Court arises out of an alleged

10 breach of an agreement between the plaintiff, Ms. Clifford;

11 there's a business entity called Essential Consultants; and

12 Mr. Trump regarding the nondisclosure of certain confidential

13 information by Ms. Clifford relating to an alleged intimate

14 relationship with Mr. Trump.

15     And then on March 26 Ms. Clifford filed a first amended

16 complaint in this Court.  There were proceedings prior to that,

17 but first amended complaint was filed on the 26th of March.

18 And in the first amended complaint, Ms. Clifford has moved for

19 declaratory judgment that no agreement was formed, confidential

20 or otherwise, and that in the alternative, she requests that

21 this Court declare any agreement null and void and invalid.

22     In this second amended complaint -- in this first amended

23 complaint, Ms. Clifford has also included a second count of

24 action for defamation against Mr. Cohen.  And in her defamation

25 claim, she alleges that on February 13th, 2018, Mr. Cohen made

1    a statement to the effect that just because something isn't

2    true, doesn't mean that it can't cause you harm or damage.

3        And the allegations in the first amended complaint allege

4    that because the facts and circumstances known to persons who

5    read or heard the statement, it was understood that Mr. Cohen

6    meant to convey that Ms. Clifford is a liar and that she lied

7    about her relationship with Mr. Trump.  She also claims that

8    the statement has exposed her to ridicule and, I think,

9    personal threats.

10       So separate and apart from the first amended complaint,

11   also pending before the Court is defendant Essential

12   Consultants' motion to compel arbitration; plaintiff's first

13   count in the first amended complaint, that's the declaratory

14   relief count; and then we have pleadings filed by Ms. Clifford

15   for expedited jury trial and limited discovery pursuant to

16   Section 4 of the Federal Arbitration Act.

17       The final matter that is before the Court concerns

18   Mr. Cohen's anti-slap motion for -- requesting an order from

19   this Court striking plaintiff's second count in the first

20   amended complaint, and that relates to the defamation count.

21       So all of these motions -- this case has exploded a little

22   bit since the start.  There are many matters before the Court,

23   and all of the motions were set to be heard by the Court on the

24   7th of May.  And I think all the lawyers were preparing for

25   that when the FBI raided Mr. Cohen's law offices -- or office,

1   residence and then hotel room.

2       Now, this Court is not privy to the warrant issued by the

3   magistrate judge in the Southern District of New York

4   authorizing the search of Mr. Cohen's premises, so it's not

5   clear to this Court what the breadth and scope of the criminal

6   investigation of Mr. Cohen is.

7       I have reviewed the docket that was generated by the

8   Southern District of New York concerning proceedings before

9   Judge Wood, and what I do know from a review of that docket --

10  and the Court can take judicial notice of court proceedings,

11  but what I do know from review of the docket, that a search

12  warrant was executed on April 9th authorizing the search of

13  Mr. Cohen's premises.

14      There were proceedings regarding the warrant that were

15  held before Judge Wood on the 13th of April and then on the

16  16th of April, and the proceedings concerned Mr. Cohen's motion

17  for restraining order restricting or precluding government

18  review of the items seized.  From a review of the docket, it is

19  clear that President Trump intervened in those proceedings, and

20  also, in opposition to Mr. Cohen's motion for restraining

21  order, the government filed a pleading indicating that

22  Mr. Cohen is under criminal investigation.

23      So that provides some backdrop to the request to stay

24  before the Court.  In the request to stay that's before the

25  Court, the defendants are requesting what they claim is a

1    limited stay.  It's a stay for 90 days.  They claim that the

2    stay is warranted because Mr. Cohen is a key witness and most

3    knowledgeable person with respect to the facts underlying the

4    civil action.  And because there is a criminal investigation

5    targeting Mr. Cohen and because his Fifth Amendment rights

6    against self-incrimination are implicated because of that

7    investigation in the proceedings before this Court, he will be

8    unable to fully defend himself.  And since he is the primary

9    witness in the proceedings before the Court, the other

10   defendants are also precluded or inhibited in defending

11   themselves because of the criminal investigation.

12        So that kind of sums up the background, procedural

13   background of the case.  I think the pleadings that have been

14   offered here, the Court has carefully reviewed the pleadings.

15   I think everyone understands that whether a stay is granted or

16   not, the Court has broad discretion to grant or not grant the

17   stay of civil proceedings in the face of criminal parallel

18   proceedings when the defendant's Fifth Amendment rights are

19   implicated.  And the law is pretty clear, I think it's briefed

20   on both sides, a stay in civil proceedings is not required in

21   the absence of substantial prejudice.

22        So the burden is on the party requesting the stay, so I'll

23   hear first from Mr. Blakely.

24             MR. BLAKELY:  Thank you, Your Honor.  Brent Blakely

25   for Essential Consultants and Michael Cohen.

1    The FBI raid that was conducted on April 9th pursuant to a

2    search warrant, which I will represent to the Court did include

3    information relating to Ms. Daniels and the $130,000 payment --

4         THE COURT:  I'm sorry, the lectern that you're

5    standing behind is adjustable, and so you can raise it because

6    you're a little bit taller.  It goes up and down.

7         MR. BLAKELY:  Thank you, Your Honor.

8         THE COURT:  It's our new state-of-the-art court

9    building.

10        MR. BLAKELY:  I experienced that two weeks ago in

11   Judge Hatter's courtroom, Your Honor.  Everything was breaking

12   down.

13        THE COURT:  Feel free.  Sorry.

14        MR. BLAKELY:  They seized all of Mr. Cohen's files,

15   his cell phones, his computers containing a number of records,

16   including all of his records in relation to this case, as well

17   as my attorney-client communications with Mr. Cohen.  All of

18   those documents, as Your Honor indicated, are now -- are now at

19   issue in the New York proceeding where Judge Wood is

20   determining if she's going to have attain team, what it's going

21   to -- you know, how those documents are going to be screened.

22        THE COURT:  So as I understand it, Mr. Cohen's

23   residence was searched, and as I understand, his residence was

24   being renovated or -- at the time, so his residence was raided,

25   his hotel room was raided, and then an office of some sort was

raided; is that correct?

          MR. BLAKELY:  That's correct, Your Honor.

          THE COURT:  Were items taken from all three locations?

          MR. BLAKELY:  My understanding -- I was with Mr. Cohen yesterday in New York.  My understanding is, yes, they took everything, and they still have it.

          THE COURT:  Please.

          MR. BLAKELY:  Certainly, Your Honor.

    So -- and as plaintiff's counsel has indicated, who was at that hearing, that records seized were related to this case, and he's gone on the record saying, yes, he has been working with the U.S. Attorney's Office, and he is predicting an indictment will come down in 90 days alleging serious allegations against my client.  So there is clearly overlap between the FBI seizure and this case.

    And also, Your Honor, particularly in the context of them seizing all of my client's records, again, clearly attorney-client communications between myself and Mr. Cohen, and we see this in a lot of cases, in the *Chrome Hearts* case that I cited that I actually had in front of Judge Birotte -- or actually have in front of Judge Birotte that's on stay, and there is currently a case --

          THE COURT:  In that case there were actual criminal proceedings that were filed.

1          MR. BLAKELY:  It was stayed twice, Your Honor.  The

2     first time they were stayed there were not, and so the first

3     stay was subject to a 90-day order.  And then they refiled, and

4     Judge Birotte granted another 90-day stay.  But also,

5     Your Honor, there was a case that was in front of Judge Carney

6     down in Santa Ana, the *Delphi* case, very similar situation,

7     where -- and again, I do a lot of these kind of brand

8     enforcement cases where there is counterfeit items that are

9     seized from law enforcement.

