BLAKELY LAW GROUP
BRENT H. BLAKELY (CA Bar No. 157292)
1334 ParkView Avenue, Suite 280
Manhattan Beach, California 90266
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:        BBlakely@BlakelyLawGroup.com
Attorneys for Defendant
ESSENTIAL CONSULTANTS, LLC
and MICHAEL COHEN

HARDER LLP
CHARLES J. HARDER (CA Bar No. 184593)
RYAN J. STONEROCK (CA Bar No. 247132)
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:        CHarder@HarderLLP.com
               RStonerock@HarderLLP.com
Attorneys for Defendant
DONALD J. TRUMP

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual, <br><br> Plaintiff, <br> v. <br><br> DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:18-CV-02217-SJO-FFM <br><br> **SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF JOINT *EX PARTE* APPLICATION OF DEFENDANTS ESSENTIAL CONSULTANTS, LLC, DONALD J. TRUMP AND MICHAEL COHEN FOR A STAY OF THIS ACTION** <br><br> Assigned for All Purposes to the Hon. S. James Otero <br><br> Action Filed:  March 6, 2018 |

Defendants Essential Consultants, LLC ("EC"), Michael Cohen ("Mr. Cohen") and Donald J. Trump (collectively, "Defendants") respectfully request, pursuant to Rule 201 of the Federal Rules of Evidence ("Rule 201"), that the Court take judicial notice of the contents of the documents attached as: (1) **Exhibit 1** to this Request: a transcript of the April 13, 2018 hearing in the matter of *Michael D. Cohen v. United States of America*, United States District Court, Southern District of New York, case number 1:18-mj-03161-KMW (see relevant excerpts at: p. 24, ln. 20-22; and p. 40, ln. 12-20); and (2) **Exhibit 2** to this Request: a transcript of the April 16, 2018 hearing in the matter of *Michael D. Cohen v. United States of America*, United States District Court, Southern District of New York, case number 1:18-mj-03161-KMW (see relevant excerpts at: p. 69, ln. 6-7; p. 83, ln. 11-20; p. 88, ln. 13-14; and p. 89, ln. 18, 24-25).

Under Rule 201, "[t]he court may judicially notice a fact that is not subject to a reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid.* 201(b). "Federal courts may take judicial notice of orders and proceedings in other courts, including transcripts." *Neylon v. Cty. of Inyo*, 2016 WL 6834097, at *2 (E.D. Cal. Nov. 21, 2016); *see also Engine Mfrs. Ass'n v. South Coast Quality Maint. Dist.*, 498 F.3d 1031, 1039 n.2 (9th Cir. 2007) (taking judicial notice of a transcript of an oral argument before the California Supreme Court); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) (a federal court "'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue'"); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-689 (9th Cir. 2001) ("a court may take judicial notice of 'matters of public record'"); *Gerritsen v. Warner Bros. Entertainment Inc.*, 112 F.Supp.3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as website run by governmental

agencies.").

The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Fed. R. Evid.* 201(c)(2); *see also Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1075 (9th Cir. 2010) (holding that district court erred in refusing to take judicial notice of official action filed by Bureau of Indian Affairs).

Dated: April 25, 2018                    BLAKELY LAW GROUP

By: */s/ Brent H. Blakely*
            BRENT H. BLAKELY
            Attorneys for Defendants
            ESSENTIAL CONSULTANTS, LLC and
            MICHAEL COHEN

Dated: April 25, 2018                    HARDER LLP

By: */s/ Charles J. Harder*
            CHARLES J. HARDER
            Attorneys for Defendant
            DONALD J. TRUMP

Pursuant to Local Rule 5-4.3.4, I Brent H. Blakely, hereby attest that all other signatories to this Supplemental Request for Judicial Notice, and on whose behalf it is submitted, concur in its content and have authorized its filing.

Dated: April 25, 2018

/s/ Brent H. Blakely
BRENT H. BLAKELY

# Exhibit 1

I4dWcohC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   *In the Matter of Search Warrants*
3  *Executed on April 9, 2018*
   ------------------------------x
4  MICHAEL D. COHEN,

5                Plaintiff,

6          v.                                18 Mag. 3161

7  UNITED STATES OF AMERICA,

                                             Conference
8
                Defendant.
9
   ------------------------------x
10                                           New York, N.Y.
                                             April 13, 2018
11                                           10:30 a.m.

12 Before:

13                    HON. KIMBA M. WOOD,

14                                           District Judge

15
                            APPEARANCES
16
   MCDERMOTT WILL & EMERY LLP
17      Attorneys for Plaintiff
   BY:  TODD HARRISON
18      JOSEPH B. EVANS
        MICHAEL R. HUTTENLOCHER
19
   ROBERT S. KHUZAMI
20      Acting United States Attorney for
        the Southern District of New York
21 THOMAS A. McKAY
   RACHEL A. MAIMIN
22 NICOLAS ROOS
        Assistant United States Attorneys
23

24

25

I4dWcohC

1    Also Present:

2

     SPEARS & IMES LLP
3         Attorneys for Intended Intervenor
          Donald J. Trump, President
4    BY:  JOANNA C. HENDON

5

     DAVIS WRIGHT TREMAINE LLP
6         Attorneys for ABC
     BY:  RACHEL F. STROM

7

8    MICHAEL AVANATTI
          Attorney for Interested Party
9         Stephanie Clifford a/k/a "Stormy Daniels"

10

     John Riley, *Newsday*
11   Benjamin Weiser, *The New York Times*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4dWcohC

```
1              (Case called)
2              THE COURT:  Good morning.  Please have a seat.
3              MR. McKAY:  Good morning, your Honor.  Tom McKay,
4    Rachel Maimin and Nicolas Roos, for the government.
5              THE COURT:  Good morning.
6              MR. HARRISON:  Good morning, your Honor.  Todd
7    Harrison and Joe Evans, from McDermott Will & Emery.
8              THE COURT:  Good morning.
9              I have a letter from the legal department of *The New*
10   *York Times*, asking that the press be heard if the Court takes
11   any argument at sidebar or under seal.  The law is clear-cut
12   here.  I'm not sure that we need a lawyer from *The New York*
13   *Times*, other than the person who authored the letter to me, but
14   let me state at the outset that Mr. Cohen's lawyers applied
15   yesterday evening for an opportunity to take the first cut at
16   identifying documents that are relevant or not relevant to the
17   investigation, and to identify any documents subject to
18   attorney-client privilege or the work product doctrine.
19             The arguments that bear on this issue are largely ones
20   having to do with an ongoing criminal investigation and the
21   government's position that flows from that investigation.
22             Let me also say that although both parties recognize
23   that the search conducted here was a search of attorney's
24   offices and an attorney's devices, and that a search of
25   attorney's information is subject to special consideration
```

I4dWcohC

1    given the possibility of breach of attorney-client privilege or

2    the work product doctrine, there is no dispute about that.  The

3    dispute before the Court is who should make the determination

4    in the first instance of what is subject to attorney-client

5    privilege or the work product doctrine.

6         The government's view is that a taint team should make

7    that determination, and the view of Mr. Cohen's lawyers is that

8    the determination should be made either by Mr. Cohen's lawyers,

9    or their fallback position is a special master.

10        A special master was used in the *Lynne Stewart* case.

11   I note that in that case there was a heightened need for a

12   special master because the search swept in documents relating

13   to clients other than the subject of the investigation and to

14   work product and otherwise privileged materials of other

15   lawyers who were in the same law office as Lynne Stewart and

16   had shared computers with her.

17        I believe that the balance of what needs to be argued

18   has to be at sidebar and under seal, and I take that decision

19   not lightly at all, but having reviewed the papers, it's clear

20   to me that the arguments will reveal the ongoing investigation.

21   I note, parenthetically, that *The New York Times* seeks access

22   to the search warrant and related documents.  Those, too, are

23   subject to sealing to protect the ongoing investigation,

24   notwithstanding the views of the Second Circuit on this point.

25        At this point, I would like to hear --

I4dWcohC

1          MS. STROM:  Your Honor, I'm an attorney for ABC.  My

2     name is Rachel Strom, and I am not here for *The New York Times*,

3     but that letter was written by Dave McCraw --

4          THE COURT:  Do you want to come to the podium?

5          MS. STROM:  That would be great.  Thank you so much.

6          Where would you like me, your Honor?

7          THE COURT:  Oh, just by the podium so that the mike

8     will pick up what you're saying.

9          MS. STROM:  I'll note there's no press here for me and

10     that I was given about a 15 minute warning that I'd be here.

11          Your Honor, I'm sure that letter came from Dave

12     McCraw, who is an expert in this area.  I don't have much to

13     add.  I'm sure he laid out all the *Press Enterprise* factors

14     that must be considered before a Court will seal the courtroom

15     or deny access to court records that are necessary for a

16     determination at a proceeding.

17          The only thing I would say is that the *Press*

18     *Enterprise* factors require the Court to make specific,

19     on-the-record findings, as I think you have, but the findings

20     must include that the closure, or the nondisclosure, must be

21     essential to preserve a compelling interest.  And I think what

22     you articulated here is the compelling interest is protecting

23     the attorney-client material.

24          THE COURT:  I'm sorry.  The compelling interest here

25     is protecting the ongoing criminal investigation as well as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4dWcohC

1    attorney-client privilege.

2            MS. STROM:  But I'm just confused.  The fact that

3    there's an ongoing criminal investigation is already public.

4            THE COURT:  Yes.

5            MS. STROM:  We're here today because we knew that

6    there was going to be a hearing today.

7            THE COURT:  Of course.

8            MS. STROM:  The factors kind of turn in on each other,

9    and one of the factors is that the closure has to be effective,

10   that the nondisclosure order has to be effective, and we know

11   that there's an ongoing proceeding.  Many of us do; it's about

12   as full of a courtroom as I've ever been in.  So I don't know

13   what specific things that will be protected by ordering the

14   press out of this courtroom or not sealing something, and I do

15   think we deserve an answer of what specific things will be

16   protected.  And just, because I see I'm going to get an

17   argument, the other thing --

18           MR. McKAY:  Your Honor --

19           THE COURT:  Could you wait just a moment.

20           MR. McKAY:  I think I may be able to short circuit

21   this.

22           THE COURT:  OK.

23           MR. McKAY:  I think it won't be so much an argument as

24   agreement in part, which is that we filed our responsive brief

25   this morning with the Court largely publicly.  There were few

I4dWcohC

1    portions that we redacted for the specific purpose of not

2    disclosing ongoing law enforcement investigations that weren't

3    otherwise disclosed, but we were very careful in our brief to

4    try to talk as much as we could at a high level so that the

5    right of access would be respected and at the same time we'd be

6    able to make the points to the Court that we think are

7    necessary for the Court to resolve the instant motion.

8            We're comfortable today having oral argument in open

9    court and describing those things which are publicly filed in

10   our brief, which is really the vast majority of our brief.

11           To the extent that the Court has specific questions

12   about particular things, including the things that were

13   redacted or other aspects of the investigation that aren't

14   already public, we would be happy to go to sidebar on that.

15   But I think that the inquiry for the present motion need not go

16   into that great detail about the ongoing investigation, because

17   we think the issues at stake are clear and can be decided based

18   on things that are already public.

19           THE COURT:  All right.  Ms. Strom, have you had access

20   to what Mr. McKay has described?

21           MS. STROM:  If that was public -- was that publicly

22   filed on Pacer.

23           MR. RILEY:  We don't have a case number yet to look up

24   yet on Pacer, Judge.

25           THE COURT:  OK.  Thank you.

I4dWcohC

1           Ms. Strom.

2           MS. STROM:  I have not had access to that.

3           MR. McKAY:  Your Honor, I think that's just a matter

4    of docketing.  We sent it to the Court.  I think it will be

5    publicly filed whenever the Clerk of the Court is able to get a

6    docket assigned and the briefs up on Pacer.

7           THE COURT:  All right.  I don't have a redacted copy.

8    My copy simply says "filed under seal."

9           Yes.

10          MR. HARRISON:  Thank you, Judge.

11          THE COURT:  Mr. Harrison.

12          MR. HARRISON:  Judge, as your Honor noted, we

13   previously requested that this proceeding be under seal.  We

14   would prefer to do it as your Honor just suggested, at sidebar

15   and in chambers.  We are going to be asking, since the

16   government apparently is going to be arguing in their favor,

17   about facts of their underlying investigation, we think we

18   deserve to know some more of the facts about the underlying

19   investigation in order to rebut their arguments.  That's only

20   fair.

21          There's another related issue, Judge, which is there

22   is another attorney in the courtroom today for an individual

23   privilege holder, who would like to be heard and be part of

24   these proceedings, and she and we, Mr. Cohen's attorneys, are

25   going to request that we have some sort of adjournment and some

I4dWcohC

1    time for her to get up to speed and, frankly, for us to get all

2    the way up to speed.  I haven't had a chance to read the

3    government's submission from this morning, so perhaps if we

4    could have some sort of adjournment to do that and to deal with

5    all the media issues, perhaps that would be the most prudent

6    thing to do.

7             MR. McKAY:  Your Honor, a few things on that.

8             First of all, the privilege holder has had notice of

9    these searches on Monday, when they became widely publicly.

10   The privilege holder in question publicly commented on these

11   searches.  That privilege holder is representing the exact same

12   interests as Mr. Cohen is here, so he adds absolutely nothing

13   to the discussion.

14            THE COURT:  She.

15            MR. McKAY:  She adds nothing to the discussion.  And

16   so the only point of intervention and delay for this privilege

17   holder to get up to speed, as Mr. Cohen's counsel said, would

18   be to further delay the review of materials seized pursuant to

19   lawfully authorized search warrants.  We think there's no basis

20   for this privilege holder to delay these proceedings any

21   further, and to the extent that Mr. Harrison is saying he

22   hasn't had time to review the brief, with respect, they filed

23   their brief shortly after 5:00 last night.  We got our response

24   out in less than -- very quickly, by 9 a.m. this morning.  He's

25   had an hour and a half to read before these proceedings.  I

I4dWcohC

1    think that falls on deaf ears.

2          THE COURT:  I do think that it's important for anyone

3    asserting an interest in this matter to be able to review the

4    government letter, and if you haven't had that opportunity, I

5    think we should adjourn.  I would assume that a short

6    adjournment suffices.  In other words, we could resume this

7    afternoon once you have had a chance to review the letter and

8    think through the law.

9          MR. McKAY:  Your Honor, I think a very short

10   adjournment would be the most that's appropriate -- about an

11   hour -- to read the papers, which are only about 22 pages.

12         Again, this privilege holder has had notice of this

13   since Monday, has likely been in contact with Mr. Cohen's

14   counsel.  The privilege holder's counsel notified us last

15   night.  They've had plenty of time to get involved in this

16   proceeding.  It's just another attempt at delay.

17         MS. HENDON:  Your Honor, may I?

18         THE COURT:  Yes, you may, but we haven't finished with

19   Ms. Strom, who is still at the podium.

20         Ms. Strom.

21         MS. STROM:  What I would say is that it does sound

22   like there may be times where there is information that might

23   meet this compelling-interest need and that there might be a

24   need for sidebars.  Like Dave McCraw, I'd like to be able to

25   have some opportunity to argue at those junctures, but to kick

I4dWcohC

1    the press out completely from a decision-making process --

2              THE COURT:  I'm not kicking them out.

3              MS. STROM:  OK.  I thought you were saying you wanted

4    to make this decision in private and have it under seal.

5              THE COURT:  No.  Based on the copy I have of the

6    government's letter, which is what you have not seen, I thought

7    that most of what the government argued was going to need to be

8    under seal.  The government has corrected my misapprehension

9    there.

10             MR. McKAY:  Your Honor, if I can?

11             THE COURT:  Yes.

12             MR. McKAY:  I think the copy that you have has certain

13   sentences that are highlighted in gray.

14             THE COURT:  Yes.

15             MR. McKAY:  Those are the ones which are going to be

16   redacted in the publicly filed copy.

17             THE COURT:  I see.

18             MR. McKAY:  If you skim through, you'll see it's about

19   four or five sentences in a 22-page brief.  Like I said, we're

20   comfortable having this proceeding in open court and answering

21   as many of the Court's questions as we think we can.  I think

22   that the issues here are straightforward and don't require a

23   deep dive into an underlying criminal investigation.

24             THE COURT:  Good.

25             Ms. Strom, the adjourned proceeding that I

I4dWcohC

1    contemplate, in an hour or a few hours, would be public to the

2    extent it can be, and to the extent I find it cannot, I will

3    make the requisite findings.

4              MS. STROM:  Absolutely.

5              THE COURT:  And I will allow you to argue at that

6    point.

7              MS. STROM:  Thank you so much, your Honor.  We

8    appreciate it.

9              THE COURT:  All right.

10             Now, I believe an attorney wishes to be heard.

11             MS. HENDON:  Yes.  Thank you, your Honor.

12             My name is Joanna Hendon.  It's been a long time since

13   I was before you.  I'm here with my partner Chris Dysard and my

14   colleague Reed Keefe.  It's very nice to see you.

15             We represent Donald Trump in this matter.  As a

16   privilege holder, he has an acute interest in these proceedings

17   and in the manner in which these materials are reviewed, etc.

18   Your Honor, I therefore request permission to be heard with

19   respect to the issues that have been, at least I understand,

20   briefed by Mr. Cohen's counsel.

21             Now, I should say my firm was engaged Wednesday

22   evening, April 11.  That's a day and a half ago.  Last night, I

23   contacted the U.S. Attorney's Office on behalf of the privilege

24   holder, whose interests are different and not entirely the same

25   as the lawyer, because the privilege belongs to the privilege

I4dWcohC

1    holder, not the lawyer.  A client can waive the privilege.  The

2    lawyer cannot waive the privilege.

3           I contacted the government and I conveyed my concern

4    about the use of a taint team.  I conveyed my concern about the

5    mechanism by which even after a review of the documents has

6    been done -- whether by a taint team or by a special master --

7    the mechanism by which parties may then make objections to and

8    seek judicial review of those decisions, because the most

9    critical moment here, your Honor, for a privilege holder, is

10   when a special master or a taint team, or whomever has

11   conducted a review, made a judgment about what is not

12   privileged and then turns to hand that material over to the

13   prosecution team, who will then make charging decisions and

14   otherwise.

15           THE COURT:  Wait just a moment.

16           MS. HENDON:  I plan to raise --

17           THE COURT:  May I interrupt you.

18           MS. HENDON:  Yes, of course, your Honor.

19           THE COURT:  There hasn't been a determination as to

20   whether the prosecution team would have access to those

21   documents before the privilege holder or the attorney can be

22   heard.

23           MS. HENDON:  Oh, I understand, your Honor.  I'm just

24   letting you know that in a day and a half we identified these

25   issues for our client, conveyed them in writing to the office

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    last night and said, Look, can we sit down with you and see if

2    we can reach agreement on both of these questions, who does the

3    review and what's the mechanism for judicial review?  I said,

4    Look, Can you agree not to touch these documents and begin a

5    review until we've met and conferred and, if necessary, engaged

6    in any litigation and come to the Court.

7            What I am asking today, your Honor -- and I know the

8    government objects to this, because I met and conferred with

9    them to get their views; I think Mr. Cohen's counsel is

10   amenable -- I am not prepared, even with two hours' notice, to

11   vindicate this very important right on behalf of my client in

12   this matter.  These parties apparently have filed papers.  I've

13   not seen what Mr. Cohen filed.  I've not seen what the

14   government filed, and given the interest at stake here and the

15   exceptional nature of my client, giving me two hours to get up

16   to speed so that I can come make oral argument before your

17   Honor makes very important decisions is simply inadequate.

18           What I would ask, what I thought would be best was

19   that we have a -- I'm not trying to delay anything, nor do I

20   see a particular rush here.  The searches have been executed.

21   The concerns typically announced in a search warrant affidavit

22   about the need for expediency because evidence will be

23   destroyed, those searches have been executed.  The evidence is

24   locked down.  I'm not trying to delay.  I'm trying to make

25   sure -- I think everyone, the Court, the government, my client,

I4dWcohC

1    the public, all have an interest in how this review of

2    privileged material takes place.  The interest is that it be

3    done scrupulously, so that it's not subject to taint complaints

4    later, so that it withstands scrutiny for all time, frankly.

5             I don't see that we need to rush these proceedings.  I

6    think my client should be allowed to join in a briefing

7    schedule.  We should get this litigation that your Honor was

8    prepared to address today on the track for next week or the

9    week after and let the owner of the privilege participate

10   alongside the government and the individual whose materials

11   were seized, and do this in an orderly way, because what's at

12   stake, the viability of this prosecution, it has to be done

13   right.

14            My client's interests as a privilege holder -- this is

15   the oldest privilege, I think, one of them, that our law

16   recognizes; he is the President of the United States.  These

17   interests are so weighty that I think we need more than,

18   respectfully, an afternoon's adjournment so that I on his

19   behalf can weigh in thoroughly and be heard on these issues,

20   because ultimately, in my view, this is of most concern to him.

21   I think the public is a close second and anyone who has ever

22   been represented, everyone who's ever hired a lawyer a close

23   third.  And I just want to say that I don't want anyone in this

24   room to take from my remarks any lack of confidence in the way

25   the United States Attorney's Office in this district is

I4dWcohC

 1    prepared to conduct itself, but there's an

 2    appearance-of-fairness problem here.

 3            In addition, there has been so much media coverage of

 4    the matters under investigation, of my client, that the idea

 5    that anyone could neutrally and fairly pick up communications

 6    between him and Mr. Cohen and make privilege calls, that's

 7    going to be a very, very heavy lift for anyone.  And I think

 8    the prosecutors, who are properly trained to investigate and

 9    rule out evidence of crimes, they would not be my first choice,

10    even though they're the best prosecutors in the country, for

11    that work and for that role.

12            I thank your Honor.

13            THE COURT:  Thank you very much.

14            Mr. McKay rose to speak.

15            MR. McKAY:  Counsel just referenced the appearance of

16    fairness and the exceptional nature of her client, and with

17    respect, his attorney-client privilege is no stronger than any

18    other person who seeks legal advice.  He has been on notice of

19    this search since Monday.  There's no excuse for the late

20    intervention, and his interest is undifferentiated from

21    Mr. Cohen's here.  It's just a question of who is asserting it.

22            There is no question in Mr. Cohen's papers that he is

23    asserting the privilege on behalf of his client, and he's doing

24    so with very experienced, very qualified counsel.  There's no

25    danger that the privilege holder's interest is going to be not

I4dWcohC

1    represented here.  If Mr. Cohen were prepared to waive

2    privilege on behalf of some clients and weren't objecting to

3    our search in the manner he is, there would be a different

4    analysis.  But here, where Mr. Cohen is asserting the

5    privilege, which Mr. Trump also intends to assert, there's no

6    reason that -- well, there's no differentiation between the

7    arguments that he would make.

8             If Ms. Hendon wants an hour to read the papers so that

9    she can see if there are any unique arguments that she ought to

10   make, we don't object to that, but we absolutely do object to

11   this last, second intervention, which would further delay our

12   lawful review of materials that were seized pursuant to a

13   federal search warrant.

14            THE COURT:  Please.

15            MR. HARRISON:  Just very briefly, Judge.

16            I join in Ms. Hendon's application, and the other

17   problem with just adjourning for a couple hours, while it might

18   give me time to read the government's 20-plus-page filing, it

19   won't give me time to do research on it and things like that,

20   which I can't do from the courthouse here, unfortunately.  I

21   don't feel like we'd be able to fully prepare --

22            MR. McKAY:  Your Honor, Mr. Cohen --

23            THE COURT:  One second.

24            MR. HARRISON:  -- that I would be able to fully

25   prepare within that short period of time, and I really don't

I4dWcohC

1   see the problem -- we do have these weighty issues, which

2   Ms. Hendon so eloquently laid out for the Court -- why there's

3   a problem with adjourning to, say, even just Monday, a couple

4   of days.

5           THE COURT:  I was about to propose an adjournment

6   until Monday.  I'm happy to hear Ms. Hendon whenever she wishes

7   to be heard.  It appears to me that the interests are

8   completely parallel with those of Mr. Cohen, but if you'd like

9   to be heard, I'd be glad to hear you so long as there's no

10  undue delay.  I propose that we resume on Monday after

11  everyone's had a chance to review the government's letter and

12  consider, I must say, the very sparse law that applies.  I

13  think probably everyone in this courtroom is familiar with the

14  right of the press and the public to judicial documents.

15          Go ahead, Ms. Hendon.

16          MS. HENDON:  Can I just have a moment with my

17  colleague?

18          THE COURT:  Yes.

19          MS. HENDON:  That's fine, your Honor.  Thank you very

20  much.

21          THE COURT:  All right.

22          Mr. McKay, you jumped up.  Did you want to be heard

23  again?

24          MR. McKAY:  No, your Honor.  I'd just note our

25  objection to the adjournment.

I4dWcohC

1          I will note for the record that in light of the

2    Court's adjournment, we will not begin our review of the

3    materials until whenever we reappear on Monday.

4          THE COURT:  All right.  I propose 2:00 on Monday.

5          MR. HARRISON:  That works for us, your Honor.

6          MR. McKAY:  Fine for the government, your Honor.

7          THE COURT:  Good.

8          MR. McKAY:  Your Honor, if I may?

9          Given that Mr. Cohen filed his papers around 5 p.m.

10   last night and we responded by 9 a.m. this morning, we put a

11   deadline on Mr. Trump's time to weigh in, which is not the last

12   minute, so that if there are any differentiated arguments we'll

13   have an opportunity to file our responsive brief before Monday.

14         THE COURT:  All right.

15         Ms. Hendon, if you have any arguments that are

16   different from those made by Mr. Cohen, could you give me a

17   filing describing that by 11 a.m. on Monday.

18         MS. HENDON:  Yes, your Honor.

19         THE COURT:  Thank you.

20         MR. McKAY:  Your Honor, if I may?

21         If it's 11 a.m. on Monday, we won't have an

22   opportunity to file a responsive brief by 2 p.m.  Can we make

23   it sometime on Sunday so that we can get our filing in by

24   Monday morning?

25         THE COURT:  All right.  Ms. Hendon, could you have it

I4dWcohC

1    by 3:00 on Sunday?

2              MS. HENDON:  No, we can't, your Honor.  I've conferred

3    with my team.  We can have papers filed by 10:00 Monday

4    morning, and if we need to slide the hearing, I would

5    respectfully ask that we do that.  We're already talking about

6    48 hours to put a brief together on this issue.  I think the

7    most that we reasonably can be asked to do.

