BLAKELY LAW GROUP
BRENT H. BLAKELY (CA Bar No. 157292)
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:        BBlakely@BlakelyLawGroup.com

Attorneys for Defendants
ESSENTIAL CONSULTANTS LLC, and MICHAEL COHEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual,<br><br>             Plaintiff,<br><br>      v.<br><br>DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive,<br><br>             Defendants. | Case No. 2:18-CV-02217-SJO-FFM<br><br>**EX PARTE APPLICATION OF DEFENDANT MICHAEL COHEN FOR A RESTRAINING ORDER AGAINST PLAINTIFF'S COUNSEL, MICHAEL AVENATTI**<br><br>Assigned for All Purposes to the Hon. S. James Otero<br><br>Action Filed:  March 6, 2018 |

## **<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ........................................................................... 1

II.    RELEVANT PROCEDURAL BACKGROUND ........................... 6

III.   MR. AVENATTI'S PUBLICITY TOUR ..................................... 8

     A.     Mr. Avenatti's Television Appearances ................................ 8

     B.     Mr. Avenatti's Tweets Concerning the Case and/or Mr. Cohen .......... 12

     C.     Mr. Avenatti's Leak of Confidential Financial Information ............... 14

IV.   GOOD CAUSE EXISTS FOR A RESTRAINING ORDER ......................... 15

V.     CONCLUSION ........................................................................... 19

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**CASES**

4

*Bailey v. Sys. Innovation, Inc.*,
    852 F.2d 93 (3d Cir. 1988) .................................................................17

5

6

*Estes v. Texas*,
    381 U.S. 532 (1965) .........................................................................16

7

8

*Levine v. United States*.,
    764 F.2d 590 (9th Cir. 1985).........................................6, 16, 18, 19

9

10

*Nebraska Press Ass'n. v. Stuart*,
    427 U.S. 539 (1976) .................................................................17, 18

11

12

*Patterson v. Colorado ex rel. Attorney General*,
    205 U.S. 454 (1907) .........................................................................16

13

14

*Sheppard v. E.L.  Maxwell*,
    384 U.S. 333 (1966) .........................................................................17

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

Defendant Michael Cohen ("Mr. Cohen") will and hereby does move *ex parte* for an order restraining Plaintiff's counsel of record, Michael Avenatti, from communicating with the press and/or public regarding the merits of this case.

As this Court has probably already surmised, Ms. Avenatti's actions are mainly driven by his seemingly unquenchable thirst for publicity.  Mr. Avenatti's publicity tour, wherein he routinely denigrates Mr. Cohen with claims of alleged criminal conduct, is contrary to the California Rules of Professional Conduct, likely to result in Mr. Cohen being deprived of his right to a fair trial, and threatens to turn what should be a solemn Federal Court proceeding into a media circus.

Judge Kimba Wood, who is presiding over Mr. Cohen's action in the Southern District of New York relating to materials seized during FBI raids of his home, office and hotel room (the "Cohen SDNY Action"), already came to this conclusion when she recently admonished Mr. Avenatti in connection with his failed attempt to be admitted *pro hac vice* in the Cohen SDNY Action:

> I've a different view from you [Avenatti], from the one you have expressed earlier as to what it is that would subject you to the standards for professional responsibility in this court.
>
> In my view, this matter, which is a potential precursor to a criminal trial if charges are filed against Mr. Cohen, I believe that once you are participating in this proceeding, you are subject to the New York Code of Responsibility 3.6 and the local rule for the Southern District of New York 23.1.  That means that you would have to stop doing some things you have been doing.  If you participate here, you would not be able to declare your opinion as to Mr. Cohen's guilt, which you did; you would not be able to give publicity to documents that are not public.  It would change your conduct.  That is my only possible role in doing what Mr. Cohen's lawyers want, which is, to essentially stop in its tracks your publicity tour on TV

and elsewhere.  And I say "publicity tour" not in a derogatory sense.  You are entitled to publicity so long as – that is, I can't stop you, unless you are participating in this matter before me.

So I either want you to participate or not be in the matter at all.  I don't want you to have some existence in limbo, where you are free to denigrate Mr. Cohen and I believe potentially deprive him of a fair trial by tainting a jury pool.  I know a jury, if there is one, is way down the road, and memories certainly may fade, but this conduct is inimicable to giving Mr. Cohen eventually a fair trial.

