# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 21, 2018

**BY EMAIL**
Guy Petrillo, Esq.
Petrillo Klein & Boxer LLP
655 Third Avenue, 22nd Floor
New York, NY 10017

     Re: <u>United States v. Michael Cohen</u>, 18 Cr. _____ (WHP)

Dear Mr. Petrillo:

     This prosecution and the protection against prosecution, with respect to tax offenses, set forth below have been approved by the Tax Division, Department of Justice.

     On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Michael Cohen (the "defendant") to Counts One through Eight of the above-referenced Information (the "Information").

     Counts One through Five of the Information charge the defendant with evasion of personal income tax, for the calendar years 2012, 2013, 2014, 2015, and 2016, respectively, in violation of 26 U.S.C. § 7201.  Counts One through Five each carry a maximum term of imprisonment of 5 years; a maximum term of supervised release of 3 years; a maximum fine of $100,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

     Count Six of the Information charges the defendant with making false statements to a financial institution in connection with a credit decision, from at least in or about February 2015, up to and including in or about April 2016, in violation of 18 U.S.C. § 1014.  Count Six carries a maximum term of imprisonment of 30 years; a maximum term of supervised release of 5 years; a maximum fine of $1,000,000; and a $100 mandatory special assessment.

     Count Seven of the Information charges the defendant with willfully causing an unlawful corporate contribution, from at least in or about June 2016, up to and including in or about October 2016, in violation of 52 U.S.C. §§ 30118(a) & 30109(d)(1)(A), and 18 U.S.C. § 2(b).  Count Seven carries a maximum term of imprisonment of 5 years; a maximum term of supervised release of 3 years; a maximum fine of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count Eight of the Information charges the defendant with making an excessive campaign contribution, on or about October 27, 2016, in violation of 52 U.S.C. §§ 30116(a)(1)(A), 30116(a)(7) & 30109(d)(1)(A), and 18 U.S.C. § 2(b).  Count Eight carries a maximum term of imprisonment of 5 years; a maximum term of supervised release of 3 years; a maximum fine of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

The total maximum term of imprisonment on Counts One through Eight is 65 years.

It is further understood that at least two weeks prior to the date of sentencing, the defendant shall file with the IRS, and provide copies to the Office, accurate amended personal tax returns for the calendar years 2012 through 2016.

In consideration of his plea to the above offenses, the defendant will not be further prosecuted criminally by this Office and, with respect to tax offenses, the Tax Division, Department of Justice, for any crimes relating to: (1) evasion of payment of income taxes, for the calendar years 2012 through 2016, as charged in Counts One through Five of the Information; (2) making false statements to a financial institution in connection with a credit decision, from at least in or about February 2015, up to and including in or about April 2016, as charged in Count Six of the Information; (3) causing an unlawful corporate contribution, from at least in or about June 2016 through in or about August 2016, as charged in Count Seven of the Information; (4) making an excessive campaign contribution, on or about October 27, 2016, as charged in Count Eight of the Information, and (5) making false statements to a financial institution in connection with a credit decision by Sterling National Bank, from at least in or about October 2016, up to an including in or about April 2018, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.*  In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant. This Agreement does not provide any protection against prosecution except as set forth above. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Count Six of the Information and agrees to forfeit to the United States, pursuant to pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting or derived from, proceeds obtained directly or indirectly, as a result of the commission of offense alleged in Count Six.  It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

The defendant further agrees to make restitution in an amount ordered by the Court in accordance with Sections 3663, 3663A and 3664 of Title 18, United States Code, and that the obligation to make such restitution shall be made a condition of probation, *see* 18 USC §

3563(b)(2), or of supervised release, *see* 18 USC § 3583(d), as the case may be.  In particular, pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A(a)(3), the defendant agrees to pay restitution to the IRS for the amount of additional taxes, penalties and interest due as a result of his filing of tax returns for tax years 2012 through 2016, and as determined by the Internal Revenue Service ("IRS"), which based on current information is $1,495,305 in past taxes due and owing for calendar years 2012 through 2016. The defendant also agrees not to contest the applicability of civil fraud penalties and interest with respect to the aforementioned taxes due and owing as restitution.   The restitution amount shall be paid according to a plan established by the Court.  If the Court orders the defendant to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of supervised release or probation, the IRS will use the restitution order as the basis for a civil assessment.  See 26 U.S.C. § 6201(a)(4)(C).  Neither the existence of a restitution payment schedule nor the defendant's timely payment of restitution according to that schedule will preclude: (1) the IRS and the defendant from reaching an agreed upon schedule for payments of past due taxes, civil penalties and interest, or (2) the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

1.   The November 1, 2016 Guidelines apply to these offenses.

2.   Because the offenses charged in Counts One through Eight are determined largely on the basis of the total amount of harm or loss, they group pursuant to U.S.S.G. § 3D1.2(d) (the "Group").

