1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   STEPHANIE CLIFFORD a.k.a. STORMY      )
    DANIELS a.k.a. PEGGY PETERSON, an     )
6   individual,                           )
                                          )
7                   Plaintiff,            )          Case No.
                                          )   2:18-cv-02217-SJO-FFM
8        vs.                              )
                                          )
9   DONALD J. TRUMP a.k.a. DAVID          )
    DENNISON, an individual, ESSENTIAL    )
10  CONSULTANTS, LLC, a Delaware Limited  )
    Liability Company, MICHAEL COHEN, an  )
11  individual, and DOES 1 through 10,    )
    inclusive,                            )
12                                        )
                    Defendants.           )
13  _____ )

14  STEPHANIE CLIFFORD a.k.a. STORMY      )
    DANIELS,                              )
15                                        )
                    Plaintiff,            )          Case No.
16                                        )   2:18-cv-06893-SJO-FFM
         vs.                              )
17                                        )
    DONALD J. TRUMP,                      )
18                                        )
                    Defendant.            )
19  _____ )

20

21            REPORTER'S TRANSCRIPT OF PROCEEDINGS
              FRIDAY, MONDAY, SEPTEMBER 24, 2018
                         1:57 P.M.
22               LOS ANGELES, CALIFORNIA

23  _____

24        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
               FEDERAL OFFICIAL COURT REPORTER
                350 WEST 1ST STREET, SUITE 4311
25             LOS ANGELES, CALIFORNIA 90012-4565
                       (213) 894-3539

1                    **APPEARANCES OF COUNSEL:**

2

3       **FOR THE PLAINTIFF:**

4            AVENATTI & ASSOCIATES
             BY:  MICHAEL J. AVENATTI
5            BY:  AHMED IBRAHIM
                  Attorneys at Law
6            520 Newport Center Drive, Suite 1400
             Newport Beach, California 92660
7            (949) 706-7000

8

        **FOR THE DEFENDANT DONALD J. TRUMP:**
9
             HARDER LLP
10           BY:  CHARLES J. HARDER
             BY:  RYAN J. STONEROCK
11                Attorneys at Law
             132 South Rodeo Drive, Fourth Floor
12           Beverly Hills, California 90212
             (424) 203-1600

13

14      **FOR THE DEFENDANTS ESSENTIAL CONSULTANTS, LLC and MICHAEL COHEN:**

15
             BLAKELY LAW GROUP
16           BY:  BRENT H. BLAKELY
             BY:  JESSICA COVINGTON
17                Attorneys at Law
             1334 Park View Avenue, Suite 280
18           Manhattan Beach, California 90266
             (310) 546-7400

19

20

21

22

23

24

25

1    **LOS ANGELES, CALIFORNIA; FRIDAY, MONDAY, SEPTEMBER 24, 2018**

2                               **1:57 P.M.**

3                               **--oOo--**

4            THE COURTROOM DEPUTY:  Calling Item No. 9:

5    Case number CV 18-02217 SJO; Stephanie Clifford versus Donald

6    J. Trump, et al.  And also calling Item No. 10:  Case number

7    CV 18-06893 SJO; Stephanie Clifford versus Donald J. Trump.

8         Counsel, please state your appearances.

9            MR. AVENATTI:  Good afternoon, Your Honor.  Michael

10   Avenatti on behalf of the plaintiff, Stephanie Clifford.

11           MR. IBRAHIM:  Good afternoon, Your Honor.  Ahmed

12   Ibrahim on behalf of plaintiff Stephanie Clifford in both

13   cases.

14           THE COURT:  Good afternoon.

15           MR. HARDER:  Good afternoon, Your Honor.  Charles

16   Harder on behalf of President Donald J. Trump.

17           MR. STONEROCK:  Good afternoon, Your Honor.  Ryan

18   Stonerock on behalf of defendant Donald Trump.

19           MR. BLAKELY:  Good afternoon, Your Honor.  Brent

20   Blakely on behalf of Michael Cohen and Essential Consultants.

21           MS. COVINGTON:  Good afternoon, Your Honor.  Jessica

22   Covington on behalf of Michael Cohen and Essential Consultants.

23           THE COURT:  Good afternoon, everyone.

24        So the matter is here on a scheduling conference in case

25   number CV 2217, which we will put aside for the time being, and

1    then we also have the matter here on defendant's, Mr. Trump's,

2    special motion to dismiss Ms. Clifford's complaint for

3    defamation.

4        I think some procedural history is probably in order here.

5    The subject complaint by Ms. Clifford was filed in the Central

6    District of -- I'm sorry, the Southern District of New York.

7    The defendant, Mr. Trump, moved to transfer the case from the

8    Southern District of New York to this Court because the claim

9    was it relates to litigation already in this court, and that

10   was the CV 02217 case.

11       The parties thereafter met and conferred, and there was a

12   stipulation to transfer the matter in the Southern District to

13   this Court, and then Judge Furman issued that order granting

14   the transfer, and this Court accepted the transfer, so the

15   matter is here.

16       There was a comment by one of the bloggers that this Court

17   must have done something bad in the past to inherit all these

18   cases, and I -- such as running over a nun or something.  I

19   just want to make clear, I enjoy First Amendment matters.  The

20   lawyers in the proceedings before me, I think, have been

21   professional in court, have been very professional, so I enjoy

22   the lawyers who have participated in the proceedings here.  And

23   I was a product of Catholic school, so I would not run over a

24   nun.

25       So the issue before the Court is -- involves certain

1  foundational matters.  Ms. Clifford's defamation lawsuit, the

2  subject lawsuit, concerns an April 2018 tweet posted by

3  Mr. Trump from his personal Twitter account regarding

4  Ms. Clifford and an artist sketch of a man Ms. Clifford claims

5  threatened her in 2011 because she had agreed to cooperate with

6  a magazine in connection with an article about her prior

7  intimate relationship with -- or alleged intimate relationship

8  with Mr. Trump.

9       So in the complaint that has been filed in court,

10  Ms. Clifford claims that in 2011, while she was in Nevada,

11  Las Vegas, a person, a man, approached her and her infant

12  daughter and threatened Ms. Clifford, told her to leave Trump

13  alone and forget the story.  Thereafter, Mr. Trump was elected

14  president in 2016.

15       And then in 2018, Ms. Clifford worked with an artist to

16  render a sketch of a person who had allegedly threatened her in

17  2011.  Thereafter, Ms. Clifford released the sketch on April

18  17th, 2018, and the next day, April 18th, Mr. Trump -- then

19  President Trump or now President Trump -- posted what is

20  claimed to be false statements regarding Ms. Clifford's sketch

21  and Ms. Clifford's account of the threatening incident.

22       So the subject tweet posted by President Trump was -- or

23  reads:  "A sketch years later about a nonexistent man, a total

24  con job playing the fake news media for fools," in parens, "but

25  they knew it."

1     It should be referenced, as referenced in the complaint,

2  that President Trump's tweet was posted in response to another

3  tweet which was by another person, which showed side-by-side

4  images of the sketch released by Ms. Clifford and then a

5  picture of Ms. Clifford's then husband, and the inference being

6  that the two looked alike.

7     Based on the tweet by Mr. Trump, Ms. Clifford has sued

8  Mr. Trump for defamation, and she argues that the tweet attacks

9  the veracity -- her veracity of her account regarding the

10 incident that took place or allegedly took place back in 2011,

11 that Mr. Trump meant to convey that Ms. Clifford is a liar, and

12 that she was falsely accusing the man depicted in the sketch of

13 committing a crime.