10          THE COURT:  I recognize you have many matters in the

11     Central District of California.

12          MR. BLAKELY:  Yes.  So I have run into this issue

13     many times, usually on the other side of the issue, where law

14     enforcement will come in, seize not only the allegedly

15     counterfeit goods, but the records themselves, and then

16     sometime thereafter, the plaintiff will bring a lawsuit.

17          THE COURT:  Let me just -- there's, I think, an

18     important issue raised by Mr. Avenatti, in that you have -- in

19     the motion to stay, you filed a declaration, and in your

20     declaration you state that on April 9th, 2018, the FBI raided

21     Mr. Cohen's premises and sought documents relating to the

22     payment of 130,000 to Ms. Clifford.  And then in the reply, you

23     state that this establishes the overlap between the facts in

24     the FBI investigation and the facts at issue in this case.

25          So let's put aside the issue of overlap.  Mr. Cohen has

1   filed at least two declarations in this case.  I think there

2   was a declaration filed on April 2nd, and then a declaration

3   filed after the FBI raid on April 9th, but he has not filed a

4   declaration personally declaring that his Fifth Amendment

5   rights will be compromised in the absence of a stay.  You're

6   asserting that.  You filed a declaration; Mr. Cohen has not.

7        So the question is:  Is there authority supporting the

8   granting of a stay in the absence of a declaration filed by the

9   parties whose Fifth Amendment rights would be implicated?  I

10  don't have any declaration from Mr. Cohen.  It's yours.

11       MR. BLAKELY:  Well, given what's occurred, Mr. Cohen

12  is not going to be doing any declarations in this case,

13  Your Honor.

14       THE COURT:  But the Fifth Amendment right is

15  personal to him.  He would have to assert it, not you.

16       MR. BLAKELY:  And I'm his representative.

17       THE COURT:  Yes.

18       MR. BLAKELY:  And so I --

19       THE COURT:  It's still personal to him.

20       MR. BLAKELY:  It is, but I can act on his behalf as

21  his attorney and assert it for him, just as any objection.

22       THE COURT:  Let me just see if I understand this.

23  The position you're taking today is that you will not be --

24  Mr. Cohen will not be filing a declaration before this Court

25  where he's requesting a stay because he believes his Fifth

1  Amendment rights on advice of counsel will be compromised?

2       MR. BLAKELY:  I don't think it's necessary,

3  Your Honor.  But if Your Honor would require that to grant,

4  again, a short stay to deal with the issue of his records and

5  even my ability to represent him in this case because, you

6  know, law enforcement has all of his files, you know, I would

7  consult with his attorneys in New York, and we can see if we

8  can provide a very narrowly tailored affidavit to that effect.

9       THE COURT:  Is there authority out there supporting

10 the granting of the stay in absence of such a declaration from

11 the party whose Fifth Amendment rights would be implicated?

12      MR. BLAKELY:  I'm not sure there's authority either

13 way.  In other words, Your Honor, I believe that as an

14 attorney, just like in any objection, I'm the one that's going

15 to assert the Fifth Amendment right.  For instance, if we were

16 in a deposition and, you know, my client would follow my

17 instructions --

18      THE COURT:  Yes.

19      MR. BLAKELY:  -- he doesn't make the objection; I do

20 on his behalf.

21      THE COURT:  You would advise -- if this was a

22 proceeding in court, you would -- and if your client was called

23 as a witness, you would advise your client to assert his

24 Fifth Amendment right.  The question would be asked, and your

25 client would be asserting his Fifth Amendment right.  If it was

1    a deposition, your client would be placed under oath.  You

2    would be at the deposition.  Questions would be asked, and you

3    would be advising your client not to answer the question, and

4    your client, on the record, would be asserting his Fifth

5    Amendment right.  There is no declaration offered to this Court

6    where he's indicated that he would do that, and based on the

7    advice of counsel, there's no declaration stating that his

8    Fifth Amendment rights would be compromised.

9             MR. BLAKELY:  Well, Your Honor, to respond to your

10   question, I think twofold:  happy to look up that issue to see

11   if there's, you know -- but also, again, we could provide a

12   very narrow affidavit from Mr. Cohen in that regard.

13             THE COURT:  Okay.  So let's move to the issue of --

14       Somebody is, I guess, touching microphones with paper.

15   That's technology.

16       So I would think that at the very least a declaration

17   would be required.

18             MR. BLAKELY:  Your Honor, I have just been informed

19   in the *Chrome Hearts* case, there was no declaration from the

20   defendant.  It was from counsel.

21             THE COURT:  Do you intend to file one or not?

22             MR. BLAKELY:  It seems like Your Honor is going to

23   require it, and so yes.

24             THE COURT:  I don't know what the eventual outcome

25   would be, but I would just like a definitive answer.

**UNITED STATES DISTRICT COURT**

1          MR. BLAKELY:  I think the answer to that is, yes, we

2     can file one as long as it's very narrowly tailored to that

3     issue.

4          THE COURT:  And then you are -- in the motion to

5     stay you filed a declaration.  In your declaration you state on

6     April 9th, 2018, the FBI raided Mr. Cohen's premises and sought

7     documents relating to the payment of $130,000 to Ms. Clifford.

8     And then in the reply, you indicate that this establishes the

9     overlap between the facts in the FBI investigation and the

10    facts at issue in this case.

11         And so I think the law is clear, and the authority is

12    *U.S. versus Bodwell* at 66 F.3d at 1000, the authority is clear

13    it's your burden not to show that there is any factual overlap.

14    Your burden is to show a large degree of overlap to justify a

15    stay.

16         So are there any other factual -- is there any other

17    factual overlap that supports a stay, other than what's

18    included in the declaration and in your reply?

19         MR. BLAKELY:  Your Honor, and that's kind of the

20    conundrum we're in right now because we don't have the

21    documents.  I do know what the warrant said, and it

22    specifically referenced Ms. Clifford and the $130,000 payment.

23         We do not have my client's files back yet, so we are not

24    in a position to evaluate that.  That's why, unlike the *Delphi*

25    case where they just stayed the entire action, we are just

1  asking for a short stay to evaluate exactly or to have

2  Judge Wood go through the process so that we can set in motion

3  getting those documents back and evaluating what could

4  potentially be at risk.

5      And also, as plaintiff's counsel said, whether or not the

6  U.S. attorney is going to hand down an indictment against my

7  client, and Mr. Avenatti said it should be coming down in 90

8  days, so --

9          THE COURT:  I want to put aside the statements that

10 there's been -- look, this case has been hotly discussed in the

11 press and elsewhere by counsel and parties and commentators,

12 and I think it's best to put all of that aside and focus on

13 admissible evidence before the Court.  So your statements or

14 Mr. Avenatti's statements are not going to be considered by the

15 Court.

16     So let me -- let's put this on hold, and let me hear from

17 Mr. Avenatti on the issues raised by the Court.

18     Mr. Avenatti, the conundrum here -- first of all, I think

19 everyone understands that the *Keating* factors apply.

20     You're going to have to stop with the rustling of the

21 papers with the microphone, please.

22     The *Keating* factors apply.  And in order for the Court to

23 determine whether a stay should be granted or not, the burden

24 is to show a large degree of overlap to justify the stay.  So

25 the problem or the conundrum for Mr. Blakely and his client is

1  that they don't really know what the government is

2  investigating in reference to Mr. Cohen.  So the breadth and

3  scope of the criminal investigation is a mystery.  It could

4  involve more than simply the payment of $130,000 to

5  Ms. Clifford.  And because it's unknown, any prudent lawyer

6  advising a client in the face of the civil proceedings that are

7  in this Court would probably have to advise his client to take

8  the Fifth and not answer questions.