8              THE COURT:  I said, and I'm sure of this, that the law

9    is very sparse on the issues here and that no one is likely to

10   uncover any case law that hasn't already been uncovered in the

11   filings.

12             MS. HENDON:  Your Honor, we could file by Sunday

13   night, 9:00.  I can't do it by Sunday at 3 p.m.

14             These are important matters, and for me, Judge, even

15   when there's sparse case law, it takes me a long time to

16   satisfy myself that there is sparse case law.  We pride

17   ourselves on careful, thorough, meticulous work product, and I

18   really feel that I'm being rushed here.

19             THE COURT:  You're proposing Sunday at?

20             MS. HENDON:  Sunday at 9 p.m.

21             THE COURT:  Mr. McKay.

22             MR. McKAY:  Your Honor, that's fine.  We'll respond by

23   then.

24             I just want to note again that this is a TRO brought

25   by Mr. Cohen, not by the government, so these claims of undue

I4dWcohC

1    rush are a little strange coming from the person who brought

2    the motion for a TRO and the privilege holder for whom he's

3    making the motion.  We will respond whenever the papers come

4    in, your Honor, but I just want to note that.

5              THE COURT:  All right.

6              MR. HARRISON:  I'm happy to respond if you want me to.

7              THE COURT:  I think I understand what the response

8    would be, which is that the rush has to do with whether the

9    government will have immediate access to any potentially

10   privileged or work product documents.

11             I have a few questions that I think might short

12   circuit some of this, and I'm loath to state them in public

13   until I understand whether they should be privileged, so I'll

14   ask counsel to come to sidebar with the court reporter.  These

15   will be very brief and narrow.

16             MS. STROM:  Your Honor, I'm sorry.  Before you do a

17   sidebar, could you just give the on-the-record findings about

18   why the nondisclosure of these questions will serve a

19   compelling need and how the nondisclosure for the sidebar will

20   be effective and narrowly tailored.

21             THE COURT:  Yes.

22             MS. STROM:  Thank you, your Honor.

23             THE COURT:  My question will be very narrowly tailored

24   and the higher interest that I identify is the protection of

25   any innocent parties whose information may be divulged.

I4dWcohC

| | |
|---|---|
| 1 | MS. STROM:  By your questions. |
| 2 | THE COURT:  By the answers to my question, both my |
| 3 | questions and the answers to them. |
| 4 | MS. STROM:  OK.  And the one question, you'll be |
| 5 | having a sidebar for just the question and the answer that will |
| 6 | go to the types of information you're hoping to see in the |
| 7 | briefs?  Is that what this is about? |
| 8 | THE COURT:  They have to do with whether there's a |
| 9 | factual basis for certain arguments being made. |
| 10 | MS. STROM:  Thank you, your Honor.  I just wanted to |
| 11 | notify the Court that I will not be here on Monday.  I have |
| 12 | another matter that will take me away, but we will find someone |
| 13 | on Monday to appear for the sidebar. |
| 14 | THE COURT:  Thank you. |
| 15 | (At sidebar) |
| 16 | THE COURT:  In order for me to understand -- |
| 17 | (In open court) |
| 18 | MS. STROM:  Your Honor, can I just ask one question? |
| 19 | If the secrecy is so essential here, why are |
| 20 | Mr. Trump's lawyers able to be at the sidebar and we are not? |
| 21 | THE COURT:  Actually, I don't need Mr. Trump's lawyers |
| 22 | here for this question. |
| 23 | I'm sorry, Ms. Hendon. |
| 24 | MS. HENDON:  That's all right. |
| 25 | THE COURT:  Thank you for pointing that out. |

I4dWcohC

```
 1              (At sidebar)
 2              THE COURT:  In order for me to gain an understanding
 3     of what delay would necessarily ensue if a special master were
 4     the inspecting person rather than the government taint team, I
 5     need to know how many clients Mr. Cohen has whose documents
 6     have been seized.
 7              MR. HARRISON:  That's a good question, Judge.  I don't
 8     have an exact number for you.
 9              THE COURT:  I expected that you wouldn't have an
10     answer, and I want you to contact your client and get me the
11     answer.
12              MR. HARRISON:  Sure.  Will do.
13              Part of it's a little complicated, Judge, because as
14     we put in our papers, he did have an affiliation with another
15     law firm and he was on a lot of communications and things with
16     a number of those clients, as I understand it, from that law
17     firm.
18              THE COURT:  I'll need to have you identify all of that
19     given the government's contention that Mr. Cohen did not have
20     access to the bulk of it, not all of the law firm's privileged
21     communications.
22              MR. HARRISON:  OK.
23              (In open court)
24              THE COURT:  Could the spectators please step outside
25     if you wish to speak.
```

I4dWcohC

1           (At sidebar)

2           MR. HARRISON:  We'll do that, your Honor.  I haven't

3    read their papers yet, but I assume that's what they say in

4    their papers, so we'll read that and figure it out.

5           THE COURT:  I see.

6           I'll be asking the government when we have the

7    adjourned proceeding to identify precisely how appointment of a

8    special master would cause more delay than a government taint

9    team.  Without having heard from the government, I anticipate

10   that the argument may be that the taint team is already up to

11   speed with respect to the investigation, and hence, there won't

12   be any delay for them in getting up to speed, but how long the

13   delay would be in getting up to speed is something I need to

14   know.  If, for example, the special master can be briefed on

15   the relevant issues and the likely scope of any crime fraud

16   exception, it doesn't seem that there would be much delay.

17          MR. McKAY:  Your Honor, I can answer that in part now.

18   I'm happy to elaborate further, but it's not just the delay in

19   getting up to speed and getting a special master selected.

20   It's that this is a fast-moving investigation.

21          We are devoting a large amount of resources to the

22   whole case but, in particular, to our filter team to get this

23   review done very quickly.  We reference in our brief that we've

24   already searched email accounts.  We did our privilege review

25   of those remarkably quickly because of the size of our filter

 1   team and the hard work that they're doing.

 2          With all respect, I'm sure you could find a special

 3   master who's willing to work very hard, but the example that

 4   you have in this district is the *Stewart* case.

 5          THE COURT:  I know, 15 months.

 6          MR. McKAY:  And that was 15 months for them to even

 7   do, and before that wasn't even done, I don't know how long it

 8   ultimately took to respond, to produce the report.  Judge

 9   Koeltl in that very opinion -- in *Sattar* -- I think it is,

10   laments the appointment of the special master and the delay

11   that arose.  So it's not just that.  As well, if the special

12   master is making the identifications in the first instance --

13   first of all, I want to note that their proposal to have the

14   special master do responsiveness, not just privilege, is

15   completely divorced from their alleged harm.

16          THE COURT:  I agree.

17          MR. McKAY:  With respect to the privilege, part of the

18   delay is that if the special master is making the first

19   determination of privileged materials, the government, the

20   filter team, will be unable to understand the context of what

21   is going on with these privileged materials without seeing the

22   documents.

23          By contrast, Mr. Cohen understands, because he's going

24   to be the author of these documents; he likely has access to

25   them anyway, so we're severely handicapped in our ability to

I4dWcohC

1   understand the privilege determinations, and that's going to

2   result in protracted and costly litigation.  It's going to

3   delay our investigation.  It's going to be burdensome on the

4   special master and the Court's resources, and so experience

5   suggests, we think, that a special master is a very

6   time-consuming process.  And even more importantly, I think,

7   even if the Court were inclined to appoint a special master,

8   the request to have a special master review everything for

9   privilege is likely overbroad.

10          As we set forth in our brief, we think the universe of

11   privileged materials is likely to be a fraction of what was

12   actually seized, and the large majority of emails or

13   communications or documents which may have been seized quickly

14   could be identified as not privileged by the use of simple

15   search terms, for instance, knowing individuals with whom

16   Mr. Cohen undoubtedly does not have an attorney-client

17   communication.  A backup proposal could be, and this would help

18   the delay of a special master to some degree, to agree on a

19   unique set of calls or determinations that a special master's

20   required to make.

21          For example, if the Court were compelled by some

22   unique argument on behalf of Mr. Trump, you could have sorting

23   of only those potentially privileged communications involving

24   Mr. Trump and have a special master make the first

25   determination as to those only, but as to the broader universe

I4dWcohC

1    of documents, it would be much more efficient to have the

2    filter team making the judgment in the first instance.

3         THE COURT:  Now, there is a process point that I don't

4    understand.  In the *Stewart* case, Lynne Stewart's lawyers were

5    given a copy of all of the documents, etc., that were seized.

6    They then decided what information they would argue was subject

7    to the privilege.  I believe they then conferred with the

8    government, and where there was not agreement, it went to the

9    Court.  The problem in the *Stewart* case is that the preparation

10   of the privilege log took months instead of the days or weeks

11   that had been conveyed would be enough, and I'll be looking to

12   Mr. Cohen's lawyers to tell me how quickly they could prepare a

13   privilege log.

14        MR. McKAY:  Your Honor, I would say that, as we make

15   clear in our papers, we think we have a more efficient proposal

16   than that, which is that when the filter team makes the first

17   review, there is a certain subset of documents with which we

18   would be perfectly willing to consult with the privilege holder

19   or the Court, depending on the nature of the call.  For

20   instance, if Mr. Cohen would give us a client list, which he's

21   refused to do to date, we could run emails or communications

22   between Cohen and any clients, and any of those that we marked

23   nonprivileged or potentially privileged as opposed to us making

24   a call, You know what, this is privileged, we're not going to

25   look at, we could present those to Mr. Cohen, he could raise

1    objections and any disputes could be brought to the Court or to

2    a special master.

3         We think that would be a far more efficient procedure

4    than having defense counsel who, with respect, has every

5    incentive to delay.  They can commit all they want to making a

6    privilege log.  They have every incentive to delay this matter,

7    because there is an ongoing criminal investigation of their

8    client, and delay is very, very good for them.

9         THE COURT:  I don't yet quite understand the point at

10   which defense counsel would have the opportunity to claim

11   privilege.

12        MR. McKAY:  Under our current filter protocol

13   proposal, we would run clients' names and attorney names and a

14   series of search terms that hit on or were keyed to identifying

15   potentially privileged materials.  We would then have the

16   filter team make the initial review.  Anything that fell within

17   the category of attorney-client, whether between Cohen and

18   client or Cohen and attorney, and we marked them either not

19   privileged or subject to an exception, such as crime fraud or

20   waiver, those things we'd be willing to present to defense

21   counsel.

22        And like I say, as we say in the brief, we think this

23   is going to be a very narrow universe of documents, and that's

24   the reason why we think this is going to be the most efficient

25   protocol.  If you start with the shoe on the other foot, with

I4dWcohC

1    respect, defense counsel has every incentive to be overbroad in

2    their privilege calls, and we're going to have much more

3    protracted litigation over privilege issues than if the

4    government can in the first instance narrow the universe to the

5    things about which we might reasonably.

6              MS. ZORNBERG:  Lisa Zornberg with the criminal

7    division.

8              We're getting reports that the audio of your sidebar

9    is on in the overflow room.

10             THE COURT:  It's got to be off.

11             I believe that counsel should return at some point

12   this afternoon to answer the question how many other clients

13   Mr. Cohen had with respect to whose documents would have been

14   seized in the search and how large Mr. Cohen believes the set

15   of privileged or work product-protected documents would be

16   compared to the overall amount of information.  Is he claiming

17   80 to 90 percent, which is what I would have guessed from his

18   past privilege claims, which seem indeed overbroad, or are we

19   looking at maybe 5 percent?

20             The volume matters in terms of delay.

21             MR. HARRISON:  Sure.

22             MR. McKAY:  Your Honor, if I may, we've asked defense

23   counsel for a client list.

24             THE COURT:  I know.

25             MR. McKAY:  We'd ask that if they're giving a number

I4dWcohC

1    today they give names.

2              THE COURT:  OK.

3              MR. McKAY:  And we do that for two reasons.  One is

4    that if we are going to be doing the first review, it's

5    important to us that we know the names of the clients so at

6    least we can make our search as accurate as possible.  But the

7    second is we already have considerable amounts of information

8    about Mr. Cohen's activities, and so to the extent that they're

9    making overbroad claims today about their client list, we'd

10   like the ability to challenge those, because we want to make

11   sure that the Court is given an accurate estimate of the number

12   of clients.

13             THE COURT:  All right.  I believe a client list should

14   be provided.

15             Yes.

16             MR. HARRISON:  If I can just respond to some of the

17   things that Mr. McKay has said?

18             THE COURT:  I think we'll need to speak more slowly

19   than we've been speaking.

20             MR. HARRISON:  The issue really does come down in this

21   conversation to who reviews the materials first.  It's our

22   position there's already been a Fourth Amendment violation,

23   because I think we all would agree that the government has

24   seized materials that are beyond the scope of the warrant.

25             MR. McKAY:  We would not agree with that.

I4dWcohC

1          THE COURT:  I believe that this part of the argument

2     doesn't need to be made now.

3          MR. HARRISON:  Then I'll just respond -- I'm just

4     trying to respond to what Mr. McKay has already said.

5          THE COURT:  Yes.

6          MR. HARRISON:  I'll say that.

7          I'll also say I do not think that it would take long

8     to appoint a special master.  I do not think it would take long

9     to get a special master up to speed.  We already have someone

10    in mind, and we're happy to work with the U.S. Attorney's

11    Office on rules and guidelines for that special master, which

12    we're happy to do very quickly, so I don't think that process

13    would take very long.

14         THE COURT:  These, I note, are the same arguments that

15    were made to Judge Koeltl in the *Stewart* case, and as Mr. McKay

16    pointed out, Judge Koeltl later rued the day that he allowed

17    defense the time they said they needed, because it was so much

18    more time than defendant had argued would be needed.

19         MR. McKAY:  Your Honor, we agree, and also, defense

20    counsel says they have someone in mind for the special master.

21    We respectfully request, if the Court's considering that, that

22    it be someone the Court pick, not who defense counsel picks.

23         THE COURT:  There is no harm in attorneys suggesting

24    names, but I, of course, would be the appointing person if the

25    special master is appointed.

I4dWcohC

1          MR. McKAY:  Thank you, your Honor.

2          MR. HARRISON:  Of course, your Honor.  I didn't mean

3     to suggest anything different.

4          THE COURT:  I understand.

5          MR. HARRISON:  In relation to the client list, Judge,

6     they keep saying we refuse to turn it over as if we at this

7     point have some obligation -- I know your Honor just directed

8     us to, but prior to now, that we have some obligation to turn

9     over our client list.

10          The reason we haven't turned over a client list is we

11     don't think it's appropriate at this point.  The Court hasn't

12     decided the issue of who is going to be reviewing this stuff

13     first, and that really goes to the heart of the arguments as to

14     who should be reviewing it first.  If there are clients that

15     are totally unrelated to their investigation, they shouldn't

16     get that client list and interview those people and try and get

17     dirt on my client.

18          THE COURT:  This is, I think, a specious argument.  To

19     say that you have refused to give it does not suggest that you

20     have an obligation to give it.  It just suggests that the

21     government asked for something and you refused to give it at

22     that point.

23          The reason I think it's important to have it now is,

24     first, I believe that what I've seen so far of Mr. Cohen's

25     lawyers' arguments about privilege suggests to me that your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4dWcohC

 1   view of the privilege is much broader than the law permits, and

 2   hence, I think that needs to be checked.

 3        Secondly, my determination needs to be based in part

 4   on how long it will take anyone -- a special master, a taint

 5   team, the Court -- to deal with the universe of potentially

 6   privileged or work product-protected documents.

 7        All right.  Now, before I learned that the feed was

 8   on, it was on my mind to ask at the end of this sidebar, could

 9   each side please review everything said at sidebar and let me

10   know what needs to be sealed and what does not need to be

11   sealed and try to reach agreement on that.

12        MR. HARRISON:  Sure.

13        THE COURT:  In terms of the client list and universe

14   of privileged documents or potentially privileged documents, I

15   assume you could learn that in an hour or two.  Is that right?

16        MR. HARRISON:  I'll do my best.

17        THE COURT:  Is that fair?

18        MR. HARRISON:  Probably, Judge.  I'll do my best.

19        THE COURT:  Why don't we resume at 2 p.m. here.

20        MR. HARRISON:  I would request, Judge, that that

21   information be filed under seal.

22        THE COURT:  I agree.

23        MR. HARRISON:  I think potentially innocent third

24   parties, who are totally unrelated to my client, should be kept

25   under seal.

I4dWcohC

1          THE COURT:  That's why I'm hearing you at sidebar.

2          MR. HARRISON:  Thank you, Judge.

3          MR. McKAY:  Your Honor, just to note, we don't object

4   to the client list being under seal.  We don't think anything

5   said at this sidebar needs to be sealed.  We didn't go into any

6   detail about the investigation beyond what we said in our

7   papers, so we have no objection to this being in open court.

8          THE COURT:  All right.  If you have an objection, you

9   need to let me know by 2.  Otherwise I'll be releasing it.  I

10  think Mr. McKay is right.

11         MR. HARRISON:  OK.  And we're coming back here at 2,

12  Judge?

13         THE COURT:  Yes.

14         MR. HARRISON:  Just to respond briefly to what Mr.

15  McKay said, we're not trying to delay anything, Judge.  We've

16  been moving quickly.  We're not asking for long delays.  We

17  don't have an interest in delay.

18         THE COURT:  I understand.

19         MR. HARRISON:  The only other thing I'll say -- I'll

20  save the rest of my arguments for later, Judge.

21         THE COURT:  Thank you very much.  See you at 2.

22         (In open court)

23         THE COURT:  I'd like to note for those still in the

24  courtroom that I believe it is likely that a transcript of what

25  transpired at sidebar can be made public, but I need to hear

I4dWcohC

1    argument from the attorneys when they've had a chance to think

2    through the issues before I do that.

3         I will be convening here with the attorneys for

4    Mr. Cohen and the government to flesh out some facts that I

5    believe will be relevant to whether a special master needs to

6    be appointed or whether a government filter team or taint team

7    should be the filtering body.

8         MR. RILEY:  I'm confused, Judge.  John Riley from

9    Newsday.  You're saying that you're going to be convening in

10   private or in public session to discuss that?  If it's private,

11   I would object.

12        THE COURT:  I understand.  I'm not surprised to hear

13   that you object.  I've enjoyed your objections in the past, and

14   not to demean them, they're always well-taken but not

15   necessarily adopted by the Court.

16        I believe that what I will be hearing at sidebar

17   relates to potentially innocent individuals being identified

18   and their privacy interests being invaded if what I'm going to

19   hear is public.  That's my rationale at this point, and I

20   believe that that's a higher interest than the need of the

21   press and the public to learn this information.

22        MR. RILEY:  Just so I can explain to our lawyers at

23   *Newsday* and the *Times*, is this something you're talking about

24   occurring on Monday when this hearing reconvenes or something

25   that is going to occur prior to the reconvening of this

I4dWcohC

1   hearing?

2          THE COURT:  What I intend to learn at 2 p.m. consists

3   of facts that might invade the privacy interests of any

4   innocent person.

5          MR. RILEY:  You're talking about 2 p.m. today.

6          THE COURT:  2 p.m. today.

7          MR. RILEY:  And you intend to close the courtroom for

8   that hearing and exclude us?

9          THE COURT:  I intend to hear the parties as to whether

10  it should be closed, and I may close it.  Let me say I'll be

11  glad to hear from the press as to whether a transcript of that

12  should be made public, but in the first instance, I need to

13  hear the attorneys in a sealed proceeding, and I know you

14  object.

15         MR. RILEY:  So you intend to -- you have decided it

16  will be closed at 2:00 but will consider unsealing the

17  transcript afterwards, or will we be allowed to be heard at

18  2:00 with lawyers for the media arguing that it should not be

19  sealed in the first place?

20         THE COURT:  I'll be glad to hear you if you like, but

21  I'm very familiar with the public interest in transparency, and

22  it would be only if I'm quite certain that innocent

23  individuals' privacy interests would be invaded if the public

24  had this information.

25         MS. STROM:  Your Honor, I would love to be heard at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4dWcohC

1     that hearing, because it seems to me that we should at least

2     consider less restrictive means.  For example, if there are

3     certain individuals that we're worried about, we could give

4     them pseudonyms.  Or at least when we're arguing about why the

5     proceedings writ large must be public, there must be ways that

6     we can have pseudonyms or just not state the person's name

7     while we're discussing the larger interest of who should be

8     reviewing these materials and what types of information would

9     be in the materials.  It seems to me there are less restrictive

10    means than just not allowing us at all.

11            THE COURT:  I think you're making a good point, and

12    I'll ask counsel to consider whether pseudonyms would solve the

13    privacy interests.

14            MR. McKAY:  Your Honor, from our perspective, as long

15    as we understand what the pseudonyms are, we don't object.  I

16    think we could propose a hybrid procedure where the specific

17    question that you propose to defense counsel that calls for

18    some names, those names might be given at sidebar, but the

19    discussion that follows, as long as specific names are not

20    used, could be in open court.

21            MS. STROM:  To me, that seems like a great

22    alternative.  I understand that there are extraordinarily

23    compelling interests for keeping innocent people's names out of

24    these, but there are extraordinarily compelling interests on

25    the other side that I don't think we've articulated.  The press

1   and the public are so interested in this governmental

2   investigation and also on the idea of when it's appropriate to

3   breach attorney-client privilege; when the government can look

4   at attorney-client privileged documents, who should be the

5   person that is able to search these documents in the first

6   interest.  This is something the President has been tweeting

7   about.  This is something that's on the front page of every

8   newspaper in the country, and to exclude us completely from

9   these proceedings, I think, is something we need to keep in

10  consideration.  If there's a way to have a hybrid procedure

11  where we keep the names out, it seems to me, would be a good

12  alternative.

13          THE COURT:  I think you've made a very good point.

14  The government accepts it.

15          Do Mr. Cohen's lawyers wish to weigh in on this?

16          MR. HARRISON:  Judge, could we approach very briefly

17  for one second?  Something else that I just thought of related

18  to the Court's request.

19          THE COURT:  All right.  I'll hear you briefly at

20  sidebar.

21          (At sidebar)

22          MR. HARRISON:  Judge, I just want to front an issue

23  for you.  I'll make sure to go try and find out the answers to

24  the close questions for sure.  It occurred to me, I don't know

25  this for sure, but there may be clients of Mr. Cohen's that

I4dWcohC

 1   have a privacy interest in not having the government know that

 2   they've been talking to him, so I don't know if we're going to

 3   have to go get permission from the clients to reveal their

 4   names to the Court and to the government.

 5            I haven't thought about that issue yet.  Maybe it's

 6   not an issue.  I don't know.

 7            MR. McKAY:  Your Honor, I think that a list of client

 8   names is not covered by the privilege.  The mere fact of the

 9   representation is not privileged.

10            THE COURT:  That's correct.

11            MR. HARRISON:  I'll try and look at the law really

12   quickly, but I think it might be in some instances.  I don't

13   know if that's the case here.  Maybe it's not.

14            Come on, Tom.  You're not deciding it right now.  Come

15   on.

16            THE COURT:  No, we're not deciding it right now.

17            MR. HARRISON:  OK.

18            THE COURT:  If you have any authority that a client

19   list is privileged, I want to have you bring copies of the

20   decisions with you.

21            MR. HARRISON:  Sure.  Thank you, Judge.

22            THE COURT:  OK.  Thank you.  A copy for the government

23   and for the Court.

24            (In open court)

25            THE COURT:  Let's talk about what happens next.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4dWcohC

```
 1          At 2:00, I'll be glad to hear the press, anyone from

 2    the press, if you wish to be heard, and at that point, I will

 3    hear counsel at sidebar to learn whether the information in

 4    question should be under seal or not.  I don't yet know what

 5    their arguments are, but I can't make the decision without

 6    hearing you and without hearing them.

 7          MS. STROM:  Thank you, your Honor.  I appreciate the

 8    opportunity.

 9          THE COURT:  Yes.

10          MR. AVANATTI:  Your Honor, could I be heard briefly?

11          THE COURT:  Yes.

12          MR. AVANATTI:  Michael Avanatti.  I represent

13    Stephanie Clifford, otherwise known as "Stormy Daniels."

14          I would like an opportunity at 2:00 to weigh in on

15    this issue relating to the privacy, or lack thereof, concerning

16    the documents.  We have every reason to believe that some of

17    the documents that were seized relate to my client and, in

18    fact, may impact this privacy issue that the Court is speaking

19    about, so I would like the opportunity to address the Court

20    briefly at 2:00.

21          THE COURT:  I'll give you that opportunity.

22          MR. AVANATTI:  Thank you, your Honor.

23          THE COURT:  Would anyone else like to be heard at this

24    point?

25          MR. RILEY:  Judge, I just don't know the case number
```

I4dWcohC

```
1    yet, and we have no capacity to follow what is and isn't sealed

2    and what has or hasn't been filed without a case number to look

3    up on Pacer.  That would be very helpful.

4              THE COURT:  Can the government help with identifying

5    how the press would learn what's public?

6              MR. McKAY:  Yes, your Honor.  We'll ask the clerk's

7    office to see if they can assign a case number speedily, if it

8    hasn't already been assigned, and then we can provide that

9    number, I suppose.  I suppose the Clerk of Court's press office

10   will be provided with that number and can communicate it.

11             THE COURT:  All right.  Is there a member of the press

12   you would designate to be your point person who can then

13   communicate with the rest of the press?

14             MR. RILEY:  We all will.

15             MR. WEISER:  I think we all can.

16             THE COURT:  Very good.

17             We're adjourned.  Thank you.

18             (Recess)

19

20

21

22

23

24

25
```

I4dWcohC

```
 1                    AFTERNOON SESSION

 2                        2:00 p.m.

 3            MR. HARRISON:  Judge, could I have 30 seconds?

 4            THE COURT:  Yes.

 5            While he takes that 30 seconds, I'd like to ask anyone

 6    else who is with Mr. Harrison to review the transcript of what

 7    occurred at sidebar to make sure that it can be released

 8    publicly.  The government has said it can.  I believe it can.

 9    I just need to have you review it.

10            Mr. Harrison, are you ready?

11            MR. HARRISON:  Yes, Judge.  Could we approach the

12    sidebar, please?

13            THE COURT:  Why?

14            MR. McKAY:  Your Honor, we don't think there's any

15    basis for the application they're about to make to be made at

16    sidebar.

17            THE COURT:  All right.  Can you proceed from there,

18    please.

19            MR. HARRISON:  As to the issue that we discussed at

20    sidebar in the previous appearance today, your Honor, I was

21    able to have one of my colleagues do some research over the

22    short break, and I do think that there's some case law that

23    demonstrates that it would potentially be an ethical breach for

24    us and/or us on behalf of our client to turn over the specific

25    information that we discussed potentially turning over.
```

I4dWcohC

1          THE COURT:  I told you at sidebar that you'd need to

2     hand me up copies of any decisions you rely upon and have a

3     copy for the government.