[Declaration of Brent H. Blakely ("Blakely Decl."), ¶ 2, Ex. A, 5/30/18 Transcript, pp. 27:12-28:13.]  Judge Wood's comments were made in the context of potentially admitting Mr. Avenatti *pro hac vice* in the Cohen SDNY Action so that Ms. Clifford could file a motion to intervene.  If Mr. Avenatti wanted to be admitted to the case, Judge Wood stated that he would be required to cease his publicity tour.  However, demonstrating his true colors, Mr. Avenatti instead chose to withdraw his application approximately one hour later.  [*Id.*, ¶ 3, Ex. B.]   Furthermore, either not comprehending or otherwise ignoring the fact that the same conduct which led to Judge Wood's rebuke could get him into serious trouble in California and with this Court, Mr. Avenatti continued his publicity tour with renewed vigor.

Since Plaintiff filed this action on March 6, 2018, Mr. Avenatti has made a minimum of 121 television appearances to discuss the facts and circumstances relating to this case, in addition to countless other statements Mr. Avenatti has made to the media.  [Blakely Decl., ¶ 4, Ex. C.][1]  Mr. Avenatti has also issued at least 439 tweets relating to this case and/or Mr. Cohen to his 538,000 Twitter followers.[2]  [*Id.*, ¶

---

[1] As of May 16, 2018, the *Media Research Center* placed Mr. Avenatti's total television appearances at one hundred-forty seven (147).  [Blakely Decl., ¶ 6, Ex. E.]
[2] This figure is accurate as of June 14, 2018.  [Blakely Decl., ¶ 7, Ex. F.]

5, Ex. D.]  During these appearances and tweets, Mr. Avenatti has repeatedly denigrated Mr. Cohen, predicted that Mr. Cohen would be indicted for bank fraud, wire fraud, campaign finance violations, and accused Mr. Cohen of hiring a "thug" to allegedly threaten Ms. Clifford. [*See* Section 3, *infra*.]

For example, as recently as last night, Mr. Avenatti stated the following during an appearance on *The Late Show With Stephen Colbert*:

> I predicted a couple months ago that Michael Cohen was going to be indicted, that he was in a whole heap load of trouble, and, and I think that we've seen that play out over the last couple of months.  There's no question in my mind that he's going to be indicted, and there's no question in my mind that he's going to try to flip on the President.  I think that Michael Cohen is in a very, very bad spot, and I think the President is in a very, very bad spot because this is what happens when you trust your inner most secrets to a moron.

[Blakely Decl., ¶ 8, Ex. G.]

On the same day (June 13), during an interview with Jake Tapper on *CNN*, Mr. Avenatti stated:

> With each passing day Jake, [Mr. Cohen's] options become potentially more and more limited because if Bob Mueller ultimately concludes that a sitting president cannot be indicted, and I think he will ultimately conclude that….Michael Cohen could be left without a chair when the music stops…What I mean by that is that Michael Cohen could be left to face significant jail time with no one to flip on.

[Blakely Decl., ¶ 9, Ex. H.]  During this same interview with Jake Tapper on *CNN*, Mr. Avenatti further stated:

> But look I predicted this a couple of months ago, I said that he would be indicted within the next 90 days, I think we are at day 58 right now. And I also predicted that he would ultimately flip on the President because he

1   would not be left with a choice and I'm going to hold to those predictions

2   and I think ultimately that is going to happen.

3   [*Id.*]

4   Also on the same day (June 13), during an interview with Lawrence O'Donnell

5   on *MSNBC*, Mr. Avenatti stated:

6   …so what's going to happen here is the narcissism of this president, um,

7   you know, his arrogance, his stupidity, is ultimately going to catch up to

8   him because he's not covering, he's not providing their cover, for the guy

9   [Michael Cohen] that knows where all the bodies are buried, I've been

10   saying this for a while, I mean this is the guy that that handled all of the

11   nonsense for the President, for the better part of twelve years, okay, if

12   there's one guy, on the face of the planet, that you provide air cover for,

13   that you provide legal fees for, that you bring in the tent, that you make

14   him feel loved and welcomed, it's this guy, okay, but that's not what we've

15   seen in fact we've seen just the opposite and this arrogance and this

16   narcissism is very, very dangerous, okay, this, this is the guy [Michael

17   Cohen] that knows where the bodies are buried and I believe that he's

18   going to sing like a canary because he's not going to have any choice but

19   to try to save his family, and the people that he care about, that he cares

20   about, and he's going to be out of money.