3.   Because different Guidelines apply to the offenses charged in Counts One through Eight,[1] pursuant to U.S.S.G. § 3D1.3(b), the Guideline that results in the highest offense level for the Group applies.[2]  Here, application of U.S.S.G. § 2B1.1 results in the highest offense level and therefore applies to the Group.

4.   Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7 because at least one offense comprising the Group has a statutory maximum term of imprisonment of 20 years or more.

---

[1] The applicable Guideline to the offenses charged in Counts One through Five is U.S.S.G. § 2T1.1.  The applicable Guideline to the offense charged in Count Six is U.S.S.G. § 2B1.1.  The applicable Guideline to the offenses charged in Counts Seven and Eight is U.S.S.G. § 2C1.8.

[2] There is no stipulation regarding whether the tax counts group with the bank fraud and campaign finance counts under U.S.S.G. § 3D1.2.  Under the Government's grouping analysis, set forth above, all counts group under Section 3D1.2, resulting in an offense level of 24.  The defendant believes that the tax counts do not group with the false statements and campaign finance counts.  Under the defendant's grouping analysis, the Guidelines offense level would be 23.  The parties agree not to appeal or challenge collaterally the Court's determination on the grouping analysis.

5. An additional 16 levels are added pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the offenses that comprise the Group involved more than $1,500,000, but less than $3,500,000.

6. An additional two levels are added pursuant to U.S.S.G. § 2B1.1(b)(10) because the Group involved the use of sophisticated means, including the defendant's creation of shell companies and fake invoices.

7. An additional two levels are added pursuant to U.S.S.G. § 3B1.3 because the defendant used a special skill—to wit, his education, training and licensing as an attorney in New York State—in a manner that significantly facilitated the commission and concealment of the offense comprising the Group.

8. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 24 under the Government's calculations and 23 under the defendant's calculations.

**B. Criminal History Category**

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

**C. Sentencing Range**

Based upon the calculations set forth above, the defendant's Guidelines range is either 51 to 63 months' imprisonment under the Government's calculations, or 46 to 57 months' imprisonment under the defendant's calculations. Accordingly, the stipulated Guidelines range is 46 to 63 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At an offense level of 23 or 24, the applicable fine range is $20,000 to $1,000,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range of 46 to 63 months' imprisonment (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's Criminal History Category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, see U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States

Page 6

Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 46 to 63 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal any fine that is less than or equal to $1,000,000, and the Government agrees not to appeal any fine that is greater than or equal to $20,000. The defendant also agrees not to appeal any order of restitution that is less than or equal to $1,495,305, and the Government agrees not to appeal any order of restitution greater than or equal to the same. Finally, the defendant agrees not to appeal any special assessment that is less than or equal to $800. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred

by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office and, to the extent set forth above, the Tax Division, Department of Justice.

Page 8

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant.  No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

ROBERT KHUZAMI,
Attorney for the United States
Acting Under Authority Conferred
By 28 U.S.C. § 515

By:

Andrea Griswold
Rachel Maimin
Thomas McKay
Nicolas Roos
Assistant United States Attorneys
(212) 637-2200

APPROVED:

RUSSELL CAPONE
Chief, Public Corruption Unit
EDWARD B. DISKANT
Deputy Chief, Public Corruption Unit

AGREED AND CONSENTED TO:

_____
Michael Cohen

_____8/21/18_____
DATE

APPROVED:

_____
Guy Petrillo, Esq.
Attorney for Michael Cohen

_____8/21/18_____
DATE

Rev. 04.24.2018

# Exhibit B

ORIGINAL                                    Judge Pauley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :      **INFORMATION**

            - v. -                   :      18 Cr. ___ (WHP)

MICHAEL COHEN,                       :      **18 CRIM  602**

            Defendant.               :

                                     :      USDC SDNY
                                            DOCUMENT
- - - - - - - - - - - - - - - - - - x       ELECTRONICALLY FILED
                                            DOC #:_____
                                            DATE FILED: AUG 2 1 2018

            The United States Attorney charges:

                          **Background**

                        The Defendant

        1.    From in or about 2007 through in or about January
2017, MICHAEL COHEN, the defendant, was an attorney and employee
of a Manhattan-based real estate company (the "Company").  COHEN
held the title of "Executive Vice President" and "Special Counsel"
to the owner of the Company ("Individual-1").