14    And there's a claim in the complaint that the tweet

15 constitutes defamation, per se, because it charges her with

16 committing a crime under New York law as well as the law of

17 other states.  So she claims to have been damaged as a result

18 of the tweet, including exposing her to ridicule and threats

19 and hatred and contempt.

20    So before we get to the substance of the issues that are

21 raised in the pleading, there are certain substantive -- there

22 are certain threshold questions that need to be addressed

23 before we get to the substantive issues, and the first is the

24 choice of law.  The Court has determined which state law

25 governs the special motion that has been filed in this case.

1    So, not surprisingly, Mr. Trump claims that Texas law, the

2    Texas anti-SLAPP statute applies, and it's not surprising that

3    Ms. Clifford argues that the New York law applies.

4    Ms. Clifford argues that the New York law applies because

5    Mr. Trump was a citizen of New York or is a citizen of New York

6    and not Texas.

7         The law that applies is important because the Texas

8    anti-SLAPP statute is modeled after California, which is an

9    expansive statute and provides much protection for persons

10   accused of making defamatory statements in the context that's

11   before the Court, and then New York law is much narrower and

12   provides far less protection.  So the Court is not surprised

13   that the parties have taken different positions regarding

14   application of which law this Court should apply in this case.

15        So we start with where the case was filed.  The case, as

16   mentioned, the complaint -- the subject complaint was filed in

17   New York and then transferred to this Court because it related

18   to litigation already pending in this court.

19        And so I think I'll hear from counsel, but I think the

20   Supreme Court -- U.S. Supreme Court precedent is clear in this

21   area:  When a case is transferred from a federal court in one

22   state to a federal court in another state, the choice of law

23   principles that apply are the state from where the case was

24   transferred.  And that's *Van Dusen versus Barrack*,

25   376 U.S. at 612.  In that case there was a transfer by a

1    defendant.  That's a 1964 decision.

2        The Supreme Court followed that same reasoning and

3    rational in *Ferens versus John Deere*, where a plaintiff moved

4    to transfer.  In both cases the Supreme Court made it clear

5    that the law -- choice of law principles that would apply would

6    be the law of the state where the matter was first filed.

7        So if Mr. Avenatti disagrees for any reason, I'll hear

8    from him at this point.

9            MR. AVENATTI:  Your Honor, Mr. Ibrahim is going to

10   be handling this, but we don't disagree.

11           THE COURT:  Okay.  So that, I think, is pretty

12   clear.

13       Does counsel for President Trump or Mr. Trump wish to be

14   heard on this?

15           MR. HARDER:  No, Your Honor.  We agree.

16           THE COURT:  So we start looking at the New York

17   choice-of-law principles.  And under New York choice of law

18   regarding rules in cases concerning defamation, New York choice

19   of law, I think, indicates that the plaintiff's domicile will

20   usually have the most significant relationship to the case, and

21   it's the domicile of the plaintiff that would control.

22       In the complaint that has been filed here, the plaintiff,

23   Ms. Clifford, references that she's a resident of Texas, and

24   the complaint references that the President is a resident of

25   New York.  So the Court has researched the Second District

authority -- I'm sorry, the Second Circuit authority regarding the applicable law that should apply here. And it would appear that the authority that best guides the Court is *Lee versus Banker's Trust*.

In *Lee versus Banker's Trust*, the plaintiff was hired by Banker's Trust to be a vice president. Thereafter, the plaintiff was accused of certain conduct that the bank would not tolerate. The bank ended up discharging the plaintiff. In discharging the plaintiff, the bank filed a suspicious activity report with the U.S. Attorney's Office in the Southern District of New York. Based on the filing of that suspicious activity report, the plaintiff claimed that the plaintiff was defamed, and the plaintiff sued.

In that lawsuit the district court applied the law of New Jersey in analyzing the defamation claim and not the law of New York. The plaintiff appealed and argued that New York law applied because Banker's Trust was headquartered in New York, and the defamatory conduct, the filing of the suspicious activity report, took place in New York; therefore, New York law applied. And the Court for the Second Circuit disagreed, making it clear that it was the state where the plaintiff was domiciled that would control in defamation cases.

So the *Lee versus Banker's Trust* stands, in the Court's view, for the proposition that the Court has to look at where plaintiff is domiciled in a defamation case to determine the

law to apply, whether it's New York law or whether it's Texas

law.

Separate and apart from *Lee/Bankers*, the Court has

reviewed the Restatement (Second) of Conflict of Laws.  And in

the Restatement (Second) of Conflict of Laws -- this is the

1971 edition -- references that when a natural person claims

that he or she has been defamed by an aggregate communication,

the state of most significant relationship would usually be the

state where the person was domiciled at the time.

So I'm interpreting the complaint that has been filed here

to be one where the plaintiff admitted the domicile being in

the state of New York -- I'm sorry, the state of Texas.  If

that's the case, then the Court is guided by *Lee versus*

*Banker's Trust* and the Restatement, and it would be Texas

anti-SLAPP statute that would apply and Texas law that would

apply.

But before we go on, I will hear from counsel to see if

there's disagreement there, and we can start with Mr. Ibrahim.

MR. IBRAHIM:  Yes, Your Honor.

THE COURT:  And if you would argue at the lectern,

please.

MR. IBRAHIM:  Thank you, Your Honor.

While Your Honor was reciting some of the case law that

the Court has researched, I had an opportunity to go back to

some of the briefing, and what I had suspected is, indeed,

true, that the *Van Dusen* case and the analysis that Your Honor

and its clerks have engaged in was not briefed for the Court.

That also goes for the *Lee versus Banker's Trust* case.

And so absent having all of that authority before me and

all those arguments, I'm going to go ahead and defer to the

Court's analysis on that issue; and, therefore, we would

concede that plaintiff's domicile is in the state of Texas, and

that, therefore, Texas law would apply in this instance.

THE COURT:  Okay.  This is becoming a very easy

hearing.

Several pleadings have been filed, especially in reference

to the scheduling conference, so that threshold issue has been

resolved.

So the next issue is the Court has to decide whether

Mr. Trump's special motion should be treated as a motion for

summary judgment and guided by -- and whether the Court should

be guided by FRCP Rule 56 or whether the motion is a motion

that is governed by FRCP 12(b)(6), in other words, a motion to

dismiss.

The distinction between the two is important because if

the Court treats the motion as a motion for summary judgment,

then under the principles that apply in federal court, the

plaintiff would be allowed to conduct discovery.  If the matter

is treated as a 12(b)(6) motion, then the Court is to make a

decision based on the allegations contained in the complaint.

 1     So the Court has, in reference to this issue, reviewed the

 2   *Planned Parenthood* case.  This is *Planned Parenthood versus*

 3   *Center for Medical Progress*.  And so this is a Ninth Circuit

 4   decision.  The Court has relied on Ninth Circuit law here

 5   because we could not find any Fifth Circuit law -- Texas being

 6   in the Fifth Circuit -- concerning the issue here.  And so the

 7   Texas statute is modeled after the California statute.  So it

 8   appears that in the absence of Fifth Circuit law, the Court

 9   should be guided by Ninth Circuit law.

10     So in the *Planned Parenthood* case, the plaintiff,

11   Planned Parenthood, filed a lawsuit alleging that the

12   defendant, Center For Medical Progress, created false videos

13   and used fraudulent means to enter into the premises of

14   Planned Parenthood to create false videos.  The defendant was

15   sued.  The defendant moved to dismiss under 12(b)(6) under the

16   California anti-SLAPP statute.

17     And in looking at the case, the Court held that the

18   anti-SLAPP motion only challenges the legal sufficiency of the

19   complaint; and, therefore, if it only challenged the legal

20   sufficiency of the complaint, the analytical construct would be

21   under 12(b)(6).  If it challenged the facts as alleged in the

22   complaint, the veracity of the facts as alleged in the

23   complaint, it would be a matter that should be governed by

24   Rule 56, the rules that apply to a motion for a summary

25   judgment.