9       So what do you have to say about that?

10            MR. AVENATTI:  Well, Your Honor, let me address a

11  couple things:  first of all, this is, as Your Honor noted,

12  their motion, and it is their burden.  They filed it on an

13  emergent or ex parte basis.  And when they did that, it was

14  their obligation to come before Your Honor with admissible

15  evidence supporting the application.  That was their burden,

16  and, Your Honor, they failed to do so.

17       The declarations submitted are completely inadequate to

18  support the relief they are seeking.  As Your Honor noted,

19  there is no declaration from Michael Cohen.  Even when we

20  pointed this out in opposition, they did not respond with a

21  declaration from Michael Cohen.  That was a strategic decision,

22  and it was a purposeful one.  It was not inadvertent; it was

23  not a mistake.

24       They did not respond with a declaration from Mr. Trump.

25  Again, a strategic, purposeful decision.  So the idea that now

1    we are going to give them yet a third bite of the apple to come

2    before the Court with a declaration supporting their ex parte

3    application, I do not believe the Court should permit them that

4    opportunity.  They have had every opportunity to submit

5    competent, admissible evidence.

6         Now, what could they have done?  They could have submitted

7    a declaration from Michael Cohen that stated that it was his

8    intention to invoke his Fifth Amendment rights if this case

9    were to continue.  But in reality, Your Honor, publicly

10   Mr. Blakely stated just the opposite, that no decision had been

11   made by Michael Cohen as to whether his Fifth Amendment rights

12   would truly be implicated in connection with this matter.

13        What else could they have done, Your Honor?  And what have

14   you seen in other cases before you?  What you've seen is not

15   just the declaration, but you've seen exhibits attached to the

16   declaration.  And, in fact, if you look at the cases they cite,

17   you have many exhibits, such as a copy of the grand jury

18   subpoena, such as a letter from the assistant U.S. attorney,

19   things of that nature.

20             THE COURT:  Mr. Avenatti --

21             MR. AVENATTI:  We have none of that.

22             THE COURT:  -- I think I share your concern or the

23   objection that you raise concerning the lack of a declaration

24   from Mr. Cohen.  Separate and apart from that, the Court can

25   take judicial notice of certain events.  It is clear from this

1  Court's review of the docket before Judge Wood, the government

2  has targeted Mr. Cohen.  There is a criminal investigation.

3  The FBI has raided his premises.

4      I have been on this court for a number of years, and I can

5  tell you, based on my experience and common sense, that if the

6  FBI is raiding the premises of and the offices of a lawyer, and

7  that lawyer is counsel to the president, or at least at one

8  time was counsel to the president, that is a significant and

9  serious matter.

10          MR. AVENATTI:  And, Your Honor, I would agree with

11  that, but let me touch -- let me touch briefly, if I could, on

12  the raid and my understanding of the raid.

13      First of all, the comments of counsel here today, those

14  are not -- that's not evidence, and that's not proper evidence

15  before the Court relating to what was seized and the content of

16  the warrant, et cetera, so those statements on the record,

17  that's not proper evidence.

18      Here's my understanding, Your Honor.  My understanding is

19  that the FBI raided the three locations.  While on the

20  premises, they imaged cell phones, computers and the like, but

21  according to the assistant U.S. attorney, Tom McVey, on the

22  record before Judge Wood on Monday, those items were left

23  behind.  They took the images with them, but they left the

24  computers and the cell phones behind.  The only thing they took

25  with them, according to Mr. McVey, constituted a total of ten

1   bankers boxes of documents.  There is no showing that any of

2   those documents relate to this case.

3        Counsel stated that the FBI took various attorney-client

4   privileged communications between him and his client.  My

5   understanding is that Mr. Blakely's office was not raided.

6   They didn't confiscate anything from Mr. Blakely, so

7   Mr. Blakely has a copy of those communications.  And according

8   to the assistant U.S. attorney, Mr. McVey, in charge of the

9   investigation or the prosecution -- potential prosecution, the

10  FBI left behind the cell phones, the computers, et cetera.  So

11  there's no prejudice as it relates to that.

12       And let me touch on one other thing, Your Honor.

13           THE COURT:  Aren't the statements of Mr. McVey,

14  isn't all of that hearsay, and you're asking the Court to

15  consider Mr. McVey's statements?

16           MR. AVENATTI:  Your Honor, I don't know where the

17  line is going to be drawn relating to what's hearsay and what's

18  not, so I just want to put that on the record.  And ultimately,

19  if Your Honor decides to treat those statements similar to

20  statements of Mr. Blakely, I completely agree.

21           THE COURT:  What I do know, I think, based on

22  admissible evidence, again, review of the docket before

23  Judge Wood, is that the premises of Mr. Cohen was raided by the

24  FBI.  There's a criminal investigation by the FBI.  I assume

25  that every item of evidence that relates to any criminal

1　activity was seized by the FBI, including imaging of hard

2　drives and so on and so forth.  And it would appear to the

3　Court, again, that that's a serious matter, and it would take

4　some time before a party or counsel would be able to assess the

5　situation to determine precisely, you know, what's involved

6　here.

7　　　　The warrant is not publicly disclosed so we don't know,

8　and it hasn't been -- I'm not privy to it, so I don't know the

9　scope or breadth of that investigation.  But if you're a lawyer

10　representing a client, you have to assume the worst, you know,

11　expect the unexpected and advise the client appropriately.  And

12　I would think the advice would probably be to exercise or

13　assert your Fifth Amendment right.

14　　　　　　MR. AVENATTI:  And, Your Honor, you may be right

15　about that, but it doesn't necessarily follow that just because

16　of that, you automatically get a stay in the civil case.

17　　　　　　THE COURT:  No, I agree.

18　　　　　　MR. AVENATTI:  And Mr. Blakely has access, by way of

19　his client, to the content of a warrant, presumably, and he

20　could have filed it in an in camera review.  And, Your Honor,

21　you set forth the standard perfectly when you were asking

22　counsel questions.  The question is or the standard is

23　substantial overlap between the criminal case, which there is

24　not a criminal case right now; there's just an investigation

25　and this case.  There's no evidence of substantial overlap at

1  all.

2      All we know, according to Mr. Blakely, according to his

3  statements, which are not admissible evidence, that they

4  seized, among a whole host of other things, information

5  relating to this $130,000 payment and the agreement.  That's

6  all we know.

7      For all we know, Your Honor, the criminal investigation is

8  focused on -- there's been discussion about taxi medallions,

9  other business interests of Mr. Cohen, perhaps ties of

10 Mr. Cohen to individuals in Russia.  There's a whole wide range

11 of things that investigation could relate to.  There is no

12 competent evidence in this court of any overlap -- frankly,

13 substantial overlap warranting a stay of this case.

14 Your Honor, our position is that alone should end the inquiry

15 as it relates to the motion.

16          THE COURT:  It's not just an investigation.  I've

17 denied stays in prior matters when it was just an

18 investigation.  Again, you have to look at the nature of the

19 investigation here, investigation by FBI warrant issued by

20 magistrate judge, because I've been involved in warrants

21 before, and when you have situations of this magnitude, you're

22 going to make sure that it's more than a bare-bones case.

23 You're going to make sure all the I's are dotted and the T's

24 crossed because of the significance in nature.  And again, I

25 would think it's probably substantially likely there's going to

1  be some type of criminal action to follow, so --

2          MR. AVENATTI:  And, Your Honor, I would agree with

3  that, but we don't know if it's going to have anything to do

4  with this case.

5          And going back to Your Honor's question relating to the

6  implication of the Fifth Amendment, first of all, counsel is

7  mistaken; it's not for counsel to invoke the Fifth.  The law is

8  clear that the client has to invoke the Fifth.  But even more

9  important than that, Your Honor, even if Mr. Cohen is forced to

10  invoke the Fifth Amendment, so be it.  It happens not on a

11  regular basis, but it happens in case after case in connection

12  not only in the Central District, but other locations.