4          MR. HARRISON:  We've got copies of the decisions,

5     Judge.  I'll hand them up in one second.

6          THE COURT:  And I hope you've indicated in the

7     decision what portion we should read.

8          MR. HARRISON:  I'm sorry.  I didn't hear your Honor.

9          THE COURT:  I see you've got a fairly thick set there.

10    Can you just indicate what you want us to read, the important

11    part.

12         MR. HARRISON:  I could, Judge.  That's going to take a

13    minute.

14         THE COURT:  Just as a housekeeping matter, my law

15    clerk told me that Ms. Stormy Daniels's attorney, Mr. Avanatti,

16    is not admitted here but wishes to be heard.

17         I'll be glad to hear you.

18         MR. AVANATTI:  Your Honor, we appreciate the

19    accommodation very much.

20         THE COURT:  Not at all.

21         MR. AVANATTI:  Thank you, your Honor.

22         MR. HARRISON:  Judge, I don't know if I can perhaps

23    short circuit this a little bit.  My colleague actually did

24    prepare a letter to submit to the Court.  He just walked down

25    to court with it, since we had a short break.  I just read it

I4dWcohC

1   for the first time here.  I've got to make a couple of changes

2   to it, but it is a letter that explains everything that we

3   could conceivably submit to the Court within a very short

4   period of time, but what I was going to ask is because of what

5   I'm concerned about with certain ethical obligations that we've

6   explained in this letter, I just don't think there's any way

7   that we can give the Court an answer today.  I was going to ask

8   that we adjourn this issue to Monday, since we're already

9   adjourned to Monday.

10          THE COURT:  There's more than one question so there's

11   more than one answer.  THE question how many clients is one I'm

12   sure you can answer.

13          MR. HARRISON:  I can't give you an exact number, your

14   Honor.

15          THE COURT:  Why not?

16          MR. HARRISON:  I don't know how far the documents go

17   back.  Prior to working for the Trump organization, between

18   2006 and 2017, for instance, my client had other clients.  I

19   don't know if there are -- and I don't have an exact number.

20   It's a long time ago.  That's over 12 years ago.  We've got to

21   go back and be able to look and try and compile a list of

22   clients from that time period.

23          THE COURT:  That doesn't strike me as something that

24   takes more than a couple of hours if your client focuses on it.

25          MR. HARRISON:  I can try and sit down with him and

I4dWcohC

1    have him do that, Judge, but it's hard for me to do that from

2    Pret a Manger up the street and try and comply with the Court's

3    other orders at the same time and try and do research on this

4    ethical issue so I make sure I'm not violating any ethical

5    obligations.

6         THE COURT:  I appreciate what you're saying, but you

7    have a team and I'm expecting the team to be working full time,

8    given that you're the ones who want emergency relief.

9         MR. HARRISON:  We are, Judge.  We're working round the

10   clock.  Mr. Huttenlocher was not even on this case until an

11   hour and a half ago, and he jumped on that research and he

12   wrote a three-page letter for the Court.

13        THE COURT:  Could you please just read out loud the

14   key portions of the letter.

15        MR. HARRISON:  Sure.  I'll skip to the reference to

16   the pertinent case law, your Honor.

17        First, the New York Court of Appeals has stated that

18   "in discussing whether the attorney-client privilege insulates

19   a client's identity from disclosure, we have stated on a

20   previous occasion that notwithstanding opinion to the contrary,

21   the rule in New York is not so broad as to state categorically

22   that the privilege never attaches to a client's identity."

23        THE COURT:  You're speaking of New York State law.

24        MR. HARRISON:  That is a New York State case, Judge.

25        THE COURT:  I don't think we should pay too much mind

I4dWcohC

1     to that.

2           MR. HARRISON:  OK.  That particular opinion references

3     a Southern District of New York opinion, so let me just read

4     that sentence.  The Court of Appeals continued, the New York

5     Court of Appeals, your Honor, and stated that:  "Absent other

6     circumstances, an attorney cannot be compelled to reveal the

7     client's identity where the latter is not a party to the

8     pending litigation.  This rule has been applied by courts in

9     this district"; that is, the Southern District of New York,

10    your Honor.

11          THE COURT:  What case is that and what did it hold,

12    the Southern District one?

13          MR. HARRISON:  Sure.  The reference I've got here is

14    *Elliott Associates L.P. v. Republic of Peru*, and the cite which

15    I have here is 176 F.R.D. 93, 99 (S.D.N.Y. 1997).  The quote

16    from that is, "The grounds for exempting a client's identity or

17    location" -- sorry, Judge.  I'm just making sure I've got the

18    right one.  The quote is, "The grounds for exempting a client's

19    identity or location from the scope of the attorney-client

20    privilege rarely apply where, as here, the client is a

21    nonparty."

22          There's also a reference to another Southern District

23    of New York case from 1994, *Allen v. W. Posh Pepperell Inc.*,

24    848 F.Supp. 423, 431-32.  The quote is, "Defendants here have

25    not made a showing of a need for disclosure of the names of

I4dWcohC

1    Mr. Crone's other clients sufficient to overcome the legitimate

2    fear of retaliation harbored by those clients."  And that goes

3    on to state, I believe, your Honor, if I'm reading this

4    correctly, if covered by the attorney-client privilege that

5    identity "cannot be revealed by the attorney without the

6    client's consent."

7         There's also ethical obligations on the part of

8    attorneys as they've been interpreted by the New York State Bar

9    Association, your Honor.  In pertinent part, quoting from New

10   York State Bar Association, Committee on Professional Ethics,

11   ethics opinion 1088.

12        THE COURT:  Again, this is New York State law?

13        MR. HARRISON:  That is New York State law, Judge, yes,

14   which covers ethics.

15        THE COURT:  Anything else that's federal law?

16        MR. HARRISON:  Federal law.  I've got some quotes from

17   that ethics opinion, but I'll skip that.

18        I don't have any other federal cases cited in this

19   particular letter, your Honor.

20        Can I just have one second to confer with

21   Mr. Huttenlocher?

22        THE COURT:  Yes.

23        MR. HARRISON:  Judge, that's all that we were able to

24   find in the short period of time that we've had so far.

25        THE COURT:  OK.  Now, you've referenced how long your

I4dWcohC

1   client has been representing the Trump organization.

2            MR. HARRISON:  I believe that's correct, Judge, yes.

3            THE COURT:  And that began when?

4            MR. HARRISON:  I believe it's 2006 that he started

5   working for the Trump organization, your Honor.

6            THE COURT:  At that time did he have any other clients

7   who continued with him during his representation of the Trump

8   organization?

9            MR. HARRISON:  I don't know the answer to that

10  question, Judge.  I think that he did have other individual

11  clients.  I don't know if they continued with him from his

12  prior employment, but my understanding is he did have other

13  individual clients during that period.

14           THE COURT:  All right.  Your inability to answer these

15  questions suggests to me that Mr. Cohen should be with you in

16  court next time so that the Court will have an answer to these

17  factual questions; that is, the ones that are not privileged.

18           Thank you.

19           MR. McKAY:  Your Honor, could I be heard briefly on

20  this?

21           THE COURT:  Yes.

22           MR. McKAY:  We'll obviously consider Mr. Cohen's

23  counsels' letter.  We haven't seen a copy yet nor the authority

24  therein, but it sounds like their cases were referring to

25  compelling an attorney to disclose client's names.

I4dWcohC

1          Here, we're in quite a different situation.  Mr. Cohen

2    is seeking a TRO to assert privilege on behalf of his clients.

3    The law, federal law in the Second Circuit, is very clear.

4    This is a quote from a Second Circuit case:  "In the absence of

5    special circumstances, client identity and fee arrangements do

6    not fall within the attorney-client privilege, because they are

7    not the kinds of disclosures that would have been made absent

8    the privilege, and their disclosures do not incapacitate the

9    attorney from rendering legal advice," *Vingelli v. DEA*, 992

10   F.2d 449.

11         My colleague has copies for the Court and defense

12   counsel.  We're happy to hand it up.

13         THE COURT:  What year was that?

14         MR. McKAY:  That was Second Circuit 1993.

15         THE COURT:  OK.

16         MR. McKAY:  I think it's important to remember that

17   what's going on here is Mr. Cohen filed a temporary restraining

18   order.  They made a representation to the Court about the vast

19   amount of attorney-client privileged material that was

20   allegedly seized.  Now they're being asked by the Court to back

21   up those assertions with just the names of those clients where

22   there's not privilege.  The law is very clear on this.  The

23   attorney-client privilege can't at the same time be used as

24   both a sword and a shield.  The quote for that is the Second

25   Circuit case of *Bilzerian*, 926 F.2d 1285.

1           What they are trying to do right now is use

2      attorney-client privilege as a sword to challenge the

3      government's ability to review evidence seized pursuant to

4      lawful search warrants, and then when we contest the factual

5      allegations that they use as a basis for that motion, they try

6      to use attorney-client privilege as a shield and refuse to

7      provide the Court with the information the Court has asked.

8           By their own account, in their brief, the case is a

9      cause of action in equity.  In equitable proceedings, you can't

10     be trying to use the privilege as both the sword and the

11     shield.  They've deprived the Court of the facts that you've

12     asked in order to base your decision, and so for that reason,

13     we think that the Court could deny the application on this

14     basis alone if they're not willing to turn over the client

15     list, if you don't have any basis to know that the

16     representations that are made about the scope of the seizure

17     have any basis in fact.

18          THE COURT:  I must say I find it intriguing that

19     Mr. Harrison's application to the Court and attendant

20     memorandum tells me that there are thousands of documents that

21     the government seized that are subject to attorney-client

22     privilege.  How could you know there are thousands if you can't

23     answer my question?  Please tell me.

24          MR. HARRISON:  Sure, Judge.

25          So, I don't have a copy and we haven't been able to

I4dWcohC

1    review what the government has seized, so I can't give you an

2    exact number.  I know basically from what was seized that there

3    are a lot of documents.

4              THE COURT:  I'm not asking whether there are a lot.

5    I'm asking the basis for your contention that there are

6    thousands and thousands.

7              MR. HARRISON:  That is our best understanding without

8    being able to look at the documents and give the Court an exact

9    number.

10             THE COURT:  How did you get that understanding?

11             MR. HARRISON:  Discussions among the defense team,

12   Judge, about the case.

13             THE COURT:  Really?

14             MR. HARRISON:  Yes, Judge.

15             THE COURT:  Who on the defense team represented that

16   there are thousands and thousands of privileged documents?

17             MR. HARRISON:  Judge, I'm not prepared to get into

18   internal defense discussions today.  I don't think I can

19   ethically reveal this.

20             THE COURT:  What I need to know is whether you have a

21   basis, as an officer of the court, to tell me that there are

22   thousands and thousands of privileged documents.

23             MR. HARRISON:  I want to be very careful, because I

24   want to be as up-front with the Court as possible.  The

25   "thousands" is an estimate.  I can't tell the Court that it's

I4dWcohC

1    exactly a thousand or it's in the thousands.  That is my best

2    understanding without having the documents to look at.  That's

3    an approximation, an estimate of how many documents are

4    relevant.  I don't know the exact number, your Honor.

5              THE COURT:  All right.

6              MR. HARRISON:  It might be less than a thousand.  I

7    don't know for sure.  I haven't had a chance --

8              THE COURT:  Did anyone have a basis for telling me

9    thousands and thousands?

10             MR. HARRISON:  Yes, I think we do have a basis.

11   That's our sort of best guess or best estimate based on what we

12   know at this time without looking at the actual production.

13             THE COURT:  I'm going to want to know your basis for

14   that.

15             I don't know of any better way to handle this thing

16   than to adjourn it briefly to allow Mr. Harrison to talk to his

17   client to find out the approximate number of other clients'

18   privileged documents that were likely in his possession;

19   documents or device information, how many, the number, and I

20   want you to have the names with you.  I'm not telling you you

21   have to give them to me, but I'll be reading the case law and

22   deciding whether you have to give them to me, so I want you to

23   have them right there in case I decide you must give them to

24   me.

25             Yes.

1          MR. AVANATTI:  Your Honor, could I be heard briefly?

2          Your Honor, I dealt with this issue in another case,

3    just for the Court's benefit, and I think actually the question

4    is not how many other clients are there.  The question is how

5    many other clients that have not been previously disclosed are

6    there?  Because if Mr. Cohen represented a client and that

7    client was disclosed to an opponent or another attorney or

8    there was a lawsuit that was filed, that's no longer privileged

9    even if it was privileged at some point in time, so we're

10   talking about a very small subset of clients, and what we're

11   talking about is clients that consulted Mr. Cohen on a

12   confidential basis and who were never disclosed to anyone.  And

13   as a practicing attorney, and your Honor knows from your

14   experience, that's a very small number in the grand scheme of

15   things, and so I think that's the inquiry, and it should be

16   able to be answered in short order.

17          I appreciate you giving me the time and opportunity to

18   address the Court.

19          THE COURT:  Thank you very much for that.

20          All right.  I suggest that we reconvene at 4 p.m., at

21   which point I expect Mr. Harrison to be able to answer my

22   questions so long as I have a basis in law to learn the answer.

23          MR. HARRISON:  Judge, I'm going to need more time.  I

24   need to consult internally at our firm with our ethics people

25   and talk to them about these ethics opinions.  I need more time

 1   to do that.  I need more time.  I'm not going to be able to do

 2   it at 4:00.

 3          THE COURT:  I believe you can so I want you to try.

 4          If anyone else wishes to be heard, I'll be glad to

 5   hear you.

 6          MS. STROM:  Your Honor, I'd like to just say one

 7   thing.

 8          THE COURT:  Please come to the podium.

 9          MS. STROM:  Thank you.

10          Just to the extent that the names of clients will be

11   used as a justification for sealing, since we have time to

12   think about it, I thought I'd put one more case in front of

13   your Honor, which is the *Bernstein v. Bernstein Litowitz* case.

14   I know the docket was just put out, so I don't know if that was

15   in the government's briefing or not, but there, they talked

16   specifically that a lawyer's ethical obligation to protect

17   client confidences is more extensive than the very narrow

18   attorney-client privilege, and generally, the fact that you

19   represent a client, as was discussed before, is generally,

20   absent special circumstances, not privileged.  So to narrow

21   even this inquiry, it's not only people that we didn't know

22   that Mr. Cohen represented before, it's people that have a

23   special circumstance, that there's some reason that the fact

24   Mr. Cohen was representing them was privileged, and I can give

25   you those case cites if you hold on.

I4dWcohC

1          All right.  The *Bernstein v. Bernstein Litowitz* case

2     is 814 F.3d 132 (2d Cir. 2016).  That's the one that talked

3     about the ethical duty is broader than the attorney-client

4     privilege.  And then the fact -- sorry.  I had associates

5     working hard over the time that we were out.

6          The fact that generally, the fact that a lawyer

7     represents a client is not privileged, the name of which case

8     my email isn't picking up right now, is *Vingelli v. U.S. Drug*

9     *Enforcement Agency*.  That's also Second Circuit 1993, case cite

10    992 F.2d 449.

11         To the extent that this is the reason that they want

12    sealing, we would argue that there needs to be a special

13    circumstance that the fact they were clients of Mr. Cohen

14    should be deemed privileged.

15         THE COURT:  All right.

16         Now, we discussed this morning your suggestion that

17    pseudonyms could replace the actual names.  I think everyone is

18    operating on the premise that pseudonyms can be used.

19         MS. STROM:  Absolutely.  If there is a reason to use a

20    pseudonym, that seems Luke a reasonable alternative.

21         THE COURT:  All right.  Anything else?

22         MS. STROM:  That's it, your Honor.  Thank you.

23         THE COURT:  OK.  Thank you.  See you at 4.

24         (Recess)

25         THE COURT:  Good afternoon.  Please have a seat.

I4dWcohC

1        I'd like to begin by asking Mr. Harrison his view of

2    whether the colloquy at sidebar can be unsealed.

3        MR. HARRISON:  I don't think we have an objection,

4    Judge.

5        THE COURT:  All right.  It will be unsealed

6    immediately.

7        I'll turn now to Mr. Harrison to give me the

8    information that I sought.

9        MR. HARRISON:  Judge, I believe you asked us to answer

10   two questions.  The first one was our basis for the assertion

11   in our papers that we believe, or we estimate that there are

12   thousands of privileged documents that have been seized.

13       THE COURT:  Thousands and thousands.

14       MR. HARRISON:  I'm sorry.  What, Judge?

15       THE COURT:  I think you said thousands and thousands.

16       MR. HARRISON:  I think we just said thousands, but I

17   don't object, Judge.

18       THE COURT:  OK.  Go ahead.

19       MR. HARRISON:  We make pretty clear in our papers,

20   Judge, that there are, at least as we understand it, two

21   general categories of what we believe to be privileged

22   documents.  One is between Mr. Cohen and his clients, and the

23   other category of privileged communications is between

24   Mr. Cohen and his attorneys.

25       Mr. Cohen's involved in a number of different ongoing

I4dWcohC

1    legal issues right now, and he has attorneys another more than

2    one firm and he has attorney-client privilege for those

3    communications.  Based on that, I think we're pretty confident

4    that there are thousands of privileged communications.  Again,

5    we haven't seen what the government seized.  I haven't reviewed

6    it.  I don't have an exact count for you, but there is that.

7            In addition to that, Judge, we don't know exactly how

8    far back in terms of the time period the seized materials go,

9    but just so the Court understands, prior to working for the

10   Trump organization, my understanding is that Mr. Cohen was an

11   attorney for over 20 years before that, with clients, so we

12   believe, we assume that a lot of those communications, that

13   there were privileged communications with clients during that

14   period, and those may well be encompassed in the materials that

15   the government seized, because they seized a lot of stuff.

16           THE COURT:  I think your premise is that some of these

17   date back at least 30 years, and that the attorney would have

18   kept that in his office?

19           MR. HARRISON:  Well, I think, and I didn't have a

20   chance to check this, the beginning of the time period of the

21   Trump organization, I think he started there in 2006, so that

22   would be 12 years going back as far as we go back.  We don't

23   know what time period is in the seized materials.

24           Based on that and based on what we've also clearly

25   included in our memo, a reference to privileged communications

I4dWcohC

1    between Mr. Cohen and his own lawyers, that's where we get the

2    basis from, Judge, to say that there were thousands and

3    thousands.

4              THE COURT:  Thank you.

5              MR. HARRISON:  As to an approximate number of clients,

6    I don't have an approximate number of clients, but I'm

7    confident in telling the Court as an officer of the court right

8    now, I need more time.  We need more time to really analyze

9    that question.  As the government has pointed out, whether or

10   not someone is a client is not necessarily a black-and-white

11   issue.  Mr. Cohen did have a relationship.

12             THE COURT:  Just a moment.  The question has to do

13   with attorney-client privilege.  It doesn't have to do with his

14   business clients.

15             MR. HARRISON:  I understand that, Judge, but that's

16   sort of why it's a more complicated issue than it would be, I

17   think, for instance, for, say, me or other attorneys who work

18   only at law firms.  Mr. Cohen had his own individual clients.

19   He also had an affiliation with another major law firm.

20             THE COURT:  Of brief duration.

21             MR. HARRISON:  Relatively brief, Judge, but still not

22   really brief, not like a week or two.

23             We're still trying to work through whether those are

24   considered as clients or not, and that obviously has an impact

25   on Mr. Cohen and an impact on what representations we're going

I4dWcohC

1    to make about that law firm and whether they were shared

2    clients or the law firm's clients or Mr. Cohen's clients.  It's

3    not an easy issue to figure out.

4              I know the Court is attuned to this issue.  I know the

5    Court wants us to respond with as much specificity as possible,

6    but we need time to work through those issues.  All I'm asking

7    is that you give us until Monday to give you an answer that I

8    feel more confident in giving to the Court as an officer of the

9    court.

10             THE COURT:  All right.  Can you get me the answer by

11   10 a.m. Monday and get the government the answer.  Then people

12   will have a chance to consider what to agree with and what not

13   to.

14             MR. HARRISON:  I think so, your Honor.  I will do my

15   best, and we will try and meet that 10 a.m. deadline.  I don't

16   know of a reason right now why we couldn't, and we will try and

17   meet that deadline.

18             THE COURT:  Will you have access to your client, or

19   are you telling me you don't know whether you will?

20             MR. HARRISON:  I believe I'll have access to him over

21   the weekend, yes, Judge.

22             THE COURT:  All right.  I'm directing that he be here

23   present with you at counsel table at 2 p.m. so that we don't

24   need to have many more adjournments.

25             Mr. McKay, does the government wish to be heard?

1          MR. McKAY:  Yes, your Honor.

2          We seized evidence pursuant to judicially authorized

3     search warrant on Monday.  Since Monday, we have had the legal

4     authority to review that evidence for the crimes that were set

5     forth in the detailed affidavit.

6          After Mr. Cohen's counsel contacted us asking us to

7     stop our review, and then after he filed the temporary

8     restraining order, we ceased our review of this important

9     evidence, first as a courtesy and then in light of the pending

10    motion, but every day that goes by is a day that we are

11    lawfully allowed to review this evidence and further our

12    investigation, and we're not able to.

13         Mr. Cohen's counsel says he needs more time, but this

14    is their motion.  They made a motion for extraordinary

15    temporary relief asking us not to review lawfully seized

16    materials.  As the reason for the immediacy, which is the

17    subject heading in Mr. Harrison's affidavit at page 36, he

18    says, "the seized materials contain thousands, if not millions,

19    of pages of documents that are protected by the attorney-client

20    privilege and/or the attorney work product doctrine."

21         Now, today he can't tell you how many clients

22    Mr. Cohen has or how many documents are out there.  He's

23    walking back those representations, which were the premise of

24    their motion.  We're now here for the third today.  The defense

25    still cannot provide the Court with the information that the

I4dWcohC

1    Court needs to make the decision.  They've talked about their

2    ethical obligations under Rule 1.6 of the ethical rules that

3    say that you can disclose a client name when permitted or

4    required under these rules or to comply with the law or a court

5    order.

6            Now the Court has directed them to provide a client

7    list, and there's no ethical obligation there.  As we've

8    discussed, the case law is clear that the fact of the client

9    list is privileged.

10           But Mr. Cohen's counsel --

11           THE COURT:  But the fact of the client list is not

12    privileged.

13           MR. McKAY:  Not privileged, correct.

14           They put themselves in this place by filing a TRO and

15    asking for this extraordinary relief, and now they are delaying

16    the government's investigation because they can't come up with

17    the facts that are necessary to predicate their motion.  It's

18    their burden to show likelihood of success on the merits.  This

19    is a quote from a Second Circuit case, "A TRO is an

20    extraordinary and drastic remedy, one that should not be

21    granted unless the movant, by a clear showing, carries the

22    burden of persuasion."  The cite for that is *JBR, Inc.*, 618

23    F.App'x 31, a 2015 Second Circuit case.

24           Your Honor, we respectfully submit that the Court

25    should conclude right now that the defense has failed to meet

I4dWcohC

1    that burden, because their failure to provide the basic facts

2    that support their motion is, I think, fatal in a couple

3    different respects, and I'd like to briefly describe those.

4           The first is the very premise of their argument is

5    that an attorney's office has special protections, that in

6    extreme cases, like the *Lynne Stewart* case, it requires the

7    appointment of a special master to protect the privilege.  But

8    if Mr. Cohen and his counsel can't substantiate his assertions

9    about the thousands, if not millions, of documents of

10   privileged material, this case is not like the *Lynne Stewart*

11   case.  It's not like the *Lynne Stewart* case for a couple of

12   other reasons, which I've talked about and we've briefed, but

13   it brings us quite squarely into the run-of-the-mill case in

14   which an individual, who may at times seek advice from

15   attorneys, has his evidence or his documents or his hard drives

16   seized and in that evidence there is some attorney-client

17   communication.  The common practice for such cases in this

18   district is a filter team like we propose.  The failure to

19   substantiate the amount of documents and the number of clients

20   takes us out of the law firm realm and squarely into the realm

21   of cases like *Grant* and *Winters* that we cite in our brief.

22          The second point is that whether it's defense

23   counsel's primary proposal, where they get to make the first

24   review, or it's the special master context, where defense

25   counsel will get to make privilege claims to the special master

1    and the government filter team will be able to see the

2    documents, both situations require defense counsel to have an

3    honest and complete and clear picture of who his clients are

4    and what sorts of attorney-client relationships exist.

5            In light of what has transpired, in their motion and

6    their declaration, I'm not sure the Court can have faith that

7    defense counsel is going to fairly participate in that process

8    in the way that would be required to make it work.

9            What the Court should do instead is exactly what is

10   proposed, a filter team made up of walled-off AUSAs, which will

11   make an honest and accurate sorting of privilege from

12   nonprivileged, and even despite what I've said, we still intend

13   to follow the procedure that we set forth in our brief, which

14   is that in a certain class of documents or communications, we

15   provide the defense with the ability to make objections to our

16   designation of something as not privileged, and in such

17   circumstances, if there was disagreement, it could be taken up

18   with the Court.

19           This is exactly the issue that Judge Jones flagged in

20   the *Grant* case, because if you've got defense counsel, and even

21   in the special master context, making wildly overbroad claims

22   of privilege and the government has got a hand tied behind its

23   back because it can't see the documents, you're not going to

24   have an efficient process.

25           Your Honor, for all those reasons, we think you can

I4dWcohC

1   and should deny Mr. Cohen's motion right now.  I think the

2   delay, and this has clearly been a delay tactic from the

3   outset, their failure to be able to back up their facts is

4   clearly fatal to their argument.  For that reason, we think you

5   should deny the motion now.

6          I'll note that I say this with respect to Mr. Cohen's

7   motion.  I think he's failed to meet his burden.  Obviously, at

8   this time, the Court has allowed President Trump to intervene

9   to assert his own interest as the privilege holder.  We don't

10  object, given the Court has already set a briefing schedule for

11  President Trump's counsel and a hearing Tuesday at which we can

12  address his privilege claims, but we think Mr. Cohen has

13  utterly failed in his motion at this time and that you can and

14  should deny it so that, on Monday, all we should be considering

15  is a narrower set of documents, which are any documents that

16  might have a plausible claim of privilege by President Trump

17  asserting his own interest as a privilege holder, but not all

18  of Mr. Cohen's documents where he's trying to make these

19  overbroad privilege claims.