21   [Blakely Decl., ¶ 10, at 4:51-5:45.]  During this same interview with Lawrence

22   O'Donnell on *CNN*, Mr. Avenatti further stated:

23   O'Donnell:  Why doesn't Michael Cohen just drop that case?

24   Avenatti:     Well at this point, uh Lawrence, cause we put him in a box,

25   uh he doesn't have the ability to drop that case, you know,

26   that, that ship sailed many, many weeks ago and it was uh, it

27   was a trap, a trip wire that we laid and he fell right into it, uh

28   as he's done time and time again in connection with these

1    cases, uh you know I have to tell you people ask me,
2    Lawrence, you know, over the last three or four months what
3    has surprised you the most, in connection with what has
4    happened, and the answer is very, very clear, and that is the
5    incompetence of these lawyers, the incompetence of Michael
6    Cohen, uh, and the fact that they keep falling into every trap
7    that we lay and again, ultimately this is going to prove to be
8    a very, very big problem, um, for this President.

9    [*Id*., at 7:10-7:55; *See Also* Exs. N-W.]

10       Mr. Avenatti, on behalf of Plaintiff, has also filed two additional separate
11   lawsuits related to this action, in an attempted end-run around the order staying this
12   action (the "Stay Order") [ECF No. 53], and to provide Mr. Avenatti further fuel for
13   his ongoing publicity tour.  These actions are as follows:

14       (1) *Clifford v. Donald J. Trump*, filed in Southern District of New York, Case
15   No. 1:18-cv-03842-JMF, on April 30, 2018 (the "Second Clifford Action").  The
16   Second Clifford Action involves a claim by Plaintiff against Donald J. Trump ("Mr.
17   Trump") for defamation.  This claim falls squarely within the arbitration provision at
18   issue in this action [ECF No. 20], and also heavily overlaps with Plaintiff's
19   defamation claim against Mr. Cohen in this action, as both claims arise out of
20   statements that allegedly accuse Plaintiff of lying about circumstances relating to "her
21   relationship with Mr. Trump."  [Blakely Decl., ¶ 11, Ex. J, Complaint – Second
22   Clifford Action, ¶¶ 6, 28; First Amended Complaint, ECF No. 14, ¶ 67.]

23       (2)  *Clifford v. Davidson and Cohen*, originally filed in Los Angeles Superior
24   Court on June 6, 2018, Case No. SC129384, and removed to the Central District of
25   California on June 7, 2018, Case No. 2:18-cv-05052 (the "Third Clifford Action").  In
26   the Third Clifford Action, Plaintiff asserts two causes of action for, (1) Breach of
27   Fiduciary Duty against Keith Davidson and (2) Aiding and Abetting Breach of
28   Fiduciary Duty against Mr. Cohen, arising out of Mr. Davidson's representation of

Plaintiff in connection with the Settlement Agreement at issue in this action.  [Blakely Decl., ¶ 12, Ex. K, Complaint – Third Clifford Action.]  The Third Clifford Action is related to this action for the reasons set forth in the Notice of Related Case filed by Mr. Cohen in the Third Clifford Action.  [*Id*., ¶ 13, Ex. L, Notice of Related Case.]

The reason Mr. Avenatti filed these two new cases, both of which violate this Court's Stay Order, is obvious.  This Court issued the Stay Order on April 27, 2018.  [ECF No. 53.]  Finding himself on the losing end of this issue, there was no real reason for the press to speak to Mr. Avenatti for 90 days.  In a desperate bid to somehow stay relevant, Mr. Avenatti contemptuously circumvented this Court's Stay Order by filing two new lawsuits concerning the very same subject matter stayed in *Clifford v. Trump* – the validity of the Settlement Agreement.   Indeed, the Second Clifford Action was filed the next court day after this Court issued its Stay Order.

As the Ninth Circuit has instructed, trial publicity, which Mr. Avenatti is employing to an unheard of extreme, has the potential to undermine the integrity of the judicial process.  *Levine v. United States*., 764 F.2d 590 (9th Cir. 1985).  Mr. Avenatti's publicity tour is also a flagrant and ongoing violation of California Code of Professional Ethics Rules 5-100, which prohibits the threats of criminal charges to gain an advantage in a civil litigation, and 5-120, which prohibits trial publicity.  *See Also* L.R. 83-3.1.2.  Enough is enough.  As Judge Wood stated, if Mr. Avenatti wants to participate in a lawsuit in the role of an attorney, he is subject to the ethical guidelines governing attorneys, and his comments to the press/public and malicious attacks on Mr. Cohen must be stopped in its tracks.