        2.    In or about January 2017, COHEN left the Company
and began holding himself out as the "personal attorney" to
Individual-1, who at that point had become the President of the
United States.

        3.    In addition to working for and earning income from
the Company, at all times relevant to this Information, MICHAEL
COHEN, the defendant, owned taxi medallions in New York City and
Chicago worth millions of dollars.  COHEN owned these taxi

medallions as investments and leased the medallions to operators who paid COHEN a portion of the operating income.

### Tax Evasion Scheme

4.    Between tax years 2012 and 2016, MICHAEL COHEN, the defendant, engaged in a scheme to evade income taxes by failing to report more than $4 million in income, resulting in the avoidance of taxes of more than $1.4 million due to the IRS.

5.    In or about late 2013, MICHAEL COHEN, the defendant, retained an accountant ("Accountant-1") for the purpose of handling COHEN's personal and entity tax returns. After being retained, Accountant-1 filed amended 2011 and 2012 Form 1040 tax returns for COHEN with the Internal Revenue Service ("IRS"). For tax years 2013 through 2016, Accountant-1 prepared individual returns for COHEN and returns for COHEN's medallion and real estate entities. To confirm he had reviewed and approved these returns, both COHEN and his wife signed a Form 8879 for tax years 2013 through 2016, and filed manually for tax year 2012. Each Form 8879 contained an affirmation, "[u]nder penalties of perjury," that COHEN "examined a copy of [his] electronic individual Income tax return and accompanying schedules and statements" and "to the best of [his] knowledge and belief, it is true, correct, and accurately lists all amounts and sources of income [COHEN] received during the tax year."

2

6.    Between 2012 and the end of 2016, MICHAEL COHEN,
the defendant, earned more than $2.4 million in income from a
series of personal loans made by COHEN to a taxi operator to whom
COHEN leased certain of his Chicago taxi medallions ("Taxi
Operator-1"), none of which he disclosed to the IRS.

7.    Specifically, in March 2012, pursuant to a loan
agreement, Taxi Operator-1 solicited a $2 million personal loan
from MICHAEL COHEN, the defendant, so that Taxi Operator-1 could
cover various personal and taxi business-related expenses.   On
April 28, 2014, Taxi Operator-1 and his wife entered into a new
loan agreement with COHEN, increasing the $2 million loan, the
principal of which remained unpaid, to $5 million.   Finally, in
2015, Taxi Operator-1 and his wife entered into an amended loan
agreement with COHEN, increasing the principal amount of the loan
to $6 million.   Each loan was interest-only, carried an interest
rate in excess of 12 percent, and was collateralized by either
Chicago taxi medallions or a property in Florida owned by Taxi
Operator-1 and his family.   COHEN funded the majority of his loans
to Taxi Operator-1 from a line of credit with an interest rate of
less than 5 percent.

8.    For each of the loans, at the direction of MICHAEL
COHEN, the defendant, Taxi Operator-1 made the interest payment
checks out to COHEN personally, and the checks were deposited in

3

COHEN's personal bank account, or an account in the name of his wife.   COHEN did not provide records that would have allowed Accountant-1 to reasonably identify this income.

9.   Pursuant to the terms of the loan agreements between MICHAEL COHEN, the defendant, and Taxi Operator-1, COHEN received more than $2.4 million in interest payments from Taxi Operator-1 between 2012 and 2016, and reported none of that income to the IRS.   COHEN intended to hide the income from the IRS in order to evade taxes.

10.   As a further part of the scheme to evade paying income taxes, MICHAEL COHEN, the defendant, also concealed more than $1.3 million in income he received from another taxi operator to whom COHEN leased certain of his New York medallions ("Taxi Operator-2").   This income took two forms.   First, COHEN did not report the substantial majority of a bonus payment of at least $870,000, which was made by Taxi Operator-2 in or about 2012 to induce COHEN to allow Taxi Operator-2 to operate certain of COHEN's medallions.   Second, between 2012 and 2016, COHEN concealed substantial additional taxable income he received from Taxi Operator-2's operation of certain of COHEN's taxi medallions.