1        And so as I understand the motion to strike here made --

2   offered by the defendants, the motion to strike appears to be

3   analogous to a motion to dismiss because the defendant seems to

4   assume the truth of the allegations in the complaint.  And the

5   defendant has made three arguments in support of the motion:

6   one, the tweet alleged in the complaint is constitutionally

7   protected opinion; the second category of claim that is being

8   offered here by the defendant is the plaintiff has not

9   sufficiently pled facts to support damage; and then the third

10  is that the plaintiff has not pled sufficient facts to show

11  that Mr. Trump acted with requisite malice or reckless

12  disregard.

13       As I understand the complaint, the complaint appears to be

14  a motion that is best analyzed under 12(b)(6) of the Federal

15  Rules of Civil Procedure and not Rule 56.  Now, that being

16  said, Mr. Harder has filed a declaration in support of the

17  special motion to dismiss.  And in the declaration in support

18  of the special motion, Mr. Harder has attached Exhibits A

19  through F -- I'm sorry, A through S.  There are many exhibits

20  here.

21       And if Mr. Harder believes that the case should be

22  analyzed as a 12(b)(6) motion and not under 56, the question

23  is:  Well, why did Mr. Harder file all of these exhibits?  So

24  I'll hear from Mr. Harder.

25            MR. HARDER:  Thank you, Your Honor.

1    We do believe that under 12(b)(6) you can dismiss out the

2    entire claim with prejudice for the reasons that we stated.  If

3    Your Honor does not believe that 12(b)(6) is the proper

4    mechanism to dismiss out, the issue of special damages we

5    believe can be dismissed out with -- the entire case dismissed

6    out with prejudice because special damages have been offered by

7    the plaintiff, Ms. Clifford, and by way of declaration.  And

8    her declaration does not provide sufficient evidence that there

9    are special damages.

10    And so we would take the position, Your Honor, that

11    12(b)(6) should be the primary mechanism to evaluate the

12    motion.  And if so, then you don't need to look at any of the

13    exhibits.  If Your Honor does not dismiss out the entire claim

14    with prejudice based upon 12(b)(6), then we believe that you

15    have the power to dismiss out the entire claim with prejudice

16    based upon Rule 56, based upon the evidence as to that special

17    damages issue.

18            THE COURT:  So as I understand it, then, just to

19    kind of recap, you see this as a 12(b)(6) issue, the analysis

20    under 12(b)(6), but if the Court disagreed for any reason, then

21    you filed in support of a motion for summary judgment all of

22    the exhibits that are attached to your declaration, including A

23    through S.  Is that basically --

24            MR. HARDER:  Correct, correct.

25            THE COURT:  Okay.  So I guess I'll turn it over to

Mr. Ibrahim to comment on whether this is -- the analytical

construct here is a 12(b)(6) or a Rule 56.

MR. IBRAHIM:  Thank you, Your Honor.

This case was -- or, rather, the motion filed by Mr. Trump

was a motion brought pursuant to the anti-SLAPP provisions of

425.16.  And as a result, and because Mr. Trump is not

conceding that that motion is without merit, and as Your Honor

knows, there are serious consequences associated with filing an

anti-SLAPP motion, namely, the award of attorney's fees to a

prevailing party.  I don't think that we should disregard the

fact that the actual motion that Mr. Trump has filed is an

anti-SLAPP motion.

And as a result, the assertions made pursuant to that

anti-SLAPP motion is very clear, in our view, that the federal

courts, because the matter is brought in federal court, will

construe an anti-SLAPP motion as a summary judgment motion for

the purposes of determining whether discovery should be

awarded.

And if we take a step back for a second, Your Honor,

Your Honor pointed out that there is this distinction between

motions that test the legal sufficiency of the allegations in a

complaint versus assertions in a motion that are directed to

the facts in evidence.  Well, here, in our view, there is no

question that the facts in evidence are implicated, and we need

look no further than the actual tweet that we have.

1    Looking at this actual tweet, which Your Honor recited in

2    Your Honor's statement of facts, the tweet talks about the

3    threat that occurred to our client that she reported to the

4    public with regards to a threat she received in 2011 from this

5    man.  Mr. Trump called that person a, quote, nonexistent man,

6    end quote, a nonexistent man.

7         THE COURT:  I think we are getting beyond the focus

8    of the Court here.  I think everyone in this court agrees this

9    is an anti-SLAPP motion.  I believe it's been conceded that the

10   Texas anti-SLAPP motion applies, not the statute or the law

11   that would apply from New York.  If we look at the *Planned*

12   *Parenthood* case that I just cited, it's Ninth Circuit

13   authority, but, again, the Texas law is modeled after

14   California law, so we look at the Ninth Circuit authority.

15        And in the Ninth Circuit, the *Planned Parenthood* case

16   stands for the proposition that an anti-SLAPP motion can be a

17   motion that's governed by 12(b)(6) or a motion that's governed

18   by Federal Rules of Civil Procedure 56, a motion for summary

19   judgment.

20        So the way I've interpreted the motion here, in the motion

21   Mr. Trump assumes all of the facts alleged in the complaint to

22   be true.  The claim is that the tweet alleged in the complaint

23   is constitutionally protected opinion.  So if that's the case,

24   then we look only at the complaint itself, and then I can make

25   a determination, applying Texas law, as to whether the

     plaintiff has stated a claim of defamation that can go forward.

               MR. IBRAHIM:  Yes, Your Honor, if I may be briefly
     heard on this.

               THE COURT:  Yes.

               MR. IBRAHIM:  One of the arguments that defendants
     make here, page 14, is plaintiff cannot show actual malice, and
     so they are challenging the evidentiary basis of our
     allegations because they are asserting that we can't show that
     Mr. Trump issued this tweet with actual malice.

          Now, how are we going to find out whether Mr. Trump made
     this tweet with actual malice or not?  Obviously we are going
     to have to look at the evidence, and among other things we are
     going to have to examine:  Number one, did Mr. Trump know about
     this man who was sent to threaten my client in 2011?  Number
     two, did Mr. Trump know that this story in In Touch magazine
     was about to come out?  Number three, did someone within
     Mr. Trump's inner circle, did they know about the fact that
     this story was going to come out?  Did they know about this
     man?

          So these are all, Your Honor -- and I apologize for
     interrupting, but my point is that we can't look at this as a
     challenge to the pure legal sufficiency of the complaint.  They
     are clearly making factual arguments, and I haven't even gotten
     to the damages portion of it, which is also a question of fact.

               THE COURT:  Okay.  I think maybe you're jumping a

1    little bit ahead, but let me hear from Mr. Harder on this.

2             MR. HARDER:  Yes, Your Honor.  Thank you.

3        As I said before -- and, Your Honor, courts -- federal

4    courts review federal anti-SLAPP motions based on either

5    12(b)(6) or Rule 56.  You can take your choice, and you can

6    choose both ways if you want to also.

7             THE COURT:  It makes a difference because if this is

8    a Rule 56 motion analysis, then they are entitled to discovery.

9             MR. HARDER:  I understand, Your Honor.  As I said

10   before, we would like to proceed under 12(b)(6).  As to -- if

11   Your Honor does not dispose of the entire case with prejudice

12   as to 12(b)(6), we would like to address the special damages

13   issue only as to Rule 56 with regard to actual malice.  We are

14   willing to withdraw those arguments from the motion, just from

15   this particular motion, so that it's a cleaner issue to resolve

16   because I think we can easily resolve the case from the first

17   two.