13          As the ESG Court noted, and we cited this case, it's

14  Judge Wright, 2014, the defendant can't have it both ways using

15  the Fifth Amendment only when it is convenient for him and his

16  interests, and the same would be true in this case.

17          Your Honor, Mr. Cohen, furthermore, is not the only

18  witness in the case.  There's a whole host of other witnesses.

19  There's been no showing that even if he invokes his

20  Fifth Amendment right, that somehow he cannot defend himself or

21  Mr. Trump cannot defend himself.  Mr. Trump can testify.

22  Mr. Davidson, my client's former counsel, can testify.  The

23  witnesses from First Republic Bank where the $130,000 payment

24  emanated from can testify.  Perhaps Mr. Cohen's spouse can

25  testify depending on what that relationship is or what the

1   situation is.  Mr. Cohen's assistant can testify.  I mean, the

2   list goes on and on.

3      There's been no showing -- in fact, there's no declaration

4   from Mr. Cohen or Mr. Trump that state, "We can't defend

5   ourselves if Mr. Cohen has to plead the Fifth Amendment."

6   There's crickets on that issue, Your Honor.

7      THE COURT:  Let's put the issue of less drastic

8   measures aside for right now.  Let me go back to Mr. Blakely.

9      Thank you, Mr. Avenatti.

10      So another -- I think another important point raised by

11   Mr. Avenatti has to do with the issue of waiver of Mr. Cohen's

12   Fifth Amendment privilege.  And so in the opposition to the

13   stay, Mr. Cohen -- Mr. Avenatti argues that Mr. Cohen waived

14   his Fifth Amendment privilege by filing two declarations in

15   this case, by being advised that the plaintiff was claiming

16   criminal violations in the first amended complaint when the

17   complaint was filed.  And I think the first amended complaint

18   makes reference to violations or alleged violations of certain

19   campaign laws.

20      What is a bit of a mystery, I understand -- I understand

21   the filing of the declaration on April -- I think April 2nd

22   before the FBI raid, but after the FBI raid there was a

23   declaration filed by Mr. Cohen.  The FBI raid occurred on April

24   9th, and Mr. Cohen filed a declaration on April 9th after the

25   FBI raid, and the claim is that you can't have it both ways.

1  You can't offer a declaration and then claim thereafter,

2  especially after the raid, that a person's Fifth Amendment

3  right is now at issue.

4      Again, I don't have a declaration from Mr. Cohen

5  indicating when he realized that his Fifth Amendment rights are

6  implicated.  There's some gaping holes here.

7          MR. BLAKELY:  Well, Your Honor, that has more to do

8  with my office's knowledge than anybody else.  That declaration

9  was prepared --

10         THE COURT:  There's gaping holes.

11         MR. BLAKELY:  Well, that declaration was prepared

12  before the raid.

13         THE COURT:  Yes.

14         MR. BLAKELY:  After the raid, they knew as much

15  as -- you know, I knew as much as anybody else.  I thought it

16  was in connection with the Mueller investigation on Russia,

17  didn't think it had anything to do with this case.  When we

18  found out the following day, the following night --

19         THE COURT:  Mr. Blakely, I understand when the FBI,

20  metaphorically speaking, is kicking down doors, I understand

21  that can cause a lot of confusion, a lot of distraction, and I

22  can understand that before someone realizes the consequences of

23  all of this, it can take some time.  I recognize that.  The

24  fact that there was a declaration filed on April 9th, after the

25  raid, can be explained, I recognize that, but there's no

1  declaration here by Mr. Cohen.  There's no declaration filed by

2  Mr. Cohen that at some point in time after all this occurred he

3  realized, based on advice of counsel or from some other source,

4  that his Fifth Amendment rights are implicated.

5          MR. BLAKELY:  And without getting into privilege, I

6  mean, there were a lot of communications on Tuesday, and then

7  we raised the matter immediately with counsel and got it before

8  the Court as soon as possible.

9          THE COURT:  I think we're almost like two ships

10  passing in the night, because you're making the statements;

11  Mr. Avenatti is saying your statements are not evidence; I'm

12  suggesting that your statements are not evidence; and you

13  continue to offer the statements by yourself.  And what's

14  important here is Mr. Cohen's statements or claims.

15          MR. BLAKELY:  I think that as his counsel, as in the

16  *Chrome Hearts* case --

17          THE COURT:  Let's just have clarity.  If that's your

18  position and it's not going to change, then there's no need to

19  further discuss.

20          MR. BLAKELY:  As I previously indicated, Your Honor,

21  we will submit an affidavit from Mr. Cohen on that issue.

22  Again, as Your Honor indicated, the Court can take judicial

23  notice of the proceedings in New York, and it sounds like it

24  has, and it's very clear --

25          THE COURT:  Mr. Blakely, let me make it clear.

1   There's a lot that occurred in New York and a lot of statements

2   made by the lawyers in New York that the Court cannot take

3   judicial notice of.  I can take judicial notice of certain

4   events based on docket information, but the substance of

5   comments made in declarations, so on and so forth, are probably

6   not the basis for judicial notice.

7           MR. BLAKELY:  And, Your Honor, as I indicated

8   earlier, that's kind of the conundrum we're in.  This is a very

9   unusual situation where you have a no-knock warrant issued on

10  an attorney for the president of the United States.

11          THE COURT:  I appreciate the significance.

12          MR. BLAKELY:  And things are moving fast, and we're

13  trying -- and I hope Your Honor can appreciate, we tried to get

14  this in front of the Court as fast as we could.

15          THE COURT:  The reason why I set it for hearing

16  today is I recognize that the parties were proceeding on

17  hearings on May 7th, and then the FBI raid took place and a lot

18  occurred and you had to rush to move for a stay.  And I

19  recognize that a lot of work had to be done in a short period

20  of time, and that's why we are having a hearing today.

21          MR. BLAKELY:  And also, Your Honor, the affidavit

22  was submitted in connection with an anti-slap motion in regard

23  to a statement.  Whatever was said in that affidavit does not

24  involve the issues that appear to be overlapping with the

25  investigation.  And really, that's -- the anti-slap is really

1  just kind of a question of law.  Is the statement an opinion?

2  Is it truth?  It's, you know -- I don't think it really

3  implicates what's going on with the investigation and potential

4  indictment of my client.  And I can tell you as counsel for

5  Mr. Cohen, he is not waiving his privilege with regard to

6  what's going on in that investigation.

7        And again, I don't -- and again, yes, it is hearsay.  Go

8  ahead.

9              THE COURT:  Go ahead.  Finish.  I didn't mean to.

10             MR. BLAKELY:  My understanding is that the U.S.

11  attorney's office has all of my client's files and has not

12  returned them or made copies of them for my client, and that

13  puts us in a very unusual situation.

14             THE COURT:  I recognize -- I recognize reasonable

15  deducible inference at this point based on the review of the

16  docket by this Court before Judge Wood, the matters before

17  Judge Wood, it's going to be very hard to predict exactly the

18  nature and scope of the FBI's investigation.  It could go a

19  number of different directions, and because of that, it's a bit

20  difficult for you to establish overlap between the criminal

21  proceedings and the civil proceedings.  I appreciate that.

22        Let's go to another point that was raised by Mr. Avenatti,

23  and that is that in determining whether a stay should be

24  granted or not, the Court should also consider whether there's

25  less drastic means that could be imposed.  And he suggested

1   that if there's a deposition of your client, that your client,

2   Mr. Cohen, can assert his Fifth Amendment rights at the

3   deposition on a question-by-question basis.  So why shouldn't

4   the Court consider that?