20          THE COURT:  All right.

21          Yes.

22          MR. HARRISON:  Quick response, Judge.

23          I think that turns things on its head to say we put

24  ourselves in this place.  This has happened because the

25  government seized the documents, and they told us that they

I4dWcohC

1   were going to start reviewing.

2          THE COURT:  I mentioned that today.

3          MR. HARRISON:  Yes, and they told us they were going

4   to start reviewing by today at noon, so we had to file

5   something.

6          We're not delaying.  All I'm asking for, basically for

7   the reasons I've already put in front of the Court, is to give

8   us until 10 a.m. on Monday to answer the Court.  That's all we

9   ask.

10          THE COURT:  I'm going to give you that time, but I

11   expect that in return, there will be a good faith effort on the

12   part of counsel to be able to answer the Court's factual

13   questions, and if you don't have the answers by 2 p.m. on

14   Monday, I'm likely to discount the argument that there are

15   thousands, if not millions, of privileged documents.

16          Now, I want to be sure I understand the government's

17   proposal with respect to when defense counsel can review

18   documents as to which the government finds no privilege.  I had

19   understood one thing from the government's submission, but what

20   I understand now is that as soon as the government taint team,

21   if that's who is the first reviewer, identifies a set of

22   documents or any documents that it views as not privileged, it

23   will then show them to defense counsel.  Is that right?

24          MR. McKAY:  No, your Honor.  It's a narrower subset.

25          Just to give a concrete example, let's say that we

I4dWcohC

1    know for a fact that someone named John Smith is not an

2    attorney for Mr. Cohen, he's not a client of Mr. Cohen.  In the

3    initial review, what we would do is we'd get the client list

4    from Mr. Cohen, if one can be made, and we'll get an attorney

5    list for Mr. Cohen.  We will run keyword searches.  All the

6    evidence will be in an electronic database.  We'll run searches

7    designed to segregate any emails that are to or from or

8    documents that involve clients or attorneys.

9            Out of that subset, the filter or taint review team

10   will review the documents for privilege.  If Mr. Cohen has

11   exchanged an email with an attorney who represents him in a

12   matter -- let's say it's Mr. Harrison -- and it's clearly

13   privileged, the filter team will designate it as such and there

14   will be no need to present it to the Court or to defense.  But

15   let's say the email did something that very obviously waived

16   the privilege, like copied a third party on the email -- so

17   Mr. Cohen emails Mr. Harrison and the Court is cc'd -- we'd

18   likely take the position that that waives any privilege in that

19   email, and we'd designate that as nonprivileged.

20           The other example might be, let's say, there's an

21   email between Mr. Cohen and his client and the filter team or

22   taint team believes that they've got a showing as to the crime

23   fraud exception.  In those instances where there's a document

24   that is sort of presumptively privileged because it's to or

25   from an attorney or a client, and the government filter team

1    nevertheless thinks it's not privileged, that's the situation

2    in which we present our finding to defense counsel and say, Do

3    you object to this?

4           But in the broader scope of things, if Mr. Cohen has

5    an email with his plumber saying, Hey, can you come fix my

6    sink, and we know that this is a plumber, and the filter team

7    sees that, they're just going to mark that not privileged

8    because it's very obvious, and we don't need to burden defense

9    counsel or the Court with arguing about privilege over what is

10   likely to be the vast majority of documents that are very

11   obviously not privileged.

12          What we're focused on is consulting with the defense

13   in instances where there's some plausible reason to believe

14   that the document might be privileged.

15          I should say we've asked the defense in our initial

16   letter to give us its client list, attorney list and any sort

17   of input on the review.  The devil may be in the details on

18   this.  If there are particular adjustments that the Court

19   thinks are appropriate to the procedure or that defense counsel

20   thinks are appropriate to the procedure, we're willing to

21   discuss those, of course.

22          What we have proposed is as I just described, but we

23   think that's the most efficient process.  That's the process

24   that we're using, by the way, in many of our cases that have

25   these filter teams.  We think that's a fair and efficient way

I4dWcohC

1   to tee up with defense counsel the narrowest universe of

2   documents where there might be a dispute, because we think that

3   the vast majority of things are going to be obviously

4   nonprivileged, no reason to argue about it, and there are going

5   to be certain things that are very obviously privileged, we're

6   going to mark them as such, and the filter team is never going

7   to release them.

8           THE COURT:  Thank you.

9           I'd like to note something that may not have been

10  obvious this morning.

11          When I was asking the plaintiff's counsel about the

12  names of clients, I had in mind not the immediate use of the

13  names for which pseudonyms could be substituted.  What I had in

14  mind was that the government would need those names if it were

15  to do the type of search that is suggested, and so we do need

16  to decide whether those names must be divulged.

17          I looked at all of the cases that counsel cited, and

18  it's quite clear, under Second Circuit law, that the identity

19  of a client is not privileged unless the mere identification of

20  the client gives away what advice was given or what advice was

21  sought, and that that would be incriminating.

22          We are left with the need for you to at least have in

23  hand, Mr. Harrison, the identity of the other clients, not

24  business clients but clients who sought legal advice from

25  Mr. Cohen as an attorney.

1        Yes.

2              MR. McKAY:  May I make one request, your Honor?

3              THE COURT:  Yes.

4              MR. McKAY:  Obviously you've given defense counsel

5    until Monday to come up with the names of the clients.  I think

6    the case law is also clear that the burden of establishing

7    attorney-client privilege rests on the person asserting it.  In

8    light of the fact that the Court has given the defense numerous

9    opportunities to come up with a list and it can't, we're

10   concerned that whatever list is going to come on Monday morning

11   is going to be something that's difficult to substantiate.

12             The case law is also clear that the Court is permitted

13   to require, because there is this *prima facie* burden, some

14   substantiation of the attorney-client relationship.  The case

15   I'm thinking of is actually the case they cited earlier this

16   morning, *Elliott Associates*, 176 F.R.D. 93 at 97, which says,

17   "courts permit questions necessary to test the factual

18   grounding of an asserted attorney-client privilege."

19             I think in light of what has transpired today, it

20   would be appropriate for defense counsel to give us not just

21   names but some substantiation, whether that's a retainer

22   agreement or some indicia of attorney-client relationship, and

23   if whatever that indicia is is something that they believe is

24   privileged, we don't have an objection to them presenting it to

25   the Court on an *ex parte* base, because we don't want to see

I4dWcohC

```
 1    that privileged information.  But I do think just a bare list
 2    of names may result in a situation where we say, your Honor, we
 3    have reason to think that some of these names aren't actually
 4    names with which he had an attorney-client relationship, that
 5    they were business relationships.
 6         Given the extra time that you've given defense
 7    counsel, we think it's also reasonable to ask for
 8    substantiation, so that on Monday morning we don't find
 9    ourselves with yet another adjournment while they find the
10    substantiation for those claims.
11         THE COURT:  That's right.  I thought maybe you were
12    going to raise the question of whether they had the burden of
13    contacting the clients and seeing if the clients waive the
14    privilege or insist upon it.
15         MR. McKAY:  As we've discussed, the release of the
16    identity of the client isn't privileged, so for just giving the
17    names, I don't think there's any privilege waiver required.
18         If you're asking for underlying substantiation --
19         THE COURT:  Yes.
20         MR. McKAY:  -- I suppose there might be, although I
21    don't know that presenting something in camera to the Court
22    would waive the privilege.
23         THE COURT:  I don't think it would.
24         MR. McKAY:  If there are concerns about disclosing
25    privileged information to substantiate the claim, we don't
```

I4dWcohC

1    object to an *ex parte* showing, whether it's retainer agreement

2    or whatever, but we do think that there needs to be some actual

3    substantiation for whatever claim we get on Monday morning so

4    we don't find ourselves with another adjournment.

5              THE COURT:  All right.

6              Mr. Harrison, I think Mr. McKay's point is well-taken.

7    Do you disagree?

8              MR. HARRISON:  I'm not sure, Judge.  I'll take a look

9    at the case and think about how we can do that.  It depends on

10   what "substantiation" has to mean.  I'll take a look at it,

11   Judge, and we'll do our best to be prepared on Monday to show

12   something or to make a representation to the Court.

13             THE COURT:  I would like to have that in your 10 a.m.

14   letter.

15             MR. HARRISON:  Understood, Judge.

16             THE COURT:  In other words, if you do need to be

17   prepared to substantiate that the relationship was a

18   lawyer-client relationship, I need to know that by 10 a.m.

19             MR. HARRISON:  I understand, your Honor.

20             THE COURT:  Would anyone else like to be heard?

21             Yes, Mr. Riley.

22             MR. RILEY:  Judge, we have a docket number for the

23   case.

24             THE COURT:  Yes.

25             MR. RILEY:  And it includes the government's filing.

1    There is nothing else.  The petition that originally initiated

2    this isn't filed.  There's no notation that it even exists, and

3    we would request that it be filed and unsealed.

4             There's also no indication of any minute entries as to

5    any action you've taken.  I'm not trying to interview you, but

6    I don't actually know whether you've issued a TRO or not.

7             THE COURT:  I have not.

8             MR. RILEY:  So any action leading up to today we would

9    hope would be in the docket.

10            THE COURT:  All right.  There should be in the docket

11   the application made by Mr. Cohen's lawyers with only three

12   paragraphs redacted.

13            I think it's three.  Yes, it is three.

14            MR. HARRISON:  I think that's right, Judge.  I'll

15   check.

16            THE COURT:  The government response, I believe, has

17   been docketed.

18            MR. McKAY:  It has, your Honor.

19            THE COURT:  I think you will find those in the docket.

20            MR. RILEY:  Thank you.

21            THE COURT:  The memorandum of law, my recollection as

22   to where I last left it with my law clerk, was that Mr. Cohen's

23   counsel was going to review the memorandum of law and give me

24   proposed redactions.  The government agrees with him.  If that

25   hasn't already been filed, it will be filed.

I4dWcohC

1           MR. RILEY:  Thank you, Judge.

2           THE COURT:  Anything else?

3           MS. STROM:  Will the submission from President Trump

4    on Sunday and Mr. Cohen on Monday morning be publicly filed as

5    well?

6           THE COURT:  I don't know whether any privilege will be

7    claimed, but I would think they'd be public.

8           MS. STROM:  Because the presumption of access to this

9    proceeding was it would attach to any documents that would be

10   filed in this proceeding, so if anything was going to be asked

11   for sealing, it would have to meet the four-part standard that

12   we discussed this morning.

13          THE COURT:  Yes, and apply to the Court and get a

14   ruling.

15          MS. STROM:  Yes.  Thank you, your Honor.

16          THE COURT:  All right.  Thank you.

17          We're adjourned.

18          (Adjourned)

19

20

21

22

23

24

25

# Exhibit 2

14G3COH1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     *In the Matter of Search Warrants*
3    *Executed on April 9, 2018*
     ------------------------------x
4    MICHAEL D. COHEN,

5                    Plaintiff,

6          v.                                18 Mag. 3161

7    UNITED STATES OF AMERICA,

8

                      Defendant.
9
     ------------------------------x
10                                      New York, N.Y.
                                        April 16, 2018
11                                      2:15 p.m.

12   Before:

13                     HON. KIMBA M. WOOD,

14                                      District Judge

15
                           APPEARANCES
16
     MCDERMOTT WILL & EMERY LLP
17        Attorneys for Plaintiff
     BY:  TODD HARRISON
18        JOSEPH B. EVANS
          STEPHEN RYAN
19
     ROBERT S. KHUZAMI
20        Acting United States Attorney for
          the Southern District of New York
21   THOMAS A. McKAY
     RACHEL A. MAIMIN
22   NICOLAS ROOS
          Assistant United States Attorneys
23