The relief sought herein is warranted on an *ex parte* basis because Mr. Avenatti continues to make television appearances and tweet regarding Mr. Cohen on an almost daily basis, and often multiple times per day.

## II.   RELEVANT PROCEDURAL BACKGROUND

Plaintiff filed this action on March 6, 2018.  [ECF No. 1.]  On Friday, April 27, 2018, at 2:04 pm, this Court issued the Stay Order.  [ECF No. 53.]  Two minutes after

1  the Court issued the Stay Order, at 2:06 p.m. on Friday, April 27, 2018, Mr. Avenatti

2  announced on Twitter that Plaintiff intended to file an appeal of the Stay Order,

3  stating: "While we certainly respect Judge Otero's 90 day stay order based on Mr.

4  Cohen's pleading of the 5th, we do not agree with it.  We will likely be filing an

5  immediate appeal to the Ninth Circuit early next week."  [Blakely Decl., ¶ 14, Ex. M.]

6       Instead of filing an appeal, on the next court day, Monday, April 30, 2018,

7  Plaintiff and her counsel reversed course and filed the Second Clifford Action.

8  [Blakely Decl., Ex. J.]

9       On June 6, 2018, Plaintiff filed the Third Clifford Action against Mr. Davidson

10  and Mr. Cohen.  [Blakely Decl., Ex. K.]  In the Third Clifford Action, Plaintiff alleges

11  that Mr. Cohen aided and abetted Mr. Davidson in a breach of his fiduciary duty owed

12  to Ms. Clifford.  [Blakely Decl., Ex. K, ¶¶ 74-82.]  This claim is focused on

13  communications between Mr. Davidson and Mr. Cohen concerning Ms. Clifford's

14  performance of the Settlement Agreement and Mr. Davidson's attempt to prevent Ms.

15  Clifford from breaching the same.  [*Id*.]

16       On June 14, 2018, counsel for Mr. Cohen conferred with Plaintiff's counsel and

17  Mr. Davidson, and advised them Mr. Cohen intended to bring the instant *Ex Parte*

18  Application.  [Blakely Dec., ¶ 29.]  In response, Plaintiff's counsel advised that

19  Plaintiff would oppose the relief requested herein.  *Id*.  Despite Mr. Cohen's counsel's

20  request to meet and confer with Mr. Avenatti in person, Mr. Avenatti insisted that the

21  meet and confer take place via telephone.  [*Id*., Ex. AA.]  Presumably, this was

22  because Mr. Avenatti was in New York in connection with his numerous television

23  appearances.  Counsel for Mr. Cohen has also informed counsel for Defendant

24  Donald J. Trump, Charles Harder, of Mr. Cohen's intent to bring the instant *Ex Parte*

25  Application, and he has advised that Mr. Trump will not oppose this Application.

26  [*Id.*]

27

28

## III.   MR. AVENATTI'S PUBLICITY TOUR

### A.   Mr. Avenatti's Television Appearances

Since the filing of this action on March 6, 2018, Mr. Avenatti has appeared on television a minimum of 121 times to discuss the facts and circumstances surrounding this case. [Blakely Decl., Ex. C.]

In the course of Mr. Avenatti's campaign, he has attacked Mr. Cohen by, among other things, routinely accusing Mr. Cohen of engaging in criminal conduct for which Mr. Avenatti contends Mr. Cohen will be indicted, claiming Mr. Cohen has no credibility, and disparaging the propriety of the professional services he has provided to others.

In addition to the interviews quoted above, during an April 15, 2018 interview with Jake Tapper on *CNN*, Mr. Avenatti specifically stated that Mr. Cohen may be indicted for bank fraud, wire fraud and/or campaign finance violations:

> **Tapper:**   Do you have any specific examples of things Mr. Cohen has done that you or the U.S. Attorney's Office believe to be criminal?
>
> **Avenatti:**   Well, I think there's a number of possibilities, Jake. I think he could be indicted for bank fraud, wire fraud, campaign finance violations. I think there's a whole host of potential criminal conduct that could be charged. You know, according to his attorneys, the FBI seized thousands, if not millions, of pages of documents in connection with the raids going back some 30 years. This guy is radioactive right now, and this is not going to end well, Jake.

[Blakely Decl., ¶ 28, Ex. I.]