11.   To ensure the concealment of this additional operator income, MICHAEL COHEN, the defendant, arranged to receive a portion of the medallion income personally, as opposed to having

4

the income paid to COHEN's medallion entities.   Paying the medallion entities would have alerted Accountant-1, who prepared the returns for those entities, to the existence of the income such that it would have been included on COHEN's tax returns.

12.   As a further part of his scheme to evade taxes, MICHAEL COHEN, the defendant, also hid the following additional sources of income from Accountant-1 and the IRS:

a.   A $100,000 payment received, in 2014, for brokering the sale of a piece of property in a private aviation community in Ocala, Florida.

b.   Approximately $30,000 in profit made, in 2015, for brokering the sale of a Birkin Bag, a highly coveted French handbag that retails for between $11,900 to $300,000, depending on the type of leather or animal skin used.

c.   More than $200,000 in consulting income earned in 2016 from an assisted living company purportedly for COHEN's "consulting" on real estate and other projects.

### COUNTS 1 THROUGH 5
### (Evasion of Assessment of Income Tax Liability)

The United States Attorney further charges:

13.   The allegations contained in paragraphs 1 through 12 are repeated and realleged as though fully set forth herein.

14.   From on or about January 1 of each of the calendar years set forth below, through the present, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, who during each calendar year set forth below was married, did willfully and knowingly attempt to evade and defeat a substantial part of the income tax due and owing by COHEN and his wife to the United States by various means, including by committing and causing to be committed the following affirmative acts, among others: preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, in or about the month of April of each said calendar year, a U.S. Individual Income Tax Return, Form 1040, for each of the calendar years set forth below, on behalf of himself and his wife, which falsely omitted substantial amounts of income in or about the years listed below.

| Count | Tax Year | Unreported Income | Tax Loss |
|-------|----------|-------------------|----------|
| 1 | 2012 | $893,750 | $192,188 |
| 2 | 2013 | $499,400 | $299,229 |
| 3 | 2014 | $670,667 | $232,883 |
| 4 | 2015 | $969,616 | $375,390 |
| 5 | 2016 | $1,100,618 | $395,615 |

(Title 26, United States Code, Section 7201.)

### False Statements to a Bank

The United States Attorney further charges:

15.   In or about 2010, MICHAEL COHEN, the defendant, through companies he controlled, executed a $6.4 million promissory note with a bank ("Bank-1"), collateralized by COHEN's taxi medallions and personally guaranteed by COHEN. A year later, in 2011, COHEN personally obtained a $6 million line of credit from Bank-1 (the "Line of Credit"), also collateralized by his taxi medallions. By February 2013, COHEN had increased the Line of Credit from $6 million to $14 million, thereby increasing COHEN's personal medallion liabilities at Bank-1 to more than $20 million.

16.   In or about November 2014, MICHAEL COHEN, the defendant, refinanced his medallion debt at Bank-1 with another bank ("Bank-2"), which shared the debt with a New York-based credit union (the "Credit Union"). The transaction was structured as a package of individual loans to the entities that owned COHEN's New York medallions, personally guaranteed by COHEN. Following the loans' closing, COHEN's medallion debt at Bank-1 was paid off with funds from Bank-2 and the Credit Union, and the Line of Credit with Bank-1 was closed.

17.   In or about 2013, in connection with a successful application for a mortgage from another Bank ("Bank-3") for his

7

Park Avenue condominium (the "2013 Application"), MICHAEL COHEN,
the defendant, disclosed only the $6.4 million medallion loan he
had with Bank-1 at the time.  As noted above, COHEN also had a
larger, $14 million Line of Credit with Bank-1 secured by his
medallions, which COHEN did not disclose in the 2013 Application.