18            THE COURT:  So under 12(b)(6) analysis, the Court

19   would accept all of the allegations in the complaint to be true

20   and then the determination as to whether the tweet is

21   constitutionally protected opinion.

22            MR. HARDER:  For purposes of analyzing the motion,

23   yes.

24            THE COURT:  Yes, for purposes of analyzing the

25   motion.

1          MR. HARDER:  Correct.

2          THE COURT:  So there's one other threshold issue

3     that needs to be discussed before we get into whether the

4     statements of the President are constitutionally protected, and

5     that is the issue of timeliness.  So there's an issue that was

6     raised by the -- by Ms. Clifford, that assuming that the Texas

7     statute applied, that because President Trump did not file the

8     motion -- the anti-SLAPP motion within 60 days from the date of

9     service, he's waived any opportunity to bring this motion.  So

10    is that claim being maintained, or is it withdrawn?

11         MR. IBRAHIM:  Well, Your Honor, I have to confess,

12    I'm a little bit confused here.  Is this an anti-SLAPP motion

13    still, or have they withdrawn the anti-SLAPP motion?

14         THE COURT:  The Court has made a determination that

15    the issue regarding whether the statements in the complaint are

16    constitutionally protected should be analyzed under 12(b)(6).

17         MR. IBRAHIM:  Okay.

18         THE COURT:  Then we go to the issue of timeliness,

19    and then we are going to get to the substance, but the issue --

20    do you stand by the argument, or are you withdrawing that

21    argument?

22         MR. IBRAHIM:  Well, Your Honor, to be clear, we

23    never made an argument that the 12(b)(6) portion of their

24    motion was untimely.  The assertion that we made was that the

25    anti-SLAPP motion that they filed is untimely.  So if we no

1  longer have an anti-SLAPP motion that is before the Court, then
2  we will -- I suppose that argument would also go by the
3  wayside.  But if there is still an assertion that the
4  anti-SLAPP motion applies, then, yes, we would be making an
5  argument that the motion is untimely and that it should have
6  been filed within 60 days.
7          THE COURT:  I think we may be talking past each
8  other.  The motion here is in the nature of an anti-SLAPP, but
9  because the motion only raises issue with the statement of
10  Mr. Trump and whether that is constitutionally protected
11  opinion, the Court can analyze that motion in the terms of
12  12(b)(6) construct.  So that's how I see the analysis going
13  forward.
14          MR. IBRAHIM:  Your Honor, our position is that the
15  motion should have been filed within 60 days, and they didn't
16  file it within 60 days; therefore, it's untimely.
17          THE COURT:  Okay.  So just in reference to the
18  60-day rule, Texas law -- because we have to apply Texas law
19  here, Texas law requires that a party bringing a motion, an
20  anti-SLAPP motion, whether it's in the context of summary-
21  judgment-type issue or whether it's a motion-to-dismiss-type
22  issue, it has to be brought within 60 days.  So I think the
23  timeline here is important.
24      Ms. Clifford filed her complaint on April 30th of 2018.
25  Mr. Trump waived service in May, about a month later, May 23rd,

1  2018, and then on 7/23, within the 60-day window, Mr. Trump

2  filed a motion to transfer.  And then on 8/8/2018, Judge Furman

3  granted the joint stipulation and transfer.  And so the motion

4  that is brought before the Court is -- was filed on 8/27/2018,

5  19 days after the transfer.

6      So what doesn't make sense to me is why the motion should

7  have been filed within 60 days after the -- after Mr. Trump

8  waived service?  At that time the matter was pending before

9  Judge Furman in the Southern District of New York.  There was

10  pending a motion to transfer, so it would make little sense to

11  file the motion in New York when there was a motion to transfer

12  that was pending.  And so I guess I do not understand your

13  argument as to why it's untimely.

14          MR. IBRAHIM:  Yes, Your Honor.  The argument is that

15  there's a 60-day time limit.

16          THE COURT:  Yes.

17          MR. IBRAHIM:  Whether it made procedural sense or

18  not, Your Honor, in our view is beside the point.  It's very

19  common, for example, when the defendant is asserting certain

20  defenses, let's say, based on personal jurisdiction, that

21  unless they get some type of a stipulation from the plaintiff

22  to extend the deadline on various other motions that the

23  defendant may want to bring, that that defendant is required to

24  observe whatever time limits are necessary and to file all of

25  their motions together.  And that this case, it's no different.

1    If they wanted to file an anti-SLAPP motion, then the

2  clock was ticking at the point in time when they waived

3  service, and it was their responsibility, Your Honor, to bring

4  the motion.

5         THE COURT:  The clock -- the 60-day clock ticks if

6  it makes sense for it to tick, and my point being that since

7  the matter was pending in New York, and since Mr. Trump had

8  filed a motion to transfer, and that issue had to be decided by

9  Judge Furman under the circumstances there, Judge Furman would

10  not have ruled on the anti-SLAPP issue because of the motion to

11  transfer.  And so under those circumstances, it makes a little

12  sense to require a defendant to comply with the 60-day rule in

13  light of those circumstances.

14    Separate and apart from that, Texas law is clear, and the

15  proposition for this is *Schimmel versus McGregor* at 438 S.W.3d,

16  but it stands for the clear proposition that the Court can

17  waive the 60-day rule if good cause exists.  And it would

18  appear to require Mr. Trump to have filed the complaint -- the

19  motion in New York when there was a motion to transfer pending,

20  makes little sense.

21    And I would just suggest that under the circumstances

22  here, there's good cause to allow the -- the motion to be filed

23  when it was.  And it was only filed 19 days after the transfer

24  to this Court, so it was timely filed.  And separate and apart

25  from that, I see no prejudice to Ms. Clifford.

1    Is there any prejudice?

2         MR. IBRAHIM:  Well, Your Honor, we didn't know that

3    they were going to pursue an argument based on Texas law,

4    Your Honor, until, really, four days before they filed the

5    motion.  There's a whole separate issue on whether there was a

6    proper meet and confer, and that hasn't been, in fairness,

7    brought before the Court.  I'm not necessarily injecting that,

8    but to respond to your question about whether there's

9    prejudice, Your Honor, yes, there is prejudice because we were

10   expected to drop everything on one-week notice to address a

11   completely novel issue that they only brought to bear shortly

12   after the case was transferred, so we do believe there is

13   prejudice.

14        And, finally, Your Honor, our position is that the venue

15   has no bearing on the 60-day requirement, whether we're in

16   New York, California, or another forum.  If they wanted to get

17   an extension of time to file their anti-SLAPP motion, then they

18   were required to either get a stipulation from the plaintiff or

19   they were required to move before Judge Furman for an

20   extension.

21        THE COURT:  What's your position in reference to

22   *Schimmel versus McGregor*, where applying Texas law, the Court

23   has discretion to waive the 60-day rule where good cause

24   exists?

25        MR. IBRAHIM:  Well, our position is that the Court

**UNITED STATES DISTRICT COURT**

1    should not exercise its discretion to find that good cause

2    exists for all of the reasons I've recited.  I'm not sure I'm

3    going to, based on Your Honor's comments, I'm going to be able

4    to persuade you otherwise, and for that reason, we can

5    certainly move on with the rest of the argument.