5           MR. BLAKELY:  Well, Mr. Avenatti has indicated in

6   his motion to -- for expedited discovery that he wants to

7   inquire into many of the issues that I believe are subject to

8   the federal investigation, and that is a very drastic

9   situation, particularly in the context of where we sit right

10  now, not knowing what the government is doing, that my client

11  would have to assert the Fifth to practically everything, and

12  that is very drastic.

13      So basically -- and obviously, plaintiff, you know, as I

14  expect plaintiff would, would like that situation because it

15  gives him a much greater chance of prevailing.  I think in 90

16  days or even 40 days, I think, whatever Your Honor -- we are

17  asking for basically a brief hit-the-pause-button, give

18  Judge Wood the opportunity to issue whatever ruling she is

19  going to issue with regard to these documents, we get our files

20  back, and probably get a better understanding of the full

21  extent of the overlap.

22      I think on one hand of the spectrum, if I was just asking

23  Your Honor to stay the entire proceeding, and then you've got

24  Mr. Avenatti on the other end of the spectrum saying my client

25  just needs to take the Fifth and we get to tear up the

1  contract, we are actually asking for a very modest stay to give

2  us an opportunity to evaluate exactly what is happening in

3  New York with the documents and this investigation.

4      THE COURT: So I don't -- I guess I'm trying to

5  summarize your point, and what you're saying is that if the

6  Court would deny the request for a stay, allow discovery to go

7  forward, and if your client was deposed, your client would be

8  asserting his Fifth Amendment right almost to any question that

9  would be asked by Mr. Avenatti, and, therefore, that whole

10 taking of the deposition would be a futile act?

11     MR. BLAKELY: Yes, Your Honor, because I think that

12 would be the prudent thing because we're talking on the one

13 hand about my client's potential liberty, and without knowing

14 exactly what the charges -- if there are going to be charges

15 and what those charges are, that would be, I think, as

16 Your Honor indicated, the reasonable advice to give.

17     THE COURT: Do you have any other points to make at

18 this juncture?

19     MR. BLAKELY: Well, certainly I know that the

20 potential prejudice one way or the other is a factor for the

21 Court to consider. You know, on our part, as I think we talked

22 about, there will be considerable prejudice to my client if he

23 were forced to assert the Fifth to questions in this

24 proceeding, and it would also, as Your Honor can appreciate,

25 give rise to a host of discovery disputes in front of the

1 magistrate judge and unduly burden the Court.

2      On the other hand there is absolutely no prejudice, none

3 whatsoever, to plaintiff to grant a short stay. If you look at

4 the *Delphi* case, Judge Carney pointed out the fact that from

5 the time of the seizure, the plaintiff waited six months and

6 used that as a factor to say, "How are they prejudiced if they

7 waited?"

8      Here, Your Honor, plaintiff waited 16 months honoring the

9 agreement until she decided suddenly that she wanted to tear it

10 up, even though the agreement makes it very clear there is a

11 confidentiality provision. This has not prevented Ms. Clifford

12 from going on 60 Minutes or The View or her counsel having at

13 least 53 appearances, 54 tonight if you include Bill Maher, to

14 talk about her story, which she, pursuant to contract, is

15 prohibited from doing. Frankly, I can't think of a situation

16 where they won't talk to the press about this. And so there's

17 just no prejudice, Your Honor.

18        THE COURT: Let me stop you there, and let me hear

19 from Mr. Avenatti on the issue of prejudice.

20      So, Mr. Avenatti, there's two parts to the first amended

21 complaint. In the first count you're essentially suing to

22 allow your client to be able to tell her story without threat

23 of litigation. And I recognize that the defendant here,

24 Mr. Cohen, moved for an injunction before a judge, with ADR,

25 based on the agreement itself, but separate and apart from

1   that, since this litigation started, your client has been on

2   60 Minutes, has been on The View.  The claim here is that this

3   suit to tell her story, there's no prejudice because she has

4   told her story, and she continues to tell her story.  So that's

5   an important issue.

6           MR. AVENATTI:  That is an important issue,

7   Your Honor, but I would disagree with counsel.  There's even

8   more substantial prejudice in this case than when you have a

9   standard case, if you will, for the following reason,

10  Your Honor:  the harm to my client.  The threat to my client is

11  continuing with each passing day.

12          THE COURT:  She doesn't appear to be deterred.

13          MR. AVENATTI:  Well, Your Honor, she's given two

14  interviews.  They continue to tell us repeatedly that every

15  time she speaks, they're going to sue her for a million

16  dollars.  They hold the agreement over her head day in and day

17  out against my client.  They do that.

18          THE COURT:  I'm sorry, it hasn't deterred her.  She

19  doesn't believe it.

20          MR. AVENATTI:  Well, Your Honor, I don't know that

21  you can actually state that it hasn't deterred her because

22  there's been a number of things she hasn't done.  I will make a

23  representation to the Court, there's a number of things that

24  she has not done out of fear, out of threat relating to this

25  million dollars liquidated damage clause.

1      They cannot, Your Honor, continue to hold the agreement

2  over my client's head as a threat and tell her they're going to

3  take her house, wipe her out, go on vacation.  Michael Cohen

4  stated -- this is not hearsay.  This is a statement by a party,

5  that he was going to effectively bury my client, sue her for

6  over $20 million and take an extended vacation on her money.

7  That's what he said during the pendency of this case,

8  Your Honor.

9      So he can't make those threats and those statements in

10 reliance on the very NDA that we sued on and at the same time

11 claim that somehow there's no continuing prejudice in the case,

12 Your Honor.

13             THE COURT:  When was that statement made?

14             MR. AVENATTI:  The statement was made about two or

15 three weeks ago.

16             THE COURT:  And since that statement, your client

17 has been on The View.

18             MR. AVENATTI:  Correct.

19             THE COURT:  Yes.  Not deterred.

20             MR. AVENATTI:  Not deterred as it relates to that

21 interview, Your Honor.  But again, are they going to make a

22 representation to the Court that they have no intention of

23 holding my client to a million dollars liquidated damage clause

24 every time she speaks or I speak?  If they are willing to make

25 the representation on the record here today and waive those

1    rights on behalf of Mr. Cohen and Mr. Trump, to the extent they

2    actually have those rights, I think it changes the inquiry.

3         But I do want to talk, if I could, about a couple of the

4    other issues that Your Honor raised.

5              THE COURT:  Yes.  Which are?

6              MR. AVENATTI:  The issue of the declaration that was

7    submitted after the raid, Your Honor.

8              THE COURT:  Yes.

9              MR. AVENATTI:  At no point in time, all the way up

10   through this very moment, did they move to withdraw that

11   declaration or strike it after having submitted it, number one.

12   Number two, it's almost two weeks later, Your Honor.  The raid

13   occurred on a Monday.  This Monday will be two weeks.  We still

14   don't have a declaration from Mr. Cohen.  We don't have

15   anything from Mr. Cohen.  Why should they be given another

16   opportunity to submit another declaration?

17        And here I think, Your Honor, is, perhaps, one of my post

18   important points.  Discovery is not open yet in this case,

19   Your Honor.  We haven't even had the Rule 26 conference.  We

20   have a pending motion for a deposition that Your Honor has

21   slated to take up in the first two weeks of May, our motion.

22   There is no prejudice to Mr. Cohen if a stay is denied by this

23   Court today.  There's no prejudice whatsoever.

24        And, Your Honor, as it relates to the less intrusive

25   means, they don't even address that in their papers on reply.

We raised that clearly in our opposition. They failed to even

address it in the reply. And, Your Honor, furthermore, the

*Keating* court specifically held that a defendant's reliance on

the fact that he or she may have to have an adverse inference

drawn as a result of the invocation of the Fifth Amendment is

not enough to justify a stay. And yet, that's exactly what

Mr. Blakely is arguing. He's arguing that Mr. Cohen should not

be put in a position where he has to plead the Fifth on

deposition and then have an adverse inference drawn against

him.