24

25


                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

14G3COH1

```
 1   Also Present:

 2

 3   SPEARS & IMES LLP
         Attorneys for Intervenor
         Donald J. Trump, President
 4   BY:  JOANNA C. HENDON
             REED M. KEEFE
 5           CHRISTOPHER W. DYSARD

 6   ALAN FUTERFAS
         Attorney for Intended Intervenor
 7       Trump Organization

 8   DAVIS WRIGHT TREMAINE LLP
         Attorneys for ABC, Inc., New York Times Co., Associated
 9   Press, CNN, Newsday
     BY:  ROBERT BALIN

10

11   MICHAEL AVANATTI
         Attorney for Interested Party
12       Stephanie Clifford a/k/a "Stormy Daniels"

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              THE COURT:  Good afternoon, please have a seat.

 2              THE DEPUTY CLERK:  The Court calls Michael D. Cohen v.

 3    the United States of America.  Counsel, state your appearances.

 4              MR. McKAY:  Tom McKay, Rachel Maimin and Nicholas Roos

 5    for the government.

 6              MR. HARRISON:  Good afternoon, your Honor.  Todd

 7    Harrison and Joe Evans who you've seen in the courtroom before

 8    on behalf of Mr. Cohen.  I also have and would like to

 9    introduce my client Steve Ryan who is two down from me who

10    filed a pro hac vice --

11              THE COURT:  Your partner?

12              MR. HARRISON:  Yes, your Honor.

13              MR. RYAN:  It is an honor to appear before you, your

14    Honor.

15              THE COURT:  That's very kind.  I will grant it.

16              MR. HARRISON:  Thank you, Judge.  He may address the

17    Court today, so thank you.

18              THE COURT:  That's fine.  It also occurs to me that

19    the lawyers for President Trump and the Trump Organization

20    should probably be at counsel table as well.

21              MS. HENDON:  Should we note our appearances first,

22    your Honor?

23              THE COURT:  Yes.  I've signed an order that you are an

24    intervenor.

25              MS. HENDON:  Yes, Joanna Hendon, Spears & Imes, LLP.

1   With me Christopher Dysard and Reed Keefe on behalf of the

2   president.

3           MR. FUTERFAS:  Alan Futerfas, good afternoon.  We

4   filed a letter this morning on behalf of the Trump

5   Organization, so I wanted to let your Honor know we're here and

6   just at least pursuant to that letter request the opportunity

7   to intervene.

8           THE COURT:  All right.  Some time after this

9   proceeding could you file a motion to intervene.

10          MR. FUTERFAS:  Yes.

11          MS. HENDON:  We're very comfortable where we are, if

12  your Honor wouldn't mind us remaining at our seats.

13          THE COURT:  I don't mind.

14          Now I'd like to turn to Mr. Harrison and ask can you

15  answer the questions I posed at our last hearing.

16          MR. HARRISON:  Yes, Judge.  We did file a letter this

17  morning at 10 o'clock pursuant to your Honor's direction.

18  That's a reflection of a lot of work we did this weekend to try

19  to narrow things down as much as possible and to answer the

20  Court's questions.  I think it answers the Court's questions

21  pretty much all way.

22          I believe that it actually sort of supports our

23  application for us doing the review or having a special master,

24  because I think it has narrowed things down a little bit and I

25  think hopefully will help to alleviate the Court's concerns

1    about any potential delay in relation to a special master.

2              THE COURT:  Do you know the volume, roughly the volume

3    of privileged documents that were seized?

4              MR. HARRISON:  No, Judge, I don't.  We laid out as

5    much as we know in our letter.  We indicated the privilege

6    relationships that Mr. Cohen had as both a client and as an

7    attorney.  We don't recognize all of the items that the

8    government seized.  We don't know -- they list a hard drive, a

9    disc, things like that, Judge, and we don't know exactly how

10   many documents are on there or even exactly what is on those

11   particular, these media.

12             THE COURT:  May I interrupt you just to ask Mr. McKay

13   if the government has a feeling for how many documents in all

14   were seized.

15             MR. McKAY:  How many documents in all were seized.  In

16   terms of physical documents?

17             THE COURT:  I'll begin there.

18             MR. McKAY:  No.  In fact, because of the pendency of

19   this motion, the investigative team has tried to be very

20   careful about any communications with the filter team to get

21   into particulars.

22             Very broadly speaking, I understand that a few or

23   maybe as much as 10 boxes of physical documents were seized.

24   But in terms of the real volume, it is going to be the hard

25   drives, the electronic devices, that's where you're going to

14G3COH1

1   see the real volume.

2               THE COURT:  All right.  Is it feasible for you to give

3   duplicate sets of all you have to Mr. Cohen?

4               MR. McKAY:  It's feasible, but there are many reasons

5   why we oppose that request, and I'm happy to set forth those

6   reasons now if your Honor is prepared to hear them.

7               THE COURT:  Yes.

8               MR. McKAY:  So, despite Mr. Cohen's counsel's sworn

9   assertions last week that there were thousands if not millions

10  of privileged documents, his letter this morning admits he has

11  only three legal clients.  And I think this is fatal to their

12  motion.

13              THE COURT:  Now, what time period are you talking

14  about?

15              MR. McKAY:  I'm talking about 2017-2018.  I'm going to

16  go back through the other time periods in a minute because I

17  think this is very important --

18              THE COURT:  Okay.

19              MR. McKAY:  -- to discuss.

20              But, just to explain why I think the number and volume

21  of materials is really critical is in their brief they say,

22  well, Friday's hearing got away from the legally operative

23  facts.  But the number of clients and the volume of materials

24  seized are very important.  Because Mr. Cohen has premised his

25  motion on the assertion that he is an attorney and has lots of

1    privileged materials, and so, for that reason, this case is

2    like the Lynne Stewart case.  But now that assertion has proven

3    to be a little bit misleading.  I think it undermines his

4    argument and it makes this case a lot more like any white

5    collar case in which the subject of a search has sought legal

6    advice.  Mr. Cohen sets forth he's got more attorneys of his

7    own than he has clients.

8            So with respect to the facts that Mr. Cohen has now

9    provided, I'd like to walk through them because he claims that

10   he had numerous clients when he was practicing between 1991 and

11   2006 with I believe it was three different firms.  But for each

12   of those firms, Mr. Cohen's letter states that counsel does not

13   know whether any privileged materials were seized.

14           Now, that should be surprising to the Court because,

15   A, defense counsel has had access to their client all weekend,

16   who should be able to know what is in his files and on his

17   computer, and B, they actually have the electronic devices.

18   Most of the devices, with a few exceptions, were imaged on site

19   during the search.  So they can open up the computer and see

20   what, if any, privileged files were in there.  But, apparently,

21   they have not done so despite the Court's direction that they

22   provide more information by this morning.

23           THE COURT:  Could you just pause.  I'm not sure I

24   understood.  Is it your assertion that all privileged

25   communications are in the devices they have?

1            MR. McKAY:  No, it's not my assertion.  It may be

2      there were some physical documents that were seized that

3      include privileged communication.  We don't know because we

4      haven't reviewed them yet.  But they do have access to their

5      client who should be aware of what physical documents were

6      located in his premises.

7            I'd also point out that with respect to everything

8      that occurred pre-2006, all of the different practice that

9      Mr. Cohen may have had 20, 30 years ago, all of the rider terms

10     in the search warrants are either explicitly limited by date

11     range to much more recent years, or, they specifically refer to

12     conduct that is considerably more recent than 2006.

13            THE COURT:  Remind me what the period is.

14            MR. McKAY:  It depends on which specific subject in

15     the rider term we're talking about.  And since those are still

16     under seal, I don't want to get into the details.  But for

17     certain subjects we asked for documents from January 1st, 2013,

18     going forward.  Other subjects aren't specifically date bound,

19     but the events that they relate to are all sort of post 2011 I

20     believe.

21            And so, to the extent that Mr. Cohen had documents on

22     his hard drives or in his physical files that go back beyond

23     2006 when he was actually practicing representing clients,

24     they're likely to be not responsive to the warrant.  I'm not

25     committing that they are, but they're likely not to be.

1          So if that was the concern and Mr. Cohen were actually

2     able to assert that he had legal practice, that some of the

3     privileged materials related to his legal practice, 2006 were

4     included, it may be that we could do some carve out for that

5     period of time, because it could be treated differently, given

6     the low likelihood that such documents are actually likely to

7     be responsive.

8          So then you go from 2007 to January 2017.  Mr. Cohen's

9     letter states that he was working as a counsel at the Trump

10    Organization.  But that letter does not state one way or the

11    other whether he has retained any materials from his employment

12    at the Trump Organization since he left there over a year ago.

13    The Trump Organization has put in its own letter, but nowhere

14    does it state a belief or an assertion of fact that Mr. Cohen

15    in fact took privileged materials with him over a year and a

16    half ago and still has them in his possession.  And most

17    corporations don't permit employees to keep their privileged

18    client files with them after they leave.

19         So Cohen's failure to assert that there actually is

20    privileged material from the Trump Organization on his devices

21    or in his premises is pretty telling, because for those prior

22    three firms that we just talked about, the letter affirmatively

23    states that they don't know the answer.  But the silence as to

24    the Trump Organization is telling.

25         So that leaves us with January 2017 to the present

14G3COH1

1    when Mr. Cohen has stated that he had only three legal clients.

2    He hasn't even provided evidence of these relationships as the

3    Court directed on Friday.  But, more importantly he's provided

4    no detail about the volume of communications with these

5    clients.  So it's still not clear whether his counsel had a

6    valid basis for the assertions they made in their briefing last

7    week.

8            All of that supports the argument that we've made from

9    the outset, which is that Mr. Cohen might have a legal degree,

10   but this investigation and the search is largely focused on his

11   private business dealings and personal financial dealings.  And

12   that is very significant for the analysis the Court has to

13   conduct, because this takes this far from the realm of the

14   Lynne Stewart case.  Which, again, involved a practicing

15   criminal defense attorney, the seizure of large amounts of

16   privileged material, the seizure of materials from other

17   attorneys that were not under investigation, files that were

18   related to criminal defendants.  And not just that, criminal

19   defendants being prosecuted by this office, which was extremely

20   consequential because it meant that the filter protocol that we

21   proposed was actually impracticable because the walled AUSAs --

22           THE COURT:  Proposed in that case.

23           MR. McKAY:  Correct.  Because the filter protocol, the

24   walled AUSAs might stumble upon the files of their own criminal

25   defendants.

14G3COH1

1         Lynne Stewart is very, very different from this case.

2    That's why we've been focusing on the number of clients and the

3    volume of privileged communications, because we think this is

4    just the run-of-the-mill case, the kind of case where every day

5    we have filter teams doing privilege reviews.

6         Now, a lot of their brief talks about their inability

7    to disclose the identity of this third client.  I can dispute

8    whether they're correct that it's privileged.  I don't think

9    they're accurately describing the special circumstances

10   exception.  I think the ethical obligations they describe yield

11   to a court order, and their discussion of the ethical

12   obligations all presupposes that the client's name will be

13   publicly disclosed, when I think the Court's directive on

14   Friday was to do it under seal, and the government had no

15   objection to being done under seal.

16        But the critical point as to the failure to disclose

17   the third client is that Mr. Cohen's refusal to provide that

18   client's name or a full client list or details about the

19   representation suggests -- it's powerful evidence of how this

20   review is likely to play out if Mr. Cohen's proposal is

21   granted.  If he can't disclose the client name, even to the

22   Court under seal, or to the filter team under seal, how can the

23   proposed review process that he'd like possibly work?

24        In his proposal, he wants to make the initial

25   privilege call.  So presumably he's going to have to produce a

1    privilege log so we have some indication of what things he's

2    claiming privilege over.  But without the name of the client,

3    or any information about the representation, how can the

4    government ever hope to push back against the inevitably

5    overbroad claim of privilege?  It is impossible.

6          The same is true with the special master.  I think the

7    letter suggests that Mr. Cohen would be willing to disclose

8    this third client's name to the special master but still not to

9    the government.  So you have the same problem.  Without the

10   name of the client, we can't contest the determination, and

11   that's actually really significant because we may know facts

12   about an individual who may be the client in question that the

13   special master doesn't know, and they are relevant to analysis

14   of the privilege inquiry or crime fraud inquiry.

15         I can just give one example, which is that Mr. Cohen's

16   letter states that he has some clients for whom he provides

17   strategic advice or business consulting.  Now, he hasn't put

18   those in the realm of legal clients for now, but let's say he

19   lists on his privilege log an e-mail with a representative of

20   an anonymized major corporation.  It may be we have subpoenaed

21   that corporation, that we have his consulting agreement with

22   Mr. Cohen.  It may be that we've interviewed the executives of

23   that corporation, and the executives have told us that there

24   was no attorney-client relationship.  But if they won't give us

25   the name, they just anonymize the client, then we can't make

14G3COH1

         1    that same challenge to the special master.  So we're going to

         2    be stuck with this overbroad claim of privilege and no way to

         3    litigate it.

         4            This is really what Judge Jones was describing in the

         5    Grant case when she denied the request for a special master.

         6            So, I think the continued resistance to provide the

         7    Court with facts and names is just a preview of what's going to

         8    happen if the Court grants Mr. Cohen's requested proposal.  I

         9    think it indicates that he's going to continue to hide behind

        10    overbroad claims of privilege, which is going to drag out the

        11    investigation with litigation and delay.  All of which is very

        12    much to the benefit of the party who is under criminal

        13    investigation.

        14            Briefly, since the letter that was filed this morning

        15    went sort of well beyond the disclosure of the client list and

        16    added a few other arguments, I'd like to respond to those if

        17    the Court would allow.

        18            THE COURT:  Sure.

        19            MR. McKAY:  One is Mr. Cohen makes a halfhearted

        20    Fourth Amendment claim.  He says we did an end run around the

        21    Fourth Amendment.  But of course we got a search warrant, so

        22    that of course is a frivolous claim.

        23            He admits that to obtain the search warrant we had to

        24    show probable cause that his premises and devices contained

        25    evidence of a crime.  He said the search warrant was designed

14G3COH1

1    to allow the government to obtain that material and that

2    material only, but now the government is in possession of all

3    of Mr. Cohen's data, a classic example of overreach.  That's

4    page 7.

5           But that argument completely misunderstands how

6    searches of electronic evidence work under Rule 41 and the

7    applicable warrants.  The Second Circuit described this in the

8    Ganias case, that because of the volume of evidence in

9    electronic material, and the logistical issues, it is perfectly

10   appropriate to do on-site imaging of electronic devices for

11   later review for responsiveness to the warrant.  That's

12   expressly provided for in Rule 41, it was expressly provided

13   for in the warrants in this case.  There was nothing improper

14   about the way the search warrants were executed in this case.

15          Lastly, if I may, there is one argument which seems to

16   permeate Mr. Cohen and President Trump's submissions.  And I

17   think it is best stated at page 8 of Mr. Cohen's letter when he

18   writes "The appointment of a special master will protect the

19   integrity of the government's investigation from the toxic

20   partisan politics of the day and attacks on the impartiality of

21   the Justice Department and the U.S. Attorney's Office."

22          Now, there are three parties to this litigation as of

23   right now.  Only two of them have made public comments about

24   the searches.  Last Monday both Mr. Cohen and President Trump

25   made inflammatory public statements about this case.  Our

1  office has done no such thing.  So it is improper for the

2  parties to a litigation to attempt to drum up media attention

3  about the case, and then turn around and cite that media

4  attention to the Court as the basis for their requested relief.

5  The Court shouldn't allow that.

6        So they may question the impartiality of the career

7  prosecutors who would be doing the filter team review, but

8  Judge Jones felt very differently in <u>Grant</u>.  She wrote in her

9  decision to approve a filter team as opposed to a special

10 master that it was based on the expectation and presumption

11 that the government's privilege team and the trial prosecutors

12 will conduct themselves with integrity.  She said the

13 government is entitled to that presumption.  I think this Court

14 should reach the same result.

15       Mr. Cohen and President Trump both make this argument,

16 but it is important to remember why we're here, which is that a

17 federal magistrate judge found probable cause that there was

18 evidence of crimes in Mr. Cohen's premises and on his devices.

19 The judge was made well aware that this search, like many

20 searches in white collar cases, would result in a seizure of

21 some potentially privileged information.  That's why the

22 warrants expressly provide for the review of seized materials

23 conducted in a manner that respects the privilege such as the

24 filter team here.

25       So, when President Trump and Mr. Cohen -- well, the

1     only thing that makes this case unusual in any respect is that

2     one of Mr. Cohen's clients is the president.  But neither

3     Mr. Cohen nor the president in the letter that he filed last

4     night, which we responded to in writing and I won't repeat

5     those arguments now, neither one of them has a persuasive

6     reason why this case should be any different.  Why the

7     president should be entitled to a privilege review procedure

8     that's different than the ones that are ordinarily and commonly

9     conducted in this district.

10          And both Mr. Cohen and the president have explicitly

11     invoked in their briefs the appearance of fairness in the

12     administration of justice.  But I actually think that cuts

13     against their argument.  It would not protect the public's

14     confidence in the administration of justice to give Mr. Cohen

15     and the president special treatment.  This Court should promote

16     the appearance of fairness by treating this case like any

17     ordinary case in this district and approving the government's

18     proposed use of a filter team.

19          THE COURT:  All right.  Let me ask you a question.

20     Going back to the Stewart case, Mr. McKay, the government

21     eventually was allowed to argue to the Court questions of

22     privilege, so the government had to have seen the privileged

23     documents.  Mr. Khuzami was on that case.

24          Are you aware of what happened there?

25          MR. McKAY:  Your Honor, I'm not specifically aware,

14G3COH1

1   but I think the answer is not that the filter team was

2   permitted to review -- I will confirm this if I'm wrong.  But I

3   think the filter team was not permitted to review the actual

4   documents, but rather a privilege log was created by defense

5   counsel.  And based on the privilege log, which has information

6   like the name of the communicants and the timing and some

7   general explanation, the government was then able to contest

8   the application based on context.  And I think that is what

9   Judge Jones describes in the <u>Grant</u> case as being inadequate.

10  That without actually looking at the privileged documents, the

11  government doesn't have the requisite context to challenge the

12  privilege determination.

13          So I think it is the case that in <u>Stewart</u> all that was

14  done is a privilege log.  If I'm wrong about that, I will

15  correct myself as soon as I can.

16          THE COURT:  Okay.  Good.  All right.

17          With respect to the client's name being withheld, that

18  is not in accord with the law in this circuit.  If you have a

19  reason for that client's name to be treated under seal, you'll

20  tell me.  Yes.

21          MR. RYAN:  Your Honor, Steve Ryan.

22          With respect to that client, the client is a publicly

23  prominent individual.  The representation was legal in

24  analysis.  With regard to naming that person now, the concern

25  was that even if we put it in a sealed proceeding right now,

14G3COH1

1    that it might be released.  If we could count on that not being

2    released to the public, at this point no one would want to be

3    associated with the fact that they were a client in this way

4    because of the notoriety around this search warrant.

5           We are protecting the identity of that person, but not

6    from the Court and not from an in camera review by the Court.

7    And I can give you that name right now in a sealed envelope and

8    provide it to the Court.

9           The client was contacted over the weekend and asked

10   that we not disclose their name.  And further, that we take an

11   appeal if the Court was going to make that name public.

12          THE COURT:  What is the legal ground for withholding

13   the client's name?

14          MR. RYAN:  The legal ground, your Honor, is, first of

15   all, Mr. Cohen's duty to the client under the Bar codes that

16   we've presented the Court with.

17          THE COURT:  Well, remember that what we deal with here

18   is federal law and Second Circuit law.  This is not a diversity

19   case.

20          MR. RYAN:  No, no, understood.  I'm talking about the

21   Bar rules that govern Mr. Cohen's conduct in terms of releasing

22   it.

23          THE COURT:  Well, if I order that it be released, he

24   has no problem with respect to his own ethics.

25          MR. RYAN:  This is an issue, your Honor, where I would

14G3COH1

1  ask the Court, if the Court's going to deny our motion for a

2  special master, then there is no reason to disclose the name

3  because it won't matter, and the government will go about its

4  business and the taint team will see all of these things

5  anyway.

6          If we give it to you, and I have some assurance that

7  we're not violating that client's right not to be disclosed

8  publicly today, then I can do this.  I can write it down and

9  put it in an envelope right now.

10         But this client is not associated with any of the

11  paragraphs of the specification to my knowledge.  In other

12  words, we pared everything down over the weekend.  We looked,

13  and if it was a business client, we've dropped all of that.  We

14  really did our level best to do that.  I've got this one last

15  matter and the name, and I'm simply trying to protect the

16  privacy of that individual, your Honor.

17         THE COURT:  All right.  If you hand the name up, I'll

18  maintain it under seal.  But it seems to me that the

19  government, perhaps just Mr. McKay should know who it is so

20  that he can identify whether that person had any responsive

21  documents.

22         MR. BALIN:  Your Honor, I apologize for interrupting.

23  I'm a lawyer representing the press, ABC, the New York Times,

24  Associated Press, CNN, and Newsday.

25         THE COURT:  I think you'd better come to the podium.

1             MR. BALIN:  I think I better, too, your Honor.

2             I've sat and listened until we got to the point where

3    I realized there is a public access issue here, your Honor.  I

4    think that you got to start with two things -- I'm Robert

5    Balin, Davis, Wright, Tremaine.  Thank you very much.

6             One, your Honor, the Second Circuit in the very cases

7    that are before you has said that they've never actually held

8    that the attorney-client privilege is a higher value under the

9    First Amendment that may rebut the presumption of access.

10   That's number one.

11            Secondly, there is no credible claim that this

12   client's mere identity is attorney-client privileged

13   information.  Counsel for the government alluded to it.  Your

14   Honor, the law on this is pretty clear, too, and it is the

15   case, actually, the very case cited by Mr. Cohen's counsel.

16   It's the <u>Vingelli</u> case.  In the <u>Vingelli</u> case, the Court made

17   it very clear the general rule absent special circumstances is

18   there is no attorney-client privilege in the name of a client

19   except for two circumstances:  When naming that client would

20   somehow identify the communications with counsel, or, if the

21   communication is known but the source isn't, by naming that

22   client, again, same thing, it would be invading the

23   attorney-client communication.

24            Mr. Cohen's letter, which I read very closely this

25   morning, doesn't make that argument at all.  Mr. Cohen's letter

14G3COH1

1    makes the argument that it would be embarrassing to be

2    associated with what he terms a raid on a house, at a home.

3    That argument was also expressly rejected in <u>Vingelli</u>.  And

4    your Honor, I must point you to the relevant paragraph because

5    I think it says it better than me.

6              THE COURT:  If you give me the beginning word, I'll

7    have the paragraph in front of me.

8              MR. BALIN:  "Disclosing," your Honor.  "Disclosing."

9              THE COURT:  I've got it.  I've got it.

10             MR. BALIN:  "Disclosing the client's name would not

11   necessarily reveal his or her purpose in consulting Attorney

12   Vingelli.  The client may harbor concern that he or she will be

13   tarnished by guilt by association.  Fear of such a tinge does

14   not suffice to show that revealing the client's identity would

15   be tantamount to exposing the purposes for which the client

16   sought legal services."

17             And lastly, your Honor, the rule governing the

18   unprivileged nature of client identification implicitly accepts

19   the fact that a client might retain or consult an attorney for

20   numerous reasons.

21             Your Honor, I hardly need to remind the Court of the

22   intense public interest in the issues that are currently before

23   this court.  I look around and I see that every other seat is

24   occupied by a member of the press.  Ultimately, however your

25   Honor rules, right, the public is going to want to know the

14G3COH1

1   basis for your Honor's ruling.  That is the very nature of the

2   First Amendment access right, so that we, the people, and the

3   press, can monitor our institutions and have a rational basis

4   for agreeing or disagreeing.

5        And I hesitate to add, your Honor, that I suspect no

6   matter how you rule, those in the public will agree or

7   disagree.  That is what we do in society.

8        Finally, your Honor, I would make one last point.  It

9   was Justice Burger who I think put it well.  "People in our

10  open society do not demand infallibility from their

11  institutions.  But it is difficult for them to accept what they

12  are prohibited from observing." That was in Winston Newspapers

13  v. Virginia many years ago.

14       Your Honor, I see no basis for denying public access.

15  If your Honor is going to order disclosure of this name, I see

16  no basis for denying public access to that name.

17       THE COURT:  Well, you're quite right that Vingelli

18  supports your position and it's good law in this district and

19  circuit, even though it's rather old.

20       I think you're right that Mr. Harrison has not met the

21  standard for an exception to the notion that client identity,

22  and even fee arrangements, must be revealed.

23       Mr. Harrison, tell me how you meet the Vingelli

24  standard for not disclosing the name of that client.

25       MR. RYAN:  Your Honor, let me summarize my position on

1    this.

2              THE COURT:  Yes, Mr. Ryan.

3              MR. RYAN:  First of all, had a subpoena been issued,

4    this person's name would never have been turned over.  It would

5    have been non-responsive to any of the activity.

6              THE COURT:  This is not a subpoena.

7              MR. RYAN:  Second, we have a duty under Rule 1.6(15)

8    to protect the identity of this.  The client has asked their

9    identity be protected.

10             THE COURT:  That is not enough under <u>Vingelli</u>, and I

11   point out to you that if a Court requires disclosure of the

12   name, your client is off the hook.

13             MR. RYAN:  Finally, I think in the future this will

14   affect people's willingness to consult an attorney if this is

15   the end result, the end result of having done so where they're

16   not associated with the event, but they've chosen an attorney

17   who has been treated in this way.  And this could happen.  I

18   don't think it's a proper message.

19             With regard to those cases, your Honor, I don't have

20   another case to cite for you.  I have the name, I'll hand it up

21   to the Court.  But this is what -- this is what we were trying

22   to avoid.  Because if the Court's not going to grant our

23   application, this is unnecessary to publicize this person's

24   name.

25             THE COURT:  Let's take one thing at a time.  Under

14G3COH1

1  Vingelli, you have not made out that your client meets the

2  exception at all.  And hence, I rule it must be disclosed

3  publicly now.

4       MR. McKAY:  Your Honor, if I may.  I just briefly want

5  to respond to this whole line of inquiry because I think it is

6  important to emphasize that although I think the Court and

7  counsel for the New York Times are right about the issue of

8  disclosure of this nature, that's not why we're focused on it.

9  I want to make sure the government's point is clear on this.

10  That is, what Mr. Ryan just said was if this was a subpoena,

11  this name would be not responsive to it.

12       It is not a subpoena, it is a search warrant.  But

13  still I believe he said earlier that this name would not be

14  covered by any of the descriptions in the rider for the search

15  warrant, i.e., materials relating to this individual aren't

16  responsive to the search warrant.  Now, without the name, we

17  don't know that.  Right.

18       So this is a perfect illustration of what is going to

19  happen if Mr. Cohen's proposal carries the day.  Is that

20  they're going to hide behind attorney-client privilege to try

21  to not disclose facts like this one which the Court has made

22  very clear they have an obligation to disclose.  And then use

23  that to try to hide behind, or prevent us from reviewing

24  documents that may well be non-privileged and responsive to the

25  warrant.

14G3COH1

1          I just pulled out the Stewart case and confirmed what

2     I had said earlier, because I wasn't positive, I want to make

3     clear.  At page 9 of the Stewart case, the Court makes clear

4     that although the government will not have the opportunity to

5     review any of the documents for which a privilege has been

6     asserted before raising objections to the special master's

7     determinations, it then goes on to say the special master may

8     make some calls in their favor nevertheless.

9          So I think what I said earlier was correct, that there

10    was a privilege log prepared in Stewart, and the government

11    wasn't able to actually see the underlying documents that they

12    sought to challenge.

13         So what Mr. Ryan just said, that documents relating to

14    this client will be non-responsive to the search warrant

15    illustrates our point exactly.  If they are going to continue

16    to hide behind overbroad and incorrect claims of privilege, the

17    process isn't going to work.

18         THE COURT:  Give me again your point on Stewart?  It

19    was page 7?

20         MR. McKAY:  Page 9, your Honor.  Throughout the

21    opinion there is discussion of how the defendant will prepare a

22    privilege log.  But there at the bottom of page 9 it describes

23    how the government won't actually see the documents.

24         And I would point out again that that's the concern

25    that Judge Jones raised in Grant, and that's at page 2 of

14G3COH1

1   <u>Grant</u>.  She explained that without the benefit of such review,

2   i.e., review of content of the documents, the privilege team

3   would be likely unable to argue, for example, that no

4   attorney-client attached.

5          THE COURT:  You're touching on a point that concerns

6   me with respect to privilege logs because they often don't

7   convey enough so that the other side can actually know what's

8   in there, and they take a very long time to prepare.  They took

9   a very long time in <u>Stewart</u>.  So I'm not sure that a privilege

10  log does the trick.

11         MR. McKAY:  Your Honor, that's exactly the concern

12  that we're expressing, both Mr. Cohen's proposal and the

13  special master.  I don't see how either of those two proposals

14  can work without someone preparing a privilege log.  Whether it

15  is Mr. Cohen in the first instance, or the special master.

16  Because either way, if they're going to determine that certain

17  documents aren't privileged, they need to find a way to

18  communicate that to the government.  And if they're not going

19  to show the privileged documents or the potentially privileged

20  documents to the government, the next best thing is a privilege

21  log.  It is an incredibly time-consuming process, it is not

22  particularly effective, as Judge Jones has described in this

23  context.  And so that's why we think our proposal is the most

24  efficient and in many ways the most protective of the

25  privilege.

14G3COH1

1    THE COURT:  Mr. Harrison.

2    MR. HARRISON:  Can I respond to Mr. McKay, your Honor?

3    THE COURT:  Certainly.

4    MR. HARRISON:  Thank you, Judge.  Thank you.  Good to

5    see you this afternoon.  Thank you very much for giving us the

6    time over the weekend to really do properly the work that we

7    needed to do.

8        And with all due respect to Mr. McKay, who is an

9    excellent advocate, a lot of things he says just don't match up

10   with the facts as we know them in this case.  It seems like

11   something that he prepared to say before we submitted our

12   10 a.m. letter.  Because he says that we're trying to hide

13   behind an overbroad exertion of the privilege.

14       We spent a lot of time this weekend narrowing things

15   down.  And we got it down to one person who has requested of

16   our client that his identity remain -- not go out into the

17   public domain.  It is an understandable reaction on his part.

18   It doesn't make a whole lot of difference to us in this case.

19   We were willing to disclose it to the Court and to the

20   government, which is what Mr. Ryan was saying he was willing to

21   do.  We got an instruction that we're trying to comply with

22   from one of Mr. Cohen's clients.

23       So, to narrow it down to one individual out of all the

24   individuals that Mr. Cohen has represented in the past, as we

25   put in our 10 a.m. letter this morning, was a pretty good

14G3COH1

1   effort and I think demonstrates pretty clearly we're not trying

2   to hide behind an overbroad assertion of the privilege.

3   Another point that Mr. McKay --

4        THE COURT:  I just don't understand the argument that

5   just because this undisclosed client consulted Mr. Cohen, that

6   that is somehow embarrassing or an invasion of privacy.  That's

7   not enough under case law, and I don't understand it factually.

8   I understand that he doesn't want his name out there.  But,

9   that's not enough under the law.

10       MR. HARRISON:  I understand, your Honor.  We

11  understand Mr. Cohen, and frankly, derivatively, our ethical

12  obligations to be as we laid them out of our letter of 10 a.m.

13  But if the Court disagrees and rules against us, we'll do

14  whatever the Court directs us to do.

15       THE COURT:  I'm directing you to disclose the name

16  now.

17       MR. RYAN:  Do you want me to stand and say it or

18  should I give you the piece of paper that you told me to write.

19       THE COURT:  Whatever you are most comfortable with.

20       MR. RYAN:  The client's name that is involved is Sean

21  Hannity.

22       THE COURT:  Thank you.

23       MR. HARRISON:  Judge, to continue just responding to

24  what Mr. McKay said about the various factors.  Going back

25  through Mr. McKay's comments first and then I'll turn to my

14G3COH1

1   sort of more prepared remarks.  The next thing --

2                THE COURT:  May I, before we get to that, I would like

3   to have someone on each team be thinking if I were to appoint a

4   special master to deal with some set of the documents, can you

5   give me four names, can each side give me four names.  I

6   haven't decided this yet, but I'd like to at least be ready for

7   it.  Go ahead.

8                MR. HARRISON:  Thank you, your Honor.  So just going

9   back through Mr. McKay's remarks.  The next thing he discussed

10  didn't make a whole lot of sense in light of our 10 a.m. letter

11  either.  He talked about the fact that we had said in our

12  letter that Mr. Cohen previously had strategic and business

13  related clients.  And he did.  He had a number of them.  And as

14  we pointed out in our letter, we went back and reviewed that

15  stuff, reviewed his relationship with those clients, and as we

16  said in our letter, I think it is an arguable proposition for

17  us and Mr. Cohen as to whether they are legal clients or not.

18  These are often very hard questions to determine.  It is a

19  mixed issue of facts and how the relationship played out.

20               At the end of the day, we took a very conservative

21  position and we told the Court and the government that we were

22  not going to claim that they were legal clients, and we were

23  not going to claim that those were privileged relationships

24  that would be covered by the privilege.

25               So I don't really understand Mr. McKay's point in

14G3COH1

1    relation to those clients that we were making an overbroad

2    claim of privilege.  We did exactly the opposite per the

3    Court's instruction on Friday.  So, that didn't make a whole

4    lot of sense.

5         Mr. McKay also said a couple of times referred to the

6    focus on the volume of materials here.  But he doesn't know

7    what the volume of materials are.  It seems pretty clear to us,

8    just based on the little we know and looking at the list of

9    things that were seized, and I won't get into the detail, but a

10   lot of electronic media that there is most likely a lot, a

11   decent amount, at the very least, of documents, e-mails and

12   other documents on there.  So, there probably is a decent

13   amount of volume.

14        But Mr. McKay makes a good point about the fact that

15   there aren't -- makes a good point about the fact that we can

16   conceivably limit this search in time and subject.  And I think

17   a special master could do that and you could certainly do that.

18   That's something we could work with the Court and the

19   government on.

20        My guess is, I don't know, Judge, because I don't know

21   the volume of the materials, I don't know exactly what's on

22   there.  But my guess is that this could be done in a relatively

23   short, in relatively short order and wouldn't be some lengthy

24   review like in the Lynne Stewart case.

25        THE COURT:  What would make this case easier than the

1  Lynne Stewart case?  That case had three boxes of documents.

2          MR. HARRISON:  Well, Judge, just based on what

3  Mr. McKay said, it sounds like we can probably work out a limit

4  on time.  For instance, if he's saying that things before the

5  time period that Mr. Cohen was at the Trump Organization

6  starting in either late 2006 or early 2007, I keep getting that

7  mixed up.  But from before that time period is not relevant,

8  then probably will cut off a certain number of documents.

9          THE COURT:  I wonder if you could confer with your

10  client to give us his best estimate of the total number of

11  documents.

12          MR. HARRISON:  Judge, I can tell you we don't know.

13  We really don't know.  And I think that if anybody can sort of

14  relate to that, if all of my documents and electronic media

15  were seized, I wouldn't know how much stuff was on there.  I

16  wouldn't necessarily know what was on there.  Especially if it

17  went back a number of years.  If you seized all the documents

18  in my office and my house, I would have not a very good idea

19  how many documents had been seized, especially when we're

20  talking about a lot of electronic media.

21          Mr. McKay also said that a couple times in the

22  beginning of his remarks that we had sort of been misleading

23  and misled the Court when we said there were thousands of

24  documents.  There is no doubt that there's thousands of

25  documents.  I am even more sure of that assertion today than I

14G3COH1

1    was on Friday.  Thousands of documents that have been seized.

2    The next question is how many privileged documents or

3    privileged relationships are within that seizure.  And we laid

4    that out a little bit in our 10 a.m. letter for the Court, and

5    I think it is worth going over a little bit.  Because it is

6    more complicated than the government makes out.

7              Even if we just start in 2007, Judge, when Mr. Cohen

8    started at the Trump Organization, and we ignore his many years

9    of law firms dealing with clients before that, we still have a

10   number of privilege relationships there.  During his time at

11   the Trump Organization, Mr. Cohen's a lawyer for the Trump

12   Organization, we assume that there are a number of Trump

13   Organization related documents in what was seized.  Mr. Cohen

14   was also the personal attorney for Mr. Trump during that period

15   that he was at the Trump Organization.  We assume that there

16   are privileged documents related to that legal relationship.

17   During that period, Mr. Cohen was also a lawyer at the Trump

18   Organization, as we laid out, who was managing the

19   organization's relationships with outside attorneys who were

20   handling any number of matters around the world.  Litigation,

21   real estate issues, corporate issues.  And the nature of all

22   those relationships is really something that Mr. Cohen is, and

23   we as his attorneys are going to have much more familiarity

24   with in the first instance than the government will.

25             I can tell you, I don't believe, Judge, that in that

14G3COH1

1    section where we laid out outside attorneys with whom Mr. Cohen

2    had a legal relationship, either as a client or as a lawyer

3    overseeing their work for his client, my guess is there are

4    more attorney relationships like that.

5            While he was a lawyer at the Trump Organization, he

6    had, he managed a number of different outside firms.  I don't

7    think, going back 10 or 10 years or over 10 years he can

8    remember all the lawyers that he dealt with on different legal

9    outside legal matters.

10           So, I think there are going to be some other issues

11   that crop up like this that we and Mr. Cohen will recognize

12   immediately if we are doing the review that are privileged.

13   When you're putting on a privilege log communications between

14   Mr. Cohen and an outside law firm that's not going -- that's

15   not going to be much of an issue I don't think, Judge, but

16   we're going to be best placed to do that review, either with

17   the privilege holders, the Trump Organization, or in some

18   instances with Mr. Trump as Joanna, Ms. Hendon will get to in a

19   minute.

20           So there are a number of relationships there that are

21   very tricky, and it won't be obvious on a review, but we'll

22   know what they are.  And I don't think that they're going to be

23   an issue at all.

24           Judge, let me just go back again.  This, as the Court

25   knows, Mr. McKay said a couple time this is just a normal case

14G3COH1

1   like any other white collar case.  That's just not correct.

2   We're talking about an unprecedented raid on the office and the

3   home of the sitting President of the United States' personal

4   attorney, during the course of which the government seized all

5   the records, paper, electronic, whatever else, was in

6   Mr. Cohen's home and his temporary residence and his office,

7   without regard to whether those materials fit within the four

8   corners of the warrant.

9           Now that's not unusual, Judge, and I'm not accusing

10  the government of doing anything improper necessarily there.  I

11  don't know exactly how it was done and what happened.  We may

12  get to those issues at some other time.  I'm not accusing them

13  of doing anything wrong.  I'm just saying when you execute a

14  search warrant like that, just by its very nature, and

15  Mr. McKay touched on this as well, you sweep up a ton of

16  documents that are not related to the warrant, that are not

17  related to the probable cause determination that an independent

18  magistrate judge has signed off on.

19          And in the normal case, maybe some other procedure

20  would be okay.  Not in this one, Judge.  The stakes are too

21  high.  Everyone is watching this case.  There are partisan

22  attacks going back and forth from this side to that side.

23  50 percent of America thinks that this general investigation is

24  unfair.  50 percent think it is a great idea.  I don't take

25  sides on the issue, Judge.  All I say is, the American public

14G3COH1

1   is watching this, and I don't think a lot of people feel

2   comfortable or think in their gut that it's right that the

3   government can execute a search warrant in this case, on the

4   sitting President of the United States, an investigation into

5   what appears to be in his personal life, sweep up a whole bunch

6   of documents and look at all of them without regard to what

7   they are and without regard to whether they're pursuant to the

8   warrant.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4GMCOH2

1        MR. HARRISON:  I think that this case is incredibly

2   different.

3        THE COURT:  I think you are overstating your problem

4   because Mr. McKay has narrowed his approach and what he intends

5   to look at.

6        MR. HARRISON:  That's not clear to me, Judge, and I'm

7   sure we can work something out with the government and with a

8   special master and with the Court's involvement, if necessary.

9   We do need to hammer out guidelines.  Whatever course the Court

10  picks, we certainly need to hammer out guidelines.

11       I'm not aware from any of the remarks that Mr. McKay

12  made that any of his guidelines or suggested guidelines are

13  going to solve that problem.  My understanding is the

14  government is going to look at everything.  Whether it's with a

15  taint team or some other way, they are going to look at every

16  scrap of paper that they got through the execution of this

17  warrant, and we don't think that's fair in the first instance,

18  which is why we have made the request to the Court in this

19  extraordinary case to let us do, as in the *Lynne Stewart* case,

20  not just the initial review for privilege along with the

21  privilege holders, who will have the best idea of what that

22  true legal relationship was, but also for responsiveness.  We

23  think that's only fair.  I think that's something that would

24  make sense to the average American.  That should be done.

25       And I think America, frankly, is looking to the Court

I4GMCOH2

1    as the third coequal branch of government in this fight that's

2    going on in the executive and legislative branch to give people

3    a sense that things are fair, to give people a sense that this

4    is being done impartially, to give people a sense that there is

5    the appearance of fairness, Judge, in addition to fairness.

6              And I'll say again, your Honor, I'm not accusing the

7    government of doing anything wrong legally here.  I'm not.

8    There is nothing legally wrong in the way that they executed

9    the search warrant.  All I'm saying is, it's the nature of

10   search warrants versus the service of a subpoena to sweep up a

11   whole bunch of stuff that is not being seized pursuant to or

12   within the scope of an independent review by a federal judge.

13   That's an important distinction here and it's what makes this

14   case, in addition to the fact that it's an unprecedented raid

15   and seizure of the sitting president's personal attorney.

16             Those two factors together make it combustible, Judge.

17   That's why the press is all here.  That's why everybody is

18   looking at this case.  That's why there are commentators

19   arguing with each other on all the different news networks

20   about what we are talking about here today.  It's important in

21   this particular case.  It's different, Judge.  It's important

22   here to get it right and tell people we are doing this fairly,

23   not that the government is doing anything wrong.

24             I say that again because it's an important point to

25   make.  But why not have a special master, at the very least,

I4GMCOH2