During an April 20, 2018 interview with Bill Maher on *Real Time* on HBO, Mr. Avenatti stated:

| | | |
|---|---|---|
| 1 | Maher: | How do you actually make Donald Trump show up [to a |
| 2 | | deposition]? |
| 3 | Avenatti: | Well, we get a federal judge to order him to appear for a |
| 4 | | deposition. |
| 5 | Maher: | and a federal judge you think will do that? |
| 6 | Avenatti: | I do.  I think Judge Otero here in Los Angeles who is one of |
| 7 | | the best. |
| 8 | Maher: | and it can be any federal judge? |
| 9 | Avenatti: | It could be any federal judge, but it's going to be Judge Otero |
| 10 | | in Los Angeles. |
| 11 | Maher: | Because he f….d her here in Los Angeles? |
| 12 | Avenatti: | No, because we filed here in Los Angeles. |
| 13 | Maher: | It's not like I'm letting the cat out of the bag. |
| 14 | Avenatti: | But they did spend some time at the Beverly Hills Hotel, |
| 15 | | talking about Shark Week…. Michael Cohen knows where |
| 16 | | almost all of the bodies are buried and I think he is going to |
| 17 | | sing like a canary. |
| 18 | Maher: | I agree. |
| 19 | Avenatti: | Here's the problem. |
| 20 | Maher: | How do you know he's going to fold? |
| 21 | Avenatti: | I know he's going to fold. Because here's the problem.  When |
| 22 | | you have a fixer, you need two things, you need a guy that's |
| 23 | | tough, you need a guy who's smart.  This guy is neither tough |
| 24 | | or smart….The basis for the FBI warrants was the fact that |
| 25 | | the FBI and U.S. Attorney Office had reason to believe that |
| 26 | | Michael Cohen was undertaking efforts to destroy |
| 27 | | documents. |
| 28 | [Blakely Decl., ¶ 15, Bill Maher Interview, at 2:30.] | |

On April 25, 2018, during an interview with Don Lemon on *CNN*, Mr. Avenatti stated:

> Well I haven't been wrong yet in this case. I haven't been wrong about a single thing that I predicted in this case. I was the first one to talk on August – on April 5th about the fact that I thought too much faith had been put in Michael Cohen and then ultimately there is going to be serious consequences of that and then ultimately he was going to be charged.

[Blakely Decl., ¶ 16, Ex. O.]

On May 8, 2018, during an interview with Anderson Cooper on *CNN*, Mr. Avenatti stated:

> Cooper:     I mean, if you are looking for some form of expertise from Michael Cohen, understanding of President Trump, access to President Trump, that would seem to be his biggest calling card of the last several years.
>
> Avenatti:   Well, that actually would be his only calling card, legitimate calling card of the last several years. But look, he shouldn't be selling access to the president of the United States, to the people's president. I mean, that's—Michael Cohen should not be selling that access."

[Blakely Decl., ¶ 17, Ex. P.]

On May 8, 2018, during an interview with Lawrence O'Donnell on *MSNBC*, Mr. Avenatti stated:

> So all of the sudden, beginning in 2017, after Donald Trump is elected president of the United States, Michael Cohen becomes an expert, an expert in the following. Business and real estate consulting, capital raising on behalf of the oligarch entity. Novartis, evidently, he is a pharmaceutical expert now we find out. He is an expert on access to the – or insight into the administration. We already know he is a phenomenal attorney. That's

1   been well established over the last two month, especially as it relates to

2   drafting contracts and NDAs.  Of course, I'm being sarcastic.

3   [Blakely Decl., ¶ 18, Ex. Q.]

4       On May 9, 2018, during an interview with Rachel Maddow on *MSNBC*, Mr.

5   Avenatti stated:

6       And by the way, I should have apologized when I sat down. I'm going to

7       apologize now.  I hope everyone understands I'm only a lawyer. So, I'm

8       not a doctor or an accountant. I'm not an expert in FCC or

9       telecommunications or real estate or business consulting or capital raising.

10      I'm sure I've left something out.  I'm not the Renaissance Man, the

11      Michelangelo, the Leonardo Da Vinci that Michael Cohen is

12      clearly….[Mr. Cohen] is being hired under the guise I guess…of doing

13      things he is completely unqualified to do.

14  [Blakely Decl., ¶ 19, Ex. R.]