18.  In or around February 2015, MICHAEL COHEN, the
defendant, in an attempt to secure financing from Bank-3 to
purchase a summer home for approximately $8.5 million, again
concealed the $14 million Line of Credit.  Specifically, in
connection with this proposed transaction, Bank-3 obtained a 2014
personal financial statement COHEN had provided to Bank-2 while
refinancing his medallion debt.  Bank-3 questioned COHEN about the
$14 million Line of Credit reflected on that personal financial
statement, because COHEN had omitted that debt from the 2013
Application to Bank-3.   COHEN misled Bank-3, stating, in
substance, that the $14 million Line of Credit was undrawn and
that he would close it.  In truth and in fact, COHEN had
effectively *overdrawn* the Line of Credit, having swapped it out
for a fully drawn, larger group of loans shared by Bank-2 and the
Credit Union upon refinancing his medallion debt.  When Bank-3
informed COHEN that it would only provide financing if COHEN closed
the Line of Credit, COHEN lied again, misleadingly stating in an

email: "The medallion line was closed in the middle of November 2014."

19. In or around December 2015, MICHAEL COHEN, the defendant, contacted Bank-3 to apply for a home equity line of credit ("HELOC"). In so doing, COHEN again significantly understated his medallion debt.

20. Specifically, in the HELOC application, MICHAEL COHEN, the defendant, together with his wife, represented a positive net worth of more than $40 million, again omitting the $14 million in medallion debt with Bank-2 and the Credit Union. Because COHEN had previously confirmed in writing to Bank-3 that the $14 million Line of Credit had been closed, Bank-3 had no reason to question COHEN about the omission of this liability on the HELOC application. In addition, in seeking the HELOC, COHEN substantially and materially understated his monthly expenses to Bank-3 by omitting at least $70,000 in monthly interest payments due to Bank-2 on the true amount of his medallion debt.

21. In or about April 2016, Bank-3 approved MICHAEL COHEN, the defendant, for a $500,000 HELOC. By fraudulently concealing truthful information about his financial condition, MICHAEL COHEN, the defendant, obtained a HELOC that Bank-3 would otherwise not have approved.

## COUNT 6
### (False Statements to a Bank)

The United States Attorney further charges:

22.  The allegations contained in paragraphs 1 through 3 and 15 through 21 are repeated and realleged as though fully set forth herein.

23.  From at least in or about December 2015 through at least in or about April 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, willfully and knowingly made false statements for the purpose of influencing the action of a financial institution, as defined in Title 18, United States Code, Section 20, upon an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefore, to wit, in connection with an application for a home equity line of credit, COHEN made false statements to Bank-3 about his true financial condition, including about debts for which he was personally liable, and about his cash flow.

(Title 18, United States Code, Sections 1014 and 2.)

10

## Campaign Finance Violations

The United States Attorney further charges:

24.   The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Section 30101, *et seq.*, (the "Election Act"), regulates the influence of money on politics. At all times relevant to the Information, the Election Act set forth the following limitations, prohibitions, and reporting requirements, which were applicable to MICHAEL COHEN, the defendant, Individual-1, and his campaign:

a.   Individual contributions to any presidential candidate, including expenditures coordinated with a candidate or his political committee, were limited to $2,700 per election, and presidential candidates and their committees were prohibited from accepting contributions from individuals in excess of this limit.

b.   Corporations were prohibited from making contributions directly to presidential candidates, including expenditures coordinated with candidates or their committees, and candidates were prohibited from accepting corporate contributions.

25.   On or about June 16, 2015, Individual-1 began his presidential campaign.   While MICHAEL COHEN, the defendant, continued to work at the Company and did not have a formal title with the campaign, he had a campaign email address and, at various times, advised the campaign, including on matters of interest to

11

the press, and made televised and media appearances on behalf of the campaign.

26. At all times relevant to this Information, Corporation-1 was a media company that owns, among other things, a popular tabloid magazine ("Magazine-1").

27. In or about August 2015, the Chairman and Chief Executive of Corporation-1 ("Chairman-1"), in coordination with MICHAEL COHEN, the defendant, and one or more members of the campaign, offered to help deal with negative stories about Individual-1's relationships with women by, among other things, assisting the campaign in identifying such stories so they could be purchased and their publication avoided. Chairman-1 agreed to keep COHEN apprised of any such negative stories.

28. Consistent with the agreement described above, Corporation-1 advised MICHAEL COHEN, the defendant, of negative stories during the course of the campaign, and COHEN, with the assistance of Corporation-1, was able to arrange for the purchase of two stories so as to suppress them and prevent them from influencing the election.