6              THE COURT:  Well, you can persuade me if you come

7    forward with persuasive arguments.  I'm open ears, you know,

8    and I'm open to my mind being changed.  But I think just under

9    the circumstances here, if we just apply common sense, it

10   didn't make sense for -- to require Mr. Trump to have filed a

11   motion in New York because nothing would have been

12   accomplished.  And when the matter was transferred to this

13   Court, they pursued filing the motion quickly, I guess, again,

14   19 days after the transfer, which is relatively quick.

15             MR. IBRAHIM:  Your Honor, again, we don't think that

16   Judge -- the idea that Judge Furman would not be able to rule

17   on the anti-SLAPP motion, I don't necessarily agree with that.

18   I think that at the time that the motion to transfer was filed,

19   it was certainly possible that that matter would have been

20   fully briefed for Judge Furman and that Judge Furman would have

21   denied the transfer and kept the case.

22        If that was the case, then why isn't it reasonable to

23   assume that the defendant could have brought their motion at

24   the same time?  So the issue of venue having some kind of

25   bearing on this motion, we are Monday-morning quarterbacking

after the fact because we all ended up before Your Honor.  I
don't think that's a reasonable position in terms of whether
the defendant did what they should have done, which is get an
extension from Judge Furman or get a stipulation from the
plaintiff.

THE COURT:  I'm not persuaded.

Mr. Harder, do you have any comments, just --

MR. HARDER:  No, Your Honor.

THE COURT:  Okay.  Look, it makes sense not to
apply -- not to use the 60-day rule as a sword here in light of
the particular facts and the transfer to this Court and then
the fact that the motion was expeditiously filed as soon as it
was transferred here.  So the Court would conclude that it's
timely.

So we get to, I guess, the meat of all of the issues
before the Court, and the question is whether the tweet by the
President is protected commentary or political hyperbole and
nondefamatory on its face.  So the analysis of the anti-SLAPP
motion under Texas law requires a couple of steps, and the
Court is guided by *In re Lipsky* at 460 S.W.3d at 539 -- 579,
I'm sorry.

And the first step is the defendant must show that
plaintiff's complaint relates to or is in response to
defendant's right of free speech.  And so what is free speech
in the context of Texas law and then certainly federal law or

constitutional law?  So the TCPA defines exercise of free

speech as a communication made in connection with a matter of

public concern.  And then a matter of public concern is defined

further under the Texas statutes, and a matter of public

concern includes an issue related to a public official or a

public figure.  And the statutes that apply here are Texas

Civil Law Practice and Remedy Code.

        So as -- and so what I would suggest is Texas applicable

law is not inconsistent with the federal constitutional law

that applies in the analysis here, but what I would ask counsel

for the plaintiff here is it seems that there's little doubt

here, it would appear, that Ms. Clifford's complaint in

reference to Mr. Trump's tweet is one that involves Mr. Trump's

exercise of free speech.  He's a public official.  He's

President of the United States, doesn't get higher than that,

so it's free speech by a public official on an issue of public

concern.

        This whole issue regarding the person who made the threats

to Ms. Clifford was a matter of public interest involving a

public figure.  I think Ms. Clifford, by any measure, is a

public figure.  She's a movie actress.  And separate and apart

from that, she has, in the context of the lawsuit, one of the

lawsuits before this Court and then other matters, she has

appeared on various news shows, 60 Minutes being one, The View

being another.  And so it would appear that just looking at the

tweet here and in the context it was made, it appears to be one

that would be protected as opinion and political hyperbole.

Separate and apart from that, I think the Court has to

look at this in the context of who made it and why it was made.

So we have Mr. Trump has issued the tweet or made the tweet in

the context of plaintiff labeling herself as a political

adversary of the President. She certainly is a political

adversary of the President. She's made that clear in the

context of the other complaint that was filed in this court,

the complaint in 02217.

She was in the process of making her story known to the

world, the relationship between -- the alleged relationship

between herself and the President prior to the election in

November 2016. She wanted the world to know about that in the

context of the election that was taking place, to have the

public be aware of the relationship.

So I think context matters, and it would appear that, by

any measure, this would be the type of rhetorical hyperbole

that is protected. And it would seem that this is the type of

speech that really lies at the heart of the First Amendment

to -- there was a prior motion made by Mr. Cohen to silence

Mr. Avenatti here, which the Court denied.

And so I'm certainly a proponent of the First Amendment,

but to allow the complaint to go forward and to have one

consider this to be defamation in the context it was made would

1  be a chilling effect on candidates running for office,

2  certainly a chilling effect on the President, and it would

3  hamper political discourse.

4     This is the type of political discourse and the commentary

5  that takes place in elections all the time.  And I'm troubled

6  that there's a claim here for defamation in the first instance.

7  So I'll hear from Mr. Ibrahim on this issue.

8     And, again, there are numerous -- well, there's state --

9  Texas state cases that discuss the issue of political

10  commentary, and the courts have to be vigilant to protect

11  issues involving First Amendment.  And the Court is guided in

12  part by *Rehak Creative Services versus Ann Witt* at

13  404 S.W.3d 716.  In that case there were various alleged

14  defamatory remarks being made in the context of an election,

15  but the statements included being ripped off, bilked.  There

16  was -- which were alleged to be defamatory.  And the Court took

17  the political context into -- considered the political context

18  in deciding that those types of statements are protected.

19     So, Mr. Ibrahim.

20     MR. IBRAHIM:  Thank you, Your Honor.

21     There's two main points I would like to make.  First of

22  all, Your Honor, our position is that the tweet at issue is

23  100 percent absolutely a false statement in fact.  And the test

24  with regards to whether a particular statement is just mere

25  opinion or hyperbole is the Court must ask itself whether the

statement at issue can be objectively verifiable.  And here we
have a statement from Mr. Trump with regards to our client's
name, that she was threatened by this man in 2011, that this
man is, quote/unquote, nonexistent.

Now, Your Honor, we agree, context is important, and let's
look at the context at issue in this case.  The context is that
our client in 2011 was interviewed by In Touch magazine where
she made some statements about her relationship with Mr. Trump.
And our allegation is that the information that that interview
took place made its way over to Mr. Trump's camp and to
Mr. Cohen and so forth.

And the context does matter.  This is not Mr. Trump
commenting on an issue that he is detached from that could be
construed as pure political opinion, where someone on the
sidelines is commenting about a matter that he or she does not
have personal knowledge about.

If it turns out that Mr. Trump was involved in some manner
in sending this man, in hiring this man, in working with
Mr. Cohen to send this man, if there was someone within the
Trump organization who had some involvement in sending this
man, we now take this tweet from being pure political opinion,
and it is now elevated to being an objectively verifiable fact.

And if we are able to establish that, if the discovery
shows that, then it's no longer a mere statement of opinion;
it's a bald-faced lie.  Because if Mr. Trump knew that this

threat actually occurred and that he sent this man, he had some

involvement with the threat, it's not political opinion,

Your Honor.  That's a false statement of fact.  It's not only a

false statement of fact; it's actual malice, Your Honor.

And so this case -- and in support of this position, I

would direct Your Honor to the *Bentley* opinion.  The *Bentley*

opinion -- if you will give me a moment, Your Honor.  It's

*Bentley versus Bunton*, B-u-n-t-o-n, 94 S.W.3d 561.  It's a

Texas Supreme Court opinion from 2002.

And in that case the Texas Supreme Court addressed the

question of whether the accusation -- well, let me back up a

second.  That case involved a host of a call-in talk show on a

public access channel who repeatedly accused a local district

judge of being corrupt.

THE COURT:  I have it right here.