THE COURT: Correct me if I'm incorrect, but in

*Keating*, wasn't there a stay? There were two criminal

proceedings: there was a state proceeding, and there was a

stay for nine months; and then there was a federal proceeding.

And the federal proceeding, which was very different from the

proceeding here because it involved the Office of Thrift

Management, and there was issues of mismanagement by

Mr. *Keating* and issues of restitution owed to the public in the

sum of 36 million. There was a decline for a second stay, but

there was an initial stay of nine months.

And in the *Keating* case, there was another issue raised

that the parties have not raised in this case, and that was an

issue of due process, that it could be unfair to a party to

cause a party faced with a parallel criminal proceeding to

distract from the defense of that criminal proceeding by having

1    the party involved in the litigation of a civil proceeding.

2              MR. AVENATTI:  Your Honor, there is no criminal

3    proceeding.

4              THE COURT:  Well, but I recognize that an indictment

5    hasn't been filed, but this is not your standard case.

6              MR. AVENATTI:  I agree with that.

7              THE COURT:  And I would think that something big is

8    going to follow.

9              MR. AVENATTI:  Well, Your Honor, and it may, but it

10   may have nothing to do with this case.  That's the point.  And

11   the problem, Your Honor, is that we are -- you and I are -- you

12   and I are in the dark right now.  The Court and plaintiff's

13   counsel, we are in a room of darkness, and the problem is is

14   that the folks that have the matches refuse to strike them,

15   refuse to illuminate for us, for the Court and for plaintiff's

16   counsel, what they know.  And that's a strategic, purposeful

17   decision, and they need to be held accountable for it.

18              THE COURT:  Mr. Avenatti.

19              MR. AVENATTI:  I don't know what the warrant is.

20              THE COURT:  Mr. Avenatti, the party that has the

21   matches is the government, and the government knows what they

22   know and no one else does.  And constitutional rights are

23   extremely important, and so the Court has to be very careful

24   about the proceedings here.  You have raised very good points

25   and I think some very meritorious points.

1           MR. AVENATTI:  And, Your Honor, to be clear, we are

2   not trying to trample on Mr. Cohen's constitutional rights.

3   His Fifth Amendment right is intact.  He can plead the

4   Fifth Amendment in response to any question that may be posed

5   at a deposition.  He could potentially refuse to provide

6   documents.  He could do any of that.  That happens on a not

7   regular basis, but it happens in civil litigation.  I've had a

8   number of cases where it's happened, but it doesn't mean that

9   he can't defend himself in the case or that Mr. Trump can't

10  defend himself in the case.

11          THE COURT:  So let's go to the other prejudice to

12  your client.  So you have two counts in the first amended

13  complaint:  one, in the first count you are basically claiming

14  you would like -- you are suing for the right for your client

15  to tell her story, so I understand that.  In the second count

16  there's a defamation claim against Mr. Cohen.

17      So is the Court in this case able to separate the two?

18  Can we proceed on the second claim or second count regarding

19  defamation?  Because that's already been teed up.  The motion

20  has been filed by -- there's a slap motion -- anti-slap motion

21  filed by Mr. Cohen.  You have to respond.  We could go forward

22  with a hearing at least as to that count.  Does that make sense

23  to you?

24          MR. AVENATTI:  Not exactly, Your Honor, for the

25  following reason.  I think the motion to compel arbitration has

1  to be decided first because depending on the decision on that

2  motion, an argument could be made that that claim, the

3  defamation claim, actually has to be decided in arbitration.

4  So I think that the sequencing that has to occur is the motion

5  to compel arbitration has to be decided, and whatever flows

6  from that has to occur before Your Honor takes up the anti-slap

7  on the defamation claim, but I want to address this prejudice

8  point.

9        THE COURT:  Let me just stop you there.  I didn't

10  understand Mr. Cohen's pleadings to suggest or indicate that

11  the defamation claim should be decided in arbitration.  I

12  thought they were treating it separately and that the matter

13  could be decided by this Court and it's not subject to

14  arbitration.

15        MR. AVENATTI:  Well, Your Honor, our position is

16  that as to arbitration, they all go together.  So either --

17  either all of the claims go to arbitration or none of the

18  claims go to arbitration.  It's our position that none of the

19  claims should go to arbitration.  And we haven't had a chance

20  to oppose the anti-slap, and that's why Your Honor hasn't been

21  informed of our position on that point prior to today.  That

22  was an issue we were going to raise in opposition to the

23  anti-slap.

24     Going back to your point, Your Honor, as it goes to the

25  defamation claim, we have considerable concerns that if a stay

1  is granted in this case, that Mr. Cohen is going to be unable

2  to ultimately pay a judgment that may be obtained for his

3  defamatory conduct.  He's got multiple investigations now,

4  evidently, or litigation matters.  The government may very well

5  seize assets.  We don't know.  He is going to have to spend a

6  considerable amount of money on attorney's fees and the like.

7  We don't know if he is going to be gainfully employed in light

8  of what's going on.  So ultimately, my client cannot be left

9  with a worthless judgment for defamation.

10      So when we talk about a stay, Your Honor, and we talk

11  about 40 days versus 90 days, here's the other problem with the

12  request as it relates to timing, and it goes to this

13  prejudicial point, Your Honor.  Here's the problem.  There is

14  no showing that we are going to know any more in 40 days or 20

15  days or 90 days.  Your Honor has more experience than many

16  judges relating to these investigations and these warrants and

17  the like.  This thing can take 18 months or two years.

18          THE COURT:  I think your point is a good one.  I'm

19  not sure we are going to know in 90 days.  If we do know

20  something in 90 days, I would think that there's going to be

21  another request to continue the stay.

22          MR. AVENATTI:  Right.  And, Your Honor, that's the

23  strategy here, quite honestly.  It's 90 days, 90 days, 90 days,

24  and they will be making the same arguments.  There is no

25  indication from the FBI, the assistant U.S. attorney's office

or anyone else as it relates to time.  I may have my own

beliefs as related to timing, but that's not evidence, and at

the end of the day, it doesn't matter to the Court what my

opinion on those issues is, quite frankly.

        THE COURT:  I don't know what the strategy is, but

it seems to me that, you know, when we are talking about Fifth

Amendment rights and constitutional rights, those are important

rights --

        MR. AVENATTI:  And, Your Honor --

        THE COURT:  -- not only to the parties, but to

everyone as a whole, and those rights have to be protected.

        MR. AVENATTI:  And, Your Honor, I could not agree

with you more, and no one is suggesting that they can't be

protected.  If necessary, he can plead the Fifth.  Thank you.

        THE COURT:  And in reference to the other prejudice

to your client, the Courts consider loss of witnesses, the

witness's loss of memory regarding the events.  I don't see

that applying here because it appears, at least from my view,

that the primary key witnesses here are your client, Mr. Cohen,

and the lawyer that represented your client when that agreement

was discussed.

        MR. AVENATTI:  Well, Your Honor, I would

respectfully disagree.  There are other key witnesses in this

case, including individuals at the bank, First Republic Bank,

that processed this $130,000 payment that had communications

1  with Mr. Cohen relating to that payment.  They are going to

2  undoubtedly be key witnesses.  There's going to potentially be

3  one or more depositions of Mr. Cohen's assistant or others

4  within his office that assisted in connection with this

5  transaction.  I'm sure that other individuals were privy to the

6  negotiation and the communications relating to the NDA

7  agreement negotiation, as well as the $130,000 payment.  We are

8  going to find out who those individuals are.  We are going to

9  seek discovery against them.

10      Your Honor knows from Your Honor's extensive experience

11  that sometimes you don't know who all the key witnesses are in

12  a case in the very beginning, and you find out that, in fact,

13  the most important witness you don't discover for a period of

14  months or maybe even a year or more in discovery.