```
 1    your Honor?  Why not send a message to people, we are going to
 2    make sure we get this right.  We are going to make sure it's
 3    fair.  We are going to make sure everybody think it's
 4    impartial.
 5            Frankly, I wish the government had joined me in our
 6    application for a special master.  We could have gotten through
 7    this much faster.  We reached out to them last week, before we
 8    filed our papers, to see whether if they would be willing to do
 9    that, and they weren't.  I think it makes sense for everybody
10    concerned.  That's our application, Judge.
11            THE COURT:  Thank you.
12            Mr. McKay.
13            MR. McKAY:  Your Honor.  Where to begin.  This isn't a
14    battle between the different branches of government.  Career
15    prosecutors in the Department of Justice went to a federal
16    magistrate judge and got a search warrant based upon a showing
17    of probable cause that there would be evidence of crime in
18    Michael Cohen's premises.  Just because he has a powerful
19    client doesn't mean he's entitled to different treatment.
20    Everyone is watching this case, that may be true.  That's all
21    the more reason why the Court should follow the normal
22    procedure for cases like this in this district.
23            Mr. Harrison said he doesn't take sides in the
24    partisan political attack.  No one from this side of the table
25    has tried to drum up media attention about this case, but
```

I4GMCOH2

1   Mr. Harrison's law partner did on the day the searches were

2   executed.  You heard again and again and again during

3   Mr. Harrison's comments that they assumed there are documents

4   from the Trump Organization.  They assume there may be some

5   documents related to other clients.

6        On Friday you gave defense counsel a job.  Over the

7   government's objection you gave them an adjournment until

8   Monday to sit with their client, review the materials, which I

9   emphasize again, they have the electronic devices.  They have

10  the materials.  They have the opportunity to look and see

11  what's on there.  They didn't do it.  They took the whole

12  weekend.  They didn't do it.  They gave you more vague

13  assertions about how we don't know if there are documents

14  relating to these old clients.  They said nothing about whether

15  there are Trump Organization documents still in Mr. Cohen's

16  possession.  I think he just said he assumes that there may be.

17  That's not a basis on which for the Court to conclude that the

18  premise of their motion is correct.

19       The premise of their motion is that this is an

20  unprecedented raid on the law office of an attorney.  Because

21  we have established -- when they filed their motion they said

22  it wasn't thousands of documents; it was thousands, if not

23  millions, of privileged documents.  Now we learned that over

24  the last year and a half it's of three clients.

25       We are not getting down into the details of the

I4GMCOH2

1    clients' names or the amount of clients because we thought it

2    was something interesting to find out.  It is because it was

3    the fundamental premise of their motion.  They tried to put

4    this in the *Lynne Stewart* box.  And when we pressed them on

5    those factual assertions, when the Court asked for evidence to

6    substantiate their claims, they came up empty.  They came up

7    empty.  So their motion should be denied because the factual

8    premise for it is faulty.

9         They talk about making limits in time and subject

10   matter, but this is not realistically going to work.  We are

11   happy to take reasonable proposals from defense counsel.  For

12   instance, Mr. Trump's letter asked that the government provide

13   Mr. Cohen and his counsel with a copy of the seized materials,

14   all of the seized materials and to identify to the President

15   all seized materials that relate to him in any way.  Mr. Trump,

16   President Trump, one of the most talked about people on the

17   planet, Mr. Cohen worked for him for many years.  Mr. Cohen's

18   signature line in his e-mail box used to say special counsel of

19   the Trump Organization.  Now it says personal attorney to the

20   President.  An enormous volume of Mr. Cohen's documents, the

21   vast majority are likely to, quote, relate to President Trump

22   in any way.

23        That's not what attorney-client privilege is, however.

24   Attorney-client privilege is much, much narrower than that.  By

25   their requests now, by the things they are asking for now, in

I4GMCOH2

1   the interest of trying to sound reasonable, trying to sound

2   limited, they are just setting the stage for what's going to

3   happen when the Court, if the Court orders a special master,

4   orders their proposal, which is that they are going to take

5   that inch and they are going to take it a mile.  They are going

6   to use that wedge that the Court has given them to chip away,

7   chip away, make broader and broader claims of privilege and

8   slow down this ongoing criminal investigation because it is in

9   Mr. Cohen's interest to do so.

10          I cited the example of the business relationship at

11   the outset.  Not because I prepared my remarks before the

12   letter was filed, I prepared them after the letter was filed,

13   but it's because they made an overbroad assertion on Thursday

14   about the number of clients that Mr. Cohen had.  And when the

15   Court held their feet to the fire they came back and they said,

16   well, we have narrowed this.  We are not asserting these

17   business interests that he has.  And that's because when the

18   rubber meets the road, when it comes time to actually proving

19   evidence of these attorney-client relationships, they can't do

20   that except with respect to three clients.

21          So this is a preview of the type of litigation you are

22   going to have if we find ourselves in one of their proposed

23   procedures.  They are going to start by bidding high in terms

24   of the amount of privileged material, just as they did in these

25   proceedings, and only once the special master or the

I4GMCOH2

1    government, if we are able to, although we are not able to see

2    the documents under those procedures, calls them on it and a

3    Court calls them on it are they actually going to come back to

4    a more reasonable interpretation of attorney-client privilege.

5    And even today the Court had directly ordered them to disclose

6    a name that under case law is obviously not privileged.  You

7    had to directly order them in open court.  You had to drag it

8    out of them.  That's what we are going to be dealing with if

9    the Court orders a special master.  It's going to go on for

10   months, maybe years, just like the *Lynne Stewart* case.

11        MR. HARRISON:  Judge, very briefly to respond to that.

12   Mr. McKay keeps talking about how bad we are going to be in the

13   future.  We are pretty good people, Judge, and I think that the

14   10 a.m. letter --

15        THE COURT:  It's not that you are not good people.

16        MR. HARRISON:  I'm joking, Judge.

17        THE COURT:  It's that you have miscited the law at

18   times.

19        Go ahead.

20        MR. HARRISON:  Well, I don't know that we have

21   miscited the law, Judge.  But I will say that we have not

22   slowed down anything.

23        Let me just explain last week and what happened.

24   Mr. Cohen's law office and home and everything else was raided

25   on Monday.  I came onto the case on Monday night or Tuesday.

I4GMCOH2

1    So when we appeared in front of the Court and filed our papers

2    and appeared in front of the Court on Friday, I had been on the

3    case for two and a half, three days maybe.  We hadn't had time

4    to sit down with our client and go over all this information

5    about what had happened.  And so when we had our discussions in

6    court on Friday, I explained it.  I don't know that I got into

7    enough detail.  I probably should have gotten into more detail

8    about how recently I had gotten into the case.  I had been in

9    it for three days.  I needed time to sit down and figure things

10   out.

11           THE COURT:  I am going to interrupt you for a moment.

12   Your letter says on page 2 that Steven Ryan of your firm has

13   been working on the special counsel's investigation, the

14   related House of Representatives and Senate inquiries

15   regarding, among other things, campaign finance matters.  I

16   recognize that Mr. Harrison personally just came to this, but

17   Mr. Ryan has been in it for a while, right.

18           MR. RYAN:  Can I just mention, your Honor, if you

19   think of swim lanes in a pool, my swim lane was Russia and the

20   related issues to Russia.

21           THE COURT:  It says in the letter, as well as campaign

22   financing --

23           MR. RYAN:  That's only happened within the last few

24   weeks and it's in relationship to federal campaign law issues,

25   which is this narrow.

I4GMCOH2

1          With all due respect, all of us started on Monday with

2     a completely different matter.  I want to say, there are five

3     paragraphs in that attachment A that deal directly with seeking

4     the papers of the President of the United States in possession

5     of my client.  It is not what the government has represented is

6     about my client's personal life.  There are five paragraphs

7     there.  This case is that.  And we spent the weekend, frankly,

8     narrowing the issues, taking issues off the table.

9          Here is what I can tell you.  I know that materials

10    for TO, for the Trump Organization, are in the materials that

11    have been seized, so there are some materials for the Trump

12    Organization.  But the key here is a priority.  The Court can

13    order a prioritization of where a special master is needed and

14    it's needed with respect to the papers that may contain

15    privileged information about the President of the United

16    States.

17         That's the core of why Mr. Cohen on Thursday filed

18    this motion and why we believe it's still an important motion

19    and, candidly, I'm glad we withdrew claims of broader amounts

20    of privilege because we can't sustain them from the paper we

21    have now.  And we have done the right thing there and we ask

22    that the Court look with favor on the proposal that we have

23    made with regard to the special master.

24         THE COURT:  I'm intrigued by your suggestion of

25    prioritization.  Do you have a proposal for what would be

I4GMCOH2

1    prioritized?

2            MR. RYAN:  Yes.  I believe that, obviously, the issues

3    that are of the greatest importance relate to the President of

4    the United States and that the special master's role would be

5    initially directed at that.  And then what we could do is work

6    with the U.S. Attorney's Office on the prioritization of other

7    issues.  Trump Org would have to be prioritized.  I think the

8    Trump Org legal issues that he has been involved in are

9    probably frankly very easily to deal with, notwithstanding the

10   larger volume of documents.  I think that's an example of the

11   thinking that we would like to work with.

12           Candidly, this man's life has been turned upside down

13   in the past week.  We were working on the Russia case for a

14   year and, candidly, I believe the Russia case with regard to my

15   client is a complete dry hole and now we have a completely

16   different matter, so I will apologize if there are any mistakes

17   that have been made there.

18           This Court has something that's never occurred in the

19   history of the United States, which is, the papers related to

20   the President of the United States have been taken from his

21   personal attorney in a search warrant and all of them are going

22   to be reviewed by the government, that is, the FBI and

23   Assistant U.S. Attorneys, whether they are on a taint team or

24   on the actual trial team.  And candidly --

25           THE COURT:  They certainly will not be given to the

I4GMCOH2

```
 1    trial team.
 2                MR. RYAN:  Understood.  But there will always be an
 3    Assistant U.S. Attorney there.  There will always be an 1811
 4    doing it for the government and, candidly, that is not
 5    necessary.  The materials are now within the government's
 6    possession.  They can't be harmed.  This case has come out of
 7    the blue and it can just take a few weeks to straighten this
 8    out.  It won't take that long.
 9                THE COURT:  What would be straightened out in a few
10    weeks?
11                MR. RYAN:  We will know which materials related to the
12    President of the United States or other people who have been
13    swept into this don't have to be going forward because the
14    special master can make a determination that the United States
15    Attorney's Office can then challenge with regard to those
16    privileged documents.
17                THE COURT:  How soon can you produce what you believe
18    are privileged documents relating to the President?  You
19    mentioned a few weeks.  What can you do?
20                MR. RYAN:  Your Honor, we are a large law firm.  We
21    have resources.  We know how to do this.  I've practiced law
22    for 37 years.  I've tried organized crime cases here in New
23    York in the Southern District.  I've argued in the Court of
24    Appeals here.  I give the Court my answer that we will do it as
25    absolutely fast as we can with no purpose of delay in handling
```

I4GMCOH2

1   this issue.

2          THE COURT:  That's exactly what was said in *Lynne*

3   *Stewart*, which gives one pause.

4          MR. RYAN:  On the other hand, we are all officers of

5   the court.  Candidly, I don't know the volume, which is why I

6   can't make a promise.  But I'm the one who put the

7   prioritization issue on the table for you.  I'm trying to solve

8   the problem, not perpetuate it.

9          THE COURT:  Mr. McKay.

10         MR. McKAY:  Your Honor, in prioritizing the

11  President's communications, Mr. Ryan hasn't cited any legal

12  authority why those should be prioritized over other privileged

13  relationships Mr. Cohen may have.  The other individual he put

14  in his letter, the individual whose name he raised today, their

15  privilege is no different from the President of the United

16  States' privilege.

17         I understand the sensitivity of reviewing those

18  documents, but without a legal basis why he should be treated

19  differently, I don't know that their proposal makes any sense.

20  But, more importantly, the pledge that you just got was

21  something like, as fast as we can with no purpose of delay.

22  That will not hold up.  If there were going to be a

23  prioritization and there were going to be some pledge, I think

24  it should be in the form of a court order saying that the

25  privilege log needs to be created and submitted to the special

I4GMCOH2

1   master, if that's the way the Court goes, by date certain.

2              THE COURT:  I know that other courts have done that

3   and they have given law firms two to three weeks to come up

4   with a privilege log.  It's hard for me to pick a reasonable

5   amount of time until I know the volume.

6              MR. McKAY:  I think what would happen is, if we are

7   going down this hypothetical, before anything could be provided

8   to the special master and/or Mr. Cohen's counsel and/or the

9   President's counsel, we would need to do a few things that we

10  haven't done yet because of the pendency of this litigation.

11  For physical documents we would have to scan them and upload

12  onto an electronic system.  With respect to hard drives that

13  have already been imaged we need to put them onto the

14  electronic database.

15             I believe there are a few electronic devices, I think

16  just cell phones, that haven't yet been fully imaged.  Those

17  would need to be imaged and put up onto the system.  There

18  would be a little bit of logistical leg work on our hand before

19  it could get started.  The next thing that would happen would

20  be that however we are going to define the relevant priority,

21  we would need to come up with how you define that universe.

22             As I said before, the way the President has proposed

23  to define documents that he has an interest in is any document

24  that relates in any way to him.

25             THE COURT:  I know that and that's problematic.

I4GMCOH2

1          MR. McKAY:  Clearly going to be overbroad.  We would

2     need to find a narrower definition or set of search terms that

3     would govern how you narrow the field.

4          THE COURT:  I'll be looking to Ms. Hendon to address

5     this after Mr. McKay.

6          MS. HENDON:  Any time, your Honor.

7          MR. McKAY:  After you do that, we would have -- here

8     is another thing.  If you are going to do it that way, there is

9     a separate question.  Does the filter team do the uploading and

10     sorting on the electronic database?  Not reviewing documents,

11     but making these sort of mechanical sorting into the priority

12     review set.  Or does a special master do that.  I think that

13     would pragmatically have to be done by the filter time because

14     all of these electronic databases that we have already in place

15     up and running, using in this case, using in other cases that

16     work along with the FBI cart teams, electronic seizure system,

17     that would all be greatly delayed if you put that task on a

18     special master --

19          THE COURT:  I agree.  I would be glad to hear

20     Mr. Harrison and Ms. Hendon on this, but I do think the

21     government would need to be the entity that puts everything up

22     on the system.  Not that they are reading documents, but just

23     puts them on the system that they can be numbered, identified,

24     and given to Mr. Cohen's counsel, Ms. Hendon.

25          MR. McKAY:  Your Honor, I think that's the logistics

I4GMCOH2

```
1    that would have to happen.  Once that happens, we will have a

2    sense of the volume and then I think the Court could set a

3    realistic deadline for the completion of a privilege log by the

4    special master and/or defense counsel, however the mechanics

5    are going to work out.  But I emphasize again, those are the

6    logistics that would be required to follow that proposal.  We

7    don't think that proposal is necessary or appropriate in this

8    case.

9              THE COURT:  Which proposal?

10             MR. McKAY:  The proposal to narrow the field to the

11   set of President Trump documents and have a special master do

12   the privilege calls on those.  In the Lynne Stewart case, as

13   you said, it was just a few boxes of documents and it took a

14   special master more than a year to produce a privilege log.

15             What we have already seen from the overbroad privilege

16   claims that started on Thursday and the gentle walking back of

17   those facts, Mr. Harrison said he had only been on the case for

18   two and a half days.  Then don't file a sworn affirmation

19   asserting facts that you don't have knowledge of.

20             The fact that they have already made these overbroad

21   claims is proof positive that if we follow this approach we are

22   going to have more of the same down the road, and whatever

23   deadline the Court sets is going to get pushed back by more and

24   more litigation of these claims.

25             And so no one has yet given a basis why President
```

I4GMCOH2

1    Trump's assertion of attorney-client privilege is any different

2    from any other citizen of the United States.  It's more

3    interesting to the media, but his attorney-client privilege is

4    the same as any other individual.  Without that legal basis, we

5    don't see a reason for the Court to carve out an exception that

6    applies only to the President and give him a procedure that is

7    different from the procedure that happens in many, many cases

8    in this district.

9              THE COURT:  How long do you think it would take for

10   the government to put everything up on the system?

11             MR. McKAY:  Your Honor, I think we absolutely could

12   get -- if you did it on a rolling basis, we could get a large

13   volume of documents up in a fairly short order, a week or two

14   at most.  There may be certain devices, for example, for which

15   we don't have the pass code that have to be sent down to

16   Quantico to decrypt.  Those things may take longer.  But the

17   majority of evidence I think we could probably have up and

18   ready in a week or two.

19             THE COURT:  Ms. Hendon, do you wish to be heard?

20             MS. HENDON:  Yes, your Honor.  Thank you.

21             Good afternoon, your Honor.  I would just like to make

22   clear at the outset that on behalf of the President we are

23   seeking a temporary restraining order and a preliminary

24   injunction prohibiting the government from beginning any review

25   of the materials seized from Mr. Cohen until such time as (1)

I4GMCOH2

1    copies of the seized materials have been provided to Mr. Cohen

2    (2) Mr. Cohen has provided to his client through the

3    President's counsel, me, the subset of materials that relate to

4    the President and (3) the President has had the opportunity to

5    review the subset of materials for any materials that we

6    believe are covered by the attorney-client privilege or work

7    product protection.

8              THE COURT:  How much time a week could your client

9    devote to this job?

10             MS. HENDON:  Your Honor, what I expect is that as in

11   every discovery matter that I've ever been involved in,

12   criminal or civil, the district court sets a schedule for each

13   phase of the discovery matter at issue.  The parties are heard

14   on whether they think the schedule is fair and reasonable or

15   not.  The Court rules and the parties obey the Court's ruling

16   and the parties, the clients themselves, do what is required by

17   their counsel, who has appeared before your Honor, to abide by

18   the Court's schedule.

19             THE COURT:  Right.  I just want to try to figure out

20   what's a reasonable schedule.

21             MS. HENDON:  Your Honor, we can't possibly know that

22   today.  I want to make the point that the reason we can't know

23   that is because the government elected unilaterally, as is

24   their right, to seek and obtain a search warrant and sweep up

25   probably vast amounts of documents and data from the offices of

I4GMCOH2

1   a lawyer.

2          So in order for me to be in a position to prepare a

3   privilege log, two things have to happen.  The seized data,

4   some of which, somewhere throughout, contains records and

5   evidence of the representations that Mr. Cohen has engaged in

6   on behalf of my client.  I don't know where it is.  I don't

7   know how much it is.  And my client doesn't know those things

8   either, because clients don't know what's inside their lawyer's

9   files.  Clients don't know what work product and communications

10  are being engaged in and created every day that the lawyer is

11  working for the client.  Mr. Cohen needs to get that -- I'm

12  afraid, because it is occurring -- all of the materials seized

13  so that Mr. Cohen can make an assessment as to "what in here

14  relates to the work I did for the President."

15         Now, that doesn't mean every piece of paper with the

16  word Trump on it, for obvious reasons, but some amount of that

17  material was generated, whether e-mails from Mr. Cohen to

18  others or work product generated by Mr. Cohen, or I don't know

19  what.  I don't know what's in Mr. Cohen's law files.  But some

20  amount of that material was generated in the course of

21  representing my client.  Mr. Cohen needs to identify that

22  material and get it to me so that I can then review it and make

23  claims of privilege advised by my client.

24         Now, it may be that we overdesignate privilege.  That

25  sometimes happens in discovery matters.  Not through any

1    intention of overdesignating privilege, but we may think

2    something is privileged, this happens all the time, and put it

3    on a log.  And one day a Court decides you know what, I have

4    heard your proffered privilege, Mr. President.  I'm not

5    persuaded.  This document is not privileged.

6            There is some risk that the holder of the privilege is

7    going to put things on his or her privilege log that the Court

8    might one day say are not privileged.  This happens all the

9    time.  But this is what has to take place here.  We will create

10   a privilege log.  If your Honor orders that the privilege log

11   contains specifics or particular information so that some of

12   the frailties of privilege logs that your Honor alluded to

13   earlier are absent from this case, we will follow your Honor's

14   order, and then we provide the privilege log as we would in any

15   litigation, civil or criminal, to the government, and the

16   government will look at the privilege log and maybe they will

17   call me and say, you know what, items 1 through 15 are so

18   vague, we don't understand what they mean.  And I may say,

19   well, that's all you are getting because I think I complied

20   with Judge Wood's order, and they may come to your Honor and

21   say, it's too vague, and you may come back to me and say, put

22   more information.  This is what happens.

23           The government then comes to your Honor and says,

24   items 1 through 15, we have reason to believe these are not

25   privileged.  Your Honor directs me to provide the documents to

I4GMCOH2

1    you, to your Honor in camera.  You hear argument from me on

2    behalf of my client as to whether I can establish privilege,

3    your Honor makes a decision, and I'm bound by your Honor's

4    decision.

5         Now, it will take a long time here, but it's going to

6    take a long time because of the mechanism the government chose

7    to use in order to obtain information from Mr. Cohen.  When you

8    proceed by search warrant, you necessarily obtain vast amounts

9    of data.  It's different than proceeding by search warrant.

10   That's fine, but the fact that this is going to take time is

11   not to be held against the privilege holder.  It's just a fact.

12        The privilege, your Honor, has been recognized for

13   more than 400 years.  It's the oldest of the privileges known

14   to the common law and the most revered.  Nothing less than the

15   fair and just operation of our legal system, which is a beacon

16   to the world and to history, depends on this privilege and

17   without it, no client could speak freely with counsel and no

18   attorney could competently serve their client.  So, yes,

19   privilege logs are a real pain for everybody.  They always have

20   been, they always will be.  No one likes preparing them, no one

21   likes making challenges to them.  Judges don't like having to

22   adjudicate disputes over them, but we do this day in and day

23   out in federal courts across the country because it is the only

24   way to vindicate the rights of the privilege holder.

25        Once we have from Mr. Cohen the set of materials --

I4GMCOH2

```
1   again, it's not every piece of paper with the word Trump on it,
2   but it's the e-mails he wrote and received.  They might not
3   have been with Mr. Trump.  They might have been with -- I am
4   not going to go into the scenarios that could play out in any
5   lawyers' practice.  Those are in our brief.
6           But what we obtain from Mr. Cohen, the communications,
7   records, Post-it notes, whatever he finds in the materials
8   given back to him by the government, that evidence would
9   reflect work he did on behalf of the President.  We will review
10  that material and prepare a log and get it to the government on
11  the schedule that your Honor orders.  It's just that simple.
12          I agree with Mr. McKay, we are not here asking for
13  anything special or different in this case.  I'm asking for the
14  President to have the opportunity to protect this sacred
15  privilege that is given to litigants in contract disputes,
16  slip-and-fall cases, dog bite cases, any case that I think any
17  of us could name before any court.
18          As the holder of the attorney-client privilege over
19  materials seized by the government from his lawyer, the
20  President has the right, he is entitled to perform the initial
21  review of those materials so that he may designate as
22  privileged any he believes covered by an applicable privilege.
23  No other procedure will ensure, as this Court must, that the
24  President's privilege is scrupulously protected, and for the
25  Court to do otherwise would be breaking new ground.
```

I4GMCOH2

```
 1              No court in this circuit has taken that extraordinary

 2   step under these circumstances, namely, denying the privilege

 3   holder's application to be the initial privilege reviewer of

 4   documents created in the course of his legal representation

 5   seized from his lawyer by the government pursuant to search

 6   warrants.

 7              MR. McKAY:  Your Honor --

 8              MS. HENDON:  May I continue, please.  I sat for a long

 9   time.