15      On May 9, 2018, during an interview of Alisyn Camerota on *CNN*, Mr.

16  Avenatti stated:

17      Well, I think a Russian oligarch cares about currying favor with the

18      president of the United States. And I also think it's impatiently [sic]

19      improper for Michael Cohen to be selling access to the president of the

20      United States. We're talking about the president of the United States here.

21      And here you have Michael Cohen, his right hand attorney, who appears

22      to have been selling access to the Russians, to foreign – other foreign

23      entities – and to multinational corporations.

24  [Blakely Decl., ¶ 20, Ex. S.]

25      On May 18, 2018, during another interview with Lawrence O'Donnell on

26  *MSNBC*, Mr. Avenatti stated:

27      We have disclosed some very damaging, accurate information relating to

28      Michael Cohen and his activities…Michael Cohen and his attorneys don't

1   like us because we speak the truth. They don't like us because we disclose
2   accurate information about the shenanigans and illegal acts that have
3   occurred over the last two years plus between Michael Cohen and Mr.
4   Trump.   It's that clear.   It's obvious why they want to take us off the
5   playing field, because we are kicking a lot of butt, Lawrence.

6   [Blakely Decl., ¶ 21, Ex. T.]

7       On May 22, 2018, during an interview with Ari Melber on *MSNBC*, Mr.
8   Avenatti stated:

9       There's been little doubt over the last three months that Michael Cohen is
10      going to be indict [sic] for some very serious offenses.   And that in turn,
11      as I predicted for some time, and I will continue to predict it's going to
12      have a huge impact potentially on Mr. Trump….I described him weeks
13      ago as radioactive, and I meant it then and I mean it today.

14  [Blakely Decl., ¶ 22, Ex. U.]

15      On May 30, 2018, during another interview with Ari Melber on *MSNBC*, Mr.
16  Avenatti stated:

17      Michael Cohen has zero credibility.   We are going to prove it.   This is a
18      man who has a history of thuggish behavior.   There is no question in my
19      mind that Michael Cohen, a, is going to be indicted within the next three
20      months…

21  [Blakely Decl., ¶ 23, Ex. V.]

22      A review of the additional interviews set forth in Exhibit C reveals that
23  Mr. Avenatti has made countless additional statements to the press denigrating
24  Mr. Cohen.

25      **B.      Mr. Avenatti's Tweets Concerning the Case and/or Mr. Cohen**

26      Since the filing of this action Mr. Avenatti has also issued a least 439 tweets
27  relating to this case and/or Mr. Cohen to his 538,000 Twitter followers.   [Blakely
28  Decl., ¶ 5, Ex. D.]   Many of these tweets denigrate Mr. Cohen and make accusations

1  similar to those made by Mr. Avenatti in his television appearances.

2      For example, in a May 10, 2018 tweet, after leaking confidential

3  financial information purportedly related to Mr. Cohen via a report as detailed

4  below (much of it being incorrect), Mr. Avenatti stated:

5          Good thing Mr. Cohen and his atty Mr. Ryan are so focused on $25k

6          relating to a different "Cohen" as opposed to the other $3MM in

7          transactions that are correctly stated in our report and subject Mr. Cohen

8          to jail time.

9  [Blakely Decl., ¶ 24, Ex. W, p. 4.]

10      In a May 10, 2018 tweet, Mr. Avenatti stated:

11         On April 9, the FBI raided Mr. Cohen's home, office and hotel room.

12         Within 48 hours, Mr. Cohen sent the below email to Mr. Davidson. Why?

13         They had no ongoing legal matter at the time. Was it part of an attempt by

14         Mr. Cohen to obstruct justice or worse? #basta

15  [Blakely Decl., ¶ 24, Ex. W, p. 3.]

16      In a May 11, 2018 tweet, Mr. Avenatti stated:

17         Knowing what we know now, no wonder Mr. Cohen was doing everything

18         he could to interfere with Ms. Daniels' efforts to get new counsel. He was

19         desperate to avoid the cover-up from surfacing and was afraid that

20         competent counsel would expose him and Mr. Trump. #MoreToCome

21         #Basta

22  [Blakely Decl., ¶ 24, Ex. W, p. 6.]

23      In a May 29, 2018 tweet, Mr. Avenatti stated:

24         Mr. Cohen will do anything and everything to distract away from the

25         serious charges he will likely face and the complicity of Mr. Trump.

26         Distract, distract, distract. He should be producing bank stmts for EC, LLC

27         to the American people instead of lodging personal attacks. #Basta

28  [Blakely Decl., ¶ 24, Ex. W, p. 12.]