29. *First*, in or about June 2016, a model and actress ("Woman-1") began attempting to sell her story of her alleged extramarital affair with Individual-1 that had taken place in 2006 and 2007, knowing the story would be of considerable value because

12

of the election.  Woman-1 retained an attorney ("Attorney-1"), who in turn contacted the editor-in-chief of Magazine-1 ("Editor-1"), and offered to sell Woman-1's story to Magazine-1.  Chairman-1 and Editor-1 informed MICHAEL COHEN, the defendant, of the story. At COHEN's urging and subject to COHEN's promise that Corporation-1 would be reimbursed, Editor-1 ultimately began negotiating for the purchase of the story.

     30.  On or about August 5, 2016, Corporation-1 entered into an agreement with Woman-1 to acquire her "limited life rights" to the story of her relationship with "any then-married man," in exchange for $150,000 and a commitment to feature her on two magazine covers and publish over one hundred magazine articles authored by her.  Despite the cover and article features to the agreement, its principal purpose, as understood by those involved, including MICHAEL COHEN, the defendant, was to suppress Woman-1's story so as to prevent it from influencing the election.

     31.  Between in or about late August 2016 and September 2016, MICHAEL COHEN, the defendant, agreed with Chairman-1 to assign the rights to the non-disclosure portion of Corporation-1's agreement with Woman-1 to COHEN for $125,000.  COHEN incorporated a shell entity called "Resolution Consultants LLC" for use in the transaction.  Both Chairman-1 and COHEN ultimately signed the agreement, and a consultant for Corporation-1, using

13

his own shell entity, provided COHEN with an invoice for the
payment of $125,000.  However, in or about early October 2016,
after the assignment agreement was signed but before COHEN had
paid the $125,000, Chairman-1 contacted COHEN and told him, in
substance, that the deal was off and that COHEN should tear up the
assignment agreement.  COHEN did not tear up the agreement, which
was later found during a judicially authorized search of his
office.

32.  *Second*, on or about October 8, 2016, an agent for
an adult film actress ("Woman-2") informed Editor-1 that Woman-2
was willing to make public statements and confirm on the record
her alleged past affair with Individual-1.  Chairman-1 and Editor-
1 then contacted MICHAEL COHEN, the defendant, and put him in touch
with Attorney-1, who was also representing Woman-2.  Over the
course of the next few days, COHEN negotiated a $130,000 agreement
with Attorney-1 to himself purchase Woman-2's silence, and
received a signed confidential settlement agreement and a separate
side letter agreement from Attorney-1.

33.  MICHAEL COHEN, the defendant, did not immediately
execute the agreement, nor did he pay Woman-2.  On the evening of
October 25, 2016, with no deal with Woman-2 finalized, Attorney-1
told Editor-1 that Woman-2 was close to completing a deal with
another outlet to make her story public.  Editor-1, in turn, texted

14

MICHAEL COHEN, the defendant, that "[w]e have to coordinate something on the matter [Attorney-1 is] calling you about or it could look awfully bad for everyone." Chairman-1 and Editor-1 then called COHEN through an encrypted telephone application. COHEN agreed to make the payment, and then called Attorney-1 to finalize the deal.

34.  The next day, on October 26, 2016, MICHAEL COHEN, the defendant, emailed an incorporating service to obtain the corporate formation documents for another shell corporation, Essential Consultants LLC, which COHEN had incorporated a few days prior. Later that afternoon, COHEN drew down $131,000 from the fraudulently obtained HELOC, discussed above in paragraphs 19 through 21, and requested that it be deposited into a bank account COHEN had just opened in the name of Essential Consultants. The next morning, on October 27, 2016, COHEN went to Bank-3 and wired approximately $130,000 from Essential Consultants to Attorney-1. On the bank form to complete the wire, COHEN falsely indicated that the "purpose of wire being sent" was "retainer." On or about November 1, 2016, COHEN received from Attorney-1 copies of the final, signed confidential settlement agreement and side letter agreement.

35.  MICHAEL COHEN, the defendant, caused and made the payments described herein in order to influence the 2016

15

presidential election.   In so doing, he coordinated with one or more members of the campaign, including through meetings and phone calls, about the fact, nature, and timing of the payments.

36.   As a result of the payments solicited and made by MICHAEL COHEN, the defendant, neither Woman-1 nor Woman-2 spoke to the press prior to the election.