MR. IBRAHIM:  The host accused a local district

judge of being corrupt.  Now, "corrupt" is a word that's far

more ambiguous than saying that a man is nonexistent, but in

that action, the Texas Supreme Court addressed the question of

whether the accusation that the plaintiff was corrupt

constituted an opinion or statement of fact.  And resolution of

the issue hinged on the, quote/unquote, verifiability of the

accusation and the context in which the accusations were made.

And the Court found that that was defamatory.

Now, here, again, Your Honor, we have a tweet talking

about a nonexistent man, total con job.  So it is a verifiable

issue of fact whether my client is lying or not, and it is a

verifiable question of fact whether Mr. Trump knew about it.

So, Your Honor, that's the first point I want to make, that

here we have a false statement of fact that is completely

different from the context in which Your Honor is talking

about, where you have a pure political opinion or hyperbole on

a matter of public concern.  That's number one.

THE COURT:  Is the plaintiff an adversary --
political adversary of the President?

MR. IBRAHIM:  Well, that takes me to the second
point, Your Honor.

THE COURT:  The answer is "yes"?

MR. IBRAHIM:  The answer is "no."

THE COURT:  Why not?

MR. IBRAHIM:  She has never described herself as a
political adversary.  I will give you, Your Honor, that, yes,
she is an adversary of the President, but this idea that she is
a political adversary, we don't agree with that.  And let's
take a look again at how this particular issue arose.

THE COURT:  What do you mean she is an adversary of
the President?

MR. IBRAHIM:  Well, she is an adversary of the
President in that she's been repeatedly described as a liar;
she is not someone who has been telling the truth.  And I think

1   the events of the last six, seven months, Your Honor, prove
2   that everything that we've said has been absolutely true.

3       So in the sense that she's been repeatedly abused in the
4   public with not only the statements coming out from Mr. Trump
5   and his attorneys and all of Mr. Trump's surrogates contending
6   that she's not telling the truth, contending that she's a bad
7   person, saying things like what Mr. Giuliani said, that "I just
8   don't respect a woman who comes from that profession,"
9   absolutely she is an adversary, but I would take issue with --
10  Your Honor, I apologize that I interrupted.  I would take issue
11  with Your Honor's characterization as a political adversary.
12  She is not running for office.  She hasn't declared her
13  candidacy for any office within the United States.

14      And let's take a look at -- I'm sorry, Your Honor.

15          THE COURT:  Go ahead.

16          MR. IBRAHIM:  Let's look at the particular issue.  I
17  understand, Your Honor, it's easy to not have blinders on with
18  regards to everything else that's going on, but the case that's
19  before Your Honor, we have to look at the four corners of the
20  complaint and the allegations before the Court.  And the
21  allegations that arose here relate to my client's assertion
22  that she was threatened in 2011 by a man in Las Vegas who came
23  to her car and basically told her to stop, to stop speaking
24  out, and also made a veiled threat at her infant daughter at
25  the time.  That has nothing to do with politics.

1           THE COURT:  That's her claim.

2           MR. IBRAHIM:  That's her claim.

3       And the claim with regards to the tweet at issue here

4   relates back to this 2011 threat.  That has nothing to do with

5   politics.  That has nothing to do with issues related to

6   politics, Your Honor.  It relates to whether Mr. Trump is a

7   liar and whether his assertion that my client is a liar is true

8   or not.

9       So for those reasons, Your Honor, it's our position that

10  this isn't mere political opinion or commentary.  This is a

11  false statement of fact, and that we intend to prove that it's

12  a false statement of fact through the discovery in this case,

13  Your Honor.

14          THE COURT:  So do you see the *Bentley* case at all

15  being in a different context from the case before this Court?

16  In *Bentley* there was a repeated accusation that the district

17  judge was corrupt.  And, again, context is everything.  And one

18  of the factors in *Bentley* is that it was repeated and repeated

19  and repeated and repeated.  So that's not what we have here,

20  and we have something very different here, and a statement

21  that's very different from the statement in *Bentley*.

22      Let me ask you this:  In your pleadings, I think you take

23  the position that the defamation -- that the tweet is

24  defamation, per se, because it essentially accuses Ms. Clifford

25  of committing a crime.

1          MR. IBRAHIM:  Yes, Your Honor.

2          THE COURT:  Would you explain that?  Because I don't

3    understand the argument.

4          MR. IBRAHIM:  Yes.

5          THE COURT:  What crime was she being accused of

6    committing?

7          MR. IBRAHIM:  So it would be a crime to falsely

8    report that a criminal act occurred.

9          THE COURT:  Falsely report to who?

10         MR. IBRAHIM:  Well, it would be a crime to assert

11   that there was a false reporting a crime to, I presume, to a

12   governmental authority, but I don't know that that necessarily

13   would have to apply in this case because --

14         THE COURT:  So this is not defamation, per se,

15   because it's not a crime to report falsely to the world that

16   someone has been verbally assaulted.  It's a crime to file a

17   false police report, but I don't see this as a defamation,

18   per se.

19         MR. IBRAHIM:  I don't know that the analysis is so

20   narrow.  So if a person is reporting that a crime has occurred

21   to the public, to the general public as we have here, and she

22   has a reasonable belief that there was a crime that occurred, I

23   don't know that the analysis is necessarily that you have to

24   meet all of the elements of the underlying crime that you are

25   asserting that the other side is claiming that you engaged in.

1    I don't know that that's the analysis, Your Honor.

2              THE COURT:  Thank you.

3         Mr. Harder, do you have any comments?

4              MR. HARDER:  Yes, Your Honor.

5         It's interesting because the complaint initially says that

6    the crime was the false reporting to the public, which we've

7    pointed out, Your Honor, is not a crime.  We looked to the

8    statutes.  We found it out of statute that says you have to go

9    to law enforcement in order for that to be a crime.  If you

10   just say it to the public in general, it's not a crime.

11        We have not seen any criminal statutes from the

12   plaintiff's side to indicate what crime actually is being

13   accused as to Ms. Clifford.  The opposition says, well, okay,

14   also the tweet says "con job," so they provided a definition of

15   "con job," which they get, I think, from the Black's

16   dictionary, and that definition -- if I can find it here.

17        That definition is essentially somebody who -- I don't

18   have the specific reference, but somebody who engages in

19   causing someone to trust in them and gain their confidence and

20   then take money or property away from them; a swindler.  This

21   is not what this tweet is accusing Ms. Clifford of doing.

22        This tweet is hyperbolic.  It is not accusing her of

23   engaging in the crime of theft.  It is not accusing her of

24   engaging in con artistry.  What it says is "A total con job

25   playing the fake news media for fools, but they know it."

That's actually very far from accusing her of con artistry.
Because what this tweet is saying is that she's going to the
news media with a story and treating them like they're a bunch
of fools, but they are not being tricked by it because they
know it.  So there's no trickery involved; they already know.
So this is as far from an accusation of actual con artistry as
possible.

To circle back, in order for there to be an accusation of
a crime, you have to show the statute -- Mr. Ibrahim doesn't
think you have to show the statute -- and you have to show the
elements.  Well, I think you do.  I think you have to show
which criminal statute is being alleged, what are the elements,
and how is this tweet actually alleging she's committing a
crime?  That's not doing that at all.  It's a long stretch for
the plaintiff to allege that this tweet, which is hyperbolic,
exaggerated, done within the political realm to address,
Your Honor, about the politics of it all.

Mr. Avenatti, as of the time of the tweet, went on a
hundred different TV shows.  And I realize we are not looking
at the evidence, but Your Honor could take judicial notice of
things, and Your Honor's been part of this case for a while,
and we have -- you know, we've dealt with some of the evidence
in the case.