15          THE COURT:  That's true.

16          MR. AVENATTI:  So I do not agree that the only

17  witnesses or key witnesses in the case are Mr. Trump,

18  Mr. Cohen, Mr. Davidson and my client.  I think there's a

19  number of other witnesses.  We don't know what is going to

20  happen with their memories.  We don't know if they are going to

21  be available if a stay is implemented or not.  We just don't

22  know.  That's an extensive risk to make under the

23  circumstances, especially when there's been no criminal charges

24  here.

25          THE COURT:  Your point is well taken.  I think

1   you're right.  It's often that discovery discloses that there's

2   other important persons who could be key, and at this point

3   you're not able to know all of that.

4          MR. AVENATTI:  Thank you.

5          MR. BLAKELY:  Your Honor, may I just briefly be

6   heard on the anti-slap issue?

7          THE COURT:  Yes, go ahead.  I think it's a good

8   opportunity.

9          MR. BLAKELY:  Thank you, Your Honor.

10       Just very quickly, Your Honor, the defamation claim --

11         THE COURT:  Yes.

12         MR. BLAKELY:  -- is a severable claim.  It's not

13  part of that agreement.  There's no pending motion to compel

14  that claim.  The only motion to compel into arbitration is the

15  first claim.  And as far as anti-slap, if the Court rules on

16  it, whatever way the Court rules on it, it's automatically

17  appealable to the Ninth Circuit.  That's circuit law.

18         THE COURT:  I think the anti-slap provision provides

19  for immediate appeal, so the statute itself.

20         MR. BLAKELY:  So that defamation claim is not going

21  anywhere.

22         THE COURT:  So are you suggesting that the Court can

23  go forward on the defamation?

24         MR. BLAKELY:  It's briefed.  We are not submitting

25  anything else on it.  The declaration, we will probably do a

1    reply brief, but -- and again, just from -- you know, the

2    defamation claim is on a very discrete issue of a statement

3    that Mr. Cohen made, and the question before the Court is

4    whether that statement is an opinion, a truthful statement,

5    privileged.

6              THE COURT:  Yes.  The other *Keating* factor includes

7    the convenience of the Court in management of its cases and

8    efficient use of judicial resources.  What do you have to say

9    about that?

10             MR. BLAKELY:  I touched on that earlier, Your Honor.

11   And again, you know, without having my client's files, without

12   being able to properly evaluate what evidence we have and

13   information we have, this is going to turn into one big

14   discovery dispute in front of the magistrate.

15             THE COURT:  I think this is a case that I would be

16   handling.

17             MR. BLAKELY:  Well, then, it's going to be even

18   worse, Your Honor, because I know how many cases the judges in

19   this court have right now, you know.  It would be using up a

20   lot of your time on a discovery dispute when, frankly, you

21   could be handling a lot more important issues in criminal cases

22   and whatnot that I'm sure the Court has.  I don't think that --

23   I think that it's -- as in the case that Judge Carney handled,

24   he discussed that, and it's actually in the Court's interest to

25   give it a stay.  *Delphi.*  I apologize, Your Honor.

1          THE COURT:  Okay.  So, Mr. Avenatti, do you have any

2    comments on that, the convenience of the Court and management

3    of its cases?  Do you have any comments there?

4        Look, I'm here to treat all cases seriously.  I do have --

5    as I mentioned in another pleading, this is not the most

6    important case.  Today it's the most important case.  And when

7    I have a case, I treat each case importantly.  And I recognize

8    this is important to the parties here.  That being said, if

9    there is an indictment that occurs in New York, and if

10   Mr. Cohen's indicted, doesn't that have the potential of

11   streamlining this case here?

12          MR. AVENATTI:  Well, Your Honor, I don't know

13   because we don't know what that indictment is going to state.

14          THE COURT:  Yes.

15          MR. AVENATTI:  And that's why -- you know, that's

16   why the status quo of this case should be maintained, meaning

17   there should be no stay because, again, we don't know what the

18   indictment is going to state.

19        But I do want to address this issue of the judicial

20   efficiency.  As Your Honor has noted in a number of cases,

21   including the *Perez* case, the interest -- the Court has an

22   interest in clearing its docket in a timely manner, and that's

23   a significant interest.  We have no idea how long this

24   investigation could take.  I made the point earlier, it could

25   take three months, six months, a year, multiple years.  We

don't know.  Mr. Cohen may never even be charged.  There is a

possibility that he may never be charged for a whole variety of

reasons.  We don't know -- we don't know what is in play.  We

don't know who is overseeing that.  We just don't know.

So the idea that somehow we are going to push the pause

here for an indefinite period of time and that somehow the case

is going to remain on the docket for potential years on end, I

just don't think, Your Honor, is well founded.  The Court has

an interest in clearing the case off its docket.  I don't agree

about there's some bogeyman in the closet relating to all of

these discovery disputes that Your Honor is going to have to

decide.

I have a lot of experience in front of Your Honor in other

cases; I'm sure counsel does as well.  Your Honor in cases past

has been a pretty no-nonsense, cut-right-to-the-chase kind of

judge, and I'm confident that Your Honor is not going to be

entertaining frivolous discovery disputes on issues.  My belief

is if there's a discovery dispute, we are probably going to

have one or maybe two total during the pendency of the case

because I think we both have enough experience with this Court

to know what we should and should not be doing as it relates to

discovery.

So this whole idea that somehow if a stay is not granted

that it's going to increase discovery disputes and further

complicate them, Your Honor, there is no further basis for

1   that.  It should be a pretty straightforward case.

2            THE COURT:  Yes.  As I recall, you were on the Stoll

3   Nussbaum case.

4            MR. AVENATTI:  Yeah.

5            THE COURT:  Which in any event, the concern

6   regarding discovery here, that this is not your typical

7   standard discovery dispute.  The issues that would be raised

8   here are going to be Fifth Amendment issues and

9   self-incrimination issues.  So the Court may be required to, on

10  a question-by-question basis, determine what Mr. Cohen should

11  be compelled to answer or not, and that could be a

12  time-consuming task.

13           MR. AVENATTI:  Perhaps, Your Honor, but again, we

14  don't know because the way the law -- the law provides for a

15  procedure whereby we notice up a deposition, a deposition is

16  set or Your Honor grants us the right to take the deposition.

17  It's, Your Honor a multi-step process, as we all know.  We ask

18  a question; the witness invokes or doesn't invoke; we then

19  digest that answer and decide whether he should be compelled to

20  testify beyond that; and a determination is made.

21           So who knows.  If he ends up taking the Fifth as to

22  various questions in his deposition, we may not even move to

23  compel answers.  We may just be satisfied with the negative

24  inference.  Again, I don't think we can predict all of these

25  problems and all of these bogeymen in the closet as a means or

1    a reason to stay the case.

2            THE COURT:  The other *Keating* factor is the interest

3    of the public in the pending civil and criminal litigation.  So

4    do you have any comments on that?

5            MR. AVENATTI:  Your Honor, there's no question, as

6    the gallery demonstrates, the importance of this case to the

7    American public and their view of the judicial process, it is

8    of critical importance.  The issues in this case are of

9    critical importance.  I do not think that I could overstate

10   their importance.  And for that reason, it is important that

11   the public have faith in this system as it relates to the

12   efficient, timely resolution of matters, as opposed to delaying

13   them unnecessarily.

14       That saying "Justice delayed is justice denied" I don't

15   think has ever been more appropriate, Your Honor.  There is no

16   question about the significant public interest in this matter.

17   I'm not saying that should override Mr. Cohen's Fifth Amendment

18   rights.  Those two concepts, Your Honor, can easily co-exist.

19   The law and the constitution provide that they co-exist between

20   the First Amendment and the Fifth Amendment and otherwise.