10              THE COURT:  He thought you were finished.

11              MS. HENDON:  There has been a lot of discussion and

12   commentary about the President seeking to convert a search

13   warrant into a grand jury subpoena.  I don't understand that

14   argument.  Executing a search warrant and serving a grand jury

15   subpoena are simply two ways to gather evidence from a law

16   office, if that's what you want.  The choice by the government

17   unilaterally to use one rather than the other does nothing to

18   disrupt the fact that it is the client of the lawyer that owns

19   the privilege, and he is, therefore, best place to ensure it is

20   preserved.  The government has achieved its purpose in

21   executing the search warrants here.  They have everything that

22   they chose to take.  The focus now should be on ensuring that

23   the privilege is not invaded, which requires allowing the

24   privilege holder to review the new privilege claims in the

25   first instance.
```

I4GMCOH2

```
1           The government has not articulated a single reason why
2      they should be able to usurp the privilege holders' rights in
3      this regard.  Let's stop and think about this for a moment.
4      For anyone in the courtroom who has ever hired a lawyer, if
5      criminal prosecutors raided that law office and seized
6      materials relating to your case, how would you react if you
7      were told, you don't get to see those materials, you don't get
8      to make the privilege call.  Don't worry, the government is
9      going to do it for you.  I think what you would say is, well, I
10     am going to federal court because I don't think a federal court
11     in this country is going to permit that government overreach.
12          Not only has the government failed to articulate a
13     single reason why they should be permitted to usurp the
14     privilege holder's role in this process, the reasons that they
15     have given for it betray that they are not equipped for the
16     job.
17          Your Honor does not need to hear from me.  If your
18     Honor wishes to interrupt me with a question, please do.  I
19     have a few more minutes of remarks.
20          THE COURT:  Go ahead.  I want to point out that the
21     attorney-client privilege is based in policy, not the
22     Constitution.  And as Judge Koeltl said in the Stewart case, it
23     cannot stand in the face of countervailing law or strong public
24     policy and should be strictly confined within the narrowest
25     possible limits underlying its purpose.
```

I4GMCOH2

1              MS. HENDON:  I would never disagree with anything

2    Judge Koeltl says, your Honor, but I think that analysis and

3    that point, respectfully, is not germane today.  That analysis

4    is germane when you get my privilege log and I argue to you

5    that something is privileged and you have a view that it's not.

6    You may have reasons and rationales for it is not being

7    privileged in the face of my claim.

8              But I don't think the fact that the privilege is

9    rooted in policy and not the Constitution, and we have not made

10   any constitutional arguments for that reason, I don't think the

11   fact that the privilege is rooted in policy vitiates the

12   argument that it is the privilege holder who owns the privilege

13   and is best situated in the first instance to make those

14   privileged designations.  They can be rejected.  They can be

15   overruled by your Honor.

16             Now, the government, as I said, has given every reason

17   to believe that they are not equipped for this job; that is,

18   substituting for the privilege holder in making initial

19   designations designed to vindicate the privilege.  They have

20   taken the position repeatedly that Mr. Cohen is not a real

21   lawyer, that doesn't provide real legal services.  He is more

22   of a businessman.  They have made representations about how

23   little they expect there to be in terms of privileged material.

24   That may be right, that may be wrong.

25             But any third party holding those views is not

I4GMCOH2

 1    adequately positioned to make privilege calls with respect to

 2    the President's documents.  These are maybe genuinely held

 3    beliefs and they may be rooted in the investigation.  But

 4    someone who holds these views and expresses them publicly

 5    cannot be counted upon by the privilege holder, the public or

 6    the Court, to adequately vindicate the policy interests in the

 7    attorney-client privilege on behalf of the President.

 8            In addition, until today there has been a tremendous

 9    focus on speed and the need to just get going.  We have to look

10    at these things.  We have every right to these things.  And,

11    again, if I were the prosecutor, that might a paramount concern

12    to me.  But that concern, too, is not consistent with the

13    careful and deliberate and meticulous attention to whether a

14    document might be privileged or not.

15            I just want to comment on a few or respond to a few of

16    the points raised in the government's letter of this morning.

17            The government argues that we have misunderstood their

18    review protocol.  We don't at all.  Our point is that the

19    government should not be reviewing and it has no right to see

20    privileged materials seized from the law office of Mr. Trump's

21    lawyer, period.  They have no right to do that and they have

22    not asserted any authority for their right to do that.  It's

23    convenient for them to do it because they are holding all the

24    documents, but that's not a right.  Only the President holds

25    this privilege.

I4GMCOH2

1          The government relatedly has suggested that we provide

2     them with search terms and filter terms to assist them as they

3     perform their privilege review of Mr. Trump's materials.  But

4     this is such an inferior alternative to what anybody would

5     expect, namely, that the privilege holder would review his

6     materials and identify what he believes is privileged subject

7     to challenge later before the judge.

8          We don't understand why we are hearing from the

9     government, and this afternoon more generally, why there is all

10    this effort, and it feels like contortions, to try to put the

11    government in the shoes of the privilege holder so that they

12    can do what they believe is a fair and controlled review for

13    privilege.

14         The proper way is to proceed is to allow the privilege

15    holder to do that.  It is not a neutral application of

16    privilege law that is called for here.  It is the privilege

17    holder's incentive incentivized, something the government

18    criticized.  It is an incentivized review that needs to be done

19    to assure potentially privileged documents are identified.  And

20    if the President or his counsel have overclaimed, that is

21    subject to challenge.

22         On this topic I just want to raise for the Court sort

23    of the alternative.  The government says, well, the President

24    is incented to overclaim privilege.  As I said, if that

25    happens, there can be challenges and the Court will adjudicate

I4GMCOH2

```
 1   them.
 2           THE COURT:  It would appear that he already has
 3   asserted an overbroad privilege if, as Mr. McKay said and I
 4   think I recall, that every document between Mr. Trump and
 5   counsel is privileged.
 6           MS. HENDON:  I have not asserted that on behalf of my
 7   client.  That's not our position.  I'm unaware of any assertion
 8   of privilege by our client in this proceeding.
 9           One minute, your Honor.
10           MR. McKAY:  Your Honor, that was the Trump
11   Organization.
12           THE COURT:  Thank you.
13           MS. HENDON:  We made no such claim.  We don't know
14   what's privileged.  The government may be right, we may get
15   these materials, look at them and find 15 documents.  I just
16   don't know.  But no one has made any representations to the
17   Court on this point at all because they are not in a position
18   to do so.
19           While it's always true that the privilege holder who
20   has the incentive to make privilege calls, because it is his
21   privilege, he wants his information kept confidential, if he
22   misdesignates something as privileged or can't sustain that
23   claim, the remedy is the Court rejects the claim and the
24   document is deemed nonprivileged and provided to the
25   government, or whoever the adversary is in the proceeding.
```

I4GMCOH2

1          By contrast, if the government, by running a host of

2     imaginative filters and search terms because they have no

3     knowledge, no firsthand knowledge of the underlying

4     representation of how Mr. Cohen and --

5          THE COURT:  They have said they are willing to work

6     with you on that.

7          MS. HENDON:  No amount of filters, your Honor, and

8     search terms is going to adequately protect against the

9     possibility that documents are missed.

10          THE COURT:  It's a way to take a first cut so things

11    can get moving.

12          MS. HENDON:  What is left out of the first cut is any

13    number of documents that may be privileged but are never cut by

14    the search terms or the protocols, and they just go to the

15    investigative team.

16          THE COURT:  No, no.  That's not what is proposed.

17    They don't go to the investigative team at that point.

18          MS. HENDON:  I'm talking about materials that are not

19    picked up by the government's filters.

20          THE COURT:  Whatever is picked up by the government's

21    filters, and they think is privileged, that would not go

22    anywhere.  They would meet with you.

23          MS. HENDON:  I understand that, your Honor.  I'll just

24    say one point on that and revert to our sort of threshold

25    argument.  If they find something they think is privileged,

I4GMCOH2

1    they are going to meet and confer with us.  My point is, the

2    way law offices work, if you don't know how a lawyer

3    communicates or what he was supposed to be doing for a client

4    or what he was permitted to share with third parties --

5              THE COURT:  That's what you can tell the government

6    when you meet with them.

7              MS. HENDON:  But there is no filter or search term.

8    If I don't know what the documents say, I can't design filters

9    or search terms --

10             THE COURT:  You are right.  It won't pick up

11   everything, but it would be a first cut to get things moving.

12             MS. HENDON:  If the fact is that the search terms and

13   protocols cannot pick up anything, that leaves a risk that

14   never picked up as part of the cut and the taint review is

15   privileged material.

16             THE COURT:  I think the notion is that you would have

17   a chance to review other documents for privilege, but we would

18   get moving on whether the search terms turn up clearly

19   privileged documents.

20             MS. HENDON:  I have not heard the government say that.

21             THE COURT:  I may have it wrong.

22             MS. HENDON:  Your Honor, all I wanted to do there was

23   just weigh the competing risks between an overincentivized

24   reviewer and a reviewer who doesn't have sufficient facts about

25   the underlying investigations, the underlying representations,

I4GMCOH2

1    was not a party to the underlying representations and has

2    interests, you know, that are far from aligned with a privilege

3    holder to go the review.  You have to weigh those risks and I

4    think the answer is very clear that the privilege holder should

5    not be required to take those risks.

6            The threshold point in our application, your Honor, is

7    that the government should not seek privileged documents of the

8    President.  The President should make his privilege

9    determinations in the manner that I described and create a

10   privilege log, as is done every day throughout federal courts

11   in the country, the government makes its objections, and the

12   Court rules.

13           There is no reason and no authority in a case like

14   this where the law offices of the privilege holder have been

15   searched with the Court requiring otherwise of the privilege

16   holder.  We have objected to a special master because we don't

17   think a special master has the right to see privileged

18   documents of the privilege holder.  *Lynne Stewart* requested

19   that and that was the relief granted.

20           We are not requesting that.  We do not want that.  We

21   do not think a special master will adequately protect the

22   privilege or the President.  We think that the privilege holder

23   has to do it.

24           THE COURT:  The privilege holder can identify

25   documents that you are going to contend are privileged, but you

I4GMCOH2

```
 1    don't make the decision as to whether they are privileged.
 2               MS. HENDON:  No.  I didn't mean to suggest that, your
 3    Honor.  I want to be very clear.  The privilege holder
 4    identifies documents over which he claims privilege, and we
 5    give the privilege log to the government, they make challenges
 6    to your Honor, and your Honor rules.  You will ask me to make a
 7    proffer, you will ask for facts, and you will say, I just find
 8    that these are not really privileged documents and the
 9    documents go back to the government and to the investigative
10    team.  We think that process, where you have one law firm, one
11    client reviewing for privilege, as we do at my firm month in
12    and month out, making a log and getting it to the government is
13    going to be much faster than bringing in another law firm, a
14    special master, and building in layers of process there.
15               It will be faster, it will be more efficient for the
16    Court and the government to work with us on these matters.  But
17    that's a secondary concern for our client.  The primary concern
18    is, he is objecting to anyone other than himself making the
19    initial determination of privilege, the initial claim of
20    privilege.
21               The last thing I wanted to say, your Honor, before you
22    put any questions to me or Mr. McKay speaks is that I do think
23    that a decision for the government in this case sets the wrong
24    precedent.  The search of law offices in this country is an
25    extraordinary event.  The U.S. Attorney's Office manual which
```

I4GMCOH2

1    applies to all federal prosecutors recognizes this.  The search

2    of law offices in this country should remain an extraordinary

3    event, and a ruling for the government on the facts of this

4    case puts that at risk.

5             When you execute a search warrant at a lawyer's

6    office, you don't just get the documents, were your Honor to

7    rule this way.  It would mean the government doesn't just get

8    the documents.  They get the first crack at reviewing

9    privileged material that at the time that you applied for the

10   search warrant you had every expectation of finding when you

11   executed the search.  That is not something I think that anyone

12   in this room wants to see encouraged.

13            THE COURT:  Thank you, Ms. Hendon.

14            MS. HENDON:  Thank you, Judge.

15            MR. McKAY:  May I, your Honor.

16            THE COURT:  Yes.

17            MR. McKAY:  I think it might be helpful if I start by

18   just clarifying what we are proposing as the filter team

19   protocol, as there appear to be some misapprehension there.

20            First of all, we are not usurping the privilege

21   holder's rights.  With respect to communications between

22   President Trump and Mr. Cohen, if there are any such

23   communications that the filter team takes the view this is not

24   privileged, they will not be turned over to the investigative

25   team until we have either, A, gone to defense counsel or

I4GMCOH2

1   Mr. Trump's counsel or Mr. Cohen's counsel and confirm that

2   they agree with the filter team's determination, or, in

3   extraordinary circumstances in which something about the reason

4   why we think it's not privileged would disclose a nonpublic

5   aspect of our investigation, in that circumstance we might go

6   ex parte to the Court for that determination.  I expect that to

7   be an exceedingly rare, possibly even a null set, but I don't

8   want to say it could never happen.  But in almost any case the

9   filter team would be conferring with counsel for the privilege

10   holder and/or Mr. Cohen about the determination of the

11   privilege.

12        Ms. Hendon expressed some concern that things were

13   going to slip through the cracks if we don't have the right

14   search terms or filter terms.  As the Court pointed out, we

15   would intend to consult with counsel for President Trump about

16   search terms.  If there are things that they can tell us that

17   make the review better, we are happy to do it, but under no

18   circumstances is the suggestion that everything that doesn't

19   hit a search term just, boom, goes over the wall to the

20   investigative team, such that if stuff doesn't hit a search

21   term because of a pronoun, or whatever the hypothetical she had

22   in her brief was, that it automatically goes over to the

23   investigation team.

24        The filter team is still going to review, and in fact

25   review twice, these documents and make privilege calls based

I4GMCOH2

1    not just on the existence of search terms, but on a review of

2    the actual document.  This concern about things slipping

3    through the cracks is not realistic.

4            I think it's important to emphasize the incentives

5    again because the privilege holder in any case is going to have

6    an incentive to be overbroad under the assertion of privilege.

7    Where Mr. Cohen is now, clearly, obviously, under a criminal

8    investigation, he is going to have even more incentive to try

9    to slow down our investigation by dragging things out with

10   claims of privilege.

11           By contrast, the filter team at the U.S. Attorney's

12   Office has every incentive to be conservative in its view of

13   what is not privileged, which is to say, if the filter team

14   determines something to be not privileged and passes it over

15   the wall to the investigative team, the investigative team

16   reads that document.

17           We have potential problems down the road, potential

18   future litigation about suppression or about taint for the

19   members of the investigative team.  Those are things that we

20   take very seriously, and you can look at self-interest.  It's

21   not just because we are trying to honor the privilege, though,

22   of course, we are, and, of course, we have an ethical

23   obligation to do so.

24           It is in the U.S. Attorney's Office's self-interests

25   to be very concerned about those privilege determinations, and

I4GMCOH2

1    that has a very important practical effect about the amount of

2    litigation that follows and the amount of disputes over

3    privilege that follows because let's say we identify 100

4    communications between President Trump and Mr. Cohen.  It may

5    well be that the filter team for the U.S. Attorney's Office

6    says, you know what, 90 of these are clearly privileged, so

7    let's keep them on the privileged side of the wall and no one

8    ever has to argue about that.

9         We don't have to confer with defense counsel for the

10   President about those, and eight of these have no relevance to

11   our investigation.  Although they might not be privileged,

12   what's the point in arguing with counsel about whether they are

13   privileged so we can pass them over the wall, because they are

14   not relevant, they are not responsive.  Those go into the

15   privileged side of the wall and never get passed over.

16        It narrows the field to only those documents where

17   there is some claim or good-faith claim by the filter team that

18   there is in fact a basis to think this isn't privileged, and

19   these documents are responsive and have relevant importance to

20   the investigative team's case such that it is worth taking the

21   time and the resources and the Court's resources to figure out

22   whether or not this is in fact privileged.

23        If you put the shoe on the other foot and Trump's

24   counsel is reviewing the privileged documents in the first

25   instance, he has got to account for every single potentially

1    privileged document.  Out of that same set of a hundred, he has

2    got to give us a privilege log of 100 documents.

3           I think that sort of segues into the other point that

4    I want to make.  You started by asking counsel how much time

5    will President Trump be able to devote to this endeavor.  She

6    didn't answer the question, but I think the question is

7    obvious.  He's a busy man.  And defense counsel, I suspect, is

8    not likely going to agree to privilege determinations or

9    nonprivilege determinations without consulting her client.  I

10   assume that would be the case.

11          It's going to be very difficult for her to get the

12   President of the United States' time to consult about a

13   privilege log with 100 items on it.  If there are two items in

14   question that the U.S. Attorney's Office has identified, that's

15   going to be much easier to do.  So you couldn't get a

16   commitment on the amount of time it would take other than

17   Ms. Hendon said -- I think she literally said it's going to be

18   a long time, and that is the truth.

19          If it goes that way, if there is a special master or

20   Mr. Cohen or President Trump's counsel is allowed to make the

21   first cut, I think it's going to be an extremely inefficient

22   process, and whatever dates the Court sets are inevitably going

23   to result in requests for more time, more adjournment.

24          I think just, lastly, I want to come back to what

25   Judge Jones said because Ms. Hendon kept talking about how

1  privilege logs are done all the time.  They are done all the

2  time in response to sentences where we already don't have the

3  documents, where we are trying to get the documents.  For

4  reasons that we have set out in great detail in our brief, we

5  determined it was necessary to go by search warrants in this

6  case.  There are very good reasons to do that.  Judge Jones

7  explained that it's not that we are usurping the privilege

8  holders' right.

9  The filter team protocol that was approved in that

10  case that's proposed in this case, it honors the privilege.  It

11  adequately protects the privilege.  But it does so by balancing

12  the privilege against the important public interest in

13  effective law enforcement.  Judge Jones describes that in the

14  *Grant* case, and that's really important here because the filter

15  team protocol, we believe, is more efficient than the

16  alternative.  We think it honors the privilege, but you also

17  have to consider the law enforcement interest here, an ongoing

18  criminal investigation that is going to get derailed by

19  protracted practice litigation.  For that reason, we do think

20  you should rule consistent with common practice in this

21  district.

22  (Continued on next page)

23

24

25

I4G3COH3

```
1          THE COURT:  Does anyone else want to be heard?

2          MS. HENDON:  May I just reply briefly?

3          THE COURT:  Yes.

4          MS. HENDON:  Thank you, your Honor.  I just, with

5    respect to things falling through the cracks, I want to be very

6    clear about this and I also want to talk about the Judge Jones

7    case briefly.

8          Lets start with the Judge Jones case, I think it's

9    Grant.  In that case, and it is like a two-and-a-half, maybe

10   three-page opinion.  The government searched a nightclub and

11   they searched I think either a personal device or an e-mail

12   account of a gentleman who owned the nightclub, and that

13   gentleman was under indictment or he was a subject of the

14   investigation.

15         And so, we're talking about radically different

16   factual circumstances.  This is where the man worked, so it is

17   a search of his workplace, and it is a search of either his

18   e-mail account or his personal devices.