In a May 31, 2018 tweet, Mr. Avenatti stated:

> If you thought the audio released yesterday of thug Cohen berating and threatening @timkmak was disturbing and disgusting, wait until the #TrumpTapes are made public. A whole different level. #ReleaseTheTapes #GameChanger #Basta

[Blakely Decl., ¶ 24, Ex. W, p. 14.]

In a June 1, 2018 tweet, which included an innocuous email between Mr. Cohen and Keith Davidson, Mr. Avenatti stated:

> See below. Why were Mr. Cohen and Mr. Davidson communicating in this fashion earlier this year? It was entirely inappropriate and prejudicial to my client. If Mr. Cohen had nothing to hide, then why go to these efforts to cover it up? #TrumpTapes #Basta

[Blakely Decl., ¶ 24, Ex. W, p. 15.]

In a June 12, 2018 tweet, Mr. Avenatti stated:

> For those keeping track, approximately 57 days ago, I predicted that Mr. Cohen would be arrested and indicted within 90 days... I also stated it would pose a serious problem for Mr. Trump.  #ClockTicking #Basta

[Blakely Decl., ¶ 24, Ex. W, p. 17.][3]

## C.    **Mr. Avenatti's Leak of Confidential Financial Information**

Mr. Avenatti's conduct reached a new level of egregiousness when on May 8, 2018, he released what he characterized as an Executive Summary of what he has titled "Project Sunlight."  [Blakely Decl., ¶ 25, Ex. X, "Project Sunlight" Report.] This document is concerning for a number of reasons, including the number of blatantly incorrect statements it contains.  For example, Mr. Avenatti made a series of

---

[3] Additional examples of tweets denigrating Mr. Cohen posted by Mr. Avenatti since the inception of this action are included in Exhibit W to the Declaration of Brent Blakely.

claims under the heading "Possible Fraudulent and Illegal Financial Transactions." At the outset, many of the confidential bank records disclosed in this report were from other Michael Cohens, i.e. not the Michael Cohen in this case.  Of those that do relate to Defendant Michael Cohen, much is incorrect.

Moreover, Mr. Avenatti suggested that a Russian Oligarch reimbursed that $130,000 payment made to Plaintiff:

> After significant investigation, we have discovered that Mr. Trump's atty Mr. Cohen received approximately $500,000 in the mos. after the election from a company controlled by a Russian Oligarch with close ties to Mr. Putin.  These monies may have reimbursed the $130k payment.

[Blakely Decl., ¶ 24, Ex. W, p. 18.]

More troubling is how Mr. Avenatti obtained these confidential bank records, which contained the identity of, and payments made by, Mr. Cohen's business clients such as AT&T and Novartis.  These business clients have not been previously identified in public and the Inspector General of the U.S. Department of Treasury has initiated an investigation into whether these bank records were "improperly disseminated."  [Blakely Decl., ¶¶ 26-27, Ex. Y, 5/9/18 article by *The Hill*, Ex. Z, 5/9/18 article by *The Washington Post*.]  The only reasonable conclusion is that Mr. Avenatti is not lawfully in possession of these records, which have absolutely nothing to with the validity of the Settlement Agreement at issue in this case and were illegally published by him for no other reason than to procure more media attention to the detriment of, and prejudice to, Mr. Cohen.

## IV.   GOOD CAUSE EXISTS FOR A RESTRAINING ORDER

As discussed above, Plaintiff and her counsel have embarked on an unprecedented publicity tour wherein they have routinely accused Mr. Cohen of criminal conduct, maligned Mr. Cohen, and have otherwise done everything within their means to unfairly prejudice Mr. Cohen.  As Judge Wood has already observed,

this conduct on behalf of Plaintiff and her counsel violates the ethical rules governing attorneys.

California Code of Professional Conduct, Rule 5-100 states:  "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

California Code of Professional Conduct, Rule 5-120 states:

A member who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the member knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

As Justice Oliver Wendell Holmes wrote, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907) (per Holmes, J.); *see Estes v. Texas*, 381 U.S. 532, 540 (1965).  Because the potential for injury to the integrity of the judicial process is significant in cases involving trial publicity, "[t]his objective can be obtained only if publicity created by private litigants is subject to reasonable restrictions."  *Levine v. U.S.*, 764 F. 2d at 597.