37.   In or about January 2017, MICHAEL COHEN, the defendant, in seeking reimbursement for election-related expenses, presented executives of the Company with a copy of a bank statement from the Essential Consultants bank account, which reflected the $130,000 payment COHEN had made to the bank account of Attorney-1 in order to keep Woman-2 silent in advance of the election, plus a $35 wire fee, adding, in handwriting, an additional "$50,000." The $50,000 represented a claimed payment for "tech services," which in fact related to work COHEN had solicited from a technology company during and in connection with the campaign.   COHEN added these amounts to a sum of $180,035.   After receiving this document, executives of the Company "grossed up" for tax purposes COHEN's requested reimbursement of $180,000 to $360,000, and then added a bonus of $60,000 so that COHEN would be paid $420,000 in total. Executives of the Company also determined that the $420,000 would be paid to COHEN in monthly amounts of $35,000 over the course of

16

twelve months, and that COHEN should send invoices for these payments.

38.   On or about February 14, 2017, MICHAEL COHEN, the defendant, sent an executive of the Company ("Executive-1") the first of his monthly invoices, requesting "[p]ursuant to [a] retainer agreement, . . . payment for services rendered for the months of January and February, 2017." The invoice listed $35,000 for each of those two months.  Executive-1 forwarded the invoice to another executive of the Company ("Executive-2") the same day by email, and it was approved.  Executive-1 forwarded that email to another employee at the Company, stating: "Please pay from the Trust. Post to legal expenses. Put 'retainer for the months of January and February 2017' in the description."

39.   Throughout 2017, MICHAEL COHEN, the defendant, sent to one or more representatives of the Company monthly invoices, which stated, "Pursuant to the retainer agreement, kindly remit payment for services rendered for" the relevant month in 2017, and sought $35,000 per month.   The Company accounted for these payments as legal expenses.  In truth and in fact, there was no such retainer agreement, and the monthly invoices COHEN submitted were not in connection with any legal services he had provided in 2017.

40. During 2017, pursuant to the invoices described above, MICHAEL COHEN, the defendant, received monthly $35,000 reimbursement checks, totaling $420,000.

### COUNT 7
### (Causing an Unlawful Corporate Contribution)

The United States Attorney further charges:

41. The allegations contained in paragraphs 1 through 3, and 24 through 40 are repeated and realleged as though fully set forth herein.

42. From in or about June 2016, up to and including in or about October 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, knowingly and willfully caused a corporation to make a contribution and expenditure, aggregating $25,000 and more during the 2016 calendar year, to the campaign of a candidate for President of the United States, to wit, COHEN caused Corporation-1 to make and advance a $150,000 payment to Woman-1, including through the promise of reimbursement, so as to ensure that Woman-1 did not publicize damaging allegations before the 2016 presidential election and thereby influence that election.

(Title 52, United States Code, Sections 30118(a) and 30109(d)(1)(A), and Title 18, United States Code, Section 2(b).)

## COUNT 8
### (Excessive Campaign Contribution)

The United States Attorney further charges:

43.   The allegations contained in paragraphs 1 through 3, and 24 through 40 are repeated and realleged as though fully set forth herein.

44.   On or about October 27, 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, knowingly and willfully made and caused to be made a contribution to Individual-1, a candidate for Federal office, and his authorized political committee in excess of the limits of the Election Act, which aggregated $25,000 and more in calendar year 2016, and did so by making and causing to be made an expenditure, in cooperation, consultation, and concert with, and at the request and suggestion of one or more members of the campaign, to wit, COHEN made a $130,000 payment to Woman-2 to ensure that she did not publicize damaging allegations before the 2016 presidential election and thereby influence that election.

(Title 52, United States Code, Sections 30116(a)(1)(A), 30116(a)(7), and 30109(d)(1)(A), and Title 18, United States Code, Section 2(b).)

### FORFEITURE ALLEGATION

45.   As a result of committing the offense alleged in
Count Six of this Information, MICHAEL COHEN, the defendant, shall
forfeit to the United States, pursuant to Title 18, United States
Code, Section 982(a)(2)(A), any property constituting or derived
from proceeds obtained directly or indirectly as a result of the
commission of said offense.

### Substitute Assets Provision

46.   If any of the above-described forfeitable property,
as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due
     diligence;

b.   has been transferred or sold to, or deposited with,
     a third person;

c.   has been placed beyond the jurisdiction of the
     Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
     cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United
States Code, Section  853(p) and Title 28, United States Code,

20

Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

ROBERT KHUZAMI
Acting United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL COHEN,

Defendant.

### INFORMATION

18 Cr. ___ (WHP)

ROBERT KHUZAMI
Acting United States Attorney