Mr. Avenatti went on a hundred different national news
shows and attacked the President of the United States over and

over and over and over again, and Ms. Clifford went on news
shows and attacked him as well.  And his response was a single
tweet, which we've read already a couple of times, saying
"You're playing the news media as fools.  It's a con job.  They
know it.  Nonexistent man sketch years later," and referring to
the side-by-side of the sketch and a picture of Ms. Clifford's
either estranged husband or ex-husband.

And this whole thing is an opinion.  It's the President's
opinion that this person who is depicted in the sketch or
alleged person is nonexistent based on the fact that he looks
like her ex-husband.  It's her opinion that this story is a con
job, playing the fake news media for fools.  It's his opinion
that the news media know that they are being played.  These are
all opinions.  These are not facts, and this is all done in
this hyperbolic context of the political realm.

I believe Your Honor pointed out that *Bentley* involved a
situation where this individual on a radio show said flat out
that a particular judge was corrupt, and he alleged it over and
over and over again.  And the allegations were that this
commentator had actual facts, and he pointed to specific cases
and specific occurrences in the Court's record and public
documents and he says that he made lengthy investigations.

He interviewed courthouse employees and others, and he
looked into the law pertaining to personal bonds and case
disposition guidelines and judicial ethics and sheriff's

responsibilities and the district court's supervisorial

responsibility over the county auditor and the county

commissions court, and over and over and over again, this was a

sustained attack where the speaker was communicating to the

public that he was speaking from a position of fact, from a

position of evidence, from a position of conviction, from

someone who has investigated and investigated --

THE COURT:  I agree that the *Bentley* case is very

different.

MR. HARDER:  It couldn't be further from our case.

THE COURT:  Yes.  Let's -- the Court is going to

take the issues under submission and further consider.  But how

do you see the issue of attorney's fees, Mr. Harder?

MR. HARDER:  We are requesting them.

THE COURT:  And then in reference to there's a

request to amend -- to provide leave to amend the complaint.

MR. HARDER:  Your Honor, we would oppose because the

tweet sets forth what the tweet sets forth, and the allegation

is that it's a defamation.  And our position, which we've laid

out in our papers, is that it's not a defamation at all; that

this is opinion, it's protected speech, that it's within the

political context, that it's rhetorical hyperbole.  And there

are case after case after case which show that this is

protected speech.

The *Greenbelt* case *versus Bresler* is a case that

1    Your Honor should take a close look at, if you haven't already.

2    That was a case where a real estate developer was accused of

3    blackmail twice by people in the community, and it was repeated

4    in two news stories.  The case went to trial, and this

5    gentleman won a judgment for compensatory and punitive damages,

6    and it was affirmed by the highest court in his state, which

7    was Maryland, the court of appeal, and the case went to the

8    Supreme Court.

9         And the Supreme Court reversed, and it said the word

10   "blackmail" was used in a hyperbolic setting.  He actually

11   wasn't being accused of the crime of blackmail; he was being

12   accused of being a very hard-nosed business negotiator, kind of

13   a take-no-prisoners business negotiator, and he was being

14   likened to somebody who commits blackmail.

15        And even though all of the courts of Maryland sided with

16   the defamation claim, the U.S. Supreme Court said, and I will

17   quote:  "No reader could have thought that either the speakers

18   at the meetings or the newspaper articles reporting the words

19   are charging Bresler with the commission of a criminal offense.

20   On the contrary, even the most careless reader must have

21   perceived that the word, 'blackmail,' was no more than

22   rhetorical hyperbole, a vigorous epithet used by those who

23   considered Bresler's negotiating position extremely

24   unreasonable."

25        Well, that's what we have here with the word "con job,"

not accusing them of a crime -- Ms. Clifford of a crime, just saying this whole thing is trying to fool the media. That's the essence of it, and it's opinion. It's opinion she's trying to fool the media. The media is going along with it, and the President is essentially saying rubbish or hogwash or calling BS, there are various ways of saying it. And the President uses the words that he chooses, and it's all protected free speech.

And, Your Honor, *Letter Carriers versus Austin* is an important case because the plaintiff was called a traitor, and he was called a scab in the context of a labor dispute. And the Supreme Court held there, there's no such thing as a false idea. Even pernicious -- however pernicious an opinion may seem, we depend for its correction not on the conscientious of judges and juries, but on the competition of other ideas.

And what we have here is a political feud going on between the two sides, where the President's being attacked by Mr. Avenatti, acting on Ms. Clifford's behalf in a hundred different TV shows, and he sends out a tweet responding to some of the things that he's hearing. It's a give and take. And what the Supreme Court is saying is that the remedy here is more speech.

Ms. Clifford could have said, "Oh, it actually did happen, and here is my evidence. Here are the people I talked to. Here's the e-mails I sent or the text messages I sent. Here,

look, look, World, I'm telling the truth.  I'm not telling a
lie," but she didn't do that.  She just decided she's going to
sue for defamation without saying one more word about the truth
or falsity of this, and that's not what the Court says.

The *New York Times v Sullivan* case, I read it again
yesterday, there's so much in that case that's just right on
point talking about the importance of communication and free
speech and discussions on issues of importance and that
defamation actions are not the way to go.

This is a case where an elected official had sued for
defamation and won and got a $500,000 judgment back in the
1960s, which was a lot of money, and it was upheld by the
highest court of the state.  And the U.S. Supreme Court
reversed it unanimously, and they talked quite a bit about the
importance of having free political speech.

It reminds me of what Evelyn Beatrice Hall said:  "I
disprove of what you say, but I will defend to your [sic] death
your right to say it."  And, Your Honor, the framers of the
constitution insisted on adding ten amendments to the
constitution.  The very first one says "Congress shall make no
law abridging the freedom of speech."  Speech is so important
that U.S. Congress can't even touch it.  You can't enact a law
that restricts it.  That's how important this is.

And if you look at the Supreme Court cases that we have
cited to, Your Honor, it's pretty overwhelming.  I think I'm

singing to the choir because Your Honor started out by saying
you understand the importance of freedom of speech, especially
in the political context.  And if you look at the cases of
political context, it's given the most liberal view of speech,
that you have to have free speech in political context,
otherwise it leads down a dangerous path.

I hope I've answered your question.  And thank you,
Your Honor.

THE COURT:  Yes, sir.

MR. AVENATTI:  Thank you, Your Honor.

Your Honor, I'm going to correct the record because
there's been a number of misstatements on the record.  To be
clear, my client at the time of this tweet had given two
interviews on television, two:  the 60 Minutes piece and her
appearance on The View, which was, I believe, the day before
the tweet.

Your Honor, this was not political by any stretch of the
imagination at the time of this tweet.  It had nothing to do
with politics.  It had nothing to do with an election.  In
fact -- and my recollection may be wrong about this, but I
believe on at least one of those interviews, she was asked her
position relating to Donald Trump as a President, and she did
not pass judgment on her opinion of Donald Trump as a
President.

Now, the Supreme Court has taught us in *Clinton v Jones*,

1    in a unanimous decision, Your Honor, that the President is an

2    individual, just like everyone else, as it relates to

3    pre-presidential conduct and facts in evidence relating to that

4    conduct.  Donald Trump was not commenting by way of this tweet

5    on anything having to do with a political election or anything

6    having to do with politics.  Now, the fact that I may have

7    given a number of television interviews does not change that

8    analysis.

9         Let me presuppose -- or let us presuppose, Your Honor, for

10   a moment that this was a case not against Donald Trump, but

11   against a high-profile celebrity like LeBron James or a

12   high-profile business person like Bill Gates or Warren Buffett.