21   That's why the law provides a defendant an opportunity to plead

22   the Fifth Amendment.  That is his right, but that doesn't mean

23   that the denial of justice takes a back seat or the delay of

24   justice takes a back seat.  That would be my point, Your Honor.

25           THE COURT:  And I think it's a point well taken.  I

1  certainly recognize with the press here the public's interest,

2  but let me paraphrase or quote the *Keating* case.  In high

3  visibility situations, it is especially necessary to guard the

4  rights of defendant.  Public interest in high publicity cases

5  should not be allowed to override individual rights.

6          MR. AVENATTI:  And I read that quote last night,

7  Your Honor.  I read it twice.

8          THE COURT:  And you are prepared today.

9          MR. AVENATTI:  Well, I hope so.  I know better than

10 to come to Your Honor's court ill-prepared.  So here is what I

11 will say, Your Honor.  Again, absent a stay, no one is

12 compelling Mr. Cohen to either plead the Fifth or to answer any

13 question that he does not feel comfortable answering in light

14 of his Fifth Amendment rights.  His Fifth Amendment rights can

15 easily be maintained.  The fact that there may be a negative

16 inference is of no consequence, Your Honor.  Thank you.

17         THE COURT:  Thank you.

18     Any final comments?

19         MR. BLAKELY:  Just quickly, Your Honor, on the

20 public interest.  I mean, obviously there's been a lot of press

21 and interest in the case, but this is really a contract

22 dispute.  And many courts talked about the public interest, for

23 instance, *Douglas versus United States*, where the interest in

24 this case pales in comparison to what's going on in New York

25 and criminal proceedings or potential indictment.

1          And I think that interest and my client's Fifth Amendment

2     rights, particularly in this situation where -- this is, you

3     know, one thing Mr. Avenatti and I can agree on.  We are kind

4     of in the dark on a lot of this now because the government, as

5     you said, holds the matches.  And I think that the public

6     interest is more than satisfied in the outcome or what happens

7     in the criminal proceedings, and I do not think that a brief --

8     and again, we are talking two different ends of the spectrum.

9     We are not asking this Court to stay this case indefinitely.  A

10    brief stay to give us an opportunity to get the files back, to

11    figure out what's going on in the New York action, and to,

12    frankly, give me an opportunity to evaluate the case and

13    discuss it with my client.  You know, I just don't think that

14    the public interest factor weighs against us, Your Honor.

15               THE COURT:  Okay.  Yes.

16               MR. AVENATTI:  Your Honor, can I be heard briefly?

17               THE COURT:  Yes.

18               MR. AVENATTI:  Your Honor, I think it's important to

19    remember the timeline associated with what's happened here.  We

20    filed the case in early March.  Mr. Blakely was on the scene

21    almost immediately.  The raid did not occur until April 9th, a

22    full month after we had filed the case.  There was significant

23    briefing and argument and activity, as Your Honor noted, on the

24    onset of this hearing in the case.  So the idea that somehow a

25    stay will allow counsel to get his arms around what the case is

1    about or to get facts and data, I just don't think that's

2    well-founded, Your Honor.

3         Furthermore, as I mentioned earlier, he has his

4    attorney-client privileged communications with his client.  We

5    know for a fact those were not seized, even if his version of

6    events relating to what's available or not available is true.

7         The other thing, Your Honor, I will note is -- because I

8    was at the hearing, and I believe this to be true.  My timing

9    may be a little off, so I want to caution the Court as it

10   relates to reliance on the statement I'm about to make.  My

11   understanding is that all of the documents that were seized,

12   all of the documents in whatever form they may have been,

13   electronic, hard copy, bankers boxes, et cetera, are to be

14   returned, at least a copy of that, to Mr. Cohen or Mr. Cohen's

15   counsel within the next two weeks.  And again, nothing's going

16   to happen in this case that's going to require Mr. Cohen to do

17   anything in the next two weeks, so there's no prejudice at all

18   if there isn't a stay.  Thank you.

19             THE COURT:  Okay.  The issues are extremely

20   important.  The Court is going to take the matter under

21   submission.

22        And, Mr. Blakely, you would be advised to provide the

23   declaration from your client regarding whether your client

24   intends to assert his Fifth Amendment rights.  I think that is

25   probably a necessary component here and also when he realized

1  that his Fifth Amendment rights would be implicated.

2      I'm going to look at whether there's less drastic means or

3  measures that could be imposed here other than a stay.  And the

4  Court is also going to consider whether the second count can be

5  severed from the first amended complaint and whether the Court

6  can go forward on that matter alone.  So no additional

7  pleadings, other than a declaration to be filed by Mr. Cohen.

8      Yes.

9          MR. AVENATTI:  Your Honor, one request.

10          THE COURT:  Yes.

11          MR. AVENATTI:  Can we have three pages to respond to

12  the declaration since it's something we will have not seen?

13          THE COURT:  Oh, absolutely, yes.

14          MR. AVENATTI:  Within 24 hours of that.

15          THE COURT:  Mr. Blakely?

16          MR. BLAKELY:  Yes, Your Honor.

17          THE COURT:  When is that declaration going to be

18  filed?

19          MR. BLAKELY:  I will endeavor to get it done today,

20  but it might take until Monday, Your Honor.

21          THE COURT:  I recognize there's lawyers here,

22  there's lawyers in New York, and there's other parties that may

23  have to be consulted.  So let's make it on or before Wednesday

24  of next week.  Does that give you plenty of time?

25          MR. BLAKELY:  That is, Your Honor.  It sounds like

1   we are going to have to do something with the briefing schedule

2   we stipulated to.

3            THE COURT:  Yes.  So the briefing -- no

4   additional -- the Court needs to review that declaration, needs

5   to consider less drastic means and needs to consider the

6   severing issue.  So no additional pleadings to be filed except

7   for the declaration and a response by Mr. Avenatti to the

8   declaration until you hear from the Court further.

9            MR. BLAKELY:  I was actually referring to the

10  anti-slap motion.  There are oppositions and reply briefs.

11           THE COURT:  Nothing to file to the Court until the

12  Court directs the parties.

13           MR. AVENATTI:  Your Honor, can I actually have five

14  pages for our response?  If we don't need it, we won't take it.

15           THE COURT:  Yes, perfectly.

16           MR. AVENATTI:  And, Your Honor, we will file that

17  within -- how quickly do you want that after the declaration?

18           THE COURT:  What makes sense to you?

19           MR. AVENATTI:  24 hours.

20           THE COURT:  24 hours.

21           MR. AVENATTI:  Thank you.

22           THE COURT:  So, Mr. Blakely.

23           MR. BLAKELY:  Yes, Your Honor.

24           THE COURT:  Are we on board with the date for filing

25  of the declaration?

1          MR. BLAKELY:  I understand, next Wednesday.

2          THE COURT:  Thank you.

3          MR. BLAKELY:  We will try to get it done earlier,

4   but by next Wednesday.

5          THE COURT:  Thank you.

6          MR. AVENATTI:  Thank you, Your Honor, for your time.

7          MR. BLAKELY:  Thank you, Your Honor.

8          THE COURTROOM DEPUTY:  The Court's in recess.

9              (Proceedings concluded at 10:20 a.m.)

10                    ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES    )
                             )
4   STATE OF CALIFORNIA      )

5

6          I, CAROL JEAN ZURBORG, Federal Official Realtime

7   Court Reporter, in and for the United States District Court for

8   the Central District of California, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code that the

10  foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is in

13  conformance with the regulations of the judicial conference of

14  the United States.

15

16  Date:  April 21, 2018

17

18

19                          /s/ CAROL JEAN ZURBORG

20              _____
                CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                      Federal Official Court Reporter
21

22

23

24

25