19         Now, what flows from that in terms of our discussion

20   today.  If I represented Mr. Grant, and the government said

21   let's do a taint review, I could actually sit down with

22   Mr. Grant and say, well, they've got stuff from your business

23   and they've got stuff from your e-mail.  Talk to me about is

24   there an in-house lawyer at your business?  Do you use outside

25   lawyers?  Have you been involved in litigation?  And as for
```

I4G3COH3

1   your own personal e-mail or your telephone, who are your

2   lawyers.

3            You can sit down when you're not talking about a law

4   office.  You're talking about a raid of a different place.  A

5   bank, a pharmaceutical company, a nightclub, you can actually

6   say to your client, well, looks like the government wants to do

7   a taint review.  Can we come up with some search terms and

8   protocols.  And because it is your residence, and your e-mail,

9   and your personal device, you might say as the client, you

10  know, it's probably going to be cheaper, and I think the risk

11  of something getting through is de minimus, given I know what

12  the legal activities the business has been active in and I know

13  about my own legal activities.  Then let's turn over a bunch of

14  protocols and search terms because, hey, I run a nightclub.  I

15  don't run a law firm.

16           And in that situation, in almost every situation I can

17  think of, other than a law office, you can do that.  If you're

18  representing, you know, Merrill Lynch and you get a subpoena,

19  you say, all right, let's get the names of all the in-house

20  lawyers and all the external counsel, and it is Merrill Lynch,

21  it is a huge organization.  So if we run these terms ourselves,

22  and make our privilege pull based on the names of lawyers or

23  the names of disputes we've been involved in, that's a good

24  pull.  We might miss something, but that's our call.  That's

25  what we want to do.  We'll do it that way.

I4G3COH3

1          And this scenario is true of every single case cited

2     by the government.  It is not a law office scenario.  It is

3     somebody who is under investigation.  It is their business, it

4     is their home, it's their personal effects.  And it is not so

5     hard for that individual to make a judgment that here's what we

6     need to know in order for the government to preserve my

7     privilege.  I could see consenting on Mr. Grant's behalf to do

8     that.  Cost is a concern in these cases, too.

9          But, when you seize records from a law office, and I'm

10    representing the President now, he didn't make the things

11    inside that office.  He's not Michael Cohen's law partner.  He

12    doesn't know how they keep their files.  Do they make memos.

13    He also doesn't know who does Michael e-mail all day long when

14    he's doing my work.  And who of the people that he's e-mailing

15    who might look to a taint team review like a third party, who

16    of those people are actually other lawyers working for me.  So

17    it's still privileged even though there's a third party on it.

18         I haven't once mentioned communications between

19    Mr. Trump and Mr. Cohen because I think the government's

20    briefing says there are none to their knowledge.

21         THE COURT:  Well, only with respect to reviewing

22    e-mails.

23         MS. HENDON:  But, correct.  So maybe they've written

24    some -- they've written letters to each other or passed memos

25    back and forth.

I4G3COH3

1              THE COURT:  Or talked.

2              MS. HENDON:  But we're talking about seizing

3      materials.  So there could be a tape recording, your Honor,

4      that's right.  There has been some press accounts of that.

5              But, within a law office, there is so much more

6      potentially privileged material held for a client than just

7      e-mails back and forth or tape recorded telephone calls back

8      and forth with the client.

9              The other thing that the Court should consider here is

10     that there's been a series of representations made by the

11     government, I defer to them on this point, that Mr. Cohen is a

12     very active businessman and he spends a lot of his time, maybe

13     most of his time on business affairs rather than legal, doing

14     legal work.

15             Now, I and my colleagues, we're criminal defense

16     lawyers and litigators, and we are thinking about the

17     attorney-client privilege just all day long when we're working

18     and preserving privilege.

19             One of the things I worry about, and I cast no

20     aspersions with respect to Mr. Cohen who I've never spoken to

21     before saying hello before today.

22             What if he's gotten on his e-mail and relayed things

23     in e-mail, "the President wants this," "the President's top

24     concern is that," that he had no authority to relay.  Now, my

25     client hasn't waived privilege over the communications that are

I4G3COH3

1    embedded in that e-mail.  My client picked up the phone and

2    said, "Michael, I'd like you to do this for me, it's very

3    important, it has to happen by the end of the day."  If

4    Mr. Cohen wrote an e-mail or had some other communication with

5    someone, not my client, in which something my client had

6    relayed to him in confidence gets embedded, you know, my client

7    would want to assert privilege over that.

8            The problem here is everything is capable of slipping

9    through the cracks.  Because unlike <u>Grant</u> and unlike every case

10   in the government's papers, where you're talking about

11   someone's residence or their business or their own e-mail

12   account or their own phone, the privilege holder in this

13   instance just doesn't know what's there.  And he doesn't know

14   how his communications with his lawyer have been handled by

15   that lawyer.

16           And so, if you think about the taint team trying to

17   attack this, the taint team or a special master is even further

18   removed from what actually happened between the attorney and

19   the client.  They're even less likely to be able to pick up on

20   what is actually privileged material going out the door in an

21   unauthorized fashion.

22           So, you know, it cannot be that the privilege holder

23   has to identify every conceivable harm and wrong that can flow

24   from a taint process.  But I hope the Court is satisfied by the

25   ones I've proffered when it is a law office, the privilege

I4G3COH3

1   holder doesn't work there, doesn't know what's in there, hasn't

2   seen the stuff that was seized.  There is a tremendous risk

3   that privileged material will not be recognized as such.  It

4   may not be recognized, it may not be recognized as such by me

5   as the president's counsel.  But at least in that case I can

6   tell my client, you know, that's on me.  We got the documents,

7   the Court ruled for us, and I missed something.  But that's on

8   us.  That's an issue between him and me.  That's not we let the

9   government make these calls for you, and the government is so

10  good at so many things, but they are not best situated or even

11  adequately situated to the task I'm talking about.

12          THE COURT:  But your premise is wrong.  They will talk

13  to you and learn from you.

14          MS. HENDON:  But your Honor, I'm telling you I don't

15  know what's in the documents because I haven't seen them, and I

16  don't know how the -- my client doesn't know what was generated

17  inside that firm.  There is nothing for me to share with --

18          THE COURT:  May I ask you to use the microphone for

19  the overflow courtroom.

20          MS. HENDON:  I'm so sorry.

21          There's nothing for me to engage with Mr. McKay on,

22  because as I'm standing here before your Honor, I'm presenting

23  hypotheticals that I hope will persuade you and maybe even the

24  government of the risks here.  I'm not describing things I am

25  aware of.  I have no knowledge and no way of acquiring

I4G3COH3

1    knowledge of what it is I should then go discuss and engage

2    with Mr. McKay on.  I have nothing to tell him.  Because I

3    don't know how Mr. Cohen ran his office, kept his files,

4    recorded things my client said to him.

5            THE COURT:  You're getting into areas that we really

6    don't need to deal with now.  What we need to deal with now is

7    what are the next steps.  How do we get this under way.

8            MS. HENDON:  Well, your Honor, I do appreciate that

9    and I thought I was.  What I'm addressing is the inadequacy of

10   what the government would like the next step to be.

11           THE COURT:  I've heard you.

12           MS. HENDON:  Okay.  May I have one moment, your Honor?

13           THE COURT:  Yes.

14           (Pause)

15           MS. HENDON:  I have nothing further.  Thank you, your

16   Honor.

17           THE COURT:  Thank you.  Mr. McKay.

18           MR. McKAY:  I'll be brief, your Honor.  The concerns

19   that Ms. Hendon just raised are in large part why we focused in

20   our papers, and I think this focus has been borne out, about

21   the limited nature of Mr. Cohen's law practice.

22           If you look at the Grant case, yes, it is not the

23   search of an attorney's office.  That's why it is important to

24   know that the volume of privileged materials involving

25   Mr. Cohen in actual legal practice is smaller.

I4G3COH3

1          Ms. Hendon repeatedly said that she just doesn't know,

2     she doesn't know what's there.  She doesn't know how many

3     documents there are.  I think that's actually fatal to her

4     argument that this is any different than Grant.  As we've said,

5     from the e-mails, from the United States Attorney's Office's

6     search warrants, we know of no communications between President

7     Trump and Mr. Cohen.  It may be that this is an exceedingly

8     small set.  So it may be that this is just like Grant.

9          So Ms. Hendon can't really, having not talked to her

10    client, or talked to Mr. Cohen and gotten any actual facts

11    about this, really make the assertion that this is different

12    than Grant because she just doesn't know.  She said herself

13    about five times.

14         The concern that President Trump can't figure out what

15    is in Mr. Cohen's files doesn't seem like a big problem here

16    where Mr. Cohen is sitting at the table, is clearly zealously

17    asserting his client's interest.  And I think Ms. Hendon's

18    proposal was that she be consulting with Mr. Cohen's counsel

19    about these privilege determinations.  So the question that

20    President Trump can't navigate Mr. Cohen's files rings hollow.

21         The bottom line point she's making, I understand it to

22    be, that the privilege holder is the only one who can truly

23    honor the privilege.  And if that is true, then that is true in

24    every single case where attorney-client privileged materials

25    are seized.  It is not just attorneys law offices.  It is cases

I4G3COH3

1  like Grant where someone has consulted with a lawyer.  It is

2  any defendant or suspect or subject of investigation who has

3  consulted with a lawyer in the past.

4       But that's not how practice works in this district.

5  It is not any single time there is attorney-client privileged

6  communications seized during a search warrant, all the

7  materials get passed back to the privilege holder to make the

8  initial review.  That's because having the privilege holder

9  make the initial review is not the only way to honor the

10  privilege.  As courts have repeatedly held, the filter team

11  protocol adequately represents the privilege and balances it

12  against the important government interests at stake as well.

13       MR. HARRISON:  Very --

14       MS. HENDON:  May I just --

15       THE COURT:  Yes.

16       MS. HENDON:  Thank you.  It's not the case that I or

17  the President couldn't confer with Mr. Cohen and gain insight

18  into how he ran his office and what might be privileged.

19  That's exactly what I'm proposing the Court permit us to do.

20  We certainly cannot do that without the documents.

21       THE COURT:  Well, Mr. McKay, could you remind us all

22  what is still in Mr. Cohen's office.

23       MR. McKAY:  Yes.  That the electronic devices or most

24  of the electronic devices.  I think the cell phones we have

25  physical custody of.  Most of the electronic devices -- and I

I4G3COH3

1    hear the back table saying that's not true.

2           I'll be clear.  As I said earlier, because of the

3    pendency of this litigation, I haven't had a full conversation

4    with the taint agents who did the search and seizure.  I

5    haven't actually looked at the search warrant returns because

6    we're being very cautious about not letting anyone on the

7    investigative team get into that information.

8           But to be clear, my understanding is that most of the

9    electronic devices were imaged on site so that Mr. Cohen and

10   President Trump could in fact look at what they have.  And to

11   the extent that they don't still have it now, the filter

12   protocol contemplates that if we are designating things between

13   them as not privileged, we're going to provide them with the

14   copies.  So at the time that they need to make the

15   determination to weigh in on the question of privilege, they're

16   going to have copies, even if they don't already have it now.

17          MS. HENDON:  The only point I want to make, and then

18   I'll be seated, your Honor, is that the prosecutor keeps

19   referring to every other case, every other case.  What happens

20   and what has been done in every other case.  And this is just

21   isn't those cases.

22          We stated very clearly in our papers that there is no

23   case that presents the facts of this one.  This is an

24   extraordinary case.  This is a case of first impression for

25   this Court.

I4G3COH3

1          The fact that there have been taint teams agreed to or

2     put in place in other matters simply means that taint teams are

3     sometimes used.  That is not authority for the Court deciding

4     the particular question here, which is whether a taint team can

5     vindicate the privilege -- pardon me, which is whether, where a

6     privilege holder asserts the right to perform the first review

7     of materials seized by the government from his lawyer's

8     offices, the Court may direct instead that government agents do

9     so.  Thank you.

10         THE COURT:  Thank you.

11         MR. HARRISON:  Very, very briefly, your Honor.  Three

12    things.  One is Mr. McKay said a couple times we have access to

13    all the electronic media, we don't.  We simply don't.  I don't

14    know if your Honor --

15         THE COURT:  What do you have access to?

16         MR. HARRISON:  Not much, Judge.  Mr. McKay said -- I

17    encourage the Court to look at the search warrant returns and

18    see there is a number of cell phones, a large amount of cell

19    phones as Mr. McKay said.  There is also a bunch of drives,

20    electronic drives that were taken that we don't have.

21         Two, Mr. McKay said several times that we were going

22    to be inefficient if the Court allows us to do it.  The one

23    example of something that's happened so far in this case is I

24    think we're pretty efficient.  We filed our papers on Thursday

25    evening, we showed up in front of the Court on Friday at 10:30.

I4G3COH3

1    The Court ordered us to do something, we did it over the

2    weekend and we've resolved those issues by Monday.

3            If the Court allow us and the privilege holders to

4    have the materials, to have copies of the materials and do the

5    first cut, we'll do a similarly efficient job.

6            THE COURT:  There is no question but you're going to

7    get a set of the materials.  But you're not going to take away

8    what the government has.  Go ahead.

9            MR. HARRISON:  We have never suggested that we should

10   take it.  They should obviously keep, however you want to

11   describe, the master copies.  But I think the privilege holder

12   should get to do the first cut.  It is not quite clear,

13   Mr. Cohen is the privilege holder also for some of these

14   documents and communications we believe.  I think we've made

15   clear.  He was the client for certain attorneys and we put that

16   in our papers.

17           Lastly, Judge, I'll just say there has been good

18   arguments made here today.  The balance of the equities we

19   think should be with the American citizen whose stuff was

20   taken.  That's been swept up in a search warrant.

21           The privilege holders know and the lawyer in this

22   instance know the documents best.  Know the relationships best.

23   Know which relationships are privileged and which are not.

24   We're really best placed to look at these materials.  There is

25   no exigency problem.  As the Court pointed out, the

I4G3COH3

1    government's already got the documents.  They're not going to

2    go anywhere, and I think that's the best way to approach this,

3    your Honor.

4              THE COURT:  Thank you.  Would anyone else like to be

5    heard on this?

6              MR. McKAY:  Just one last point, your Honor.  The

7    American citizen whose materials were taken was someone who a

8    magistrate judge found probable cause that he had evidence of

9    crimes in his possession.

10             The efficiency example that they moved quickly over

11   the weekend, I would debate that they answered your questions

12   fully by this morning.  But in any event, their incentive this

13   weekend is they want a TRO to stop the government review.  The

14   second the review is stopped and a special master or whatever

15   other remedy the Court orders takes place, their incentive

16   flips.  Their incentive is to delay an ongoing criminal

17   investigation.

18             THE COURT:  All right.  Would anyone else like to be

19   heard?

20             MR. FUTERFAS:  Good afternoon.  Very briefly.  I'm not

21   going to weigh in on the able arguments of my fellow counsel

22   here, whether your Honor approves of a special master or

23   approves the proposal suggested by Ms. Hendon.

24             On the Trump Organization's side, all we request is

25   that we at some point be afforded a copy of the Trump

I4G3COH3

1   Organization related materials, whether we get it from the

2   government, whether we get copies made from Mr. Cohen's firm or

3   Mr. Ryan's firm receives.  And the reason we want them,

4   obviously, is because we can go through, and quite frankly, we

5   can help the government make privilege determinations.  And we

6   can weigh in, whether it is the special master or whoever is

7   going to take the charge based on the procedure and the

8   protocol that your Honor finally puts in place.

9          The reason I say that is Mr. Cohen worked within the

10  Trump Organization for 10 years.  He touched all kinds of

11  matters.  There were negotiations, litigation matters, IP,

12  intellectual property matters, a whole range of things for the

13  course of 10 years.  Mr. Ryan has asserted to your Honor that

14  there are Trump Organization materials that were seized or

15  found in his possession at the time.  Okay.  And all we want to

16  be able to do is weigh in with whoever is going to be making

17  those privilege determinations pursuant to your Honor's

18  direction, whatever process or procedure your Honor puts in

19  place.  Because those can be complicated.

20         Just giving you a quick hypothetical.  If Mr. Cohen,

21  for example, is sending an e-mail to an individual, the

22  government may not realize or the special master may not

23  realize or whoever is doing this initial cut, so to speak, may

24  not realize who that individual is.  Is that individual

25  co-counsel in another case, are they a lawyer in a different

I4G3COH3

1  firm that has a common interest privilege.  Are they a limited

2  partner in a deal that's potentially covered by the

3  attorney-client privilege.  I mean, there are so many different

4  permutations that could occur, and without having some basis of

5  knowledge to assist whoever is making that determination, we

6  want an opportunity to weigh in and say here's the body of

7  material that related to our company that was found at

8  Mr. Cohen's office, we go through it, we look at it, we make

9  our own determination, and then whoever we have to interface

10  with, whether it is a special master, whether it is your Honor,

11  whether it's a taint team, whatever it is that your Honor

12  eventually determines is the process, we just want the

13  opportunity to do that.

14  And I think it is also for that reason that we do, and

15  I stated in my letter of this morning, we do obviously support

16  the idea, either of the ideas suggest by Ms. Hendon or the

17  proposal made by Mr. Ryan and his firm, that they get the

18  materials and they do a cut of the Trump Org materials, send it

19  to us, we could then weigh in, and we think actually that would

20  greatly expedite the process.

21  If the government has to look at a piece of paper and

22  try to figure out who is the individual on the other side of

23  that e-mail, are they a lawyer, are they a doctor, are they a

24  friend, who are they, where do they fit in, that's a very

25  time-consuming job that the government will have.  We could

I4G3COH3

1   actually kind of help that process forward, whoever we're
2   dealing with.
3          And that's all I would add, your Honor.  Thank you.
4          THE COURT:  Thank you.  Does anyone else wish to be
5   heard?  All right.
6          I have faith in the Southern District U.S. Attorney's
7   Office that their integrity is unimpeachable.  I think even
8   Ms. Hendon, who worked there at one time, agrees.  So I think
9   that a taint team is a viable option.
10          In terms of perception of fairness, not fairness
11   itself, but perception of fairness, a special master might have
12   a role here.  Maybe not the complete role, but some role.
13          My interest is in getting this moving efficiently and
14   speedily.  So what I'd like to do is first have us reconvene
15   when the government has finished its designation of everything
16   and can hand over to opposing counsel copies of it.  I don't
17   know, Mr. McKay, if making copies and handing it over is a
18   time-consuming process.  So, I'll leave it to you to tell me
19   when we should next convene.
20          MR. McKAY:  Your Honor, it may be that, as I
21   mentioned, I haven't talked in detail to the filter team or
22   filter agents about the specifics in terms of number of devices
23   and volume.  So it might be that I should go back, have that
24   conversation, and then write in to the Court with a more
25   precise estimate of how quickly we would have copies of

I4G3COH3

1    everything.

2             I would, as I mentioned earlier, I suspect it is going

3    to be the case that we would be able to do this most

4    efficiently on a rolling basis.  Probably be able to give the

5    large majority fairly soon, and there may be a few devices that

6    are more difficult to extract that would take longer.  We

7    wouldn't want to hold the process up for those devices.  So it

8    may that be we say we're going to have a large majority in a

9    week and then the rest hopefully two, three weeks, whatever the

10   case may be.  But we can provide the Court with a more specific

11   estimate.

12            THE COURT:  Thank you.  And my view is that we would

13   meet at that point, we would know the volume of the documents,

14   opposing counsel will have seen the documents and other items,

15   and we can make a much more intelligent choice of whether the

16   government taint team should handle this or whether a special

17   master should handle part of it.

18            And I would want opposing counsel to move very fast in

19   terms of, if you're getting things on a rolling basis, I would

20   want you to keep up with the government just as I would want

21   the special master to keep up with everyone, if there is a

22   special master.

23            What I envision is sort of a test.  As soon as you've

24   seen the documents, I'll want to hear your proposals for how we

25   can move fast.

I4G3COH3

1            MS. HENDON:  May I ask a question, your Honor?

2            THE COURT:  Yes.

3            MS. HENDON:  Is your Honor ruling against Mr. Trump's

4     application for a TRO?

5            THE COURT:  I was about to --

6            MS. HENDON:  And preliminary injunction?

7            THE COURT:  I was about to get to that.

8            I'm denying the motion for a TRO because it's

9     currently moot.  The government is not accessing anything,

10    other than to copy it and number it for you.

11           With respect to a preliminary injunction, that I think

12    is premature at this point.  We have to wait and see what the

13    volume is and how you can argue.

14           MS. HENDON:  Okay.  So your Honor, just so I'm very

15    clear on what I'm going to be doing in the next 24 hours.  Your

16    Honor has denied the TRO, but you have not denied the

17    preliminary injunction.

18           THE COURT:  Right.

19           MS. HENDON:  And may I request two things.  That your

20    Honor please either confirm with the government that they will

21    continue to not -- to agree voluntarily not to review the

22    material, other than pulling it together for the parties, and

23    two, that the material be provided in a reasonably accessible

24    and readable manner.  Because I and my partners have received,

25    you know, productions of forensically imaged material that it

I4G3COH3

1    then takes us three weeks and the hiring of technical experts

2    to sort of open up and extract data.  This is a very big

3    problem.

4              THE COURT:  I hear you.  And I think Mr. McKay will

5    need to go back and talk to his people with respect to what

6    he'll be able to give you.

7              But on the first point, Mr. McKay, how do you respond?

8              MR. McKAY:  Yes, your Honor.  So, we are not going to

9    start reviewing the documents substantively during the pendency

10   of these proceedings while we await your determination.  So as

11   you said, the TRO is moot from that respect.

12             THE COURT:  Yes.

13             MR. McKAY:  Though I just want to clarify our ability

14   to do a few things so there is no suggestion that we've

15   breached that agreement.

16             The first is, of course, for the purpose of actually

17   getting all these documents in the database and in a place

18   where we can give them to counsel, we're permitted -- the

19   filter team is permitted to scan the physical documents into

20   our database and take the electronic documents and put them all

21   into the database.  This doesn't contemplate substantive

22   review, just the mechanical process of getting this in a format

23   where everyone can easily read it.

24             THE COURT:  Okay.  I think that's reasonable and meets

25   Ms. Hendon's concern, I hope.

I4G3COH3

1          MS. HENDON:  It does, your Honor.  I just add one

2     thing because I don't know this for a fact, but it may be

3     likewise difficult and costly for the government to take the

4     various media they've seized and put it into reasonably

5     accessible format for us.

6          I would just suggest as an option for the government's

7     consideration, if they have the data, if they decide to sort of

8     have the data up on a site for their own review, there are ways

9     to make others have access, with walls all in place, to that

10    same website or database.  This is entirely up to the

11    government, but it would alleviate their need to be pulling

12    apart forensic images for us.  If they have it uploaded in a

13    nice way where you can search and read documents and they're

14    willing to give us access, that's fine with me.

15         MR. McKAY:  Your Honor, we'll speak to counsel about

16    the most efficient way, system-wise, to give these documents to

17    them.

18         But one related point regarding the scope of our

19    ability to manipulate these documents at this point is that I

20    take the Court's direction to be we should be providing a copy

21    of all of the documents seized from Mr. Cohen to Mr. Cohen.

22         THE COURT:  Yes.

23         MR. McKAY:  With respect to President Trump, I think

24    we would object, and I suspect other clients of Mr. Cohen might

25    object to us producing documents that are either personal

1   documents of Mr. Cohen, or documents relating to other clients

2   to President Trump.  It is often the case where we produce a

3   subset of seized documents to the individual that is affected

4   by that subset of documents.  And I think that might be

5   particularly useful here, not just because of privacy interests

6   involved for third parties, but also because I took from the

7   back and forth earlier that one possible route the Court was

8   considering was employing a special master for the specific

9   purpose of reviewing documents, communications that might

10  potentially be attorney-client privilege as to President Trump.

11        So, I think if that's an option the Court is

12  considering, having the special master focus on that universe

13  of documents as opposed to all of the documents seized during

14  the searches, it would be important for us in the process of

15  production to try to determine what the field of documents that

16  could be turned over to President Trump is.  So that not only,

17  like I said, we're protecting the privacy interests, but also

18  Ms. Hendon can make a more accurate assessment of what the

19  privilege log turnaround time for her would be.

20        There has been a lot of discussion here, it may be

21  that's actually a very small number.  And so if it's really

22  truly very small, it is going to fundamentally alter the debate

23  from a circumstance where we've given everything to President

24  Trump, and now we're not sure what the volume that applies to

25  him is.

I4G3COH3

1    THE COURT:  What is the best way to sort that out.

2    Would it be for Mr. Cohen to decide what to share with others?

3    MS. HENDON:  That is what we urge the Court to permit.

4    I do not want the government doing anything to segregate

5    documents of Mr. Trump while we're in this initial very modest

6    phase of working with the Court on how we get to the end of

7    phase.  If you understand my point.

8    I think all we're doing now is get a full set of the

9    materials in a readable, searchable form to Mr. Cohen.  The

10   government has agreed not to search or review any of the

11   materials.  I will work with counsel for Mr. Cohen to ensure

12   that I receive documents pertinent to Mr. Trump's applications.

13   I do not want the government taking any steps to make cuts like

14   that, please.

15   THE COURT:  Do you wish to be heard?

16   MR. HARRISON:  Yes, your Honor.  I just join

17   Ms. Hendon in that application.  It sort of makes sense, we can

18   get stuff back and we know working with the privilege holders

19   how best and quick to get it back to them.

20   THE COURT:  All right.

21   MR. McKAY:  Your Honor, our concern with that is that

22   if we come back in two weeks, whatever the case may be, and

23   we -- I guess I'm confused about what Mr. Cohen's proposal is

24   in terms of what will happen.  He is, once he gets the copy,

25   going to make his estimate of how many of those could properly

I4G3COH3

1   be provided to President Trump?

2           THE COURT:  I believe that's the proposal.

3           MR. HARRISON:  In close consultation with Ms. Hendon

4   for Mr. Trump, yes.

5           MR. RYAN:  And T.O.  We'll do it with all of the

6   organizations, your Honor.  We will make that determination and

7   we agree that the government won't be searching for that.  And

8   if they give us the material 10 days from now, as soon as we

9   can begin the review, after that, we'll begin to turn it over

10  on a rolling basis to the other organizations, and we can

11  prioritize as well.

12          THE COURT:  Roughly how many hours a week are you

13  prepared to spend, the law firm?

14          MR. RYAN:  I think it really depends -- I am assuming

15  it is going to take 10 days, based on the representation the

16  United States Attorney's Office made before they flow us the

17  first set of materials.  If it's shorter, we'll begin work

18  shorter.  I think what happens is, when we see what we've got,

19  and the volume, first of all, that will be very helpful to

20  understanding how difficult the task is or how much labor would

21  be necessary.

22          But, candidly, the technology has changed so much that

23  there are many things we can do.  We have a discovery center.

24  We are 1,000 lawyers.  We have a discovery center that are

25  skilled in these kind of activities.  And a boutique law firm

I4G3COH3

1    would not have that technology array.  They have the better

2    brains perhaps, but not the technology array that we have.

3         So we'll work this as hard as we have to, to satisfy

4    the Court that we are giving it all of the energy that the

5    Court would direct us to do.

6         So, I would say that if you schedule your hearing to

7    talk more about this, that you do that giving us at least 10

8    business days post the time, so we can come in and give you an

9    interim report on that.  We'll in that 10 business days only

10   begin to flow it to T.O., to Trump Organization or the

11   President, President's counsel, you know, maybe the eighth day

12   before we can turn stuff over to them that they can start

13   looking at.  And I think we could, you know, if the Court wants

14   to do this in a graduated fashion, I think we can meet the

15   Court's needs and convince the Court that we're working

16   expeditiously on this.

17        THE COURT:  I'm wondering whether you should meet

18   again to consider search terms.  Meet and confer to try to get

19   a set of search terms that can speed all of this up.

20        MR. McKAY:  Your Honor, I think it would make sense to

21   do this in parallel.  Which is to say, we can speak, we will

22   expeditiously create copies of all the material and get it over

23   to Mr. Cohen's counsel.  Once they have it, they should be

24   given a very prompt turnaround.  They have 1,000 lawyers, they

25   have lots of resources to make their estimate of what the

I4G3COH3

1    universe of documents is that should be provided President

2    Trump for his review, what the universe is to the Trump

3    Organization, to any other clients they wish to identify.

4           But in parallel, I think, in fairness, we should be

5    able to have the filter team run a purely mechanical search

6    term evaluation so that we're not left trusting, with respect,

7    trusting their estimates of the volume of materials.  Which is

8    to say our filter team would run simple mechanical keyword

9    searches to see, for instance, how many to from e-mails involve

10   a particular client.  Or how many times a particular search

11   term or series of search terms hit on a particular client.

12          Then, when we come back to court shortly thereafter,

13   we've got an estimate from Mr. Cohen's counsel, an estimate

14   from the government, of what the volume of each subset of

15   documents is.  We may not agree, I'm sure we won't because our

16   search terms may differ slightly, and we can discuss what

17   appropriate terms would be.  But I think it make sense to have

18   two estimates and I think what I'm proposing is mechanical.  It

19   is not our review team going through documents and making

20   substantive determinations of privilege.  It is trying to get a

21   sense of how many e-mails with President Trump, how many

22   documents that will hit on search terms that are indicative of

23   privilege.

24          When we're back in court, we can make a more educated

25   determination of should a special master be appointed at all or

I4G3COH3

1    should it be appointed for some subset of the documents.

2                THE COURT:  Thank you.

3                MR. HARRISON:  Just --

4                THE COURT:  Have your teams had a chance to consider

5    names of special masters?  I know that Mr. Harrison said last

6    time he already had someone in mind.

7                MR. RYAN:  Could we do that tomorrow?  Submit the four

8    names to you?  I think we need overnight to do that.

9                THE COURT:  All right.

10               MS. HENDON:  Your Honor -- I'm sorry, Mr. McKay.  I

11   don't on behalf of the President consent to the government

12   running mechanical searches.  It seems the argument is that

13   they want to do that so they can trust the credibility of

14   representations that are being made by, I don't know, the law

15   firm --

16               THE COURT:  No, I don't think so.  They're doing it to

17   estimate the amount of time needed.

18               MS. HENDON:  But, well, I heard something different,

19   your Honor.  I'm not saying it is an improper concern for the

20   government to have necessarily if they want to say that.  But I

21   don't consent to mechanical searches designed to pull up volume

22   numbers of documents that might relate to Mr. Trump or not.

23               THE COURT:  If no one is reading them, I don't think

24   that your objection is well taken, so I overrule.

25               MS. HENDON:  Can we get an agreement on just

I4G3COH3

1    confirmation -- I'm not sure what a mechanical search is, your

2    Honor.  I do searches so that I can pull up subsets of

3    documents for purposes in my work.

4              THE COURT:  So I'll ask Mr. McKay to describe it.

5              MR. McKAY:  So, in the database we have, we can

6    search, for example, if it is just e-mails, we can search any

7    e-mail to and from JudgeWood@UScourts.com.  And that will say,

8    oh, there were 332 e-mails exchanged with Judge Wood.

9              With documents, it is a little more complicated.  But

10   you can use -- because you don't have a to from header that so

11   easily sorts.  You can still use search terms that whenever a

12   document hits on that search terms, you can create statistics

13   for how many responsive hits you get.  You plug in the search

14   terms and up comes the responsive list, and then the program

15   records that number.

16             THE COURT:  All right.  And with respect to search

17   terms, it seems to me that it might be helpful for the

18   government to tell opposing counsel what you propose and see if

19   they, within 24 hours, want to propose something else.

20             MR. McKAY:  Right.  And that would be, again, search

21   terms specific to individuals or entities with whom there is

22   some reason to think there may be an attorney-client

23   relationship.  So right now I think we've got four.

24             MS. HENDON:  Your Honor, that's over our objection.

25   And I'm sorry, your Honor.  I just lost my train of thought.

I4G3COH3

1              THE COURT:  Take your time.

2              MS. HENDON:  Yes.

3              THE COURT:  Take your time.  You can stand up again.

4              MS. HENDON:  I will, thank you.

5              I'm sorry, your Honor.  I remember what it was.  I

6      don't think those numbers that are generated, volume of

7      documents for a particular privilege holder should leave the

8      taint team.  I think that should be shared with --

9              THE COURT:  I'm sorry.  I'm not sure I understand what

10     you're saying.

11             MS. HENDON:  I don't think the investigative team

12     should be told -- I assume these searches are going to be run

13     by the taint team.

14             THE COURT:  Yes.

15             MS. HENDON:  I don't think the investigative team

16     should be told what the volume of documents is that are pulling

17     up a Trump --

18             THE COURT:  You don't intend to do that, do you?

19             MR. McKAY:  No, we do.

20             THE COURT:  To give it to the investigative team?

21             MR. McKAY:  Yes.

22             MS. HENDON:  He is the investigative team, your Honor.

23             MR. McKAY:  There is nothing privileged about a

24     statistical random -- computer-generated number of how many

25     e-mails there are in a database.  There is nothing privileged

I4G3COH3

1  about that.  It is the same concept as why an attorney-client

2  list is not privileged.

3       THE COURT:  That's not privileged.  I'm just wondering

4  how useful it is at that point.

5       MR. McKAY:  I think it is only useful to the extent

6  that what we're trying to decide is volume for purposes of

7  appointing a special master.  Obviously if there is 1,000 hits

8  to a particular search term, that doesn't mean there is 1,000

9  privileged documents.  It just means we're giving President

10 Trump 1,000 documents, and so now we know how long it is going

11 to take Ms. Hendon to do her privilege review.  If it is 20,000

12 documents, now we know we might have a different story.

13       THE COURT:  Right.

14       MS. HENDON:  I just note my objection to this, your

15 Honor.  Thank you.

16       THE COURT:  Okay.

17       MR. HARRISON:  Mine too, Judge.  I would say the proof

18 will be in the pudding.  It will all come out in some way at

19 the end.  I don't know it is necessary.

20       THE COURT:  I'll allow the government to do it over

21 objection.  All right.

22       So you'll have each have four names for me of a

23 possible special master, and I'm not deciding now that I'll

24 appoint one.  But I'd like to have in mind who might have

25 enough time if we need to appoint one.

I4G3COH3

1        MR. RYAN:  Yes, ma'am.

2        THE COURT:  One moment.

3        The parties have disputed whether the search, well, I

4   think the press disputes whether the search warrant should be

5   sealed.  I think I ruled on it last time.  But I would say that

6   I haven't seen anything to change my ruling that the warrant

7   and the portions of the application need to remain under seal

8   in the interest of allowing the prosecutors to do their work

9   expeditiously, and not to embarrass or taint individuals who

10  are innocent.

11       MR. BALIN:  Your Honor, may I just respond that I will

12  consult with my clients about whether they want to make a

13  written application or not?

14       THE COURT:  That's fine.  Thank you.  All right.  Is

15  there anything we should take up?

16       MR. McKAY:  Your Honor, can I just make sure I have

17  crystal clear the next step now, which is that we're going to,

18  first of all, the U.S. Attorney's Office will confer with the

19  filter team and the folks at the FBI who have the ability to

20  give us a better estimate of the volume.  And we're going to

21  write to the Court with our best estimate of how soon we can

22  have copies over to Mr. Cohen's counsel.  And we're happy to do

23  that by I think perhaps either end of the day tomorrow might be

24  a good deadline or perhaps even early Wednesday.

25       THE COURT:  All right.  Early Wednesday certainly

I4G3COH3

1   sounds soon enough.

2          MR. McKAY:  Okay.  And in the interim, we're happy to

3   put in that letter our proposed names for a special master and

4   we'll do that.

5          And the last thing was just I suppose we should meet

6   and confer with defense counsel about potential search terms.

7   And we can do that before we file our letter on Wednesday.  And

8   to the extent that any issues may arise out of that, we'll

9   notify the Court.

10          THE COURT:  All right.  And then when all counsel have

11   decided it will be fruitful to meet, you will let me know.

12          MR. McKAY:  Yes, your Honor.  And I guess we'll confer

13   with defense counsel about that as well, and hopefully we can

14   propose a date.

15          THE COURT:  Okay.  Is there anything else we should

16   take up?  All right.  Thank you very much.  We are adjourned.

17          (Adjourned)

18

19

20

21

22

23

24

25