The right to a fair trial, both in civil and criminal cases, is of the utmost importance to the administration of justice.  Many courts have held that a trial judge has the authority to adopt reasonable measures to avoid injury to the parties by reason of prejudicial or inflammatory publicity and trial orders should be issued which avoid improper attempts to undertake trials in the press and prejudice opposing litigants. *Levine v. U.S.* 764 F.2d at 595.

Litigants should not be forced to engage in corrections in the press of another parties' outright misstatements regarding Orders of this Court. *Sheppard v. E.L. Maxwell*, 384 U.S. 333, 350-351 (1966).

> [T]he Court has also pointed out that legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper....[I]t [press releases] must not be allowed to divert the trial from the 'very purpose of a court system to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures."

*Id.* at 350.

"The Supreme Court has recognized that conflict between freedom of speech and the right to a fair trial is no less troubling in the non-criminal context." *Bailey v. Sys. Innovation, Inc*., 852 F.2d 93, 97 (3d Cir. 1988); *see also Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 586 (1976) ("So basic to our jurisprudence is the right to a fair trial that it has been called 'the most fundamental of all freedoms.'" (Brennan, J., concurring) (quoting *Estes v. Texas*, 381 U.S. 532, 540 (1965)).

Further, "the case for restraints on trial participants is especially strong with respect to attorneys." *Sheppard v. Maxwell*, 384 U.S. 333, 360-63 (1966).  In the case of attorneys' representations to media, courts should analyze the requested restraint in the context of the special relationship that exists between attorneys and the court system.  Justice Brennan summarized that relationship as follows:

> As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice. It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases and to impose suitable limitations whose transgression could result in disciplinary procedures.

1   *Nebraska Press Assoc.*, 427 U.S. at 601 n. 27 (Brennan, J., concurring) (citation

2   omitted); *see also Levine v. U.S.*, 764 F.2d at 595.  In *Levine*, the Ninth Circuit noted

3   that almost all courts considering restraining orders against trial participants have

4   upheld these restraints.  *Levine v. U.S.*, 764 F.2d at 596.

5       Finally, limitation orders on trial participants are constitutional and appropriate,

6   so long as they are not overbroad and vague, and are tailored to the specific harm at

7   issue. *Levine v. U.S.*, 764 F.2d at 595

8       While the press and other third-parties are free to attend all of the formal

9   proceedings before the District Court and to report anything that happens, the

10  attorneys are bound by California's Rules of Professional Conduct.  In the present

11  case, Plaintiff's counsel, in a quest for his own personal notoriety, has shown a

12  complete disregard of the ethical obligations he is sworn to abide by as an officer of

13  the court.

14       If Mr. Avenatti chooses, as he did in the Cohen SDNY Action, to play the role

15  of a talk show guest rather than an attorney, then he is free to comment on this case.

16  However, if he remains as attorney of record for Ms. Clifford, he must comply with

17  the California Rules of Professional Conduct, and his publicity tour, which threatens

18  to turn these legal proceedings into a circus, must come to an end.

19       Accordingly, Mr. Cohen respectfully requests that this Court issue an Order

20  proscribing Mr. Avenatti from making statements to the press and/or public regarding

21  the following:

22       (1) The character, credibility, or reputation of a party and/or their respective

23  counsel;

24       (2) The identity of a witness or the expected testimony of a party or a witness;

25       (3) The contents of any testimony, admission, or statement given by a

26  defendant or that person's refusal or failure to make a statement;

27       (4) The identity or nature of physical evidence expected to be presented or the

28  absence of such physical evidence;

1    (5) The strengths or weaknesses of the case of either party; and

2    (6) Any other information the lawyer knows or reasonably should know is

3   likely to be inadmissible as evidence and would create a substantial risk of prejudice

4   if disclosed.

5   *See Levine v. U.S.*, 764 F.2d at 599.

6   **V.**    **CONCLUSION**

7    For the foregoing reasons, Michael Cohen respectfully requests that the Court

8   grant the instant *Ex Parte* Application and issue an order restraining Mr. Avenatti

9   from communicating with the press and/or public regarding the merits of this case.

10

11   Dated: June 14, 2018                BLAKELY LAW GROUP

12

13                                By:  */s/ Brent H. Blakely*

                                        BRENT H. BLAKELY
14                                Attorneys for Defendants
                                  ESSENTIAL CONSULTANTS, LLC and
15                                MICHAEL COHEN

16

17

18

19

20

21

22

23

24

25

26

27

28