13   That would not -- the conduct here would not be any different,

14   Your Honor.  What if we were seeing Warren Buffett and I went

15   on television 250 times.  Would that make -- would those

16   appearances make the dispute about politics?  Of course it

17   would not.  This had nothing to do with politics.

18             THE COURT:  Mr. Avenatti, the Court has to focus on

19   the allegations contained in the complaint and the tweet

20   itself.  And let me just say, in the Court's view, this appears

21   to be rhetorical hyperbole opinion, protected speech in the

22   context of political arena by a public official involving a

23   public figure involving matters of public concern.  So it

24   appears to be protected.  That being said, the Court will look

25   at the additional cases that have been cited here.

1      We move to the issue of whether you should be entitled to

2  amend if the Court grants the motion.

3          MR. AVENATTI:  And, Your Honor, we would stand on

4  our submission in the papers; namely, we would ask for an

5  opportunity to amend the complaint.

6          THE COURT:  Now, how would you amend it so that you

7  have a viable complaint here?

8          MR. AVENATTI:  Well, Your Honor, I believe that we

9  made notation in our papers as to how we amend it, but among

10  other things, Your Honor, I think that we can shore up the

11  malice allegations.  I think we can provide context for the

12  statement to show that, in fact, it was not political in nature

13  at the time that it was made.

14          THE COURT:  Thank you.

15          MR. AVENATTI:  Thank you.

16          THE COURT:  We are going to take a short recess, and

17  then we will go back to the issue of the scheduling conference.

18          THE COURTROOM DEPUTY:  The Court's in recess.

19      (Recess taken from 3:17 p.m. to 3:23 p.m.)

20          THE COURTROOM DEPUTY:  Please come to order.  This

21  court is once again in session.

22          THE COURT:  So we are going to address the issues in

23  02217, Stephanie Clifford versus Trump.  And the parties have

24  filed various pleadings regarding the scheduling conference

25  that's set for today.  And in the pleadings there are various

1    issues that have been raised that appear not to be appropriate

2    to address in the context of a scheduling conference.

3         In the filings there's a suggestion that Ms. Clifford's

4    lawsuit is now moot.  In particular, defendants Donald Trump

5    and Essential Consultants seemingly have or will consent to

6    rescind the settlement agreement.  More importantly, there's an

7    indication that they would covenant not to seek to enforce the

8    settlement agreement.  So the issue before the Court -- one

9    issue before the Court that has to be decided is whether there

10   is a case in controversy that remains, and so that issue should

11   be teed up in reference to a motion brought to the Court.  So

12   the Court would require the defendants to bring that motion and

13   require the plaintiffs to file an opposition.

14        And then in reference to Mr. Cohen, Mr. Cohen remains to

15   be sentenced.  That being said, Mr. Cohen has previously

16   noticed a motion and a special motion to strike plaintiff's

17   defamation case.  I don't believe that has been opposed or

18   responded to yet in light of the stay that has been in place.

19   So we need to set a schedule regarding the opposition.  And the

20   Court, after ruling on the motions, if there's a matter that

21   remains, that we could set a trial date thereafter.

22        So today the Court is going to set a scheduling conference

23   order, but the scheduling conference order is going to concern,

24   again, whether there is a case in controversy that remains

25   concerning the dec relief, and then we need to schedule

hearings and oppositions on Mr. Cohen's motion to dismiss.

So who wishes to be heard on this?  I guess we start with counsel for Essential Consultants and Donald Trump.  We need a motion.

MR. BLAKELY:  I agree, Your Honor, and I think we should set a briefing schedule.

THE COURT:  Do you have one to propose?  Because I'm open to it.

MR. BLAKELY:  I will just fly by the seat of my pants.  For the motion that's for subject matter jurisdiction, which is what the motion would be, I would request that we have one and file it in two weeks and then run the opposition off of that pursuant to Local Rule 7-3.

THE COURT:  Well, does -- Mr. Avenatti, do you need additional time?  How do you want to proceed here?

MR. AVENATTI:  Yes Your Honor, we would like additional time.  That would give them two weeks to file the motion, only give us a week.  So I would like two weeks to file our opposition to the motion.

THE COURT:  Okay.  So let's get -- let me get from the clerk a date to file the motion to dismiss plaintiff's dec relief judgement cause of action for lack of subject matter jurisdiction, and that should be filed within two weeks.

May I have a date from the clerk?

THE COURTROOM DEPUTY:  Yes, Your Honor.  That would

1  be Monday, October the 8th, 2018.

2          THE COURT:  Then we need a date for opposition.

3  Exclude that first date and have a two-week date thereafter.

4          THE COURTROOM DEPUTY:  So I believe you want it on a

5  Tuesday, Tuesday, October the 23rd, 2018.

6          THE COURT:  So it looks like October 8th for the

7  filing of the motion and then October 23rd for the opposition.

8          And then we need a reply date.  The reply should be five

9  days thereafter.

10          Yes, Mr. Avenatti?

11          MR. AVENATTI:  Yes, Your Honor.  I would actually

12  make a request that we have until Friday the 26th because we

13  have an extensive briefing due in the Ninth Circuit on the

14  20 -- around about the same time right now.

15          THE COURT:  Then the opposition would be due on or

16  before Friday, October 26th, 2018.

17          MR. AVENATTI:  Thank you, Your Honor.

18          THE COURT:  And then we need a reply five days

19  thereafter.

20          THE COURTROOM DEPUTY:  Do you want Friday -- the

21  following Friday, Your Honor?

22          THE COURT:  Five days.

23          THE COURTROOM DEPUTY:  Five business days.  Okay.

24  That would be Wednesday, November the 7th.

25          THE COURT:  Okay.  And then we can set a hearing on

1  that two weeks to follow.

2          THE COURTROOM DEPUTY:  That will be Monday, November

3  the -- actually, that would be Monday, November the 26th, 2018,

4  Your Honor.  That's when we return from Thanksgiving.  Do you

5  want it that week, or do you want it the week prior?

6          THE COURT:  Does that work?  November 26 is probably

7  not a good time.  I'm scheduled to actually be on jury duty the

8  week of the 19th.  The state court has called.

9      So let's do it the next available.

10         THE COURTROOM DEPUTY:  That would be Monday,

11  November -- excuse me, Monday, December the 3rd, 2018.

12     Do you want it at 10:00 or 2:00, Your Honor?

13         THE COURT:  At 10:00.

14     Okay.  And then we have Mr. Cohen's filed motion, the one

15  he's already filed regarding a motion to strike the plaintiff's

16  defamation cause of action, and so we need opposition to that.

17     Do you want the opposition the same date?

18         MR. AVENATTI:  Your Honor, let me make a suggestion,

19  if the Court would be so inclined, which is why don't we just

20  have the opposition due on the same day, we can have the reply

21  due on the same date, and the Court could hear all of the

22  motions on the same date.

23         THE COURT:  Perfect.

24     Agreed?

25         MR. BLAKELY:  Agreed, Your Honor.

1              MR. HARDER:  Yes.

2              THE COURT:  Is there anything else to discuss in

3    terms of the scheduling in CV 02217?  None?

4              MR. BLAKELY:  Nothing from Mr. Cohen or Essential

5    Consultants.

6              THE COURT:  Thank you very much.  It's been a

7    pleasure.

8              MR. HARDER:  Thank you, Your Honor.

9              THE COURTROOM DEPUTY:  The Court is in recess.

10                (Proceedings concluded at 3:31 p.m.)

11                       ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5

6              I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  October 2, 2018

17

18

19                          /s/ CAROL JEAN ZURBORG

20                    _____
                      CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                           Federal Official Court Reporter
21

22

23

24

25